## IN THE UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF OHIO

STATE OF OHIO, STATE OF
ALABAMA, STATE OF ARIZONA,
STATE OF ARKANSAS, STATE OF
FLORIDA, STATE OF KANSAS,
COMMONWEALTH OF KENTUCKY,
STATE OF MISSOURI, STATE OF
NEBRASKA, STATE OF OKLAHOMA,
STATE OF SOUTH CAROLINA,
STATE OF WEST VIRGINIA,

     *Plaintiffs*,

v.

XAVIER BECERRA, in his official
capacity as Secretary of Health and Human
Services; U.S. DEPARTMENT OF
HEALTH AND HUMAN SERVICES;
JESSICA S. MARCELLA, in her official
capacity as Deputy Assistant Secretary for
Population Affairs; and OFFICE OF
POPULATION AFFAIRS,

     *Defendants*.

No. 1:21-cv-675

**COMPLAINT FOR INJUNCTIVE AND
DECLARATORY RELIEF**

## <u>INTRODUCTION</u>

1.       This suit challenges the "Final Rule," *Ensuring Access to Equitable, Affordable, Client-Centered, Quality Family Planning Services*, 86 Fed. Reg. 56144-01 (Oct. 7, 2021), promulgated by the United States Department of Health and Human Services ("HHS").

2.       The Final Rule purports to interpret and implement Title X of the Public Health Service Act, which Congress passed to "assist in making comprehensive voluntary family planning services readily available to all persons desiring such services."  Pub. L. No. 91-572, §2, 84 Stat. 1508 (1970).

3.       Section 1008 of Title X prohibits its funds from being used to support abortion.  It says: "None of the funds appropriated under this title shall be used in programs where abortion is a method of family planning."  42 U.S.C. §300a-6.

4.       In light of this statutory requirement, just two years ago, HHS promulgated the "2019 Rule."  *See Compliance with Statutory Program Integrity Requirements*, 84 Fed. Reg. 7714 (Mar. 4, 2019).

5.       The 2019 Rule required that Title X grantees' programs be physically and financially separate from programs in which abortion is a method of family planning.  And it forbade Title X grantees from "perform[ing], promot[ing], refer[ing] for, or support[ing] abortion as a method of family planning."  *Id.* at 7788–90.

6.       The Final Rule abandons that approach:  it eliminates the 2019 Rule's financial- and physical-separation requirements and it requires Title X providers to make abortion referrals upon request.

7.      Abandoning the separation requirements and compelling abortion referrals will cause Title X funds to be used in "programs where abortion is a method of family planning." 42 U.S.C. §300a-6.

8.      Because the Final Rule is "not in accordance with law," this Court "shall" hold it "unlawful" and "set" it "aside" under the Administrative Procedure Act. 5 U.S.C. §706(2)(A).

9.      In addition to contradicting the text of Title X, the Final Rule is arbitrary and capricious.  The Final Rule, in abandoning the 2019 Rule's financial- and physical-separation requirements, did not consider or adopt alternatives to prevent Title X funds from subsidizing abortion.  In addition, HHS relied on flawed data and illogical reasoning in concluding that the 2019 Rule resulted in "negative public health consequences."  HHS further neglected serious reliance interests engendered by its 2019 Rule.  And HHS ignored other important considerations as well.

10.      Under the Administrative Procedure Act, this Court must "hold unlawful and set aside agency action … found to be … arbitrary and capricious." 5 U.S.C. §706(2)(A).

11.      In the end, the Final Rule is not aimed at faithfully implementing Title X.  Instead, the Final Rule *undermines* Title X by ensuring that federal funds are used to subsidize abortion.

12.      Because the Final Rule is contrary to law, and because the Final Rule is arbitrary and capricious, the States of Ohio, Alabama, Arizona, Arkansas, Florida, Kansas, Kentucky, Missouri, Nebraska, Oklahoma, South Carolina, and West Virginia bring this action to vacate and set aside the Final Rule under the Administrative Procedure Act.

## JURISDICTION AND VENUE

13.      This Court has subject-matter jurisdiction under 28 U.S.C. §1331 and 5 U.S.C. §702.

14.      Venue is proper in this judicial district under 28 U.S.C. §1391(e)(1).

## PARTIES

### I.    Plaintiffs

15.    Plaintiffs, the States of Ohio, Alabama, Arizona, Arkansas, Florida, Kansas, Kentucky, Missouri, Nebraska, Oklahoma, South Carolina, and West Virginia are sovereign States of the United States of America.

16.    The State of Ohio, through the Ohio Department of Health, is a Title X grantee.

17.    Before the 2019 Rule (which the Final Rule replaces) was adopted, the State of Ohio competed for grant funds with one other grantee—Planned Parenthood of Greater Ohio.

18.    Planned Parenthood of Greater Ohio, which provides elective abortions, left the Title X program because of the 2019 Rule.

19.    As a result, the State of Ohio, through the Ohio Department of Health, received over $4 million in additional funding for its Title X program during each of the two subsequent grant years.  Declaration of Michelle Clark, attached as Ex. 1, ¶¶7–14.

20.     The State of Ohio has been able to more effectively implement its Title X mission using this additional funding.  Since the 2019 Rule, the Ohio Department of Health has used its additional funding to pay for, among other things, subgrantees to establish or increase their presence in seventeen counties.  Ex. 1, ¶12.

21.    The Final Rule will allow abortion providers like Planned Parenthood of Greater Ohio to reenter the program, meaning Ohio will face greater competition for Title X funding.

22.    Where Title X money is divided among more grantees, Ohio will receive less money, forcing it to either reduce services or reallocate funds.

23.     And, Ohio faces reputational damage from being perceived as unable to adequately serve patients who recently relied on Title X services from subgrantee providers funded by Ohio's Department of Health with its Title X grant.

24.     Many other States are Title X grantees also, including the plaintiff States of Alabama, Arkansas, Florida, Kansas, Kentucky, Oklahoma, South Carolina, and West Virginia.

25.     These States, like Ohio, will now face greater competition for Title X grants.

26.     And, like Ohio, if these or any other States wish to participate in the Title X program, they will be bound by the Final Rule should it go into effect.

27.     Arizona state law requires the State to apply for Title X grants and dictates the manner in which the State is to distribute any Title X funds that HHS grants to the State.  *See* Ariz. Rev. Stat. Ann. §§36-145; 35-196.05(A).

## II.     Defendants

28.     Xavier Becerra is the Secretary of Health and Human Services, and is named in his official capacity.

29.     Jessica S. Marcella is the Deputy Assistant Secretary for Population Affairs, and is named in her official capacity.

30.     The Department of Health and Human Services is an agency of the United States and is responsible for administering the Title X program.  HHS promulgated the Final Rule challenged in this lawsuit.

31.     The Office of Population Affairs is a sub-agency within HHS and administers and oversees the Title X program.

4

## FACTUAL ALLEGATIONS

32.     President Richard Nixon signed the "Family Planning Services and Population Research Act of 1970" into law on December 24, 1970.

33.     The Act created the Office of Population Affairs, which coordinates population research and family-planning efforts in the federal government.  Pub. L. No. 91-572, §4, 84 Stat. 1508 (1970).

34.     And, relevant here, the Act created Title X of the Public Health Service Act.

35.     Under Title X, the Secretary of Health and Human Services is "authorized to make grants to and enter into contracts with public or nonprofit private entities to assist in the establishment and operation of voluntary family planning projects which shall offer a broad range of acceptable and effective family planning methods and services (including natural family planning methods, infertility services, and services for adolescents)."  42 U.S.C. §300(a).

## I.      Section 1008.

36.     "During the course of the House hearings" on the bill that would create Title X, "there was some confusion regarding the nature of the family planning programs envisioned, whether or not they extended to include abortion as a method of family planning."  116 Cong. Rec. at 37375 (Nov. 16, 1970) (statement of Rep. Dingell).

37.     To resolve that confusion, Congress added what is today known as "Section 1008." One sponsoring representative explained:  "With the 'prohibition of abortion' amendment—title X, section 1008—the committee members clearly intend that abortion is not to be encouraged or promoted in any way through this legislation.  Programs which include abortion as a method of family planning are not eligible for funds allocated through this act."  *Id.*

38.     The same representative elaborated: "If there is any direct relationship between family planning and abortion, it would be this, that properly operated family planning programs should reduce the incidence of abortion." *Id.* "Furthermore, there is evidence that the prevalence of abortion as a substitute or a back-up for contraceptive methods can reduce the effectiveness of family planning programs." *Id.*

39.     The representative pointed to the example of Japan, where the availability of abortion prevented what he regarded as responsible family-planning methods: approximately half of the women who had an abortion had not been attempting to prevent their pregnancies. *Id.* at 37375–76.

40.     The Senate agreed to the House's Section 1008 language without discussion.  116 Cong. Rec. at 40884–85 (Dec. 10, 1970).

41.     The conference report reflects the shared understanding of Section 1008's importance and meaning: "It is, and has been, the intent of both Houses that the funds authorized under this legislation be used only to support preventive family planning services, population research, infertility services, and other related medical, information and education activities. The conferees have adopted the language contained in section 1008, which prohibits the use of such funds for abortion in order to make clear this intent."  Conf. Rep. No. 91-1667, 97th Cong., 2nd Sess. 8–9 (1970) (footnote references omitted).

42.     Section 1008 was enacted with the rest of the bill.

43.     Section 1008 remains the law today.  It provides: "None of the funds appropriated under this title shall be used in programs where abortion is a method of family planning." 42 U.S.C. §300a-6.

II.     **Regulatory History.**

44.     The initial regulations governing the Title X program essentially reiterated Section 1008's statutory command:  each grantee's application needed to verify that its "project [would] not provide abortions as a method of family planning."  36 Fed. Reg. 18465, 18466 (Sept. 15, 1971).

45.     In 1982, the HHS Office of Inspector General determined that grantees were confused "about precisely what activities were proscribed" by Section 1008, leading to "variations in practice by grantees."  *Statutory Prohibition on Use of Appropriated Funds in Programs Where Abortion Is a Method of Family Planning, Standard of Compliance for Family Planning Services Projects* 52 Fed. Reg. 33210-01, 33210 (Sept. 1, 1987) (proposed rule).  The Inspector General found that grantees were providing Title X services and abortion services at the same sites, and recommended that the Secretary provide clear guidance on the "scope of the abortion restrictions in section 1008."  *Id*. at 33210–11.

46.     Following the Inspector General's report, HHS proposed to "revise the regulations governing Title X so as to conform the obligations of grantees to the statutory prohibition in section 1008, and to establish standards for compliance with section 1008 that will permit adequate monitoring of such compliance."  *Id*. at 33211.  The resulting "1988 Rule," *Statutory Prohibition on Use of Appropriated Funds in Programs Where Abortion is a Method of Family Planning; Standard of Compliance for Family Planning Services Projects*, 53 Fed. Reg. 2922–01 (Feb. 2, 1988), prohibited Title X projects from promoting, encouraging, advocating, or providing counseling on, or referrals for, abortion as a method of family planning.  *Id*. at 2945. The 1988 Rule further required that grantees keep their Title X funded projects "physically and financially separate" from all prohibited abortion-related activities.  *Id*.

47.     The Supreme Court upheld these regulations against constitutional and Administrative Procedure Act challenges in *Rust v. Sullivan*, 500 U.S. 173 (1991).

48.     On his third day in office, President Clinton suspended the 1988 Rule. *The Title X "Gag Rule,"* 58 Fed. Reg. 7455 ( Jan. 22, 1993); *see also Standards of Compliance for Abortion-Related Services in Family Planning Service Projects,* 58 Fed. Reg. 7462 (Feb. 5, 1993) (interim rule).

49.     In the years that followed, Congress added a rider to its annual appropriations bills requiring that any funds provided to Title X projects "shall not be expended for abortions" and that "all pregnancy counseling shall be nondirective." Pub. L. 104-134, tit. II, 110 Stat. 1321, 1321–221 (1996). Every Title X appropriation since 1996, including the most recent one, contains this language. *See, e.g.*, Consolidated Appropriations Act, 2021, Pub. L. No. 116-260, Div. H, Tit. II, 134 Stat. 1570 (2020).

50.     Congress has enacted multiple provisions that prevent the federal government from mandating abortion referrals. The "Coats-Snowe Amendment," 42 U.S.C. §238n, says that "[t]he Federal Government, and any State or local government that receives Federal financial assistance, may not subject any health care entity to discrimination on the basis that … the entity refuses to undergo training in the performance of induced abortions, to require or provide such training, to perform such abortions, or to provide referrals for such training or such abortions." *Id*. at §238n(a)(1). And the "Weldon Amendment," which was added to the annual 2005 health spend-ing bill and has been included in subsequent appropriations bills," 84 Fed. Reg. at 7716 n.9, contains similar language. It says that appropriated funds may not be "made available to a Federal agency or program, or to a state or local government, if such agency, program, or government subjects any institutional or individual health care entity to discrimination on the basis that the health care entity

does not provide, pay for, provide coverage of, or refer for abortions." *See, e.g.*, Consolidated Appropriations Act, 2021, Pub. L. No. 116-260, Div. H, Tit. V, 134 Stat. 1570 (2020).

51. Eventually, the Clinton administration finalized the "2000 Rule." *Standards of Compliance for Abortion-Related Services in Family Planning Services Projects,* 65 Fed. Reg. 41270 (July 3, 2000). That rule, among other things, required Title X projects to offer and provide pregnant women "information and counseling regarding" their options, including "[p]regnancy termination." *Id.* at 41279. And it required Title X grantees to provide a "referral" for an abortion "upon request." *Id.*

52. The 2000 Rule also eliminated the 1988 Rule's strict financial- and physical-separation requirements. *See id.* 41275–76.

53. Guidelines published alongside the 2000 Rule explained that a Title X grantee could provide abortions, as long as "the abortion element in [its] program of family planning services" was not "so large and so intimately related to all aspects of the program as to make it difficult or impossible to separate the eligible and non-eligible items of cost." *Provision of Abortion-Related Services in Family Planning Services Projects*, 65 Fed. Reg. 41281, 41282 (July 3, 2000).

54. The same guidelines elaborated on the extent to which the 2000 Rule permitted combining Title X programs and abortion services:

> Certain kinds of shared facilities are permissible, so long as it is possible to distinguish between the Title X supported activities and non-Title X abortion-related activities: (a) A common waiting room is permissible, as long as the costs [are] properly pro-rated; (b) common staff is permissible, so long as salaries are properly allocated and all abortion related activities of the staff members are performed in a program which is entirely separate from the Title X project; (c) a hospital offering abortions for family planning purposes and also housing a Title X project is permissible, as long as the abortion activities are sufficiently separate from the Title X project; and (d) maintenance of a single file system for abortion and family planning patients is

permissible, so long as costs are properly allocated.

*Id.*

55.    In 2019, HHS reinstituted certain provisions of the 1988 Rule—the rule the Supreme Court upheld in *Rust*.

56.    The 2019 Rule required that Title X projects remain physically and financially separate from any abortion-related activities conducted outside the grant program.  84 Fed. Reg. at 7789.

57.    The 2019 Rule allowed nondirective pregnancy counseling, but it forbade Title X programs from making referrals for, or engaging in activities that otherwise encouraged or promoted, abortion as a method of family planning.  *Id.* at 7789–90.

58.    The 2019 Rule required grantees to comply with most requirements, such as the financial-separation requirement, by July 2, 2019.  *Id.* at 7791.

59.    On August 19, 2019, rather than comply with the 2019 Rule, Planned Parenthood left the Title X program entirely.  Sarah McCammon, *Planned Parenthood withdraws from Title X program over Trump abortion rule*, NPR (Aug. 19, 2019), https://perma.cc/3T4Q-VTU6.  Other abortion providers also left.  86 Fed. Reg. at 19815.

60.    Their departure freed up money that HHS could give to new grantees, and to existing grantees willing to expand their services.  For example, once Planned Parenthood of Greater Ohio left the program, Ohio applied for and received more than $4 million in additional annual Title X funds.  Ex. 1, ¶¶7–14.  It has used that funding to increase or add the provision of services in seventeen of Ohio's eighty-eight counties.  See Ex. 1, ¶12.

61.    The 2019 Rule's physical-separation requirements did not go into effect until March 4, 2020.  84 Fed. Reg. at 7791.

62.     In March of 2020, many States responded to the COVID-19 pandemic with lockdowns and other restrictions on citizens' ability to leave their homes.

63.     Government-imposed restrictions aside, many citizens voluntarily stayed home with greater frequency beginning in March 2020.

64.     In February 2021, the Supreme Court granted *certiorari* to decide whether the 2019 Rule complied with Title X.  *See Cochran v. Mayor & City Council of Baltimore*, 141 S. Ct. 1369 (2021); *Oregon v. Cochran*, 141 S. Ct. 1369 (2021).

65.     Rather than await a ruling, the parties agreed to voluntarily dismiss these cases.  *See Oregon v. Becerra*, 141 S. Ct. 2621 (2021); *Am. Med. Assn. v. Becerra*, 141 S. Ct. 2170 (2021).

### III.    The Final Rule.

66.     On April 15, 2021, HHS proposed a new set of regulations that, if finalized, would repeal much of the 2019 Rule.  86 Fed. Reg. 19812 (Apr. 15, 2021) (attached as Ex. 3).

67.     Ohio and twenty other States submitted comments opposing the proposed rule.  *See* Letter to HHS Secretary from Ohio and 20 other States (attached as Ex. 2.)

68.     On October 7, 2021, HHS finalized the proposed rule with only minor changes.  The Final Rule is entitled "*Ensuring Access to Equitable, Affordable, Client-Centered, Quality Family Planning Services*," and appears in the Federal Register at 86 Fed. Reg. 56144-01 (attached as Ex. 4).

69.     The Final Rule will go into effect in early November.

70.     Grant opportunities for the 2021–2022 year are forecast to become available on October 15 and applications are forecast to be due on January 5, 2022.  Notice of Grant Opportunity for "Family Planning Service Delivery Grants," https://grants.gov (search "PA-FPH-22-001").

## A.   "Negative Public Health Consequences."

71.    HHS attempted to support its decision to jettison the 2019 Rule by claiming that the 2019 Rule caused "negative public health consequences." 86 Fed. Reg. at 56150–52.

72.    HHS failed to support this conclusion with adequate data, and it ignored important considerations bearing on the question whether the 2019 Rule caused negative public-health consequences.

### *Size of the program*

73.    HHS relied primarily on data showing that use of Title X services, and participation in the Title X program, dropped after the finalization of the 2019 Rule. *Id.* at 56146–47.

74.    In relying on this data to support its conclusion that the 2019 Rule caused negative public-health consequences, HHS implicitly assumed, without justification, that a decrease in Title X services necessarily causes harm to public health.

75.    HHS made this implicit assumption despite acknowledging that patients who ceased pursuing care through the Title X program might have instead sought care outside the program, in which case their leaving the program would not have jeopardized public health. *Id.* at 56174.

76.    And HHS made this implicit assumption despite recognizing that, in fact, Planned Parenthood—a large, former grantee—served *more* individuals in 2019 than in 2018. *Id.* at 56174.

77.    HHS conceded that "this evidence may suggest that the Title X program impacts quantified elsewhere in this [rule] may largely be associated with transfers." *Id.* at 56174.

78.    Instead of attempting to account for the number of former Title X patients who began seeking care outside the program, however, HHS simply acknowledged the possibility that patients pursued care outside the program and noted the "persistent challenges with clearly

disaggregating the effects that represent transfers from effects that represent benefits and costs as a result of this final rule." *Id*. at 56175.

79.     HHS said that the Final Rule would reduce unintended pregnancies by 25 percent. *Id*. at 56172.  But it used an impossible-to-credit memorandum prepared by an abortion-lobbying organization.  The memorandum estimates that, among women who use contraception, just 4.6 percent of women who use public-health services will become pregnant.  It estimates that, without public-health services, 29.6 percent of these same women would become pregnant—a rate six times higher.  Memorandum from Jennifer J. Frost and Lawrence B. Finer, *Unintended pregnancies prevented by publicly funded family planning services: Summary of results and estimation formula* (2017), https://perma.cc/W2HL-9Q72.  That latter figure—29.6 percent—is unsupported.  The abortion lobbying organization invented a hypothetical group, and assumed that large percentages of these hypothetical women would use either no contraception or ineffective contraceptives.

80.     HHS additionally attempted to support its negative-public-health-consequences conclusion by referring to public comments submitted during the rulemaking process, which allegedly indicated that providers witnessed patients forgoing certain services due to cost.  86 Fed. Reg. at 56151.

81.     Even assuming this qualified as evidence that the 2019 Rule had at least *some* negative effect on public health, HHS did not account for the negative *and positive* public-health effects of the 2019 Rule.

82.     Nor did it fully account for the negative and positive effects of the Final Rule.

83.     Without comparing the net benefits to public health from each rule, the agency could not rationally conclude that the 2019 Rule was worse for public health than the Final Rule.

84.     HHS was or should have been aware of evidence that the Final Rule might have negative public-health consequences.  For example, the States, in their comment letter, pointed to data from the Centers for Disease Control and Prevention showing that sexually transmitted diseases reached a record high in 2018.  *National STD Trends: Key Information on Sexually Transmitted Diseases for Public Health Leadership*, Association of State and Territorial Health Officials, https://perma.cc/G58R-WBEW.  In 2018, Title X operated under the same 2000 Rule that the Final Rule effectively reimplements.  HHS did not consider whether its former rules contributed to record high numbers of sexually transmitted diseases.

### *Assumption of static participation*

85.     HHS irrationally concluded that the 2019 Rule had permanently decreased the number of patients and grantees participating in Title X.  86 Fed. Reg. at 56152.

86.     This conclusion is not supported by the available evidence.

87.     Following the withdrawal of Planned Parenthood of Greater Ohio, the Ohio Department of Health expanded Title X services in seventeen counties.  *See* Ex. 1, ¶12.  And, the Final Rule recognizes that, in four States, six territories, and the District of Columbia, Title X participation *increased* in 2019.  86 Fed. Reg. at 56146.  Further, seven States "experienced a meaningful increase in the number of Title X clinics after the 2019 regulatory change." *Id*. at 56171 n.15.

88.     HHS did not adequately account for the fact that the States have had just over two years to fill any coverage gaps, and that most of that period coincided with a pandemic that sapped and redirected government and private resources.

89.     Even if the States and other grantees have not *yet* filled any supposed coverage gap, it does not follow that they will forever fail to do so.

14

90.    The States commented that, to justify concluding that any coverage gaps will remain unfilled, HHS would need to credibly attribute such coverage gaps to inability or disinterest rather than to the pandemic.  And the States commented that HHS lacked data that would justify that attribution.  See Ex. 2 at 9.

91.    HHS failed to adequately respond.  The Final Rule attributes only 37 percent of the decline in Title X services to the pandemic, attributing 63 percent to the 2019 Rule.  86 Fed. Reg. at 56152; *see also* Family Planning Annual Report: 2020 National Survey at App'x D, Office of Population Affairs (Sept. 2021), https://perma.cc/V7FZ-ZJHA.

92.    That calculation rests on a flawed, or at least unsupported, assumption.  In particular, the report calculated the percentage of decrease due to the pandemic by looking to the decrease in 2020 experienced by certain grantees that remained in the Title X program.  But it failed to consider the fact that this decrease is a *net* decrease—it reflects losses caused by the pandemic and also gains from patients entering the program.  It therefore underestimates the effect of the pandemic.

93.    Further, these figures do not address the degree to which the pandemic stopped prospective and actual grantees from expanding services in 2020.

94.    Without knowing whether the pandemic deterred the expansion of services, it is irrational to conclude that any coverage gaps will remain forever.

**B.    Separation Requirements.**

95.    In place of the 2019 Rule's strict financial- and physical-separation requirements, the Final Rule "reinstat[es] interpretations and policies under Section 1008 that were in place for much of the program's history."  86 Fed. Reg. at 56150.

96.     These "interpretations and policies" include the guidelines in effect under the 2000 Rule, discussed above in paragraphs 53 and 54.  *See* 86 Fed. Reg. at 56150.

97.     These interpretations and policies are insufficient to ensure that Title X funds are not used in programs where abortion is a method of family planning.

98.     In attempting to justify the abandonment of the 2019 Rule's separation requirements, HHS stated that, after reviewing reports involving the Title X program from 1975 to 2021, it found "no evidence of compliance issues regarding section 1008 by Title X grantees."  86 Fed. Reg. at 56145.  Given the absence of evidence of compliance issues, HHS deemed the strict financial- and physical-separation requirements in the 2019 Rule to be unjustified.

99.     HHS either failed to consider, or failed to consider adequately, alternatives to the 2019 Rule's requirements aside from abandoning them entirely.

100.     In particular, HHS failed to consider the alternative options that the States suggested in their comment letter for ensuring separation between Title X funds and abortion services.  Ex. 2 at 9–10.

101.     HHS also failed to explain how it could reasonably infer, based on the absence of *evidence* of compliance issues in the years before the 2019 Rule, that Title X grantees were not using Title X grants in programs where abortion was a method of family planning.  The Final Rule notes that HHS can enforce Section 1008 using "a variety of mechanisms," including "grant reports, compliance monitoring visits, third-party audits, compliance guidance, and grantee education."  86 Fed. Reg. at 56150.  But it never explains how HHS knows whether or to what degree these mechanisms actually work at uncovering violations.

102.    HHS also failed to address in its Final Rule certain critical conclusions from the 2019 Rule.  For example, in 2019, HHS wrote:  "Commenters' insistence that requiring physical and financial separation would increase the cost for doing business only confirms the need for such separation," as it showed that Title X grants were used to create efficiencies that supported the provision of abortion.  84 Fed. Reg. at 7766.  The Final Rule does not address or refute this.

103.    HHS further attempted to justify the lack of meaningful financial- and physical-separation requirements by denying that "Title X grant funds … are fungible."  86 Fed. Reg. at 56150.

104.    "Money is fungible."  *Holder v. Humanitarian L. Project*, 561 U.S. 1, 31 (2010).

**C.    Mandatory Referrals.**

105.    The Final Rule requires Title X grantees to refer women to abortion providers.  86 Fed. Reg. at 56179.

106.    HHS recognized in 2019 that, "in most instances when a referral is provided for abortion, that referral necessarily treats abortion as a method of family planning."  84 Fed. Reg. at 7717.

107.    HHS, in the Final Rule, does not address that insight or explain why it was wrong.

108.    The Final Rule also fails to address the question whether mandating referrals would contravene medical ethics.

109.    States are the primary regulators of medical ethics.

110.    The plaintiff States' comment letter warned HHS that mandating abortion referrals was contrary to medical ethics in the view of many States.  In particular, the letter informed HHS that many state laws forbid requiring "that doctors violate their consciences by endorsing or otherwise participating in abortions."  Ex. 2 at 12–13; *see* Ariz. Rev. Stat. §36-2154(A); Conn.

Agencies Regs. §19-13-D54(f); Fla. Stat. §390.0111(8); Id. Code §18-612; Ky. Rev. Stat. §311.800(4); La. Rev. Stat. §40:1061.2; Mont. Code Ann. §50-20-111(2); N.Y. Civ. Rights Law §79-i; Ohio Rev. Code §4731.91; Or. Rev. Stat. §435.485; 18 Pa. Cons. Stat. §3213(d); Wis. Stat. §253.09(1).

111.     Because States are the primary regulators of medical ethics, the many state laws forbidding requiring doctors to provide abortion referrals show that mandating referrals is or can be contrary to medical ethics.

112.     In promulgating the Final Rule, HHS did not consider this issue.

113.     HHS also failed to justify its conclusion that requiring Title X grantees to make abortion referrals upon request would not cause Title X funds to be expended in "programs where abortion is a method of family planning." 42 U.S.C. §300a-6.

114.     It noted that, in the past, Title X grantees had made such referrals. 86 Fed. Reg. at 56149–50.

115.     But it did not explain how it could be confident that those grantees were not violating Section 1008's command.

**D.     The Final Rule does not consider reliance interests.**

116.     Additional and existing grantees have accepted Title X funds to provide services in areas where former grantees have left. *See* Title X Family Planning Directory, Office of Population Affairs (Sept. 2021), https://perma.cc/5H47-UCJK.

117.     In Ohio, for example, the State's Department of Health has established a new or increased presence in seventeen counties. Ex. 1, ¶12.

118.     Filling those gaps required investments.

119.     The Final Rule does not address these reliance interests.

### E.    Public Support.

120.    States across the country have enacted laws to keep their tax dollars from supporting abortion. *See Planned Parenthood of Greater Ohio v. Hodges*, 917 F.3d 908, 910 (6th Cir. 2019) (*en banc*); *Planned Parenthood of Ind., Inc. v. Comm'r of the Ind. State Dep't of Health*, 699 F.3d 962, 969–70 (7th Cir. 2012); *Planned Parenthood Ariz., Inc. v. Betlach*, 727 F.3d 960, 964 (9th Cir. 2013); *Planned Parenthood of Kan. & Mid-Mo. v. Anderson*, 882 F.3d 1205, 1212–14 (10th Cir. 2018); *Planned Parenthood Ass'n of Utah v. Herbert*, 828 F.3d 1245, 1250 (10th Cir. 2016); *Planned Parenthood of Gulf Coast, Inc. v. Gee*, 862 F.3d 445, 450–52 (5th Cir. 2017).

121.    The federal government, for years, has avoided funding abortion. *See Rust*, 500 U.S. at 201–02; *Harris v. McRae*, 448 U.S. 297, 315–17 (1980); *Maher v. Roe*, 432 U.S. 464, 474 (1977); Pub. L. No. 115-31, §§613–14, 131 Stat. 135, 372 (2017).

122.    These state and federal laws confirm that, when given a say through the democratic process, the public frequently opts not to subsidize abortion.

123.     The States warned HHS that using Title X to support abortion even indirectly would erode public support for the program. *See* Ex. 2 at 11–12, 14.

124.    HHS did not consider this issue when promulgating the Final Rule.

19

## CLAIMS FOR RELIEF

**FIRST CLAIM FOR RELIEF**
**Violation of the Administrative Procedure Act, 5 U.S.C. §706(2)(A)**
**Not in Accordance with Law—Family Planning Services and Population Research Act of**
**1970, the Coats-Snowe Amendment, and the Weldon Amendment.**

125.    The State incorporates by reference the allegations of the preceding paragraphs.

126.    The Administrative Procedure Act requires courts to "hold unlawful and set aside agency action" that is "not in accordance with law."  5 U.S.C. §706(2)(A).

127.    The Final Rule is not in accordance with law—in particular, it is not in accordance with Section 1008 of Title X.

128.    Title X funds may not be used in programs "where abortion is a method of family planning."  42 U.S.C. §300a-6.

129.    The Final Rule violates this prohibition, and is therefore not in accordance with law, by requiring Title X grantees to make abortion referrals.

130.    The requirement that Title X grantees make abortion referrals additionally conflicts with the "Coats-Snowe Amendment" and with the "Weldon Amendment," both of which prohibit the federal government from discriminating against individuals and entities on the basis of their refusal to make referrals for abortion.  42 U.S.C. §238n; *see, e.g.*, Consolidated Appropriations Act, 2021, Pub. L. No. 116-260, Div. H, Tit. V, 134 Stat. 1570 (2020).

131.    The Final Rule further violates 42 U.S.C. §300a-6, and is therefore not in accordance with law, by eliminating the 2019 Rule's financial- and physical-separation requirements in favor of the separation requirements adopted by the Final Rule.

## SECOND CLAIM FOR RELIEF

### Violation of the Administrative Procedure Act, 5 U.S.C. §706(2)(A)
### Arbitrary and Capricious

132.    The State incorporates by reference the allegations of the preceding paragraphs.

133.    The Administrative Procedure Act requires courts to "hold unlawful and set aside agency action" that is "arbitrary and capricious." 5 U.S.C. §706(2)(A).

134.    In promulgating the Final Rule, HHS failed to adequately account for the reliance interests that the 2019 Rule engendered and the degree to which repealing that rule would erode public support for the Title X program.

135.    In attempting to justify its decision to repeal the 2019 Rule, HHS determined that the 2019 Rule caused negative public-health consequences. It based that conclusion on flawed data, data that does not speak to the relevant issue, logically flawed reasoning, and reasoning that failed to account for relevant issues.

136.    In eliminating the 2019 Rule's strict financial- and physical-separation requirements, and by replacing them with the separation policies adopted through the Final Rule, HHS failed to consider important aspects of the question how to prevent Title X funds from being used to subsidize abortion, failed to establish good reasons for its new policy, failed to consider alternative policies, relied on flawed or irrelevant data, and engaged in logically flawed reasoning.

137.    In requiring Title X grantees to provide abortion referrals upon request, HHS failed to consider important aspects of the question how to prevent Title X funds from being used to subsidize abortion, failed to establish good reasons for its new policy, failed to consider alternative policies, relied on flawed or irrelevant data, and engaged in logically flawed reasoning.

138.    The Final Rule is therefore arbitrary and capricious, in violation of the Administrative Procedure Act.  5 U.S.C. §706(2)(A).

## **PRAYER FOR RELIEF**

139.    The State requests that this Court:

    a.   Pursuant to the Declaratory Judgment Act, 28 U.S.C. §2201, declare the Final Rule to be not in accordance with law, arbitrary and capricious, and invalid;

    b.   Set aside and vacate the Final Rule; and

    c.   Enjoin the defendants, and any other agency or employee of the United States, from enforcing or implementing the Final Rule.

Dated: October 25, 2021

STEVE MARSHALL
Alabama Attorney General

THOMAS WILSON
    *(pro hac vice application forthcoming)*
Deputy Solicitor General
Office of the Attorney General
501 Washington Ave
Montgomery, AL 36130
Phone: 332-242-7300
Thomas.Wilson@AlabamaAG.gov

*Counsel for the State of Alabama*

DAVE YOST
Ohio Attorney General

*/s/ Benjamin  M. Flowers*
BENJAMIN M. FLOWERS* (0095284)
Solicitor General
  *Trial attorney*
STEPHEN P. CARNEY (0063460)
MAY DAVIS
    *(Pro hac vice application forthcoming)*
Deputy Solicitors General
30 East Broad Street, 17th Floor
Phone:  6l4-466-8980
Fax:  614-466-5087
bflowers@ohioago.gov

*Counsel for the State of Ohio*

MARK BRNOVICH
Arizona Attorney General

KATE SAWYER
    *(pro hac vice application forthcoming)*
Assistant Attorney General
Arizona Attorney General's Office
2005 N. Central Ave.
Phoenix, AZ 85004
Phone:  602-542-8304
kate.sawyer@azag.gov

*Counsel for the State of Arizona*

ERIC S. SCHMITT
Missouri Attorney General

D. JOHN SAUER
    *(pro hac vice application forthcoming)*
Solicitor General
Office of the Missouri Attorney General
Supreme Court Building
207 West High Street
Jefferson City, MO 65102
Phone:  573-751-8870
John.Sauer@ago.mo.gov

*Counsel for the State of Missouri*

LESLIE RUTLEDGE
Arkansas Attorney General

VINCENT M. WAGNER
    (*pro hac vice application forthcoming*)
Deputy Solicitor General
Office of the Arkansas Attorney General
323 Center Street, Suite 200
Little Rock, Arkansas 72201
Phone:  501-682-6302
vincent.wagner@arkansasag.gov

*Counsel for the State of Arkansas*

DOUGLAS J. PETERSON
Nebraska Attorney General

JAMES A. CAMPBELL (0081501)
Solicitor General
Office of the Nebraska
Attorney General
2115 State Capitol
Lincoln, NE 68509
Phone:  402-471-2682
jim.campbell@nebraska.gov

*Counsel for the State of Nebraska*

ASHLEY MOODY
Florida Attorney General

NATALIE CHRISTMAS
    (*pro hac vice application forthcoming*)
Assistant Attorney General of Legal Policy
Office of the Attorney General
PL-01 The Capitol
Tallahassee, FL 32399-1050
Phone:  850-414-3300
Fax:  850-410-267
Natalie.christmas@myfloridalegal.com

*Counsel for the State of Florida*

JOHN M. O'CONNOR
Oklahoma Attorney General

ZACH WEST
    (*pro hac vice application forthcoming*)
Assistant Solicitor General
Office of the Oklahoma Attorney General
313 N.E. Twenty-First St.
Oklahoma City, OK 73105
Phone:  405-522-4392
zach.west@oag.ok.gov

*Counsel for the State of Oklahoma*

DEREK SCHMIDT
Kansas Attorney General

KURTIS WIARD
    (*pro hac vice application forthcoming*)
Assistant Solicitor General
Office of Kansas Attorney General
120 SW 10th Avenue, 3rd Floor
Topeka, KS 66612-1597
Phone: 785-368-8435
Fax: 785-291-3767
kurtis.wiard@ag.ks.gov

*Counsel for the State of Kansas*

ALAN WILSON
South Carolina Attorney General

EMORY SMITH
     (*pro hac vice application forthcoming*)
Deputy Solicitor General
THOMAS T. HYDRICK
    (*pro hac vice application forthcoming*)
Assistant Deputy Solicitor General
Office of the Attorney General
P.O. Box 11549
Columbia, SC 29211
Phone: 803-734-3742
ThomasHydrick@scag.gov

*Counsel for the State of South Carolina*

DANIEL CAMERON
Kentucky Attorney General

OLIVIA F. AMLUNG (0098606)
Assistant Attorney General
Office of Kentucky Attorney General
1840 Simon Kenton Way, Suite 5300
Covington, KY 41011
Phone: 502-696-5300
Fax: 502-564-2894
Olivia.Amlung@ky.gov

*Counsel for the Commonwealth of Kentucky*

PATRICK MORRISEY
West Virginia Attorney General

LINDSAY S. SEE
    (*pro hac vice application forthcoming*)
Solicitor General
Office of the West Virginia
Attorney General
State Capitol, Bldg 1, Room E-26
Charleston, WV 25305
Phone: 681-313-4550
Lindsay.S.See@wvago.gov

*Counsel for the State of West Virginia*