### IN THE UNITED STATES DISTRICT COURT FOR THE
### SOUTHERN DISTRICT OF OHIO

| | | |
|---|---|---|
| STATE OF OHIO, STATE OF ALABAMA, STATE OF ARIZONA, STATE OF ARKANSAS, STATE OF FLORIDA, STATE OF KANSAS, COMMONWEALTH OF KENTUCKY, STATE OF MISSOURI, STATE OF NEBRASKA, STATE OF OKLAHOMA, STATE OF SOUTH CAROLINA, STATE OF WEST VIRGINIA, | : : : : : : : : : : : : | Case No. 1:21-cv-675 |
| *Plaintiffs*, | : | |
| v. | : | |
| XAVIER BECERRA, in his official capacity as Secretary of Health and Human Services; U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES; JESSICA S. MARCELLA, in her official capacity as Deputy Assistant Secretary for Population Affairs; and OFFICE OF POPULATION AFFAIRS, | : : : : : : : : : : | |
| *Defendants*. | : | |

### COMBINED MOTION FOR A PRELIMINARY INJUNCTION AND MEMORANDUM IN SUPPORT OF THE MOTION

## MOTION FOR A PRELIMINARY INJUNCTION

The Final Rule, *Ensuring Access to Equitable, Affordable, Client-Centered, Quality Family Planning Services*, 86 Fed. Reg. 56144-01 (Oct. 7, 2021) (to be codified at 42 C.F.R. pt. 59), unlawfully permits funds appropriated under Title X of the Public Health Service Act to be used in programs where abortion is a method of family planning. 42 U.S.C. §300a-6. The plaintiff States move under Federal Rule of Civil Procedure 65 for an order preliminarily enjoining the defendants from implementing or enforcing the Final Rule. This relief is justified for the reasons discussed in more detail in the attached memorandum.

The States respectfully request a ruling on this motion as soon as practicable, and no later than **December 31, 2021.**

1

Dated:  October 25, 2021

STEVE MARSHALL
Alabama Attorney General

THOMAS WILSON
    (*pro hac application forthcoming*)
Deputy Solicitor General
Office of the Attorney General
501 Washington Ave
Montgomery, AL 36130
Phone: 332-242-7300
Thomas.Wilson@AlabamaAG.gov

*Counsel for the State of Alabama*


MARK BRNOVICH
Arizona Attorney General

KATE SAWYER
    (*pro hac vice application forthcoming*)
Assistant Attorney General
Arizona Attorney General's Office
2005 N. Central Ave.
Phoenix, AZ 85004
Phone:  602-542-8304
kate.sawyer@azag.gov

*Counsel for the State of Arizona*

DAVE YOST
Ohio Attorney General

*/s/ Benjamin  M. Flowers*
BENJAMIN M. FLOWERS* (0095284)
Solicitor General
 *Trial attorney*
STEPHEN P. CARNEY (0063460)
MAY DAVIS
    (*Pro hac vice application forthcoming*)
Deputy Solicitors General
30 East Broad Street, 17th Floor
Phone:  6l4-466-8980
Fax:  614-466-5087
bflowers@ohioago.gov

*Counsel for the State of Ohio*


ERIC S. SCHMITT
Missouri Attorney General

D. JOHN SAUER
    (*pro hac vice application forthcoming*)
Solicitor General
Office of the Missouri Attorney General
Supreme Court Building
207 West High Street
Jefferson City, MO 65102
Phone:  573-751-8870
John.Sauer@ago.mo.gov

*Counsel for the State of Missouri*

LESLIE RUTLEDGE
Arkansas Attorney General

VINCENT M. WAGNER
    (*pro hac vice application forthcoming*)
Deputy Solicitor General
Office of the Arkansas Attorney General
323 Center Street, Suite 200
Little Rock, Arkansas 72201
Phone:  501-682-6302
vincent.wagner@arkansasag.gov

*Counsel for the State of Arkansas*

DOUGLAS J. PETERSON
Nebraska Attorney General

JAMES A. CAMPBELL (0081501)
Solicitor General
Office of the Nebraska
Attorney General
2115 State Capitol
Lincoln, NE 68509
Phone:  402-471-2682
jim.campbell@nebraska.gov

*Counsel for the State of Nebraska*

ASHLEY MOODY
Florida Attorney General

NATALIE CHRISTMAS
    (*pro hac vice application forthcoming*)
Assistant Attorney General of Legal Policy
Office of the Attorney General
PL-01 The Capitol
Tallahassee, FL 32399-1050
Phone:  850-414-3300
Fax:  850-410-267
Natalie.christmas@myfloridalegal.com

*Counsel for the State of Florida*

JOHN M. O'CONNOR
Oklahoma Attorney General

ZACH WEST
    (*pro hac vice application forthcoming*)
Assistant Solicitor General
Office of the Oklahoma Attorney General
313 N.E. Twenty-First St.
Oklahoma City, OK 73105
Phone:  405-522-4392
zach.west@oag.ok.gov

*Counsel for the State of Oklahoma*

3

DEREK SCHMIDT
Kansas Attorney General

KURTIS WIARD
   *(pro hac vice application forthcoming)*
Assistant Solicitor General
Office of Kansas Attorney General
120 SW 10th Avenue, 3rd Floor
Topeka, KS 66612-1597
Phone: 785-368-8435
Fax: 785-291-3767
kurtis.wiard@ag.ks.gov

*Counsel for the State of Kansas*


ALAN WILSON
South Carolina Attorney General

EMORY SMITH
   *(pro hac vice application forthcoming)*
Deputy Solicitor General
THOMAS T. HYDRICK
   *(pro hac vice application forthcoming)*
Assistant Deputy Solicitor General
Office of the Attorney General
P.O. Box 11549
Columbia, SC 29211
Phone: 803-734-3742
ThomasHydrick@scag.gov

*Counsel for the State of South Carolina*


DANIEL CAMERON
Kentucky Attorney General

OLIVIA F. AMLUNG (0098606)
Assistant Attorney General
Office of Kentucky Attorney General
1840 Simon Kenton Way, Suite 5300
Covington, KY 41011
Phone: 502-696-5300
Fax: 502-564-2894
Olivia.Amlung@ky.gov

*Counsel for the Commonwealth of Kentucky*


PATRICK MORRISEY
West Virginia Attorney General

LINDSAY S. SEE
   *(pro hac vice application forthcoming)*
Solicitor General
Office of the West Virginia
Attorney General
State Capitol, Bldg 1, Room E-26
Charleston, WV 25305
Phone: 681-313-4550
Lindsay.S.See@wvago.gov

*Counsel for the State of West Virginia*

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ......................................................................................... vi

INTRODUCTION ......................................................................................................... 1

STATEMENT ............................................................................................................... 3

Title X of the Public Health Service Act, Pub. L. No. 91-572, §4, 84 Stat. 1504, 1506–08 (1970), empowers the U.S. Department of Health and Human Services ("HHS") to provide funding for family-planning services. Section 1008 of Title X helps define the scope of the Title X program. It says: "None of the funds appropriated under this subchapter shall be used in programs where abortion is a method of family planning." 42 U.S.C. §300a-6. About two years ago, HHS promulgated the "2019 Rule," which was designed to (among other things) enforce Section 1008. *Compliance with Statutory Program Integrity Requirements*, 84 Fed. Reg. 7714-01, 7789 (Mar. 4, 2019). The 2019 Rule accomplished this goal in two ways relevant here. *First*, it required that Title X grantees strictly separate, in both financial and physical terms, their Title X programs from any abortion services. *Second*, the 2019 Rule forbade Title X grantees from making abortion referrals within the Title X program. But HHS recently abandoned these requirements. Its "Final Rule," *Ensuring Access to Equitable, Affordable, Client-Centered, Quality Family Planning Services*, 86 Fed. Reg. 56144-01 (Oct. 7, 2021), eliminates the 2019 Rule's financial- and physical-separation requirements. It replaces those requirements with rules allowing Title X grantees to have no meaningful financial or physical separation between their Title X programs and their abortion services. The Final Rule also requires that Title X grantees provide abortion referrals upon request.

LEGAL STANDARD ................................................................................................. 11

JURISDICTION ........................................................................................................ 11

ARGUMENT ............................................................................................................. 12

    I.      The States are likely to prevail on the merits of this challenge under the Administrative Procedure Act. ................................................................. 13

The Administrative Procedure Act requires that courts "hold unlawful and set aside agency action[s] that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. §706(2). The Final Rule is both not in accordance with law and arbitrary and capricious.

        A.     The Final Rule is not in accordance with law. ..................................... 13

             1.     The Final Rule violates Section 1008 by eliminating all meaningful financial- and physical-separation requirements and by mandating referrals for abortion ........................................................................................ 13

i

Section 1008 of Title X broadly prohibits Title X funds from being "used in programs where abortion is a method of family planning." 42 U.S.C. §300a-6. Even HHS, in the Final Rule, recognized that Section 1008 "prohibit[s]" the agency from "subsidiz[ing] abortion." 86 Fed. Reg. at 56150 (Oct. 7, 2021). Yet, the Final Rule violates this prohibition in two respects. *First*, it eliminates the 2019 Rule's strict financial- and physical-separation requirements, replacing them with rules that permit a significant degree of financial and physical overlap between Title X programs and programs that provide abortions as a method of family planning. Because "[m]oney is fungible," *Holder v. Humanitarian Law Project*, 561 U.S. 1, 31 (2010), this degree of intermingling guarantees that Title X funds will be used, illegally, to subsidize abortion. *Second*, the Final Rule requires Title X grantees to make referrals for elective abortions "upon request." 86 Fed. Reg. at 56179 (to be codified at 42 C.F.R. §59.5). A program that refers patients for abortions is a program "where abortion is a method of family planning." By requiring that Title X grantees provide abortion referrals, the Final Rule requires these programs to violate Section 1008's prohibition on using Title X funds in programs where abortion is a method of family planning.

2. HHS tried, but failed, to defend the Final Rule's legality. .............................19

None of HHS's anticipatory responses overcome the conflict with the statute. For example, the Final Rule stresses that HHS has taken a similar approach to referrals, and to financial and physical separation, in years past. 86 Fed. Reg. at 56149–50. That is irrelevant; the "magnitude of a legal wrong is no reason to perpetuate it." *McGirt v. Oklahoma*, 140 S. Ct. 2452, 2480 (2020). Nor does it matter that the Supreme Court has described Section 1008 as "ambiguous," in the sense that it does not speak explicitly about referrals or physical-and-financial separation. *Rust v. Sullivan*, 500 U.S. 173, 184 (1991). Ambiguous statutes do not empower executive agencies to do whatever they want. Instead, ambiguous statutes (generally) leave the agency with discretion to enforce the statute in any manner consistent with a "permissible construction of the statute." *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 843 (1984). No permissible construction of Section 1008 permits mandating abortion referrals or allowing the degree of intermingling that the Final Rule does. Finally, HHS cannot save the Final Rule from illegality by expressing its "disagree[ment]" with the proposition "that Title X grant funds … are 'fungible.'" 86 Fed. Reg. at 56150. Economic reality, not to mention Supreme Court precedent, *Holder*, 561 U.S. at 31, takes that disagreement off the table.

B. The Final Rule is arbitrary and capricious. ..........................................................20

An "administrative agenc[y]" must "engage in 'reasoned decisionmaking.'" *Michigan v. E.P.A.*, 576 U.S. 743, 750 (2015) (citation omitted). "Not only must an agency's decreed result be within the scope of its lawful authority, but the process by which it reaches that result must be logical and rational." *Id.* (citation omitted). An agency will be held not to have engaged in reasoned decisionmaking—its rules will be deemed "arbitrary and capricious"—if it "relied on factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 658 (2007) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). "When

an agency changes its existing position," it must "show that there are good reasons for the new policy." *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125–26 (2016) (quotation omitted). And it must consider any "reliance interests" that its previous position "engendered." *Dep't of Homeland Sec. v. Regents of Univ. of Cal.*, 140 S. Ct. 1891, 1913 (2020) (quoting *Encino*, 136 S. Ct. at 2126)). Relatedly, when an agency entirely abandons one position in favor of a drastically different position, it must show that it considered and rationally rejected alternative possibilities. *Id.* at 1912; *State Farm*, 463 U.S. at 47–48.

  1.  The Final Rule's abandonment of the 2019 Rule's financial- and physical-separation requirements is arbitrary and capricious. .......................................21

    a.  The Final Rule does not adequately keep Title X funds from being used to illegally subsidize abortion. ......................................................................21

HHS abandoned the 2019 Rule's strict financial– and physical-separation requirements in favor of an approach that requires no meaningful separation at all. And nothing in the Final Rule shows that HHS considered separation requirements less demanding than the 2019 Rule's requirements but more demanding than the requirements the Final Rule includes. Thus, HHS ignored an "important aspect of the problem," *Michigan*, 576 U.S. at 752, failed to provide "good reasons for the new policy" *Encino*, 136 S. Ct. at 2126, and failed to consider alternative policies, *Regents*, 140 S. Ct. at 1912.

    b.  HHS relied on flawed data and illogical reasoning when it concluded that the 2019 Rule was having "negative public health consequences." ..........25

HHS reasoned illogically in determining that the 2019 Rule caused "negative public health consequences." 86 Fed. Reg. at 56150–52. HHS based this conclusion on the supposed fact that participation in the Title X program decreased following the 2019 Rule's promulgation. But, *despite acknowledging* that former grantees who left the program continued providing family-planning services outside the program, 86 Fed. Reg. at 56175, HHS made no effort to determine the number of patients who simply transferred their care from a Title X provider to a non-Title X provider after the 2019 Rule's promulgation. Further, HHS made no effort to account for the positive public-health consequences that the 2019 Rule had. Finally, HHS irrationally failed to account for the pandemic's effect on the ability of new and existing grantees to expand their services following the 2019 Rule.

    c.  HHS failed to account for important reliance interests when it promulgated the Final Rule. ...........................................................................................31

The Final Rule ignores reliance issues. When large grantees like Planned Parenthood affiliates left the program, other grantees stepped in. Ohio, for example, saw its grant amount nearly double, and it in turn increased funds to new and existing subgrantees. Yet the Final Rule altogether fails to account for the reliance interests that the 2019 Rule "engendered." *Regents*, 140 S. Ct. at 1913 (quoting *Encino*, 136 S. Ct. at 2126). That makes the Final Rule arbitrary and capricious. *Id.*

      d.     HHS failed to consider whether abolishing the financial- and physical-separation requirements would reduce public support for Title X. ...........32

HHS failed to consider the degree to which eliminating the 2019 Rule's strict financial- and physical-separation requirements would erode public support for the Title X program. Many Americans do not want their tax dollars subsidizing abortion, even indirectly. The Final Rule will subsidize abortion, at least indirectly. And that will erode public support for the program, which will jeopardize the program's success. HHS failed to consider this issue. It thus failed to consider an important aspect of the problem before it, meaning it acted arbitrarily and capriciously. *Michigan*, 576 U.S. at 752.

      2.     HHS acted arbitrarily and capriciously by mandating referrals. ......................33

The referral mandate is arbitrary and capricious in at least four ways. *First*, it rests on the alleged negative public-health effects from the 2019 Rule. But as explained above, HHS's finding of negative public-health effects was arbitrary and capricious. *Second*, HHS failed to consider the effect that mandating referrals would have on public support for the Title X program. *Third*, HHS failed to "show" that there are "good reasons for the new policy." *Encino*, 136 S. Ct. at 2126. The 2019 Rule concluded that, "in most instances when a referral is provided for abortion, that referral necessarily treats abortion as a method of family planning," which Section 1008 bars Title X from subsidizing. 84 Fed. Reg. at 7717. The Final Rule does not even attempt to rebut this. *Fourth*, HHS "entirely failed to consider an important aspect of the problem." *Nat'l Ass'n of Home Builders*, 551 U.S. at 658 (quoting *State Farm*, 463 U.S. at 43). In particular, it failed to consider whether mandating referrals was consistent with medical ethics. And the failure to consider medical ethics in promulgating a Title X rule make that rule arbitrary and capricious. *Mayor of Baltimore v. Azar*, 973 F.3d 258, 276 (4th Cir. 2020) (*en banc*).

II.     The plaintiff States satisfy the remaining preliminary-injunction factors ...................36

    A.     The States will be irreparably injured without an injunction. ................................36

The injuries that States will suffer will be *per se* irreparable, as there is no way to recover monetary damages from the defendant officials or from the United States government. And the States will be injured. Among other things, because the Final Rule will enable abortion providers to begin providing Title X services once more, the Final Rule will force the States to compete with these providers for Title X grants. That increased competition for a limited pool of funds constitutes an "actual, here-and-now injury." *Sherley v. Sebelius*, 610 F.3d 69, 74 (D.C. Cir. 2010); *accord Planned Parenthood of Greater Washington v. United States Dep't of Health & Human Servs.*, 946 F.3d 1100, 1108 (9th Cir. 2020).

    B.     Enjoining the Final Rule will not substantially harm others and will promote the public interest. ................................................................................................37

An injunction now will not substantially harm others. It will simply maintain the *status quo* long enough for this challenge to make its way through the courts, and there is no evidence that third

parties are being *substantially* harmed under the now-existing rules.  Further, the public interest favors an injunction, as the public interest is always served by a correct application of the law.  *Coal. to Def. Affirmative Action v. Granholm*, 473 F.3d 237, 252 (6th Cir. 2006) (quotation omitted).

CONCLUSION ............................................................................................................... 39

CERTIFICATE OF SERVICE ...................................................................................... 42

LOCAL RULE 65.1(B) CERTIFICATION .................................................................. 43

v

## TABLE OF AUTHORITIES

**Cases**                                                                                              **Page(s)**

*California ex rel. Becerra v. Azar*,
    950 F.3d 1067 (9th Cir. 2020) (*en banc*) ....................................................... 9, 14

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*,
    467 U.S. 837 (1984) ......................................................................................... 13

*City of Pontiac Retired Emps. Ass'n v. Schimmel*,
    751 F.3d 427 (6th Cir. 2014) ......................................................................... 11, 37

*Coal. to Def. Affirmative Action v. Granholm*,
    473 F.3d 237 (6th Cir. 2006) ......................................................................... 12, 38

*Dep't of Commerce v. New York*,
    139 S. Ct. 2551 (2019) ............................................................................. 2, 12, 36

*Dep't of Homeland Sec. v. Regents of Univ. of Cal.*,
    140 S. Ct. 1891 (2020) ............................................................................... *passim*

*Encino Motorcars, LLC v. Navarro*,
    136 S. Ct. 2117 (2016) ............................................................................... *passim*

*Fam. Plan. Ass'n of Maine v. United States Dep't of Health & Human Servs.*,
    466 F. Supp. 3d 259 (D. Me. 2020) .................................................................... 9

*Gonzales v. Carhart*,
    550 U.S. 124 (2007) ........................................................................................... 1

*Harris v. McRae*,
    448 U.S. 297 (1980) ......................................................................................... 32

*Holder v. Humanitarian Law Project*,
    561 U.S. 1 (2010) ....................................................................................... 16, 22

*Kentucky Riverkeeper, Inc. v. Rowlette*,
    714 F.3d 402 (6th Cir. 2013) ........................................................................... 28

*Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*,
    140 S. Ct. 2367 (2020) ..................................................................................... 35

*Louisville Gas & Elec. Co. v. Fed. Energy Regul. Comm'n*,
    988 F.3d 841 (6th Cir. 2021) ........................................................................... 20

*Maher v. Roe,*
    432 U.S. 464 (1977) ...................................................................................... 32

*Massachusetts v. EPA,*
    549 U.S. 497 (2007) ...................................................................................... 11

*Mayor of Baltimore v. Azar,*
    973 F.3d 258 (4th Cir. 2020) (*en banc*) ............................................... *passim*

*McGirt v. Oklahoma,*
    140 S. Ct. 2452 (2020) ................................................................................. 19

*Michigan v. E.P.A.,*
    576 U.S. 743 (2015) ........................................................................... 20, 21, 24

*Montgomery Cty., Maryland v. Fed. Commc'ns Comm'n,*
    863 F.3d 485 (6th Cir. 2017) ....................................................................... 20

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,*
    463 U.S. 29 (1983) .................................................................................. *passim*

*Nat'l Ass'n of Home Builders v. Defs. of Wildlife,*
    551 U.S. 644 (2007) ................................................................................ 20, 34

*Ohio v. U.S. EPA,*
    798 F.2d 880 (6th Cir. 1986) ....................................................................... 24

*Oregon v. Becerra,*
    141 S. Ct. 2621 (2021) ................................................................................... 9

*Oregon v. Cochran,*
    141 S. Ct. 1369 (2021) ................................................................................... 9

*Performance Unlimited, Inc. v. Questar Pub., Inc.,*
    52 F.3d 1373 (6th Cir. 1995) ....................................................................... 36

*Planned Parenthood Ariz. Inc. v. Betlach,*
    727 F.3d 960 (9th Cir. 2013) ....................................................................... 32

*Planned Parenthood Ass'n of Utah v. Herbert,*
    828 F.3d 1245 (10th Cir. 2016) ................................................................... 32

*Planned Parenthood of Greater Ohio v. Hodges,*
    917 F.3d 908 (6th Cir. 2019) (*en banc*) .................................................... 32

vii

*Planned Parenthood of Greater Washington v. United States Dep't of Health & Human Servs.*,
  946 F.3d 1100 (9th Cir. 2020) ...................................................................... 12, 36

*Planned Parenthood of Gulf Coast, Inc. v. Gee*,
  862 F.3d 445 (5th Cir. 2017) ..............................................................................32

*Planned Parenthood of Ind., Inc. v. Comm'r of the Ind. State Dep't of Health*,
  699 F.3d 962 (7th Cir. 2012) ..............................................................................32

*Planned Parenthood of Kan. & Mid-Mo. v. Anderson*,
  882 F.3d 1205 (10th Cir. 2018) ..........................................................................32

*Preterm-Cleveland v. McCloud*,
  994 F.3d 512 (6th Cir. 2021) (*en banc*) ...........................................................1, 34

*Roe v. Wade*,
  410 U.S. 113 (1973) ..............................................................................................4

*Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*,
  547 U.S. 47 (2006) ...............................................................................................12

*Rust v. Sullivan*,
  500 U.S. 173 (1991) ..................................................................................... *passim*

*Sherley v. Sebelius*,
  610 F.3d 69 (D.C. Cir. 2010) .........................................................................12, 36

*Spokeo, Inc. v. Robins*,
  136 S. Ct. 1540 (2016) ........................................................................................11

*Tex. Children's Hosp. v. Burwell*,
  76 F. Supp. 3d 224 (D.D.C. 2014) ......................................................................36

## Statutes, Rules, and Constitutional Provisions

42 C.F.R. §59.15 (2019) .............................................................................................8

36 Fed. Reg. 18465-02 (Sept. 15, 1971) ...................................................................5

52 Fed. Reg. 33210-01 (Sept. 1, 1987) .....................................................................5

53 Fed. Reg. 2922-01 (Feb. 2, 1988) ......................................................................5, 6

58 Fed. Reg. 7455 (Jan. 22, 1993) ............................................................................6

58 Fed. Reg. 7462 (Feb. 5, 1993) ..............................................................................6

65 Fed. Reg. 41270 (July 3, 2000) ........................................................................ *passim*

84 Fed. Reg. 7714 (Mar. 4, 2019) ......................................................................... *passim*

86 Fed. Reg. 19812-01 (April 15, 2021) ............................................................. 8, 9, 34

86 Fed. Reg. 26786 (May 17, 2021) ........................................................................... 29

86 Fed. Reg. 56144-01 (Oct. 7, 2021) ................................................................. *passim*

18 Pa. Cons. Stat. §3213 ............................................................................................ 35

5 U.S.C. §706 ................................................................................... 2, 11, 13, 20

28 U.S.C. §1331 ..................................................................................................... 11

42 U.S.C. §300 ................................................................................................. *passim*

Ala. Const., §36.06 .................................................................................................. 37

Ariz. Rev. Stat. Ann. §35-196.02 ............................................................................ 37

Ariz. Rev. Stat. §36-2154 ........................................................................................ 35

Colo. Rev. Stat. Ann. §25.5-3-106 .......................................................................... 37

Conn. Agencies Regs. §19-13-D54(f) ...................................................................... 35

Consolidated Appropriations Act, 2017, Pub. L. No. 115-31, §§613–14, 131 Stat. 135 (2017) .......................................................................................................... 32

Consolidated Appropriations Act, 2021, Pub. L. No. 116-260, Div. H, Tit. V, §506 (2021) ........................................................................................................... 5, 21

Fed. R. Civ. P. 65 ...................................................................................................... 3

Fla. Stat. Ann. §627.66996 ..................................................................................... 37

Fla. Stat. §390.0111 ................................................................................................ 35

Id. Code §18-612 .................................................................................................... 35

Iowa Code Ann. §217.41 .......................................................................................... 37

Ky. Rev. Stat. §311.800 ........................................................................................... 35

La. Rev. Stat. §40:1061.2 ........................................................................................ 35

La. Rev. Stat. §40:1061.6 ........................................................................................... 37

Mich. Comp. Laws Ann. §400.109a ........................................................................... 37

Miss. Code. Ann. §41-41-91 ....................................................................................... 37

Mo. Ann. Stat. §188.205 .............................................................................................. 37

Mont. Code Ann. §50-20-111 ...................................................................................... 35

N.C. Gen. Stat. Ann. §143C-6-5.5 ............................................................................. 37

N.Y. Civil Rights Law §79-i ....................................................................................... 35

Neb. Rev. Stat. Ann. § 71-7606 .................................................................................. 37

Ohio Rev. Code §4731.91 ............................................................................................ 35

Ohio Rev. Code §5101.56 ............................................................................................ 37

Omnibus Consolidated Rescissions and Appropriations Act of 1996, Pub. L. 104-
   134, tit. II, 110 Stat. 1321 (1996) ........................................................................... 5

Or. Rev. Stat. §435.485 ............................................................................................... 35

Public Health Service Act, Pub. L. No. 91-572, §4, 84 Stat. 1504 (1970) ........................ 1

Tex. Health & Safety Code Ann. §32.005 .................................................................. 37

Wis. Stat. Ann. §20.927 ............................................................................................... 37

Wis. Stat. §253.09 ........................................................................................................ 35

**Other Authorities**

116 Cong. Rec. 24091 (July 14, 1970) ......................................................................... 3

116 Cong. Rec. 37375 (Nov. 16, 1970) ............................................................... 3, 4, 28

116 Cong. Rec. 40884 (Dec. 10, 1970) ........................................................................ 3

Association of State and Territorial Health Officials, *National STD Trends: Key
Information on Sexually Transmitted Diseases for Public Health Leadership* (2019) .................... 27

*Family Planning Annual Report: 2020 National Survey* D-5 (Sept. 2021) ................................ 29, 30

Memorandum from Jennifer J. Frost and Lawrence B. Finer, *Unintended
pregnancies prevented by publicly funded family planning services: Summary of
results and estimation formula* (2017).................................................................26

Notice of Grant Opportunity for "Family Planning Service Grants" ........................... 11

Paul R. Ehrlich, *The Population Bomb* (1968)....................................................................3

President Richard Nixon, Special Message to the Congress on Problems of
Population Growth (July 18, 1969).............................................................................3

Sarah McCammon, *Planned Parenthood withdraws from Title X program over Trump
abortion rule*, NPR (Aug. 19, 2019).............................................................................8

## INTRODUCTION

Legislative compromises are one "mark of a healthy society." *Preterm-Cleveland v. McCloud*, 994 F.3d 512, 535 (6th Cir. 2021) (*en banc*) (Sutton, J., concurring). When it comes to abortion, "[f]ederal funding has been the quintessential point of compromise between" two "opposing factions." *Mayor of Baltimore v. Azar*, 973 F.3d 258, 297 (4th Cir. 2020) (*en banc*) (Wilkinson, J., dissenting). One faction consists of the many Americans who believe that abortion entails the taking of an innocent life. The other includes those Americans who believe abortion guarantees "a woman's autonomy to determine her life's course, and thus to enjoy equal citizenship stature." *Gonzales v. Carhart*, 550 U.S. 124, 172 (2007) (Ginsburg, J., dissenting). There is no reconciling these views. Yet, both factions have reached a "compromise" on one issue—funding. The terms of that compromise "have remained quite consistent and clear." *Baltimore*, 973 F.3d at 297 (Wilkinson, J., dissenting). "Congress, on the one hand, does not seek to bar or directly restrain the right established by the Supreme Court in *Roe v. Wade* and its progeny." *Id.* "Congress, on the other hand, seeks to respect those who hold moral or religious objections to the contested practice by withholding federal funds from it." *Id.* "Like all compromises, this one may not be fully acceptable to the heartfelt and passionate views on either side of this debate. But perhaps it is for that very reason that the compromise on federal funding should be respected." *Id.*

Title X of the Public Health Service Act, Pub. L. No. 91-572, §4, 84 Stat. 1504, 1506–08 (1970), reflects this compromise. Title X provides funding for family-planning services. But Congress, in passing the law, included a provision forbidding "funds appropriated under" Title X from being "used in programs where abortion is a method of family planning." 42 U.S.C. §300a-6. The "purpose of singling out this one procedure could only have been Congress's desire not to

1

subsidize the performance of abortion with the federal fisc." *Baltimore*, 973 F.3d at 296 (Wilkinson, J., dissenting).

The Department of Health and Human Services, "HHS" for short, is not respecting this compromise. In early October, it issued a final administrative rule purporting to implement Title X. *Ensuring Access to Equitable, Affordable, Client-Centered, Quality Family Planning Services*, 86 Fed. Reg. 56144-01 (Oct. 7, 2021). The "Final Rule," among other things: permits abortion providers to subsidize their abortion practices using Title X dollars; allows Title X grantees to run family-planning programs with an "abortion element," *Provision of Abortion-Related Services in Family Planning Services Projects*, 65 Fed. Reg. 41281-01, 41282 (July 3, 2000) (incorporated into the Final Rule by reference at 86 Fed. Reg. 56150); and *requires* Title X grantees to refer patients for abortions upon request.

The Final Rule, in addition to undermining the "statutory compromise" on which Title X rests, *Baltimore*, 973 F.3d at 297 (Wilkinson, J., dissenting), is illegal. The Administrative Procedure Act requires courts to "hold unlawful and set aside agency action[s]" that are contrary to law or arbitrary and capricious. 5 U.S.C. §706(2)(A). The Final Rule is contrary to law because it permits the use of Title X funds in "programs where abortion is a method of family planning." 42 U.S.C. §300a-6. And the rule is arbitrary and capricious, too, because it did not result from "reasoned decisionmaking." *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2569 (2019) (citation omitted).

Because the Final Rule will eventually be held unlawful and "set aside," §706(2)(A), and because it will injure the plaintiff States if allowed to go into effect, the States move for a

preliminary injunction. Fed. R. Civ. P. 65. This Court should grant the motion, enjoining HHS from enforcing the Final Rule while this case proceeds.

## STATEMENT

**1.** In 1968, a best-selling book warned that "hundreds of millions of people" would "starve to death" if population growth were not controlled. Paul R. Ehrlich, *The Population Bomb* xi (1968). That concern, which looks silly in retrospect, gained significant traction. President Nixon, in a message to Congress, described population growth as "among the most important issues we face." President Richard Nixon, Special Message to the Congress on Problems of Population Growth (July 18, 1969), https://perma.cc/Z6JF-EA8F. He suggested the government should "provide assistance for more parents in effectively planning their families." *Id.*

Many members of Congress shared the President's concerns. They also worried that poor women and poor families were disproportionately burdened by a lack of access to family-planning services. *See* 116 Cong. Rec. 24091 (July 14, 1970) (statement of Sen. Cranston); 116 Cong. Rec. 40884–85 (Dec. 10, 1970) (statement of Sen. Tydings). To address these concerns, Congress set about enacting a law—Title X—that would assure access to family-planning services. In its final form, Title X makes funding available to grantees who provide these services at reduced cost.

"During the course of the House hearings," there arose "some confusion regarding the nature of the family planning programs envisioned." 116 Cong. Rec. 37375 (Nov. 16, 1970) (statement of Rep. Dingell). In particular, members of Congress wondered whether the bill would "include abortion as a method of family planning." *Id.* In 1970, funding elective abortions would have been incredibly controversial. At that time, the vast majority of States still forbade elective

3

abortions.  Just four States—Alaska, Hawaii, New York, and Washington—had repealed their laws criminalizing abortion.  *See Roe v. Wade*, 410 U.S. 113, 140 n.37 (1973).

Title X's supporters in Congress responded by proposing language clarifying that Title X would *not* be used to fund abortion.  The as-enacted version of that language appears in Section 1008 of Title X.  It provides: "None of the funds appropriated under this title shall be used in programs where abortion is a method of family planning." 42 U.S.C. §300a-6.  "With the 'prohibition of abortion' amendment—title X, section 1008—the committee members clearly intend[ed] that abortion is not to be encouraged or promoted in any way through this legislation.  Programs which include abortion as a method of family planning are not eligible for funds allocated through this act." 116 Cong. Rec. 37375 (Nov. 16, 1970) (statement of Rep. Dingell).  Indeed, "properly operated family planning programs should reduce the incidence of abortion." *Id*.  And funding abortion would undermine that goal, since "the prevalence of abortion as a substitute or a back-up for contraceptive methods can reduce the effectiveness of family planning programs." *Id*.

President Nixon signed Title X into law on December 24, 1970.  As enacted, Title X empowers the Secretary of Health and Human Services "to make grants to and enter into contracts with public or nonprofit private entities to assist in the establishment and operation of voluntary family planning projects which shall offer a broad range of acceptable and effective family planning methods and services (including natural family planning methods, infertility services, and services for adolescents)." 42 U.S.C. §300(a).  To this day, Section 1008 prohibits Title X funds from being "used in programs where abortion is a method of family planning." 42 U.S.C. §300a-6.  Indeed, Congress has bolstered Section 1008:  since the 1990s, every bill appropriating Title X funds has made clear that the funds may not be expended on elective abortions, and further

4

required that "all pregnancy counseling" conducted under Title X "shall be nondirective." *See, e.g.*, Consolidated Appropriations Act, 2021, Pub. L. No. 116-260, Div. H, Tit. V, §506 (2021); Omnibus Consolidated Rescissions and Appropriations Act of 1996, Pub. L. 104-134, tit. II, 110 Stat. 1321, 1321-221 (1996).

**2.**  The initial regulations governing the Title X program essentially reiterated the statutory command:  each grantee's application needed to affirm that the "project [would] not provide abortions as a method of family planning."  36 Fed. Reg. 18465-02, 18466 (Sept. 15, 1971).  But in 1982, HHS's Office of Inspector General determined that grantees were confused "about precisely what activities were proscribed" by Section 1008 and that this confusion led to "variations in practice by grantees."  *Statutory Prohibition on Use of Appropriated Funds in Programs Where Abortion Is a Method of Family Planning*, *Standard of Compliance for Family Planning Services Projects* 52 Fed. Reg. 33210-01, 33210 (Sept. 1, 1987) (proposed rule).  The Inspector General's Office suggested clarifying the scope of Title X.  In particular, the Office recommended that the Secretary of HHS provide clear guidance on the "scope of the abortion restriction in section 1008."  *Id*. at 33210–11 (quotation omitted).

Following this report, HHS proposed "revis[ing] the regulations governing Title X so as to conform the obligations of grantees to the statutory prohibition in section 1008, and to establish standards for compliance with section 1008 that will permit adequate monitoring of such compliance."  *Id*. at 33211.  These efforts culminated in the "1988 Rule."  *Statutory Prohibition on Use of Appropriated Funds in Programs Where Abortion is a Method of Family Planning; Standard of Compliance for Family Planning Services Projects*, 53 Fed. Reg. 2922-01 (Feb. 2, 1988).  That rule prohibited Title X projects from promoting, counseling on, or providing referrals for, abortion as a method of

family planning. *Id.* at 2945. The 1988 Rule also required that grantees keep their Title X programs "physically and financially separate" from all prohibited abortion-related activities. *Id.*

The Supreme Court upheld these regulations in *Rust v. Sullivan*, 500 U.S. 173 (1991). But President Clinton suspended the 1988 Rule on his third day in office. *The Title X "Gag Rule,"* 58 Fed. Reg. 7455 (Jan. 22, 1993); *Standards of Compliance for Abortion-Related Services in Family Planning Service Projects,* 58 Fed. Reg. 7462 (Feb. 5, 1993) (interim rule). And eventually, his administration finalized the "2000 Rule." That rule, among other things, required Title X projects to offer and provide pregnant women "information and counseling regarding" their options, including "[p]regnancy termination." *Standards of Compliance for Abortion-Related Services in Family Planning Services Projects,* 65 Fed. Reg. 41270, 41279 (July 3, 2000). And it required Title X grantees to provide a "referral" for abortion "upon request." *Id.* On top of this, the 2000 Rule eliminated the 1988 Rule's strict financial- and physical-separation requirements. *See* 65 Fed. Reg. at 41275–76. Indeed, guidelines published alongside the 2000 Rule confirmed that HHS would permit grantees to integrate their Title X and abortion services to a significant degree. In particular, the guidelines permitted grantees to integrate Title X programs with abortion practices, as long as "the abortion element in a program of family planning services" was not "so large and so intimately related to all aspects of the program as to make it difficult or impossible to separate the eligible and non-eligible items of cost." *Provision of Abortion-Related Services in Family Planning Services Projects*, 65 Fed. Reg. 41281-01, 41292 (July 3, 2000). The guidance then listed permissible *intermingling* of abortion and Title X services, confirming that grantees may operate Title X programs and provide abortions using the same staff and same facilities:

> Certain kinds of shared facilities are permissible, so long as it is possible to distinguish between the Title X supported activities and non-Title X abortion-related

6

> activities: (a) A common waiting room is permissible, as long as the costs [are] properly pro-rated; (b) common staff is permissible, so long as salaries are properly allocated and all abortion related activities of the staff members are performed in a program which is entirely separate from the Title X project; (c) a hospital offering abortions for family planning purposes and also housing a Title X project is permissible, as long as the abortion activities are sufficiently separate from the Title X project; and (d) maintenance of a single file system for abortion and family planning patients is permissible, so long as costs are properly allocated.

*Id.*

   **3.** That is where things stood until, in 2019, HHS reinstituted certain provisions of the 1988 Rule so as to better enforce Section 1008's prohibition on the use of Title X funds in programs where abortion is a method of family planning. The 2019 Rule required that Title X projects remain physically and financially separate from any abortion-related activities conducted outside the grant program. *Compliance with Statutory Program Integrity Requirements*, 84 Fed. Reg. 7714-01, 7789 (Mar. 4, 2019). In particular, it stated:

> A Title X project must be organized so that it is physically and financially separate, as determined in accordance with the review established in this section, from activities which are prohibited under section 1008 of the Act and §§ 59.13, 59.14, and 59.16 of these regulations from inclusion in the Title X program. In order to be physically and financially separate, a Title X project must have an objective integrity and independence from prohibited activities. Mere bookkeeping separation of Title X funds from other monies is not sufficient. The Secretary will determine whether such objective integrity and independence exist based on a review of facts and circumstances. Factors relevant to this determination shall include:
>
>   (a) The existence of separate, accurate accounting records;
>
>   (b) The degree of separation from facilities (e.g., treatment, consultation, examination and waiting rooms, office entrances and exits, shared phone numbers, email addresses, educational services, and websites) in which prohibited activities occur and the extent of such prohibited activities;
>
>   (c) The existence of separate personnel, electronic or paper-based health care records, and workstations; and

7

>    (d) The extent to which signs and other forms of identification of the Title X
>    project are present, and signs and material referencing or promoting abortion
>    are absent.

84 Fed. Reg. at 7789; 42 C.F.R. §59.15 (2019).

In addition to requiring strict financial and physical separation between Title X grantees and abortion services, the 2019 Rule forbade Title X grantees from making abortion referrals. The 2019 Rule, unlike the 1988 Rule, *allowed* nondirective pregnancy counseling by a physician or advanced-practice provider—counseling that might include discussion of abortion. *Id*. at 7788–89. But the rule *prohibited* Title X grantees from making referrals for elective abortions. *Id*.

The 2019 Rule required grantees to comply with most requirements, such as the financial-separation requirement, by July 2019. *Id*. at 7791. But HHS gave grantees more time to comply with the 2019 Rule's *physical-separation* requirement: that requirement would not become effective until March 4, 2020. 84 Fed. Reg. at 7791. Some grantees, including Planned Parenthood, decided to leave the Title X program rather than comply with the new requirements. Sarah McCammon, *Planned Parenthood withdraws from Title X program over Trump abortion rule*, NPR (Aug. 19, 2019), https://perma.cc/L254-VAY8; *see also* 86 Fed. Reg. 19812-01, 19815 (April 15, 2021) (proposed rule). This exodus freed up money that HHS could give to new grantees and to existing grantees willing to expand their services. HHS did just that. Ohio's experience is illustrative. Ohio has long been a Title X grantee; its Department of Health receives Title X grants and then subgrants the money to subgrantees, including county boards of health. Before the 2019 Rule, Planned Parenthood was the only other grantee in Ohio. Once Planned Parenthood left the program, Ohio applied for and received more than $4 million annually in additional Title X funds. It has used that

funding to increase or add to the provision of services in seventeen counties. Decl. of Michelle Clark, attached as Ex. 1 ¶12.

Various individuals, groups, entities, and States challenged the 2019 Rule in courts around the country. The Ninth Circuit upheld the rule. *See California ex rel. Becerra v. Azar*, 950 F.3d 1067, 1074 (9th Cir. 2020) (*en banc*). So did a district court in Maine. *See Fam. Plan. Ass'n of Maine v. United States Dep't of Health & Human Servs.*, 466 F. Supp. 3d 259, 273 (D. Me. 2020). The Fourth Circuit vacated the rule, though only in its application to Maryland. *See Baltimore*, 973 F.3d at 266, 294–95 (majority op.).

The Supreme Court, partly at the request of the federal government, agreed to hear the cases out of the Fourth and Ninth Circuits. *See Oregon v. Cochran*, 141 S. Ct. 1369 (2021). It never got the chance. Apparently to avoid an adverse ruling that might affect its ability to adopt a new rule, the federal government agreed with parties opposed to the 2019 Rule to jointly dismiss the cases—cases that both groups had just recently succeeded in convincing the Supreme Court to hear. *See Oregon v. Becerra*, 141 S. Ct. 2621 (2021). The Court granted that dismissal request over the dissents of Justices Thomas, Alito, and Gorsuch. *Id.*

**4.** HHS issued a new proposed rule in April. 86 Fed. Reg. 19812-01. In essence, the new rule would replace the 2019 Rule with requirements much like those in place under the 2000 Rule. Ohio and twenty other States submitted comments opposing the proposed rule. *See* Letter to HHS Secretary from Ohio and 20 other States, Ex. 2.

On October 7, HHS published its "Final Rule." 86 Fed. Reg. 56144-01. The Final Rule is, in all relevant respects, identical to the proposed rule. And it does two things of particular relevance here.

9

*First*, it eliminates the 2019 Rule's financial- and physical-separation requirements. In place of these requirements, HHS is "reinstating interpretations and policies under section 1008" that were "published" at 65 Fed. Reg. 41281 (July 3, 2000). 86 Fed. Reg. at 56150. Those "interpretations and policies" are the 2000-era guidelines discussed above. And they represent a sharp break from the 2019 Rule. Remember, the 2019 Rule ensured that Title X funds would not be used "in programs where abortion is a method of family planning" by requiring a strict financial and physical separation of Title X programs and the provision of abortion services. The reinstated guidelines, in contrast, allow financial and physical integration as long as "the abortion element in a program of family planning services is [not] so large and so intimately related to all aspects of the program as to make it difficult or impossible to separate the eligible and non-eligible items of cost." 65 Fed. Reg. at 41282. The guidance then goes on to address permissible *intermingling* of abortion and Title X services, suggesting the just-discussed standard allows Title X grantees to use their money to fund all but the most explicit subsidizations of abortion procedures. In particular, the reinstated guidelines allow Title X grantees and abortion providers to share "facilities" and use "common staff." *Id.*

*Second*, the Final Rule requires that Title X grantees make abortion referrals "upon request." 86 Fed. Reg. at 56179 (to be codified at 42 C.F.R. §59.5). This restoration of the referral requirement in the 2000 Rule eliminates the 2019 Rule's *prohibition* on abortion referrals. *See* 84 Fed. Reg. at 7789.

The new rules will go into effect in early November. Grant opportunities for the 2021–2022 year are forecast to become available on October 15 and applications are forecast to be due on

January 5, 2022. Notice of Grant Opportunity for "Family Planning Service Grants," https://grants.gov (search "PA-FPH-22-001") (last updated Oct. 13, 2021).

**5.** On October 25, 2021, the plaintiff States sued the HHS and various agency officials in this Court. They filed their motion for a preliminary injunction on the same day.

## LEGAL STANDARD

The plaintiff States seek to preliminarily enjoin enforcement of the Final Rule. In deciding whether to award a preliminary injunction, courts must balance four factors: "(1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of the injunction." *City of Pontiac Retired Emps. Ass'n v. Schimmel*, 751 F.3d 427, 430 (6th Cir. 2014) (quotation omitted).

On the merits, the plaintiffs seek relief under the Administrative Procedure Act, which requires that courts "hold unlawful and set aside agency action[s]" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. §706(2).

## JURISDICTION

This Court has jurisdiction to hear the case under 28 U.S.C. §1331. And the States have Article III standing to sue. Plaintiffs have Article III standing if they suffer an injury in fact, fairly traceable to the defendant's conduct, that is likely to be redressed by a favorable ruling. *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). States are "entitled to special solicitude" throughout this analysis. *Massachusetts v. EPA*, 549 U.S. 497, 520 (2007). And as long as one plaintiff has

11

standing to sue, Article III is satisfied. *See Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 53 n.1 (2006).

The States have made the necessary showing. First, they sustained an injury in fact. The Final Rule allows abortion providers (like Planned Parenthood of Greater Ohio, and Planned Parenthood's affiliates in other States) to reenter the Title X program. That increases the competition that States will face in obtaining Title X grants. That competitive injury is an injury in fact for Article III purposes. *See Planned Parenthood of Greater Washington v. United States Dep't of Health & Human Servs.*, 946 F.3d 1100, 1108 (9th Cir. 2020); *Sherley v. Sebelius*, 610 F.3d 69, 72–74 (D.C. Cir. 2010); *see also Dep't of Commerce*, 139 S. Ct. at 2565. Because the injury is traceable to the Final Rule, and because an injunction would redress the injury, the States have satisfied all three elements of the standing inquiry and have standing to sue.

## ARGUMENT

The Court should preliminarily enjoin the Final Rule pending the completion of these proceedings. *First*, Ohio will likely prevail on the merits, both because the Final Rule is contrary to law and because it is arbitrary and capricious. *Second*, because grant applications are due and because grants will be distributed before this case is finally resolved, the States will be irreparably harmed absent an injunction. *Third*, enjoining the rule will not substantially harm others—it will simply maintain the *status quo* pending a final resolution. *Finally*, an injunction is in the public interest, since "the public interest lies in a correct application" of the law and in the will of the people "being effected in accordance with … law." *Coal. to Def. Affirmative Action v. Granholm*, 473 F.3d 237, 252 (6th Cir. 2006) (quotation omitted).

I.    **The States are likely to prevail on the merits of this challenge under the Administrative Procedure Act.**

The Final Rule is contrary to Title X.  It is also arbitrary and capricious.  As a result, the States are likely to prevail on the merits.

A.    **The Final Rule is not in accordance with law.**

Title X says that its funds may not be used to support abortion, even indirectly.  In particular, Section 1008 states:  "None of the funds appropriated under" Title X "shall be used in programs where abortion is a method of family planning."  42 U.S.C. §300a-6.   This case presents the question whether the Final Rule, by eliminating meaningful financial- and physical-separation requirements and by requiring Title X grantees to provide abortion referrals, violates Section 1008. The answer is "yes."  The rule is therefore "not in accordance with law," and must be held "unlawful and set aside" under the Administrative Procedure Act.  5 U.S.C. §706(2)(A).

1.    **The Final Rule violates Section 1008 by eliminating all meaningful financial- and physical-separation requirements and by mandating referrals for abortion.**

Section 1008, as even HHS recognizes, "prohibit[s]" the agency from "subsidiz[ing] abortion."  86 Fed. Reg. at 56150.  But the statute does not expressly detail what that prohibition consists of.  It "does not," for example, "speak directly to the issues of counseling, referral, advocacy, or program integrity."  *Rust*, 500 U.S. at 184.  Section 1008 is "ambiguous" in that sense.  *Id.*  But ambiguous statutes do not empower executive agencies to do whatever they want.  Instead, ambiguous statutes (generally) leave the agency with discretion to enforce the statute in any manner consistent with a "permissible construction of the statute."  *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 843 (1984).

This case thus presents the question whether the Final Rule rests on a permissible con-struction of Section 1008. The question is one of first impression in this Court. Further, neither the Supreme Court nor the Sixth Circuit has ever addressed whether Section 1008 permits the degree of financial and physical integration of Title X programs and abortion services that the Final Rule allows. And neither court has ever considered whether Section 1008 can be interpreted to permit mandatory abortion referrals within the Title X program. Instead, the only binding case on the matter says that the statute *can be* permissibly construed to require strict financial and physical separation and to forbid Title X grantees from making referrals. *Rust*, 500 U.S. at 178–80, 184; *accord California*, 950 F.3d at 1084.

Here, the Court need not define with precision the outer bounds of Section 1008. It is sufficient to hold that the Final Rule exceeds those bounds, thereby violating the statute, by requir-ing *no* meaningful degree of financial and physical separation and by *mandating* abortion referrals.

***Financial and physical separation.*** Consider first the question whether Section 1008 for-bids the Final Rule's lax financial- and physical-separation requirements. It does.

The Final Rule eliminates the 2019 Rule's strict financial- and physical-separation require-ments. In place of those requirements, the Final Rule "reinstat[es] interpretations and policies under Section 1008 that were in place for much of the program's history." 86 Fed. Reg. at 56150. Those interpretations and policies permit an enormous amount of financial and physical integra-tion. They state that Title X grantees that provide abortion services comply with Section 1008 whenever "the abortion element in a program of family planning services" is not "so large and so intimately related to all aspects of the program as to make it difficult or impossible to separate the eligible and non-eligible items of cost." 65 Fed. Reg. at 41282 (incorporated by reference at 86

14

Fed. Reg. at 56150).   And these interpretations and policies confirm their weakness by listing the

"kinds of shared facilities" deemed "permissible":

> (a) A common waiting room is permissible, as long as the costs [are] properly pro-rated; (b) common staff is permissible, so long as salaries are properly allocated and all abortion related activities of the staff members are performed in a program which is entirely separate from the Title X project; (c) a hospital offering abortions for family planning purposes and also housing a Title X project is permissible, as long as the abortion activities are sufficiently separate from the Title X project; and (d) maintenance of a single file system for abortion and family planning patients is permissible, so long as costs are properly allocated.

*Id.* Thus, the Final Rule permits a significant degree of integration between Title X programs and abortion services.

No "permissible construction" of Section 1008 allows for the reinstatement of the 2000-era guidelines.  For starters, Section 1008 flatly prohibits Title X funds from being "used in programs where abortion is a method of family planning."  42 U.S.C. §300a-6.  The Final Rule, however, says that Title X grantees *can* have an "abortion element in a program of family planning services," as long as it is not too "large" or "intimately related" with the Title X program.  65 Fed. Reg. at 41282.  So whereas the statute *prohibits* Title X grants from being used in a program where abortion is a method of family planning, the Final Rule *permits* the Title X programs to have an element that provides abortions as a method of family planning.  That is an express violation of Section 1008.

The list of "permissible" shared facilities, *id*, makes the violation even more obvious.  As an initial matter, when Title X services and abortion services are available in the same physical location, then Title X funds are necessarily used "in a program *where* abortion is a method of family planning."  §300a-6 (emphasis added).  In any event, even assuming that Section 1008 can be read to allow *some* sharing of physical locations, the 2000-era guidelines permit integration to a degree

that plainly violates Section 1008. Even HHS admits that Section 1008 bars subsidizing abortion with Title X funds. 86 Fed. Reg. at 56150. Rightly so: a program that directly or indirectly subsidizes abortion as a method of family planning is a "program where abortion is a method of family planning." §300a-6. That dooms the Final Rule. Allowing facilities to share "staff," "waiting room[s]," and treatment rooms, as the Final Rule does, *see* 86 Fed. Reg. at 56150 (incorporating 2000 Rule and associated guidance), means Title X funds *will* be used to subsidize abortions. This follows from the fact that "[m]oney is fungible." *Holder v. Humanitarian Law Project*, 561 U.S. 1, 31 (2010). Money's fungibility means that every dollar an abortion provider receives through Title X frees up another dollar that the grantee can use to subsidize abortion. The money saved on items that Title X pays for, for example, might be used to pay the clinic's rent, to hire additional staff, to advertise abortion services, and so on.

HHS, in adopting the 2019 Rule's financial- and physical-separation requirements, acknowledged the importance of money's fungibility. For example, the agency concluded that many opponents of a strict financial and physical separation "confirm[ed]" the need for such separation by insisting "that requiring physical and financial separation would increase the cost for doing business." 84 Fed. Reg. at 7766. As HHS recognized, because money is fungible, integrating Title X programs and abortion services enables abortion providers to "achieve economies of scale"—they can improve the efficiency of their entire operation by supporting any part of it with Title X funds. *Id*. Thus, the integration permitted by the 2000 Rule allowed "Title X funds" to be used in support of "abortion as a method of family planning." *Id*.

Even assuming for argument's sake that HHS could protect against impermissible abortion subsidies without adopting the strict separation requirements set out in the 2019 Rule, the Final

Rule does not adopt any relaxed-yet-still-sufficient safeguards.  Instead, it enables abortion providers to achieve economies of scale using Title X funds.  This contradicts Section 1008's prohibition on subsidizing abortion.  Indeed, it contradicts the entire purpose of Title X.  As the Supreme Court recognized in *Rust*, "if one thing is clear from the legislative history" of Title X, "it is that Congress intended that Title X funds be kept separate and distinct from abortion-related activities."  500 U.S. at 191.  The Final Rule contravenes that intent, along with the text Congress enacted to carry its purpose into effect.

***Mandatory referrals.***  The Final Rule also violates Section 1008 by requiring grantees to provide information and counseling regarding elective-abortion referrals "upon request."  86 Fed. Reg. at 56179 (to be codified at 42 C.F.R. §59.5).

At the risk of undue repetition, Title X funds may not be "used in programs where abortion is a method of family planning."  42 U.S.C. §300a-6.  When a "program[]" is run so as to *require* that grantees make abortion referrals upon request, it qualifies as a program "where abortion is a method of family planning."  After all, if providers are *obligated* to give an abortion referral to any Title X patient who seeks an abortion in hopes of controlling her family's size, then the program is one where "abortion" is a "method of family planning."

An example unrelated to abortion illustrates the point.  Imagine a state law that subsidizes psychiatrists who agree to provide free-of-charge "psychiatric care" for teenagers.  Suppose the law contains the following qualifier:  "No money shall be used in a psychiatry program where electroshock therapy is a method of psychiatric care."  Now ask the following question:  if a psychiatry practice *required* its psychiatrists to make referrals for electroshock therapy upon request, would it be eligible for the funds?  Plainly not.  After all, a program that requires psychiatrists to make such

17

referrals would be a "program where electroshock therapy is a method of psychiatric care." The very same logic means that Title X programs in which doctors are required to make elective-abortion referrals upon request are programs where abortion is a method of family planning.

The Final Rule's deficiencies do not stop there. Remember, the Final Rule allows entities to provide abortions and Title X services out of the same facility with shared staff, shared waiting rooms, and so on. *See above* 10; 65 Fed. Reg. at 41282 (incorporated by reference at 86 Fed. Reg. at 56150). In other words, the Final Rule allows abortion providers to offer Title X services. And, because the Final Rule requires Title X grantees to make abortion referrals upon request, it empowers abortion providers to operate Title X programs in which they refer patients for abortions *at their own facilities*. An abortion clinic that refers a patient to itself for an elective abortion runs a "program[] where abortion is a method of family planning." §300a-6. And again, no one would think twice about that conclusion outside the abortion context. Is a dental practice that refers patients to its own doctors for root canals a practice where root canals are a method of dental care? Is an oncology program that refers cancer patients to its own doctors for chemotherapy a program where chemotherapy is a method of cancer treatment? Is a pediatrician's office in which doctors can refer children suspected of having ADHD to an in-office psychiatrist for a possible Ritalin prescription a practice where Ritalin is a method of treating ADHD? The answer to all these questions is "yes." Therefore, a Title X grantee that provides abortion referrals to doctors within the same office is a program where abortion is a method of family planning.

To be clear, the question for present purposes is not whether Title X grantees may be permitted to make abortion referrals in some specific contexts. Instead, the question is whether the Final Rule contradicts Section 1008 by *requiring* that grantees make abortion referrals upon

18

request. The answer to that narrower question is "yes." Therefore, the mandatory referral policy in the Final Rule is not in accordance with law.

### 2. HHS tried, but failed, to defend the Final Rule's legality.

The Final Rule's attempts to square its approach with Section 1008 are all unavailing.

It first insists that HHS has taken a similar approach to enforcing Title X for much of the past forty years. 86 Fed. Reg. at 56149–50. That is irrelevant. The "magnitude of a legal wrong is no reason to perpetuate it." *McGirt v. Oklahoma*, 140 S. Ct. 2452, 2480 (2020). The question for this Court is whether the Final Rule rests on a permissible construction of Section 1008. As just shown, it does not.

The Final Rule next points to *Rust v. Sullivan*. 500 U.S. 173. That case, recall, said that Section 1008 does not speak directly to issues like referrals and physical-and-financial separation. *Id.* at 184. On that ground, *Rust* deemed the statute "ambiguous" with respect to these issues. *Id.* It then determined that the 1988 Rule, in mandating strict financial and physical separation and prohibiting abortion referrals, rested on a permissible interpretation of Section 1008. *Id.* at 184–91. As this description shows, *Rust* does not support the Final Rule's legality. While it acknowledges some ambiguity in Section 1008, it *did not* hold that the statute can be read to permit *mandatory* abortion referrals or to permit the Final Rule's incredibly relaxed approach to financial and physical separation.

HHS concludes its defense by claiming to "disagree[] that Title X grant funds ... are 'fungible.'" 86 Fed. Reg. at 56150. That is rather like disagreeing that the sun rises in the east. Money is fungible, whether HHS likes it or not. Thus, there must be adequate safeguards to ensure that Title X grants are not used to subsidize abortion. The Final Rule does not include any.

\*

Because the Final Rule is not in accordance with law, the States will likely prevail in showing that the Final Rule must be held "unlawful and set aside." 5 U.S.C. §706(2).

**B.** **The Final Rule is arbitrary and capricious.**

The Administrative Procedure Act requires the vacatur of agency actions that are arbitrary and capricious. 5 U.S.C. §706(2). To avoid having their rules vacated for arbitrariness and capriciousness, "administrative agencies" must "engage in 'reasoned decisionmaking.'" *Michigan v. E.P.A.*, 576 U.S. 743, 750 (2015) (citation omitted). "Not only must an agency's decreed result be within the scope of its lawful authority, but the process by which it reaches that result must be logical and rational." *Id.* (citation omitted). Thus, the agency must give "a satisfactory explanation for its action." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *accord Montgomery Cty., Maryland v. Fed. Commc'ns Comm'n*, 863 F.3d 485, 491 (6th Cir. 2017).

An agency will be held not to have engaged in reasoned decisionmaking if it "relied on factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 658 (2007) (quoting *State Farm*, 463 U.S. at 43); *accord Louisville Gas & Elec. Co. v. Fed. Energy Regul. Comm'n*, 988 F.3d 841, 846 (6th Cir. 2021). "When an agency changes its existing position," it must "show that there are good reasons for the new policy." *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125–26 (2016) (quotation omitted). And it must consider any "reliance interests"

20

that its previous position "engendered." *Dep't of Homeland Sec. v. Regents of Univ. of Cal.*, 140 S.

Ct. 1891, 1913 (2020) (quoting *Encino*, 136 S. Ct. at 2126)).  Relatedly, when an agency entirely

abandons one position in favor of another, it must show that it considered and rationally rejected

alternative possibilities.  *Id.* at 1912; *State Farm*, 463 U.S. at 47–48.

The Final Rule's approach to financial and physical separation is arbitrary and capricious.

So is the Final Rule's requirement that abortion providers make abortion referrals.

> **1.      The Final Rule's abandonment of the 2019 Rule's financial- and physical-separation requirements is arbitrary and capricious.**

For at least four reasons, HHS's decision to jettison the 2019 Rule's financial- and physical-

separation requirements is arbitrary and capricious.

> ***a.      The Final Rule does not adequately keep Title X funds from being used to illegally subsidize abortion.***

HHS abandoned the 2019 Rule's financial- and physical-separation requirements.  But it

did so without adopting any alternative to keep Title X funds from being used to subsidize abortion.

It thereby failed to consider an "important aspect of the problem" before it.  *Michigan*, 576 U.S. at

752 (quoting *State Farm*, 463 U.S. at 43).  To the extent it considered the problem, it failed to

"show that there are good reasons for the new policy," *Encino*, 136 S. Ct. at 2126 (quotation omit-

ted), and failed to consider alternative policies, *Regents*, 140 S. Ct. at 1912.

Again, Title X funds cannot be used to subsidize or promote abortion.  *See* 42 U.S.C. §300a-

6; Consolidated Appropriations Act, 2021, Div. H, Tit. V, §506.  The Final Rule acknowledges

this.  86 Fed. Reg. at 56150.  Yet it abolishes the 2019 Rule's requirement that Title X grantees

remain financially and physically separate from abortion providers.  In place of the 2019 Rule's

separation requirements, the Final Rule "reinstat[es] interpretations and policies under Section

21

1008 … that were … published in the Federal Register in 2000." 86 Fed. Reg. at 56150 (citing 65 Fed. Reg. 541281). As detailed above, those interpretations and policies permit significant inter-mingling of Title X resources and abortion resources; Title X grantees cross the line from "per-missible" intermingling to impermissible intermingling *only* when "the abortion element in a pro-gram of family planning services is so large and so intimately related to all aspects of the program as to make it difficult or impossible to separate the eligible and non-eligible items of cost." 65 Fed. Reg. at 41282.

Assuming for argument's sake that this alternative approach is consistent with Section 1008, *but see above* 14–17, HHS still had to justify its choice of this alternative over other, more-demanding separation requirements. *Regents*, 140 S. Ct. at 1912–13. In other words, HHS had to justify not only its choice to abandon the 2019 Rule's strict financial- and physical-separation re-quirements, but also its decision to adopt the Final Rule's incredibly relaxed separation require-ments as a means for enforcing Section 1008. It did not do so.

HHS's primary rationale is incoherent. It claimed to "disagree[]" with those who noted that "Title X grant funds … are 'fungible.'" 86 Fed. Reg. at 56150. Based on its non-fungibility finding, apparently, the agency saw no need for any requirements beyond the exceptionally lenient qualitative guidelines adopted in 2000. The trouble is, HHS's position is objectively wrong—"[m]oney is fungible," and there can be no disagreement on that point. *Holder*, 561 U.S. at 31.

Perhaps sensing this, the Final Rule contains a backup argument. It explains that HHS reviewed reports involving the Title X program from 1975 to 2021, and found "no evidence of compliance issues regarding [Section 1008] by Title X grantees." 86 Fed. Reg. at 56145. On that

22

basis, it concluded that the 2019 Rule's strict financial- and physical-separation requirements were unjustified. *Id.*

That reasoning is doubly flawed. *First*, to the extent it proves anything, it proves only that the 2019 Rule imposed more safeguards than necessary—it does not show that the "interpretations and policies" the Final Rule adopts in place of the 2019 Rule, *id.* at 56150, imposed enough safeguards. Yet HHS failed to consider alternative approaches less strict than the 2019 Rule but more strict than the Final Rule's approach. It stated that the 2019 Rule's financial- and physical-separation requirements imposed "greatly increased compliance costs for grantees and oversight costs for the federal government." 86 Fed. Reg. at 56145. And it concluded that, given the absence of proven violations, those increased costs could not be justified. But instead of even *considering* ways to alleviate the compliance burden—"dedicating funds to assist grantees with those costs, providing additional runway for grantees to comply, giving additional guidance to clarify restrictions," "granting targeted exceptions for those Title X programs in need of flexibilities," or even just relaxing the 2019 Rule's separation requirements, States' Letter, Ex. 2 at 9–10—HHS abandoned meaningful separation requirements entirely. HHS thus failed to consider alternatives. "That omission alone renders [the agency's] decision arbitrary and capricious." *Regents*, 140 S. Ct. at 1913.

*Second*, the absence of "*evidence* of compliance issues" does not imply the absence of compliance issues. 86 Fed. Reg. at 56145 (emphasis added). Remember, only the short-lived 1988 Rule and the 2019 Rule strictly prohibited financial and physical integration. Between the repeal of the 1988 Rule and 2019, HHS permitted a tremendous degree of financial and physical integration between Title X providers and abortion clinics. *See above* 14–15; *see also* 86 Fed. Reg. at 56150

23

(incorporating guidance from 65 Fed. Reg. 41281). Given the degree of *permitted* integration, it is hard to see how HHS would have detected *impermissible* integration. Just as a city that eliminates its police force cannot infer a decrease in crime based on a decrease in arrests, an agency cannot cite the absence of compliance issues that it had no ability to detect as evidence that there were no such issues. The Final Rule does not meaningfully address this. To be sure, it vaguely alludes to "a variety of mechanisms" used to enforce Section 1008, "such as grant reports, compliance monitoring visits, third-party audits, compliance guidance, and grantee education." 86 Fed. Reg. at 56150. But the fact that these "mechanisms" exist does not mean they work. How does HHS know that they do or will? It never says, and apparently never considered the matter.

The problem is compounded by the fact that, in promulgating the 2019 Rule, HHS cited evidence of compliance issues that the Final Rule never accounts for. In particular, the 2019 Rule recognized: "Commenters' insistence that requiring physical and financial separation would increase the cost for doing business only confirm[ed] the need for such separation," since it showed that Title X grants were used to create efficiencies that supported the provision of abortion. 84 Fed. Reg. at 7766. The Final Rule altogether ignores this issue, further demonstrating its failure to grapple with the fact that, at all times between the 1988 and 2019 Rules, it had few means for uncovering improper subsidization of abortion.

In sum, when HHS replaced the 2019 Rule's financial- and physical-separation requirements with "interpretations and policies" from 2000, it ignored key aspects of the problem before it and failed to justify the new policy it adopted. It thus acted arbitrarily and capriciously. *Michigan*, 576 U.S. at 752; *Encino*, 136 S. Ct. at 2126; *Regents*, 140 S. Ct. at 1913; *see also Ohio v. U.S. EPA*, 798 F.2d 880, 882 (6th Cir. 1986).

24

> **b.** ***HHS relied on flawed data and illogical reasoning when it concluded that the 2019 Rule was having "negative public health consequences."***

In explaining the decision to abandon the 2019 Rule, including its financial- and physical-separation requirements, HHS claimed that the 2019 Rule caused "negative public health consequences." 86 Fed. Reg. at 56150–52. But its conclusion is not supported by the evidence on which it relied. Indeed, it failed to adequately account for important factors undermining the relevance of the data before it, including the pandemic's effect on elective healthcare visits. It thus acted arbitrarily and capriciously. *See State Farm*, 463 U.S. at 43.

***Size of the Title X program.*** As an initial matter, HHS placed undue emphasis on the size of the Title X program. The agency inferred that, because the Title X program saw a decrease in client and grantee participation following the 2019 Rule's finalization, public health must have suffered. *See* 86 Fed. Reg. at 56151 ("[T]he Title X program provided services to 844,083 fewer clients in 2019 compared to 2018, prior to the implementation of the 2019 rule, approximately a 22 percent decrease."); *id*. at 56147 ("[I]n 2019 compared to 2018, 225,688 fewer clients received oral contraceptives; 49,803 fewer clients received hormonal implants; and 86,008 fewer clients received intrauterine devices (IUDs)."); *id*. at 56151 ("A total of 41 states and two territories saw a decrease in clients served in 2019 compared to 2018.").

The problem with HHS's reasoning is that its conclusion does not follow from its premises: the fact that patients are not receiving care through the Title X program *does not imply* that they are forgoing care altogether. And if they are not forgoing care, the drop in Title X participation does not imply negative public-health consequences.

HHS seemed to recognize the problem. It noted that Planned Parenthood—a large Title X provider before the 2019 Rule—served *more* individuals the year it exited the Title X program in

the 2019 Rule's aftermath than it did the prior year. HHS conceded that "this evidence may suggest that the Title X program impacts quantified elsewhere in this [rule] may largely be associated with transfers." 86 Fed. Reg. at 56174. By "transfers," the Final Rule means that patients of former grantees that left the Title X program may have continued to obtain care from the same entities *outside of* Title X. Instead of attempting to account for this, however, HHS threw up its hands; it excused itself from having to quantify the effect of transfers on public health, noting the "persistent challenges with clearly disaggregating the effects that represent transfers from effects that represent benefits and costs as a result of this final rule." 86 Fed. Reg. at 56175. Apathy is not reasoned analysis.

In addition to failing to account for care that patients received outside Title X, HHS's evidence of negative public-health consequences *inside* the program was insufficient to support the conclusion that the 2019 Rule had negative public-health consequences.

For example, HHS said that the Final Rule would significantly reduce unintended pregnancy. 86 Fed. Reg. at 56172. But it arrived at this conclusion by relying on an impossible-to-credit memorandum prepared by an abortion-lobbying organization. The memorandum estimates that, among women who use contraception, just 4.6 percent of women who use public-health services will become pregnant. The rate for those same women if they were not able to use public-health services? *29.6 percent*—a rate six times higher. Memorandum from Jennifer J. Frost and Lawrence B. Finer, *Unintended pregnancies prevented by publicly funded family planning services: Summary of results and estimation formula* (2017), https://perma.cc/W2HL-9Q72; *see* 86 Fed. Reg. at 56172 & n.16. Those numbers are hard to buy. And so it is perhaps unsurprising that latter figure—29.6 percent—is unsupported. The abortion lobbying organization invented a hypothetical group, and

assumed that many of these hypothetical women would use either no contraception or ineffective contraceptives without access to public-health services. A single study from a biased source resting on unproven assumptions does not support HHS at all. Put differently, HHS cannot cure its use of unsupported assumptions by citing data from a model that *itself* rests on unsupported assumptions.

HHS also alluded to comments (from providers seeking access to federal funds), indicating that providers witnessed patients forgoing certain services due to cost. Even crediting these self-interested statements, however, they do not move the ball. These statements, if true, show that the 2019 Rule caused some negative public-health consequences. But to justify abandoning the policy based on public-health concerns, HHS needed to show that the 2019 Rule was bad for public health *on net*. More precisely, to support replacing the 2019 Rule with the Final Rule, HHS needed to show that, accounting for the negative *and positive* public-health effects of both rules, the Final Rule is better for public health.

HHS never did that. For one thing, it does not appear to have made any attempt to quantify the 2019 Rule's public-health *benefits*. For another, it appears to have ignored the evidence of the public-health harms that the Final Rule threatened. For example, the States, in their comment letter, pointed to data from the Centers for Disease Control and Prevention showing that sexually transmitted diseases reached a record high in 2018. Association of State and Territorial Health Officials, *National STD Trends: Key Information on Sexually Transmitted Diseases for Public Health Leadership* 1 & n.1 (2019), https://perma.cc/G58R-WBEW; *see* States' Letter, Ex. 2 at 7–8 & n.36. That occurred under the 2000 Rule that the Final Rule effectively reimposes. Yet the Final Rule fails to consider whether its previous approach contributed to this rise. It does not consider, for

example, whether providing Title X services through abortion providers might have encouraged riskier sexual behavior that was bad for public health. That was precisely the possibility that one of Title X's supporters recognized when explaining, on the floor of the House, "that the prevalence of abortion as a substitute or a back-up for contraceptive methods can reduce the effectiveness of family planning programs." 116 Cong. Rec. 37375 (Nov. 16, 1970) (statement of Rep. Dingell). Yet HHS considered neither this nor (it appears) any other potential public-health downsides associated with the Final Rule. HHS thus failed to consider an important aspect of the problem before it and failed to support its conclusion with relevant data, which is arbitrary and capricious. *State Farm*, 463 U.S. at 43; *Kentucky Riverkeeper, Inc. v. Rowlette*, 714 F.3d 402, 411 (6th Cir. 2013).

***Assumption of static coverage.*** In finding the 2019 Rule would lead to negative health consequences, HHS also irrationally concluded that the 2019 Rule had *permanently* decreased the number of patients and grantees participating in Title X. In the words of the Final Rule, HHS determined that "the decline in access, clients, and services from 2018 levels will continue until a new rule is in place." 86 Fed. Reg. at 56152.

This conclusion is not supported by reasoned analysis. Evidence shows that existing grantees were willing and capable of increasing services to provide for community needs. When Planned Parenthood of Greater Ohio ceased to accept Title X funds, Ohio stepped in. The Ohio Department of Health expanded Title X services in seventeen counties. *See* Clark Decl., Ex. 1 ¶12. HHS responded that Ohio and other entities failed to completely fill the gap in coverage caused by the 2019 Rule. 86 Fed. Reg. at 56151, 56169. But that hardly justifies assuming that these supposed gaps would be permanent. For one thing, the Final Rule recognizes that, in four States, six

28

territories, and the District of Columbia, Title X participation *increased* in 2019. *Id.* at 56146. Further, seven States "experienced a meaningful increase in the number of Title X clinics after the 2019 regulatory change." *Id.* at 56171 n.15.

Regardless, the fact that States, localities, and other entities have not *yet* filled any coverage gaps hardly means they never will. The 2019 Rule has been in effect barely more than two years. And for much of that time, a deadly pandemic sapped and redirected government and private resources. To assume that the current state of affairs is likely to continue, HHS would need to credibly attribute any coverage gaps to inability or disinterest rather than to the pandemic.

HHS tried to do so, but to no avail. In particular, it claimed that only 37 percent of the decline in Title X services was due to the pandemic, while 63 percent was due to the 2019 Rule. 86 Fed. Reg. at 56152; *see also* Office of Population Affairs, *Family Planning Annual Report: 2020 National Survey* D-5, (Sept. 2021), https://perma.cc/V7FZ-ZJHA. But this data does not address the relevant question, which is how the pandemic affected the ability of existing providers to expand their services to fill any gaps in coverage. The Family Planning Annual Report, on which the figures are based, purports to calculate the decrease in Title X patient participation attributable to the pandemic at former and existing Title X clinics. It did not address the degree to which the pandemic hindered public and private entities from expanding their services. How many government and private medical clinics were expanding their services or establishing new locations at a time when patients were being advised to stay home, help was hard to find, and the economy was suffering? *See Coronavirus State and Local Fiscal Recovery Funds*, 86 Fed. Reg. 26786, 26786–92 (May 17, 2021). Presumably not many. But the Final Rule never accounts for this. Without doing so, HHS cannot assume that any coverage gaps would have gone unaddressed in the years ahead.

In any event, the calculations rest on a flawed, or at least unsupported, assumption: that none of the grantees who remained in the program after the 2019 Rule saw new or additional users *because of* the 2019 Rule. In arriving at the 37 percent figure, the Final Rule points to Appendix D of the Family Planning Annual Report: 2020 National Survey. *See* https://perma.cc/V7FZ-ZJHA. That Appendix explains the assumptions that the Office of Population Affairs used to derive this figure. Relevant here, the Office first looked to forty grantees who "reported no network changes or impact because of the" 2019 Rule. *Id.* at D-2. Those entities saw user losses of 21 percent between 2018 and 2020. *Id.* at D-4, D-8. Based on this, the Office determined that the grantees who left the program would have also experienced a 21 percent loss from the pandemic if they had remained in the program. *Id.* at D-3, D-5. That, combined with a pandemic-associated drop from grantees who participated in the Title X program sporadically after the 2019 Rule, gave the Office the 37 percent figure. *Id.* at D-5. The problem with this logic is that the 21 percent figure *does not* represent the entire COVID-caused loss to the forty grantees with no network changes. Instead, it includes the *net change* in the number of patients seen by grantees that reported no network changes as a result of the 2019 Rule, which includes the patients who failed to seek care because of COVID-19 *and also* the patients who began using Title X because of the 2019 Rule—for example, patients who wanted family-planning counseling but wanted not to receive it through Planned Parenthood or another abortion provider. That possibility is hardly fanciful. Again, seven diverse States—Colorado, Delaware, Kentucky, North Dakota, New Mexico, Nevada, and Texas—"experienced a meaningful increase in the number of Title X clinics after the 2019 regulatory change." 86 Fed. Reg. at 56171 n.15. The meaningful rise in the number of clinics implies

actual or anticipated increases in demand for Title X services *because of* the 2019 Rule. HHS's analysis fails to account for this.

Because the Final Rule cites coverage gaps without making any sound effort to determine the degree to which the coverage gaps were due to the difficulty of expanding services during a pandemic, and because the Final Rule baselessly assumes that any coverage gaps remaining just two years after the 2019 Rule's issuance would last forever, HHS failed to consider important aspects of the problem before it. It thus acted arbitrarily and capriciously. *State Farm*, 463 U.S. at 43.

> ### c. *HHS failed to account for important reliance interests when it promulgated the Final Rule.*

The Final Rule completely neglects to consider reliance issues. The 2019 Rule, thanks in part to the financial- and physical-separation recruitments, caused some entities to leave the program. In Ohio, for example, the only non-State grantee—Planned Parenthood of Greater Ohio— left the program instead of complying with the 2019 Rule. As these grantees left, others began expanding their offerings to fill any gaps left by prior grantees. In Ohio, for example, the State's Department of Health met this need, establishing a new or increased presence in seventeen counties. Clark Decl., Ex. 1 ¶12. Filling those gaps required investments. Yet the Final Rule never mentions this. In other words, HHS failed to consider whether its Final Rule upsets reliance interests that grantees formed in light of the 2019 Rule. By failing to "consider" the "reliance interests" that its previous position "engendered," HHS acted arbitrarily and capriciously. *Regents*, 140 S. Ct. at 1913 (quoting *Encino*, 136 S. Ct. at 2126).

       **d.**      ***HHS failed to consider whether abolishing the financial- and physical-separation requirements would reduce public support for Title X.***

HHS failed to consider one other important aspect of the question whether to eliminate the 2019 Rule's financial- and physical-separation requirements. In particular, it failed to consider the degree to which eliminating these requirements and replacing them with the 2000-era guidance would erode public support for the Title X program.

As explained at the outset, Title X reflects a compromise: those opposed to abortion agreed to fund family-planning services as long as they could be assured that their money would not go to fund abortion. That decades-old compromise retains its worth today. Many Americans do not want their tax dollars being used to fund abortion. That is why the federal government has long avoided funding abortion. *See Rust*, 500 U.S. at 201–02; *Harris v. McRae*, 448 U.S. 297, 315–17 (1980); *Maher v. Roe*, 432 U.S. 464, 474 (1977); Consolidated Appropriations Act, 2017, Pub. L. No. 115-31, §§613–14, 131 Stat. 135, 372 (2017). And that is why States across the country have enacted laws to keep tax dollars from supporting the practice. *See Planned Parenthood of Greater Ohio v. Hodges*, 917 F.3d 908, 910 (6th Cir. 2019) (*en banc*); *Planned Parenthood of Ind., Inc. v. Comm'r of the Ind. State Dep't of Health*, 699 F.3d 962, 969–70 (7th Cir. 2012); *Planned Parenthood Ariz. Inc. v. Betlach*, 727 F.3d 960, 964 (9th Cir. 2013); *Planned Parenthood of Kan. & Mid-Mo. v. Anderson*, 882 F.3d 1205, 1212–14 (10th Cir. 2018); *Planned Parenthood Ass'n of Utah v. Herbert*, 828 F.3d 1245, 1250 (10th Cir. 2016); *Planned Parenthood of Gulf Coast, Inc. v. Gee*, 862 F.3d 445, 450–52 (5th Cir. 2017).

As these laws show, programs that fund abortion jeopardize the "compromise" that the "political process" has yielded—a compromise that protects the interests of the many people of good faith who hold diametrically opposed positions on the issue of abortion. *Baltimore*, 973 F.3d

at 297 (Wilkinson, J., dissenting). Failing to respect that compromise means jeopardizing public support for the program. And public support matters. When a program loses that support, it is likely to become less effective, either because there will be fewer grantees willing to participate or because Congress will be less eager to provide the necessary funding. The agency failed to address the concern. It thus failed to consider yet another important aspect of the question before it.

### 2. HHS acted arbitrarily and capriciously by mandating referrals.

HHS's rule requiring referrals for elective abortions is also arbitrary and capricious. There are at least four reasons why.

*First*, insofar as it rests on the conclusion that the 2019 Rule caused negative public-health effects, its decisionmaking was flawed for the reasons laid out above. *See above* 25–31.

*Second*, if Title X clinics are making abortion referrals, the program will lose support from those willing to support funding for family-planning services but *unwilling* to fund abortion. *See above* 32–33. HHS's Final Rule never mentions the concern, signaling that it failed to consider an important aspect of the problem before it.

*Third*, HHS failed to "show that there are good reasons for the new policy." *Encino*, 136 S. Ct. at 2126 (quotation omitted). As HHS recognized in 2019, "in most instances when a referral is provided for abortion, that referral necessarily treats abortion as a method of family planning." 84 Fed. Reg. at 7717. HHS does not explain how its own conclusion from 2019 has been disproven. Nor has it explained how, without a prohibition on abortion referrals, it will ensure that Title X grants are not being used to promote abortion. At most, the agency notes that grantees have experience navigating this line in the past. 86 Fed. Reg. at 56149–50. But as explained above in connection with the financial- and physical-separation requirements, HHS has not shown that it had

the tools in place to detect whether abortion-referring grantees were in fact engaging in taxpayer-funded promotion of abortion. *See above* 23–24. By failing to justify its sudden departure from its determination that Title X providers generally treat abortion as a method of family planning when they make abortion referrals, the agency acted arbitrarily and capriciously. *See Encino*, 136 S. Ct. at 2126.

*Finally*, and perhaps most importantly, HHS "entirely failed to consider an important aspect of the problem." *Nat'l Ass'n of Home Builders*, 551 U.S. at 658 (quoting *State Farm*, 463 U.S. at 43). In particular, it failed to consider whether mandating referrals was consistent with medical ethics. In its notice of proposed rulemaking, HHS stated that the 2019 Rule's prohibition on referrals was contrary to the "ethical codes of major medical organizations." 86 Fed. Reg. at 19817. The States submitted a comment explaining that it would be irrational to rely on ethical analyses from those organizations, as it is "doubtful," States' Letter, Ex. 2 at 12, that those "major medical organizations" reflect the ethical views of the medical profession as a whole. One of the organizations in question, the American College of Obstetricians and Gynecologists, has even filed briefs defending the practice of eugenic abortion, in which doctors end the lives of unborn children based on their perceived genetic inferiority. *See* Brief for Am. Coll. of OBGYNS, *et al.*, as *Amici Curiae* in Support of Appellees, *Preterm-Cleveland*, 994 F.3d 512 (No. 18-3329). As the States explained, an organization "willing to stand up for eugenics ought not be taken seriously in any discussion of ethics." States' Letter, Ex. 2 at 13. Certainly these organizations should not be presumed, without evidence, to reflect the ethical views of medical providers generally.

More importantly, however, "major medical organizations" do not dictate the ethical rules that bind medical professionals. Instead, States do. And while States are free to accept input from

major medical organizations, States have the final say. That matters here because the Final Rule, by mandating that grantees refer patients for abortion, conflicts with multiple States' ethical standards governing the practice of medicine. *See* Ariz. Rev. Stat. §36-2154(A); Conn. Agencies Regs. §19-13-D54(f); Fla. Stat. §390.0111(8); Id. Code §18-612; Ky. Rev. Stat. §311.800(4); La. Rev. Stat. §40:1061.2; Mont. Code Ann. §50-20-111(2); N.Y. Civil Rights Law §79-i; Ohio Rev. Code §4731.91; Or. Rev. Stat. §435.485; 18 Pa. Cons. Stat. §3213(d); Wis. Stat. §253.09(1).

HHS was aware of this problem—the States' comment letter informed HHS that, as these provisions showed, mandating referrals would *contravene* medical ethics. *See* States' Letter, Ex. 2 at 12–13. Yet, HHS entirely failed to address the problem. Where an agency is aware of laws that may conflict with a proposed rule, and yet fails to address those laws and articulate a satisfactory solution, it acts in an arbitrary and capricious manner. *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 140 S. Ct. 2367, 2384 (2020). And of particular relevance here, a Title X rule that fails to address medical-ethics concerns raised during the rulemaking process is arbitrary and capricious. *See Baltimore*, 973 F.3d at 276 (majority op.). (While the Fourth Circuit wrongly held that HHS gave insufficient consideration to medical ethics in promulgating the 2019 Rule, it correctly recognized that HHS must consider medical ethics. *Id.*) It follows that the Final Rule is arbitrary and capricious.

\*

In sum, the Final Rule is arbitrary and capricious *even if* it is not contrary to law. The States, therefore, will likely prevail on the merits.

35

## II.    The plaintiff States satisfy the remaining preliminary-injunction factors

The foregoing shows that Ohio will prevail on the merits.  Because it can also prove the remaining three preliminary-injunction factors, it is entitled to a preliminary injunction.

### A.    The States will be irreparably injured without an injunction.

The States will be irreparably harmed without a preliminary injunction.  For one thing, the States will be made to compete with abortion providers for grants come January, when the grant-making process begins.  (HHS cannot plausibly deny that abortion providers will reenter the program—one of its primary reasons for promulgating the Final Rule is to allow them to do so.  *See* 86 Fed. Reg. at 56171.)  That increased competition for a limited pool of funds constitutes an "actual, here-and-now injury."  *Sherley*, 610 F.3d at 74; *see also Dep't of Commerce*, 139 S. Ct. at 2565; *Planned Parenthood*, 946 F.3d at 1108.  The States, after all, will never be able to recover grant money awarded to and expended by the other grantees with whom they are made to compete by the Final Rule.  The non-recoverable nature of the injury makes it irreparable.  *See, e.g.*, *Tex. Children's Hosp. v. Burwell*, 76 F. Supp. 3d 224, 244 n.7 (D.D.C. 2014); *Performance Unlimited, Inc. v. Questar Pub., Inc.*, 52 F.3d 1373, 1382–83 (6th Cir. 1995).

What is more, at least one of the plaintiff States—Ohio—was able to expand its services *because* abortion providers dropped out of the Title X program.  *See* Clark Decl., Ex. 1 ¶ 12.  Because those providers will now reenter the program, the money will be divided among a larger group of grantees.  This means that Ohio will receive less money.  That will force it to reduce its services (or spend other state money to make up the difference).  Being forced to reduce services constitutes irreparable injury.  *See, e.g.*, *Tex. Children's Hosp.*, 76 F. Supp. 3d at 242–44.  And, Ohio faces reputational damage from being perceived as unable to adequately serve patients who recently

relied on its Title X services. Low-income patients may no longer trust that clinics associated with the Ohio Department of Health will reliably serve their needs.

Finally, with the 2019 Rule in effect, the States will be forced to support abortion by making referrals upon request. Many States, including plaintiff States, have laws designed to withhold the State's imprimatur from the practice of abortion. *See, e.g.*, Ala. Const. , §36.06; Ariz. Rev. Stat. Ann. §35-196.02; Colo. Rev. Stat. Ann. §25.5-3-106; Fla. Stat. Ann. §627.66996(1); La. Rev. Stat. §40:1061.6; Iowa Code Ann. §217.41B; Miss. Code. Ann. §41-41-91; Mich. Comp. Laws Ann. §400.109a; Mo. Ann. Stat. §188.205; Neb. Rev. Stat. Ann. § 71-7606(3); N.C. Gen. Stat. Ann. §143C-6-5.5; Ohio Rev. Code §5101.56; Tex. Health & Safety Code Ann. §32.005; Wis. Stat. Ann. §20.927. By forcing state-supported clinics to make abortion referrals, the Final Rule will under-mine that policy. And there is no repairing the damage done—the States cannot sue HHS for monetary damages or otherwise undo the fact that their clinics will have made abortion referrals.

## B.    Enjoining the Final Rule will not substantially harm others and will promote the public interest.

That leaves only the final two factors. Both support awarding injunctive relief.

*First*, "issuance of the injunction" will not "cause substantial harm to others." *City of Pontiac*, 751 F.3d at 430. To the contrary, if there are serious doubts about the legality of the Final Rule, it is better to maintain the *status quo*: neither patients nor anyone else will benefit from the confusion that would result if abortion clinics were to enter the Title X program briefly only to leave again once the Final Rule is permanently set aside. That is especially so because there is no indication that anyone is being *substantially* harmed by the current state of affairs. Planned Parenthood, the largest grantee to exit the program, served more patients and provided more ser-vices after exiting the program than it did while a part of the program. 86 Fed. Reg. at 56174. So

there is simply no evidence that the American public or abortion providers will be substantially harmed by a preservation of the *status quo*.

*Second*, the public interest favors issuing an injunction.  This follows from the fact that "the public interest lies in a correct application" of the law and the will of the people being effected "in accordance with … law."  *Coal. to Def. Affirmative Action*, 473 F.3d at 252.  The Final Rule violates the Administrative Procedure Act.  So the public interest favors an injunction.

## CONCLUSION

The Court should preliminarily enjoin the Final Rule.

Dated: October 25, 2021

STEVE MARSHALL
Alabama Attorney General

THOMAS WILSON
    (*pro hac vice application forthcoming*)
Deputy Solicitor General
Office of the Attorney General
501 Washington Ave
Montgomery, AL 36130
Phone: 332-242-7300
Thomas.Wilson@AlabamaAG.gov

*Counsel for the State of Alabama*

MARK BRNOVICH
Arizona Attorney General

KATE SAWYER
    (*pro hac vice application forthcoming*)
Assistant Attorney General
Arizona Attorney General's Office
2005 N. Central Ave.
Phoenix, AZ 85004
Phone: 602-542-8304
kate.sawyer@azag.gov

*Counsel for the State of Arizona*

DAVE YOST
Ohio Attorney General

*/s/ Benjamin M. Flowers*
BENJAMIN M. FLOWERS* (0095284)
Solicitor General
 *Trial attorney*
STEPHEN P. CARNEY (0063460)
MAY DAVIS
    (*Pro hac vice application forthcoming*)
Deputy Solicitors General
30 East Broad Street, 17th Floor
Phone: 614-466-8980
Fax: 614-466-5087
bflowers@ohioago.gov

*Counsel for the State of Ohio*

ERIC S. SCHMITT
Missouri Attorney General

D. JOHN SAUER
    (*pro hac vice application forthcoming*)
Solicitor General
Office of the Missouri Attorney General
Supreme Court Building
207 West High Street
Jefferson City, MO 65102
Phone: 573-751-8870
John.Sauer@ago.mo.gov

*Counsel for the State of Missouri*

LESLIE RUTLEDGE
Arkansas Attorney General

VINCENT M. WAGNER
   *(pro hac vice application forthcoming)*
Deputy Solicitor General
Office of the Arkansas Attorney General
323 Center Street, Suite 200
Little Rock, Arkansas 72201
Phone:  501-682-6302
vincent.wagner@arkansasag.gov

*Counsel for the State of Arkansas*

DOUGLAS J. PETERSON
Nebraska Attorney General

JAMES A. CAMPBELL (0081501)
Solicitor General
Office of the Nebraska
Attorney General
2115 State Capitol
Lincoln, NE 68509
Phone:  402-471-2682
jim.campbell@nebraska.gov

*Counsel for the State of Nebraska*

ASHLEY MOODY
Florida Attorney General

NATALIE CHRISTMAS
   *(pro hac vice application forthcoming)*
Assistant Attorney General of Legal Policy
Office of the Attorney General
PL-01 The Capitol
Tallahassee, FL 32399-1050
Phone:  850-414-3300
Fax:  850-410-267
Natalie.christmas@myfloridalegal.com

*Counsel for the State of Florida*

JOHN M. O'CONNOR
Oklahoma Attorney General

ZACH WEST
   *(pro hac vice application forthcoming)*
Assistant Solicitor General
Office of the Oklahoma Attorney General
313 N.E. Twenty-First St.
Oklahoma City, OK 73105
Phone:  405-522-4392
zach.west@oag.ok.gov

*Counsel for the State of Oklahoma*

DEREK SCHMIDT
Kansas Attorney General

KURTIS WIARD
    (*pro hac vice application forthcoming*)
Assistant Solicitor General
Office of Kansas Attorney General
120 SW 10th Avenue, 3rd Floor
Topeka, KS 66612-1597
Phone: 785-368-8435
Fax: 785-291-3767
kurtis.wiard@ag.ks.gov

*Counsel for the State of Kansas*


DANIEL CAMERON
Kentucky Attorney General

OLIVIA F. AMLUNG (0098606)
Assistant Attorney General
Office of Kentucky Attorney General
1840 Simon Kenton Way, Suite 5300
Covington, KY 41011
Phone: 502-696-5300
Fax: 502-564-2894
Olivia.Amlung@ky.gov

*Counsel for the Commonwealth of Kentucky*

ALAN WILSON
South Carolina Attorney General

EMORY SMITH
    (*pro hac vice application forthcoming*)
Deputy Solicitor General
THOMAS T. HYDRICK
    (*pro hac vice application forthcoming*)
Assistant Deputy Solicitor General
Office of the Attorney General
P.O. Box 11549
Columbia, SC 29211
Phone: 803-734-3742
ThomasHydrick@scag.gov

*Counsel for the State of South Carolina*
PATRICK MORRISEY
West Virginia Attorney General

LINDSAY S. SEE
    (*pro hac vice application forthcoming*)
Solicitor General
Office of the West Virginia
Attorney General
State Capitol, Bldg 1, Room E-26
Charleston, WV 25305
Phone: 681-313-4550
Lindsay.S.See@wvago.gov

*Counsel for the State of West Virginia*

41

## CERTIFICATE OF SERVICE

I hereby certify that on October 25, 2021, a copy of the foregoing was filed electronically. Notice of this filing will be sent to all parties for whom counsel has entered an appearance by operation of the Court's electronic filing system. Parties may access this filing through the Court's system. I further certify that a copy of the foregoing pleading and the Notice of Electronic Filing will be served by ordinary U.S. mail upon all parties for whom counsel has not yet entered an appearance electronically, at the following addresses:

Vipal J. Patel
Acting United States Attorney for the
Southern District of Ohio
U.S. Attorney's Office
303 Marconi Boulevard, Suite 200
Columbus, OH 43215

Civil-Process Clerk
Office of the United States Attorney for
the Southern District of Ohio
303 Marconi Boulevard, Suite 200
Columbus, OH 43215

U.S. Department of Health and Human
Services
200 Independence Ave., SW
Washington, DC 20201

U.S. Department of Health and Human
Services
Office of Population Affairs
200 Independence Ave., SW
Washington, DC 20201

Merrick Garland
Attorney General
United States Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

Xavier Becerra
Secretary of Health and Human Services
U.S. Department of Health and Human
Services
200 Independence Ave., SW
Washington, DC 20201

Jessica S. Marcella
Deputy Assistant Secretary for Population
Affairs
Office of Population Affairs
200 Independence Ave., SW
Washington, DC 20201

*/s/ Benjamin Flowers*
BENJAMIN FLOWERS (0095284)
Solicitor General

## LOCAL RULE 65.1(B) CERTIFICATION

I hereby certify that on October 25, 2021, I served a copy of the complaint, this motion, and

all other filings in this case by email on the defendants' attorney at the following email address:

Matthew J. Horwitz
Civil Chief
United States Attorney for the
Southern District of Ohio
Matthew.Horwitz@usdoj.gov

*/s/ Benjamin Flowers*
BENJAMIN FLOWERS (0095284)
Solicitor General

43