# Exhibit 2



Administration
Office 614-728-5458
Fax 614-466-5087

May 17, 2021

Secretary Xavier Becerra
United States Department of Health and Human Services
Hubert H. Humphrey Building, Room 716G
200 Independence Avenue SW
Washington, DC 20201

> Re: Ohio and twenty other States' comments regarding proposed rule RIN 0937-AA11, as set forth in 42 CFR Part 59, 86 Federal Register 19812.

Dear Secretary Becerra:

Ohio and twenty other States submit these comments in opposition to the notice of proposed rulemaking entitled, "Ensuring Access to Equitable, Affordable, Client-Centered, Quality Family Planning Services," set forth at 86 Federal Register 19812 (April 15, 2021), which are meant to implement Title X of the Family Planning Services and Population Research Act of 1970.[1]

I. **THE PROPOSED RULE WILL CAUSE THE DEPARTMENT TO SUBSIDIZE ABORTION IN VIOLATION OF TITLE X.**

Many Americans regard abortion as the murder of a child. Other Americans disagree—they consider abortion to be among the most important of rights. "Federal funding has been the quintessential point of compromise between the opposing factions in this fraught and volatile area."[2] "The elements of the compromise may vary in their detail, but the overall components of compromise have remained quite consistent and clear."[3] "Congress, on the one hand, does not seek to bar or directly restrain the right established by the Supreme Court in *Roe v. Wade* and its progeny."[4] "Congress, on the other hand, seeks to respect those who hold moral or religious objections to the contested practice by withholding federal funds from it."[5]

---

[1] 42 U.S.C. §300 *et seq.*
[2] *Mayor of Balt. v. Azar*, 973 F.3d 258, 297 (4th Cir. 2020) (en banc) (Wilkinson, J., dissenting).
[3] *Id.*
[4] *Id.*
[5] *Id.*; accord *Rust v. Sullivan*, 500 U.S. 173, 201–02 (1991); *Harris v. McRae*, 448 U.S. 297, 315–17 (1980); *Maher v. Roe*, 432 U.S. 464, 474 (1977); Pub. L. No. 115-31, §§ 613–14, 131 Stat. 135, 372 (2017).

1

Title X reflects this consensus. Congress enacted Title X in 1970, a few years before the U.S. Supreme Court created a national right to abortion. So, while many States had loosened their abortion laws, many others still restricted the practice as a crime, with limited exceptions. The States and citizens taking that view surely would not have supported family-planning funding that even indirectly supported, or stamped a national imprimatur on, a practice they regarded as criminal. That is why Title X's principal sponsor, Congressman John D. Dingell, offered an amendment to his own bill. He explained:

> Mr. Speaker, I support the legislation before this body. I set forth in my extended remarks the reasons why I offered the amendment which prohibited abortion as a method of family planning.… With the "prohibition of abortion" amendment—title X, section 1008—the committee members clearly intend that abortion is not to be encouraged or promoted in any way through this legislation. Programs which include abortion as a method of family planning are not eligible for funds allocated through this act.[6]

That promise—that abortion not be "promoted in any way"—is reflected in 42 U.S.C. §300a-6. That statute prohibits using Title X funds "in programs where abortion is a method of family planning." The Supreme Court, in a decision upholding regulations materially identical to those in the 2019 Rule[7] that the Department now wishes to replace, held that this phrase was ambiguous to at least some extent, as it does not "speak directly to the issues of counseling, referral, advocacy, or program integrity."[8] But the statute's use of the location-focused word "where"—which, in this context, means "at or in the place in which"[9]—makes at least two things clear.

*First*, and contrary to the Proposed Rule,[10] Title X funds must not be used at facilities that make abortion referrals. A facility that makes an abortion referral because the patient wants to manage the size of her family (rather than because of a medical emergency) is a facility at which abortion is treated as one option for managing the size of one's family. And so every such facility is, quite literally, a "program where"—a program at or in the place in which—"abortion is a method of family planning."[11]

---

[6] 116 Cong. Rec. 37375 (1970).
[7] Compliance With Statutory Program Integrity Requirements, 84 Fed. Reg. 7714 (March 4, 2019).
[8] *Rust*, 500 U.S. at 184.
[9] Webster's Third New International Dictionary 2602 (1993).
[10] *See* 86 Fed. Reg. at 19830.
[11] 42 U.S.C. §300a-6.

*Second*, and also contrary to the Proposed Rule,[12] Title X funds cannot be used to support a family-planning program that is located *in* an abortion-providing facility. Every abortion-providing facility is, by definition, a facility "where abortion is a method of family planning."[13] It follows that every Title X program that shares a physical location with such a facility is a program *where*—a program at or in the location in which—"abortion is a method of family planning."[14]

The Department cannot deviate from the best reading of the text when it does so to circumvent the statutory provision. And its reasons for deviating from the best reading could not be clearer: the Department, knowing that it cannot *expressly* subsidize abortion, plans to do so indirectly by putting Title X services and abortion services in the same place. Courts reviewing administrative actions are "not required to exhibit a naiveté from which ordinary citizens are free."[15] And when the time comes to review this rule, if it is finalized, they will not.

II. **THE DEPARTMENT HAS NOT JUSTIFIED THE NEED FOR ANY ALTERATION TO THE TITLE X RULE.**

The Proposed Rule is premised on the idea that, in order to have a successful Title X program, the 2019 Rule must be repealed and replaced. The premise is false: the Department has not sufficiently investigated the effects of the 2019 Rule; there is no reason to suspect that Title X can succeed only by stealthily subsidizing the provision of abortions; and much of the support for the Proposed Rule crumbles with the slightest examination.

A. **The Department does not have sufficient data to assess the effects of the 2019 Rule.**

The Department has tried to justify the Proposed Rule almost exclusively with reference to the purported effects of the 2019 Rule.[16] But the Department does not, and could not conceivably, have data sufficient to support its conclusion that the current rule is inadequate.

The 2019 Rule took several steps to "ensure compliance with, and enhance implementation of, the statutory requirement that none of the funds appropriated for Title X may be used in programs where abortion is a method of family planning and related statutory requirements."[17] For example, the 2019 Rule permits (but does not require) non-directive consulting about the availability of abortion.[18] It also re-

---

[12] *See* 86 Fed. Reg. at 19818.
[13] 42 U.S.C. §300a-6.
[14] *Id.*
[15] *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2575 (2019).
[16] *See* 84 Fed. Reg. 7714.
[17] *Id.* at 7714.
[18] *Id.* at 7716–17.

3

quires Title X recipients to maintain strict physical and financial separation between abortion services and programs that spend Title X money.[19] The 2019 Rule says that "to be physically and financially separate, a Title X project must have an objective integrity and independence from prohibited activities. Mere bookkeeping separation of Title X funds from other monies is not sufficient."[20]

The Department claims the 2019 Rule is not working. But how could it know? The 2019 Rule required grantees to comply with most requirements, such as the financial-separation requirement, by July 2019. But it delayed the compliance date for physical separation of abortion services to March 4, 2020. Rather than comply with the updated regulations, some entities—notably Planned Parenthood, which operates more than 600 clinics—left the program entirely before the 2019 Rule was fully implemented. And on the heels of the March 4 implementation date, the COVID-19 pandemic wreaked havoc on the healthcare industry. Not only were clinics forced to end elective procedures, but the many safety-related restrictions in cities across the country created barriers for people seeking family-planning services—barriers having no relation whatsoever to Title X.

Combining the newness of the 2019 Rule with the complications caused by COVID-19 means the data could not possibly be sufficient to conclude that the 2019 Rule is not working. The COVID-19 pandemic is a particularly complicating factor. It interfered with the provision of nearly *all* services, medical and otherwise, in the American economy. Even many elective and non-elective medical procedures having nothing to do with family planning or abortion were delayed.[21] Thus, even if there were some reason to think that Title X services will decline because of the 2019 Rule—and there is not[22]—the Proposed Rule wrongly assumes that any such decline would remain after we emerge from the pandemic and after Title X grantees become experienced in dealing with the now-in-effect 2019 Rule.

The Department made a reasoned decision in 2019 to align the Title X program with the law. Today, the facts are not sufficiently developed to allow for a meaningful assessment of the 2019 Rule's likely effects. But they will be. Given that individuals are just now, in many areas of the country, starting to leave their homes and seek elective services, and given that state budgets and other sources of funding are being replenished, the 2019 Rule will soon be implemented and the Department can compare apples to apples. Ohio requests that the Department study the effects of the 2019 Rule from January 1, 2022, through December 31, 2022, to form a reasoned basis for decision.

---

[19] *Id.* at 7763–77; 42 C.F.R. §59.15.
[20] 42 C.F.R. §59.15.
[21] *See Non-Emergent, Elective Medical Services, and Treatment Recommendations*, Centers for Medicare and Medicaid Services (April 7, 2020), https://perma.cc/6FVT-JAPN.
[22] *See below* 5–13.

4

### B. The Proposed Rule incorrectly assumes that linking abortion to family-planning services is critical to a vibrant Title X program.

**1.** The Proposed Rule does not account for successful programs in the States that have long separated Title X funds and abortion services. Many States administer their own public-health programs without funding abortion providers. And many States administer Title X programs themselves, effectively, without providing or promoting abortions. The Proposed Rule concocts a link between the success of Title X's family-planning mission and the comingling of abortion and Title X funds. In particular, by eliminating the prohibition on providing Title X services in facilities that provide abortion services, the Proposed Rule assumes that Title X can thrive only if abortion providers assist in the distribution of Title X services. But that is wrong.

Most Title X funds support state agencies and county health departments.[23] Many of these public programs provide no elective abortion services, indeed, many operate pursuant to laws that *prohibit* using federal pass-through dollars to indirectly subsidize elective abortion.[24] Yet they are indisputably able to serve the public nonetheless, providing precisely the services that Title X is designed to fund. For example, in Alabama, the State Department of Public Health is the sole Title X grantee.[25] It uses Title X funds to support 80 health centers across the State, all of which are operated by state and local county health departments.[26] These local health centers provide contraceptive services, pelvic exams, screening for STDs, infertility services, and health education. Alabama's 2019 grant award was over $5,000,000, which it used to provide services to roughly one hundred thousand people.[27] Alabama's health centers do not provide abortions. Nor do they share office space with providers that do. Yet those health centers are still able to provide precisely the services that Title X envisions. There is no reason to doubt that this model can work across the country. So there is every reason to doubt whether a successful Title X program requires allowing abortion providers to offer Title X programs—reality shows that States and other grantees can easily separate the services.

---

[23] *See Title X Family Planning Directory*, OASH Office of Population Affairs (Mar. 2021), https://perma.cc/8C75-K7XJ; *see also HHS Awards Title X Family Planning Service Grants*, OASH Office of Population Affairs (March 29, 2019), https://perma.cc/VY8D-QH4F.
[24] *See, e.g.*, Ariz. Rev. Stat. Ann. §35-196.02; Colo. Rev. Stat. Ann. §25.5-3-106; La. Rev. Stat. §40:1061.6; Iowa Code Ann. §217.41B; Miss. Code. Ann. §41-41-91; Mich. Comp. Laws Ann. §400.109a; Mo. Ann. Stat. §188.205; N.C. Gen. Stat. Ann. §143C-6-5.5; Ohio Rev. Code §5101.56; Tex. Health & Safety Code Ann. §32.005; Wis. Stat. Ann. §20.927.
[25] *See Title X Family Planning Directory*, OASH Office of Population Affairs (Mar. 2021), https://perma.cc/8C75-K7XJ.
[26] *See id.*
[27] *See HHS Awards Title X Family Planning Service Grants*, OASH Office of Population Affairs (Mar. 29, 2019), https://perma.cc/VY8D-QH4F.

The Proposed Rule entirely fails to explain the successful Title X programs coming from these States, and instead resorts to bald assertions that Title X requires a close connection with abortion services to be successful.

**2.** The Proposed Rule also assumes that any gaps created by abortion providers who left the Title X program in response to the 2019 Rule will be permanent. That assumption is baseless. It ignores the fact that, when abortion providers like Planned Parenthood left Title X in 2019, other providers stepped in to fill gaps in coverage. Ohio's experience illustrates the point. In Ohio, before the 2019 Rule went into effect, only two grantees received money through the Title X program: Planned Parenthood and the State of Ohio. (The State then subgranted the funds to other entities, including, for example, county boards of health.) In March 2019, Planned Parenthood of Greater Ohio was awarded $4 million, and the Ohio Department of Health was awarded $4.3 million.[28] Once the new rules went into effect, however, Planned Parenthood left the program because it did not wish to comply with the 2019 Rule.[29] That, however, did not leave a gap in coverage. That is because, as the Department knows, it took the funds that Planned Parenthood affiliates relinquished and granted $33.6 million in supplemental funds to Title X grantees. In Ohio, *all* of the funding that would otherwise have gone to Planned Parenthood went to the Ohio Department of Health instead.[30] And Ohio used the new money to expand its provision of Title X services in areas previously served by Planned Parenthood.

What this shows is that there are plenty of actors, including the States themselves, eager to participate in the program envisioned by Title X. (To the extent there are some gaps that remain to be filled, there is no reason to assume those gaps will remain as States and providers emerge from the pandemic and become accustomed to the 2019 Rule.) The Department need not choose between providing Title X services and indirectly supporting abortion: it can have both, by letting entities that do not wish to subsidize abortion provide the services Congress intended.

    **C.    The Proposed Rule does not adequately justify its abandonment of the 2019 Rule.**

Perhaps not surprisingly given the dearth of data and the States' long experience showing that the 2019 Rule is perfectly consistent with a successful Title X program, the Proposed Rule contains no adequate justification for jettisoning the now-existing regulations. Worse, the justifications it does give all fail.

---

[28] *Id.*
[29] *See California v. Azar,* 950 F.3d 1067, 1099 n.30 (9th Cir. 2020) (*en banc*).
[30] *See HHS Issues Supplemental Grant Awards to Title X Recipients*, OASH Office of Population Affairs (Sept. 30, 2019), https://perma.cc/5XF5-MAER.

> *1.  The Proposed Rule does not adequately identify or explain negative health consequences.*

The Proposed Rule attempts to describe "large negative public health consequences" for maintaining the existing Rule.[31] Such consequences are conjecture, and are not supported by the facts in the Proposed Rule. To the extent that the United States in 2019 experienced a decline in Title X services, the Proposed Rule fails to explain likely causes, and thus fails to address those causes in any policy alternatives.

*a.* As its primary justification, the Proposed Rule explains that fewer Title X services were provided in 2019 than 2018. That is a red herring. That fact speaks only to the size of a federal program, and not to the availability or quality of family-planning services for Americans. The bureaucratic illogic goes like this: the bigger the federal program, the better for Americans. That cannot be the case. If a city has fewer police encounters in a given year, that is likely good thing, indicating less crime. If Medicaid has fewer enrollees, that too may indicate increased health, prosperity, or the fact that the Medicaid-eligible population prefers other options. The relevant question for Title X is not whether the program provided fewer services, but whether Americans' reproductive health is better. The Proposed Rule fails to consider that issue, instead baselessly assuming that bigger is better.

Concerningly, the Proposed Rule assumes that 181,477 unintended pregnancies have resulted from the 2019 Rule, in a single year. The facts do not bear this out. First, the rate of contraception use increased in every State between 2017 and 2019, and many of these methods are long-term or permanent.[32] That increased use would indicate that unintended pregnancies decreased in 2019. Moreover, as the Proposed Rule says, 47 percent of unintended pregnancies result in unplanned births.[33] But the birthrate in 2020 fell to its lowest level in more than 40 years, with the decline occurring across every age and race.[34] The Proposed Rule's justification—that replacing the 2019 Rule is necessary for public health—is built on irrelevant and apparently false information.

In addition, the Proposed Rule speculates that the 2019 Rule threatened public health, but fails to acknowledge, let alone explain, concerning health trends that far pre-date the 2019 Rule. These trends may be continued or accelerated by the resuscitation of the 2000 Rule.[35] For example, in 2018, the Centers for Disease Control

---

[31] 86 Fed. Reg. at 19817.
[32] Ayana Douglas-Hall, Naomi Li, & Megan L. Kavanaugh, *State-Level Estimates of Contraceptive Use in the United States, 2019*, Guttmacher Institute (Dec. 2020), https://perma.cc/NRS7-9T4B.
[33] 86 Fed. Reg. at 19823–24.
[34] Brady E. Hamilton et al., *Births: Provisional Data for 2020*, National Center for Health Statistics (May 2021), https://www.cdc.gov/nchs/data/vsrr/vsrr012-508.pdf.
[35] Standards of Compliance for Abortion-Related Services in Family Planning Services Projects, 65 Fed. Reg. 41269 (July 3, 2000).

7

and Prevention reported that STDs were at a record high.[36] The Proposed Rule does not indicate why it prefers to restore the policy that was in place when America reached this unfortunate peak.

***b.*** The decrease in Title X services is likely explained, in whole or in part, by other causes. The Proposed Rule does not address them.

In simply examining the number of services provided, the Proposed Rule fails to weigh the significance of Planned Parenthood's, and other grantees', exit from the program. They declined Title X funds entirely rather than complying with the 2019 Rule. These decisions may explain most, if not all, of the Title X service reduction. Planned Parenthood served *more* individuals in 2019 than the prior year, further undermining the notion that access to certain services is threatened by the existing rule. For example, the Proposed Rule explains that 90,386 fewer Papanicolaou (Pap) tests were conducted in 2019 than 2018. But Planned Parenthood says that it performed 255,682 Pap tests in fiscal year 2018–2019 and 272,990 tests in fiscal year 2019–2020.[37] These numbers indicate that it is more likely that women continued to get tested, not that fewer Pap tests were performed in the United States—from a health perspective, it does not matter whether women receive tests in or outside of the Title X program. And as discussed above*, even if* there were a dropoff in the use of Title X services after the adoption of the 2019 rule, that alone does not justify assuming the dropoff will remain permanent as new grantees enter the program and as all grantees adjust to the 2019 Rule, all while patients return to something approaching their pre-pandemic lives.

In addition, of the women served through Title X in 2019 using contraception methods, 19 percent used more reliable, either long-acting or permanent, contraceptive methods, reducing the need for annual or more frequent visits.[38] In fact, the number of women using the most effective methods of contraception has increased 50 percent since 2009.[39]

Also, Title X is most commonly used by young, low-income individuals, many of whom are uninsured.[40] In 2019, median household income rose 6.8 percent from 2018.[41] Thus, individuals who previously used Title X services may today use a primary care provider or gynecologist through private insurance. Also, to the extent

---

[36] *National STD Trends: Key Information on Sexually Transmitted Diseases for Public Health Leadership*, Association of State and Territorial Health Officials, https://perma.cc/G58R-WBEW.
[37] *See* Planned Parenthood, Annual Report 2018-2019, https://perma.cc/T7U8-U32G; Planned Parenthood, Annual Report 2019-2020, https://perma.cc/9V7W-AAXJ.
[38] Christina Fowler et al., *Family Planning Annual Report: 2019 National Summary*, OASH Office of Population Affairs, at ES-3 (Sept. 2020), https://perma.cc/Z9HF-EHV4.
[39] *Id*. at 30.
[40] *Id*. at 10, 23–24.
[41] Jessica Semega et al., *Income and Poverty in the United States: 2019*, U.S. Census Bureau (Sept. 15, 2020), https://perma.cc/WE7T-Z387.

8

contraception is continually becoming more common, a young person may today visit her parents' physician or use her parents' insurance, when previously she would have avoided that interaction.

The healthcare market has also recently become more diverse, adding options like One Medical, a membership-based primary care option with more than 500,000 members.[42] Individuals in search of an affordable, non-insurance-based outpatient clinic have new options beyond Title X clinics.

Notably, the number of Title X services has been declining since 2010. The Proposed Rule, following its own logic, must explain why it readopts much of the 2000 Rule as purportedly better than the 2019 Rule, when the 2000 Rule coincided with declining services (and declining health outcomes, too) for a longer period of eight years—without a pandemic.

To be clear, neither the States nor anyone else can say with much confidence *why* the number of services has declined. Nor can the States or anyone else predict with much confidence whether the trend will continue. The 2019 Rule has been in effect for so short a time period, and its effects are complicated by so many variables (including a once-in-a-lifetime pandemic), that everyone needs more time to understand the likely effects of the 2019 Rules. What we do know, however, is that the Department has no basis for assuming that a decrease in the provision of services, which occurred in the midst of a global pandemic and during the transition to a new regulatory scheme, will be permanent, and the Department has no clear evidence of its impact on patient health.

***c.*** Having identified its concerns with the 2019 Rule, the Department asserts that it considered two regulatory alternatives to address them: (1) maintaining the 2019 Rule and adding more grantee oversight; or (2) re-adopting the 2000 Rule and adding even more grantee flexibility. But these alternatives do not actually meet the regulatory goals of the Proposed Rule, exposing that the Department did not actually consider policy alternatives.

The Department purportedly seeks to: (1) mimic the number of services provided during the 2000 Rule, (2) improve public health, and (3) decrease compliance costs for grantees. The Proposed Rule then explains that one alternative would be to "impose additional restrictions on grantees." [43] This is not an alternative means to seek the benefits the Department outlines. If the Department believes that grantee compliance costs are too great, then realistic policy alternatives would include: dedicating funds to assist grantees with those costs, providing additional runway for grantees to comply, giving additional guidance to clarify restrictions, or granting

---

[42] *One Medical Announces Results for Third Quarter 2020* (Nov. 10, 2020), https://perma.cc/4926-ZJGY.
[43] 86 Fed. Reg. at 19827.

targeted exceptions for those Title X programs in need of flexibilities. The Proposed Rule does not indicate that the Department considered these or any other alternatives for meeting, rather than frustrating, its stated goals.

Incidentally, the second alternative—"reducing programmatic oversight"—is entirely unexplained. It is impossible for the public to contemplate benefits of an alternative void of content.

> 2. *Removing the physical and financial separation requirements will result in the misuse of funds.*

The Proposed Rule removes the 2019 Rule's physical and financial separation requirements on the basis that the requirements provide no benefits. But the Department's failure to identify misused grant funds between 1993 and 2019 proves the need for greater, not lesser, oversight. On one hand, the Proposed Rule indicates only that "no diversion" was uncovered "that would justify" increased separation requirements.[44] To the extent the Department *is* aware of funds being diverted during that time, the Proposed Rule fails to explain why such instances do not justify keeping the 2019 Rule. On the other hand, if the Department never uncovered impermissible transfer or commingling of funds between 1993 and 2019, this emphasizes the need for greater separation, recordkeeping, and oversight: it is simply implausible that, during that long period of time, no funds were misused. (To take an analogy, if a State recorded no positive COVID tests in 2020, that would indicate a failure to test correctly, not the absence of disease.)

Moreover, fund diversion or misuse is nowhere defined or explained. At what point does the Department care whether Title X funds and other revenue sources are treated as one pot of funds? May a Title X project and a non-Title X project share rent, even if the services performed under that roof are most commonly abortion services? If a doctor receives half her salary from Title X funds but spends 80 percent of her time performing abortions, is that a permissible or impermissible commingling of funds? The Department must clarify. If the Department believes a grantee can commingle funds without consequence—for example, pay for 99 percent of the salary of an abortion doctor—this scheme violates the statute. If the Department has a line that grantees may or may not cross, the line must not be arbitrary. And if the Department agrees in theory such commingling is impermissible, but in practice fails to enforce the statute, it violates its responsibility to help the President fulfill his constitutional duty to take care that the laws be faithfully executed. In other words, the answer to potential problems with enforcing the statutory mandate is to find *better methods to enforce* that mandate, not to ignore the mandate with a deliberately blind eye.

---

[44] *Id.* at 19816.

10

> 3. *The Proposed Rule risks deterring women from seeking family-planning services.*

Removal of the 2019 Rule's physical separation requirements could also undermine the Department's purported goals of increasing services and improving public health. For a variety of reasons, many individuals might prefer to receive Title X services at a location that does not also perform abortions. Individuals who believe abortion takes an innocent life likely would not wish to enter a mixed-use Title X facility. Even individuals who are themselves in favor of abortion as a policy matter or who have had abortions in the past might experience discomfort when directly exposed to a vacuum that removes parts of a child in the womb while receiving a Pap test or STD examination.[45] Rather than increase the provision of Title X services, the Proposed Rule is likely to deter individuals from seeking those services in the first place.

> 4. *The Congressional Review Act forecloses the Proposed Rule's misguided attempt to limit State laws governing subrecipients.*

Multiple States have laws that restrict state family-planning funding, including federal funding that passes through the State, from being used to pay for abortions.[46] And some States further restrict family-planning funds from organizations that provide abortions, that contract with abortion providers, or that refer patients to get abortions.[47] These laws have permitted these States to operate family-planning services that generate broad public support, and avoid divisive and unproductive fights that may have required some States to eliminate public funding of family-planning services entirely.

In 2016, in the last days of the Obama Administration, the Department published a final rule targeting state laws governing Title X subawards. That rule provided: "No recipient making subawards for the provision of services as part of its Title X project may prohibit an entity from participating for reasons other than its ability to provide Title X services."[48]

But Congress quickly nullified this "Midnight Rule" under the Congressional Review Act.[49] And under the Congressional Review Act, the Department may not reis-

---

[45] *Gonzales v. Carhart*, 550 U.S. 124, 159 (2007).
[46] *See, e.g.*, Ariz. Rev. Stat. Ann. §35-196.02; Colo. Rev. Stat. Ann. §25.5-3-106; La. Rev. Stat. §40:1061.6; Iowa Code Ann. §217.41B; Miss. Code. Ann. §41-41-91; Mich. Comp. Laws Ann. §400.109a; Mo. Ann. Stat. §188.205; N.C. Gen. Stat. Ann. §143C-6-5.5; Ohio Rev. Code §5101.56; Tex. Health & Safety Code Ann. §32.005; Wis. Stat. Ann. §20.927.
[47] *See* Ark. Code Ann. §20-16-1602; La. Rev. Stat. §49:200.51; Ind. Code Ann. §5-22-17-5.5; Wis. Stat. Ann. §253.07(5).
[48] 81 Fed. Reg. 91852 (Dec. 19, 2016).
[49] Pub. L. No. 115-23, 131 Stat. 89 (Apr. 13, 2017).

11

sue the rule in "substantially the same form."[50] The Proposed Rule's invitation for comment regarding "some state policies restricting eligible subrecipients" targets exactly the same state laws as the 2016 Midnight Rule.[51] Thus, any final rule accomplishing what the Proposed Rule suggests may not be issued.

Not only would re-issuing the 2016 Midnight Rule violate the Congressional Review Act, it would also impermissibly intrude on the States' self-governance for no good reason. As explained above, the States have successfully implemented family-planning projects because they are able to maintain a degree of separation from publicly funded abortions, an issue that would garner enormous public outcry and threaten those States' existing programs.

> 5. *The 2019 Rule creates no ethical problems that need to be addressed, but the Proposed Rule will create ethical problems.*

The Proposed Rule suggests that it is important to permit abortion referrals and abortion counseling because such referrals and counseling are required by "ethical codes of major medical organizations."[52] But it is of no moment whether most or all medical organizations regard the 2019 Rules as contrary to medical ethics. Indeed, medical organizations represent doctors—the parties *regulated by* rules of medical ethics. While regulated entities are no doubt entitled to their opinions on the rules to which their conduct ought to be subject, the regulators are free to reject those opinions. And to the extent the medical profession as a whole thinks it is unethical to refuse to make an abortion referral, that view is *contrary to* the rules of medical ethics reflected in numerous state and federal laws, which say that doctors *may* refuse to make abortion referrals or otherwise participate in the provision of abortions.[53] The States regulate the ethics of the medical profession; the profession does not simply regulate itself.

Moreover, it is doubtful whether the medical organizations who shared their concerns truly do reflect the views of the medical profession as a whole. Surely they do not represent the views of the American Association of Pro-Life Obstetricians & Gynecologists, or the Christian Medical and Dental Associations.[54] And one of the medical organizations that has expressed concerns with the ban on referrals—the American Association of Obstetricians and Gynecologists—has filed briefs defending

---

[50] 5 U.S.C. §801(b)(2).
[51] 86 Fed. Reg. at 19817.
[52] *Id.*
[53] *See, e.g.*, Ariz. Rev. Stat. §36-2154(A); Conn. Agencies Regs. §19-13-D54(f); Fla. Stat. §390.0111(8); Id. Code §18-612; Ky. Rev. Stat. §311.800(4); La. Rev. Stat. §40:1061.2; Mont. Code Ann. §50-20-111(2); N.Y. Civ. Rights Law §79-i; Ohio Rev. Code §4731.91; Or. Rev. Stat. §435.485; 18 Pa. Cons. Stat. §3213(d); Wis. Stat. §253.09(1).
[54] *See* Br. of Amici Curiae Am. Ass'n of Pro-Life OBGYNs, et al., in Support of Petitioners *Azar v. Mayor and City Council of Balt.*, No. 20-454 (U.S., Nov. 9, 2020).

the legality of eugenic abortions.[55] Those willing to stand up for eugenics ought not be taken seriously in any discussion of ethics.

As all this shows, any change to the rules that will require counseling or referrals on abortion will *contradict* medical ethics: as state laws from around the country show, it is unethical to mandate that doctors violate their consciences by endorsing or otherwise participating in abortions.

### III. CONSIDERATION OF TECHNICAL CONCERNS.

Several of the definitions in the Proposed Rule are unclear and put grantees in jeopardy of violating federal law.

***Clarify "health equity."*** The Proposed Rule requires applicants to advance health equity. The Proposed Rule does not explain how this requirement differs from existing considerations and requirements in Title X grantmaking. All applicants must already indicate the number of patients served and the extent to which family-planning services are needed locally, and grant priority is given to projects that serve low-income families. In addition, health programs that receive funding from the Department may not discriminate on the basis of race, color, national origin, sex, age, or disability.[56] Thus existing law requires nondiscriminatory treatment, aimed to those patients most in need. To the extent promoting health equity merely reiterates these requirements, such clarification is useful. To the extent promoting health equity differs, and either requires discrimination on the basis of race or should not be aimed at certain patients, such clarification would be necessary though likely contrary to law.

***Remove "culturally and linguistically appropriate services."*** Ohio and the signing States fully support the principle that Title X services should be available to individuals regardless of their culture or language. At the same time, States owe a duty to our citizens to put science and health before any interest in the signaling of virtue. As the Department's existing standards for "culturally and linguistically appropriate services" indicate, the many elements of culture include the "use of traditional healer techniques," "how an individual finds and defines meaning in his life," and "political beliefs."[57] Requiring unique health approaches that differ based on the individual belief system of every American is not only impossible, in many cases, it can also be unwise. For example, obesity, smoking, and drug use are

---

[55] See Brief for Am. Coll. of OBGYNs, et al., as Amici Curiae in Support of Appellees, *Preterm-Cleveland v. McCloud*, 994 F.3d 512 (6th Cir. 2021) (No. 18-3329).
[56] 42 U.S.C. §18116.
[57] *National Standards for Culturally & Linguistically Appropriate Services in Health & Health Care*, U.S. Dep't of Health & Human Servs. Office of Minority Health at 139–40 (April 2013), https://perma.cc/F8YE-PJVV.

13

health and reproductive risks, no matter the culture or language of the patient seeking services.

To the extent certain populations require targeted approaches to improve health outcomes, that approach is best managed and executed at the state and local level. As it exists in the Proposed Rule, the phrase "culturally and linguistically appropriate services" may bless health practices, based on cultural norms, that lead to negative health outcomes. Ohio therefore recommends removing the phrase as a requirement in Title X grants. The States, as always, will remain passionate about providing the care that their citizens need and deserve.

***Amend "quality healthcare."*** Improving the quality of healthcare in America must be a dynamic process, constantly employing new techniques, identifying threats, preserving privacy, expanding comfort, and decreasing waste and inefficiency. This dynamism requires a nimbleness often unattainable by national requirements, which are slow to adopt useful techniques or recognize local problems. Thus "quality healthcare" should be amended as follows: "Quality healthcare is safe, effective, client-centered, timely, efficient, and equitable, with maximum flexibility at the state and local level to establish standards of care."

\* \* \*

In a country of more than 300 million people, no one gets his or her way all the time. Everyone has to compromise a bit. Title X reflects a compromise. It funds services that large numbers of Americans support while withholding that funding from services that large numbers oppose. The Proposed Rule tramples that compromise, by intertwining family-planning services with the divisive issue of publicly funded abortions. The Proposed Rule is not based on the public health, but grantee preference to have freer rein of taxpayer dollars.

        Sincerely,

        *Dave Yost*

        DAVE YOST
        Attorney General
        State of Ohio

STEVE MARSHALL
Attorney General
State of Alabama

TREG TAYLOR
Attorney General
State of Alaska

MARK BRNOVICH
Attorney General
State of Arizona

LESLIE RUTLEDGE
Attorney General
State of Arkansas

ASHLEY MOODY
Attorney General
State of Florida

CHRISTOPHER M. CARR
Attorney General
State of Georgia

JEFF LANDRY
Attorney General
State of Louisiana

LYNN FITCH
Attorney General
State of Mississippi

ERIC SCHMITT
Attorney General
State of Missouri

AUSTIN KNUDSEN
Attorney General
State of Montana

DOUGLAS J. PETERSON
Attorney General
State of Nebraska

MIKE HUNTER
Attorney General
State of Oklahoma

15

LAWRENCE WASDEN
Attorney General
State of Idaho

TODD ROKITA
Attorney General
State of Indiana

DEREK SCHMIDT
Attorney General
State of Kansas

DANIEL CAMERON
Attorney General
State of Kentucky

ALAN WILSON
Attorney General
State of South Carolina

HERBERT H. SLATERY III
Attorney General and Reporter
State of Tennessee

KEN PAXTON
Attorney General
State of Texas

PATRICK MORRISEY
Attorney General
State of West Virginia

16