UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO

STATE OF OHIO et al.,

              *Plaintiffs*,

                   v.

XAVIER BECERRA, in his official capacity as Secretary of Health and Human Services, et al.,

              *Defendants*.

No. 1:21-cv-00675

---

**BRIEF FOR THE STATES OF CALIFORNIA, NEW YORK, COLORADO, CONNECTICUT, DELAWARE, HAWAI'I, ILLINOIS, MAINE, MARYLAND, MASSACHUSETTS, MICHIGAN, MINNESOTA, NEVADA, NEW JERSEY, NEW MEXICO, NORTH CAROLINA, OREGON, PENNSYLVANIA, RHODE ISLAND, VERMONT, VIRGINIA, WASHINGTON, AND WISCONSIN, AND THE DISTRICT OF COLUMBIA AS AMICI CURIAE IN SUPPORT OF DEFENDANTS AND IN OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

ROB BONTA
  *Attorney General*
  *State of California*
1300 I St.
Sacramento, CA 95814
(916) 210-6276

LETITIA JAMES
  *Attorney General*
  *State of New York*
28 Liberty Street
New York, NY 10005
(212) 416-8020

*(Counsel listing continues on signature pages.)*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................................ ii

INTERESTS OF AMICI............................................................................................1

ARGUMENT ........................................................................................................3

POINT I

AMICI STATES' EXPERIENCE UNDER THE 2019 RULE CONFIRMS THAT AN INJUNCTION
WILL HARM TITLE X PATIENTS, PROVIDERS, AND THE PUBLIC HEALTH ..................................4

    A.    The 2019 Rule Caused a Staggering Loss of Title X Providers and a
        Corresponding Reduction in Delivery of Care to Title X Patients. .........................5

    B.    The 2019 Rule Severely Harmed Underserved and Low-Income
        Communities, with Serious Consequences for Public Health...................................8

    C.    Amici States Have Experienced Specific Harms to Their Budgets and Their
        Capacity to Promote the Public Health. ..................................................12

POINT II

AMICI STATES' EXPERIENCE CONFIRMS THAT THE NEW RULE WILL IMPROVE PATIENT
OUTCOMES AND PUBLIC HEALTH CONDITIONS.......................................................14

    A.    Elimination of the 2019 Restrictions Will Result in an Expanded Title X
        Network, Better Health Outcomes, and Increased Economic Stability. ..................15

    B.    Other Provisions of the 2021 Rule That Increase Access and Promote
        Health Equity Support Immediate Positive Outcomes for Underserved
        Populations. ...............................................................................18

CONCLUSION.....................................................................................................20

# TABLE OF AUTHORITIES

**Cases**                                                                      **Page(s)**

*California ex rel. Becerra v. Azar*,
   950 F.3d 1067 (9th Cir. 2020) ....................................................................2

*Mayor & City Council of Baltimore v. Azar*,
   973 F.3d 258 (4th Cir. 2020) ......................................................................2

*Winter v. Natural Res. Def. Council, Inc.*,
   555 U.S. 7 (2008)........................................................................................3

**Administrative Sources**

42 C.F.R.
   § 59.2.........................................................................................................18
   § 59.5.........................................................................................................18

Compliance with Statutory Program Integrity Requirements,
   84 Fed. Reg. 7,714 (Mar. 4, 2019).........................................................2, 4

Ensuring Access to Equitable, Affordable, Client-Centered, Quality Family
   Planning Services, 86 Fed. Reg. 19,812 (Apr. 15, 2021) ....................1, 11

Ensuring Access to Equitable, Affordable, Client-Centered, Quality Family
   Planning Services, 86 Fed. Reg. 56,144 (Oct. 7, 2021).................... passim

N.Y. Exec. Order No. 11 (Nov. 26, 2021),
   https://www.governor.ny.gov/executive-order/no-11-declaring-disaster-
   emergency-state-new-york........................................................................14

**Miscellaneous Authorities**

Alan Yuhas, *Don't Expect a Quarantine Baby Boom*, N.Y. Times (Apr. 8, 2020),
   https://www.nytimes.com/2020/04/08/us/coronavirus-baby-boom.html .................................8

Amanda Stevenson et al., *The Impact of Contraceptive Access on High School
   Graduation*, Sci. Advances, May 5, 2021,
   https://www.science.org/doi/10.1126/sciadv.abf6732............................17

American Coll. of Obstetricians and Gynecologists, Comm. on Health Care for
   Underserved Women, Committee Op. No. 586 (2014), https://www.acog.org/-
   /media/project/acog/acogorg/clinical/files/committee-
   opinion/articles/2014/02/health-disparities-in-rural-women.pdf ............10

American Med. Ass'n, Code of Medical Ethics Op. E-2.1.1 (2017),
   https://www.ama-assn.org/delivering-care/ethics/informed-consent .......................4

**Miscellaneous Authorities**                                    **Page(s)**

American Med. Ass'n, Code of Medical Ethics Op. E-2.1.3 (2017),
  https://www.ama-assn.org/delivering-care/ethics/withholding-information-patients .........4, 17

Brittni Frederiksen et al., *Data Note: Impact of New Title X Regulations on
  Network Participation*, Kaiser Fam. Found. (Sept. 20, 2019),
  https://www.kff.org/womens-health-policy/issue-brief/data-note-impact-of-
  new-title-x-regulations-on-network-participation/ ............................................................5, 12

Brittni Frederiksen et al., *Data Note: Is the Supplemental Title X Funding
  Awarded by HHS Filling in the Gaps in the Program?*, Kaiser Fam. Found.
  (Oct. 18, 2019), https://www.kff.org/womens-health-policy/issue-brief/data-
  note-is-the-supplemental-title-x-funding-awarded-by-hhs-filling-in-the-gaps-
  in-the-program/ ..........................................................................................................................5, 9

Brittni Frederiksen et al., *Key Elements of the Biden Administration's Proposed
  Title X Regulation*, Kaiser Family Found. (May 5, 2021),
  https://www.kff.org/womens-health-policy/issue-brief/key-elements-of-the-
  biden-administrations-proposed-title-x-regulation/ ...................................................................6

Brittni Frederiksen et al., *Rebuilding Title X: New Regulations for the Federal
  Family Planning Program*, Kaiser Fam. Found. (Nov. 3, 2021),
  https://www.kff.org/womens-health-policy/issue-brief/rebuilding-title-x-new-
  regulations-for-the-federal-family-planning-program/ ........................................................4, 6

California Dep't of Health Care Servs., Post-COVID-19 Public Health
  Emergency Telehealth Policy Recommendations (June 10, 2021),
  https://www.dhcs.ca.gov/Documents/COVID-19/DHCS-Telehealth-Policy-
  Proposal-6-10-21.pdf ...............................................................................................................20

Christina Fowler et al., *Title X Family Planning Annual Report: 2018 National
  Summary* (Off. of Population Affs. 2019),
  https://opa.hhs.gov/sites/default/files/2020-07/title-x-fpar-2018-national-
  summary.pdf ...................................................................................................................5, 7, 12

Christina Fowler et al., *Title X Family Planning Annual Report: 2019 National
  Summary* (Off. of Population Affs. 2020),
  https://opa.hhs.gov/sites/default/files/2020-09/title-x-fpar-2019-national-
  summary.pdf ................................................................................................................9, 11, 12

Christina Fowler et al., *Title X Family Planning Annual Report: 2020 National
  Summary* (Off. of Population Affs. 2021),
  https://opa.hhs.gov/sites/default/files/2021-09/title-x-fpar-2020-national-
  summary-sep-2021.pdf .................................................................................................. passim

**Miscellaneous Authorities**                                          **Page(s)**

Comment Letter from Att'ys Gen. (May 17, 2021),
    https://ag.ny.gov/sites/default/files/letter_from_23_state_attorneys_general_in
    _support_of_proposed_title_x_rule_may_17_2021.pdf.................................................. passim

Comment Letter from George M. Abraham, President, Am. Coll. of Physicians
    (May 17, 2021), https://www.regulations.gov/comment/HHS-OS-2021-0010-56001 .....10, 12

Comment Letter from Natalie Tobier, Senior Director of Sexual & Reprod.
    Health, Public Health Solutions (May 13, 2021),
    https://www.regulations.gov/comment/HHS-OS-2021-0010-52350 .....................................11

Heike Thiel de Bocanegra et al., *Enhancing Service Delivery Through Title X Funding:*
    *Findings from California*, 44 Persps. on Sexual and Reprod. Health 262 (2012),
    https://www.guttmacher.org/sites/default/files/article_files/4426212.pdf...............................9

Institute of Med., *A Review of the HHS Family Planning Program: Mission, Management,*
    *and Measurement of Results* (Adrienne Stith Butler & Ellen Wright Clayton, eds. 2009),
    https://www.ncbi.nlm.nih.gov/books/NBK215217/pdf/Bookshelf_NBK215217.pdf..............8

Jennifer J. Frost et al., *Variation in Service Delivery Practices Among Clinics Providing*
    *Publicly Funded Family Planning Services in 2010* (Guttmacher Inst. 2012),
    https://www.guttmacher.org/sites/default/files/report_pdf/clinic-survey-2010.pdf .................9

Kathryn Kost & Laura Lindberg, *Pregnancy Intentions, Maternal Behaviors, and*
    *Infant Health: Investigating Relationships with New Measures and Propensity*
    *Score Analysis*, 52 Demography 83 (2015),
    https://link.springer.com/content/pdf/10.1007/s13524-014-0359-9.pdf................................12

Kristine Hopkins et al., *Women's Experiences Seeking Publicly Funded Family Planning*
    *Services in Texas*, 47 Persps. on Sexual & Reprod. Health 63 (2015),
    https://www.guttmacher.org/journals/psrh/2015/02/womens-experiences-seeking-
    publicly-funded-family-planning-services-texas ....................................................................11

Laura Lindberg et al., *Early Impacts of the COVID-19 Pandemic: Findings from the 2020*
    *Guttmacher Survey of Reproductive Health Experiences* (Guttmacher Inst. 2020),
    https://www.guttmacher.org/sites/default/files/report_pdf/early-impacts-covid-19-
    pandemic-findings-2020-guttmacher-survey-reproductive-health.pdf...................................8

M. Antonia Biggs et al., *Findings from the 2012 Family PACT Client Exit*
    *Interviews* (Bixby Ctr. for Global Reprod. Health 2014),
    https://bixbycenter.ucsf.edu/sites/bixbycenter.ucsf.edu/files/3.%20CEI%20Re
    port_ADA.pdf ......................................................................................................................11

M. Kate Bundorf et al., *Trends in US Health Insurance Coverage During the*
    *COVID-19 Pandemic*, JAMA Health Forum, Sept. 3, 2021,
    https://jamanetwork.com/journals/jama-health-forum/fullarticle/2783874..............................8

**Miscellaneous Authorities** **Page(s)**

Martha J. Bailey & Jason M. Lindo, Nat'l Bureau of Econ. Research Working
Paper No. 23465, *Access and Use of Contraception and Its Effects on
Women's Outcomes in the U.S.* (2017), https://www.nber.org/papers/w23465 ......................17

Megan L. Kavanaugh et al., *Use of Health Insurance Among Clients Seeking
Contraceptive Services at Title X–Funded Facilities in 2016*, 50 Persps. on
Sexual & Reprod. Health 101 (2018),
https://onlinelibrary.wiley.com/doi/epdf/10.1363/psrh.12061 ..........................................16, 17

Press Release, Ctrs. for Disease Control & Prevention, *Reported STDs Reach All-
Time High for 6th Consecutive Year* (Apr. 13, 2021),
https://www.cdc.gov/media/releases/2021/p0413-stds.html ....................................................12

Taylor Riley et al., *Estimates of the Potential Impact of the COVID-19 Pandemic
on Sexual and Reproductive Health in Low- and Middle-Income Countries*, 46
Int'l Persps. on Sexual and Reprod. Health 72 (2020),
https://www.guttmacher.org/sites/default/files/article_files/4607320.pdf...............................8

U.S. Dep't of Health & Hum. Servs., Office of the Assistant Sec'y for Health, No.
PA-FPH-22-003 (Synopsis 9), Funding to Address Dire Need for Family
Planning Services (Nov. 17, 2021), https://www.grants.gov/web/grants/view-
opportunity.html?oppId=335742 ...............................................................................................16

## INTERESTS OF AMICI

Amici—the States of California, New York, Colorado, Connecticut, Delaware, Hawai'i, Illinois, Maine, Maryland, Massachusetts, Michigan, Minnesota, Nevada, New Jersey, New Mexico, North Carolina, Oregon, Pennsylvania, Rhode Island, Vermont, Virginia, Washington, and Wisconsin, and the District of Columbia—support the federal government's opposition to plaintiffs' request for a preliminary injunction that would halt the implementation of a rule issued in 2021 by the Department of Health and Human Services (HHS): Ensuring Access to Equitable, Affordable, Client-Centered, Quality Family Planning Services, 86 Fed. Reg. 56,144 (Oct. 7, 2021) (to be codified at 42 C.F.R. pt. 59) ("2021 Rule"). Amici have a strong interest in ensuring that their residents, including those in low-income and underserved communities, have safe access to quality healthcare. And amici's experience confirms that the overwhelming benefits of the 2021 Rule for providers, patients, and the public health will far outweigh any harms alleged by plaintiffs in their motion for a preliminary injunction.

The Title X program has been the linchpin of publicly funded family planning in the United States "[f]or nearly 50 years without interruption." Ensuring Access to Equitable, Affordable, Client-Centered, Quality Family Planning Services, 86 Fed. Reg. 19,812, 19,817 (Apr. 15, 2021) (proposed rule). During that time, "Title X family planning clinics have played a critical role in ensuring access to a broad range of family planning and related preventive health services for millions of low-income or uninsured individuals and others." *Id.* The Title X program funds not only family planning and reproductive health services, but also screenings for high blood pressure, anemia, diabetes, sexually transmitted diseases, and cervical and breast cancer.

Plaintiffs' requested injunction would force the Title X program to revert to its status under a rule issued in 2019 that imposed onerous medical restrictions and costly program requirements

1

on providers. *See* Compliance with Statutory Program Integrity Requirements, 84 Fed. Reg. 7,714 (Mar. 4, 2019) ("2019 Rule"). Among other restrictions, the 2019 Rule barred Title X providers from communicating certain abortion-related information to their patients and required physical separation of facilities providing Title X–funded care from facilities providing abortion healthcare services or even certain abortion-related information. *See id.* at 7,715. By preventing grantees from providing factual, neutral information to patients about their full range of treatment options, these restrictions in the 2019 Rule barred providers from communicating freely with their patients and stymied providers' ability to treat patients effectively. Accordingly, staggering numbers of providers in amici States exited the Title X program. The loss of federal funding compelled many providers to curtail services, charge higher fees, or close down altogether, which in turn caused patients to lose access to a wide range of critical healthcare. Many amici States therefore sued to stop the 2019 Rule and submitted substantial evidence supporting rescission of these requirements in a comment letter in support of the 2021 Rule.[1]

Amici States have a strong interest in the continued implementation of the 2021 Rule, which both rescinds the abortion-related restrictions of the 2019 Rule and includes new provisions to promote health equity. The 2021 Rule will reverse the most devastating effects of the 2019 Rule by allowing prior providers to rejoin the Title X network, with some opportunities to do so immediately. The removal of the 2019 Rule's harmful restrictions on clinician-patient communication furthers amici's interest in safeguarding clinicians' ability to advise and treat patients effectively. And the improvements the 2021 Rule puts into place will increase patients' access to the

---

[1] *See California ex rel. Becerra v. Azar*, 950 F.3d 1067, 1074 (9th Cir. 2020) (en banc); *Mayor & City Council of Baltimore v. Azar*, 973 F.3d 258, 266 (4th Cir. 2020) (en banc); Comment Letter from Att'ys Gen. (May 17, 2021) (internet). (For authorities available on the internet, full URLs are listed in the Table of Authorities. All URLs were last visited on November 29, 2021.)

broad range of vital Title X services. Taken together, these changes will restore and also expand access to a wide array of critical healthcare services for amici's residents and improve patient health outcomes. Underserved and low-income communities will particularly benefit, bolstering amici's efforts to promote health equity and economic stability.

## ARGUMENT

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). To obtain a preliminary injunction, the plaintiffs must make a clear showing that they are "likely to succeed on the merits," that they are "likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [their] favor, and that an injunction is in the public interest." *Id.* at 20. The Court "should pay particular regard for the public consequences" in exercising its discretion regarding "the extraordinary remedy of injunction." *Id.* at 24 (quotation marks omitted).

Here, amici States' experience confirms that the public interest and the balance of the equities weigh heavily against plaintiffs' requested injunction because halting implementation of the 2021 Rule would severely harm patients, providers, and the public health. The 2021 Rule permits reentry of the many Title X providers across the country forced to leave the program because of the 2019 Rule, restoring access to a broad range of quality health care for low-income patients and underserved communities. The Rule also provides additional means of delivering services and institutes measures to promote health equity. A preliminary injunction would obstruct the delivery of a broad range of critical health care nationwide, force low-income patients to forgo such care, and strain amici States' ability to protect the public health.

## POINT I

### AMICI STATES' EXPERIENCE UNDER THE 2019 RULE CONFIRMS THAT AN INJUNCTION WILL HARM TITLE X PATIENTS, PROVIDERS, AND THE PUBLIC HEALTH

The 2019 Rule caused significant harm to Title X patients, providers, and the public health nationwide. Plaintiffs' proposed injunction halting implementation of the 2021 Rule would reinstate and exacerbate these harms.

The 2019 Rule resulted in unprecedented provider withdrawals by disqualifying family planning clinics with co-located abortion services and by disallowing the provision of abortion referrals to patients who wanted them, contrary to well-established medical standards of care.[2] For example, pregnant patients seeking medical advice could not obtain a referral for abortion services even if the patients specifically requested it. And patients seeking counseling on abortion were forced to receive counseling about carrying their pregnancy to term regardless of their wishes. 84 Fed. Reg. at 7,747. These practices run counter to professional medical standards, which instruct clinicians to "[p]resent relevant information accurately and sensitively, in keeping with the patient's preferences,"[3] and not to "withhold[] information without the patient's knowledge or consent," which "is ethically unacceptable."[4] The requirement for strict physical separation between facilities providing Title X services and facilities providing certain abortion-related services also upended providers' reliance, when structuring their operations, on HHS's longstanding view that Title X requires only financial, but not physical, separation.

---

[2] Brittni Frederiksen et al., *Rebuilding Title X: New Regulations for the Federal Family Planning Program*, Kaiser Fam. Found. (Nov. 3, 2021) (internet).

[3] American Med. Ass'n, Code of Medical Ethics Op. E-2.1.1 (2017) (internet).

[4] American Med. Ass'n, Code of Medical Ethics Op. E-2.1.3 (2017) (emphasis omitted) (internet).

4

These onerous requirements of the 2019 Rule forced providers to leave the Title X program. As amici States' experience demonstrates, without Title X funding, many providers curtailed services or even closed down entirely, and new providers did not materialize to fill the deficit, causing patients to lose access to a broad range of critical and quality health care services.[5] *See* 86 Fed. Reg. at 56,174. And because many amici States reallocated funds to mitigate the loss of Title X funds, the 2019 Rule has also significantly strained state resources.

## A. The 2019 Rule Caused a Staggering Loss of Title X Providers and a Corresponding Reduction in Delivery of Care to Title X Patients.

Before the 2019 Rule, HHS funded 90 grantees that supported approximately 4,000 clinics nationwide through the Title X program. Clinic recipients included specialized family planning clinics such as Planned Parenthood centers; federally qualified health centers; government health departments; and school-based, faith-based, and other private nonprofit health programs.[6]

The 2019 Rule decimated the Title X program. Grantees, subrecipients, and other providers left en masse because the 2019 Rule barred clinicians from providing relevant medical information to their patients and imposed severe financial burdens through the strict physical separation require-ment. Between 2018 and 2020, the number of grantees dropped by nearly a quarter, from 99 to 75 (a loss of 24 out of 99 grantees). Subrecipients and service sites likewise dropped by nearly a quarter: the Title X program lost 261 out of 1,128 subrecipients, and 923 out of 3,954 service sites.[7] The

---

[5] Comment Letter from Att'ys Gen., *supra*, at 3.

[6] Brittni Frederiksen et al., *Data Note: Impact of New Title X Regulations on Network Participation*, Kaiser Fam. Found. (Sept. 20, 2019) (internet); *see* Christina Fowler et al., *Title X Family Planning Annual Report: 2018 National Summary* 1 (Off. of Population Affs. 2019) (internet); Brittni Frederiksen et al., *Data Note: Is the Supplemental Title X Funding Awarded by HHS Filling in the Gaps in the Program?*, Kaiser Fam. Found. (Oct. 18, 2019) (internet).

[7] *Compare* Christina Fowler et al., *Title X Family Planning Annual Report: 2020 National Summary* 9 (Off. of Population Affs. 2021) (internet), *with* Fowler et al., *2018 National Summary*, *supra*, at 7.

grantees that withdrew from the Title X program included 11 state departments of health and independent family planning associations and 8 Planned Parenthood organizations. 86 Fed. Reg. at 56,146.

Because of the 2019 Rule, there are currently 6 States without *any* Title X–funded services: Hawai'i, Maine, Oregon, Utah, Vermont, and Washington.[8] And in 8 other States—Alaska, Connecticut, Illinois, Massachusetts, Maryland, Minnesota, New York, and New Hampshire— grantees representing more than half of the Title X clinics in each of those States left the Title X program.[9]

These withdrawals had a dramatic impact on the number of patients nationwide and in amici States who received Title X services. From 2018 to 2020, the number of Title X patients fell by more than 60%, from 3.9 million to 1.5 million people.[10] In California, the State's primary Title X grantee saw an 81% decrease in patients from 2018 to 2020.[11] Wisconsin saw an 83% decrease

---

[8] Brittni Frederiksen et al., *Key Elements of the Biden Administration's Proposed Title X Regulation*, Kaiser Family Found. (May 5, 2021) (internet); Fowler et al., *2020 National Summary*, *supra*, at 2. The number of family planning patients served in States that lost all Title X funding is staggering. For example, the number of patients in Hawai'i served by the State Department of Health, the State's sole Title X grantee before it left the program in 2019, dropped more than 50% between 2019 and 2020, and dropped more than 75% between 2020 and 2021.

[9] Frederiksen et al., *Key Elements of the Biden Administration's Proposed Title X Regulation*, *supra*.

[10] Frederiksen et al., *Rebuilding Title X*, *supra*; *see also* Fowler et al., *2020 National Summary*, *supra*, at 2.

[11] 2020 program data from California's primary Title X grantee shows the devastating results of the 2019 Rule. In 2018, California's Title X program saw 974,331 patients. In 2019, California's Title X program saw 611,642 Title X patients—a 37% drop. In 2020, California's Title X program saw only 186,288 patients—an 81% drop from 2018. Of these Title X patients, a comparison of 2018 to 2020 shows that California's Title X program saw 568,202 fewer patients under 100% of the federal poverty level (FPL); 106,973 fewer patients between 151–200% of the FPL; and 31,541 fewer patients between 201–250% of the FPL. *See* Comment Letter from Att'ys Gen., *supra*, at 6 & n.22.

in the number of Title X patients served between 2018 and 2020, Michigan saw a 77% decrease, Colorado saw a 26% decrease, and the District of Columbia saw a 16% decrease.[12] In Pennsylvania, at least 3 counties were left without any Title X providers and some participating grantees experienced significant reductions in total patients served.[13]

This decimation in Title X patients served was not limited to amici States. The number of Title X patients fell in 41 States and two territories. 86 Fed. Reg. at 56,146. Even many plaintiff States experienced a huge drop in Title X patients served. For example, Ohio saw 65% fewer Title X patients from 2018 to 2020. Arizona experienced a 56% decrease, South Carolina experienced a 51% decrease, and Kentucky experienced a 40% decrease.[14]

Contrary to plaintiffs' assertions, this staggering drop in Title X patients resulted primarily from the 2019 Rule, not the COVID-19 pandemic. According to a report by the Office of Population Affairs (OPA), 94% of the decrease in Title X patients from 2018 to 2019—before the pandemic spread across the country—is attributable to the 2019 Rule. And of the total decrease in Title X patients from 2018 to 2020, the OPA report estimates that only *one-third* is attributable to the pandemic; the remainder resulted from the 2019 Rule.[15] *See* 86 Fed. Reg. at 56,146, 56,512.

---

[12] *Compare* Fowler et al., *2020 National Summary*, *supra*, app. B at B-4 to -5, *with* Fowler et al., *2018 National Summary*, *supra*, app. B at B-4 to -5. For example, Michigan's Title X program served 62,707 patients in 2018, when Planned Parenthood was a Title X provider. *See* Fowler et al., *2018 National Summary*, *supra*, app. B at B-4. In 2020, when Planned Parenthood was not a Title X provider, Michigan's Title X program served only 14,680 patients. *See* Fowler et al., *2020 National Summary*, *supra*, app. B at B-4.

[13] Comment Letter from Att'ys Gen., *supra*, at 7.

[14] *Compare* Fowler et al., *2020 National Summary*, *supra*, app. B at B-4 to -5, *with* Fowler et al., *2018 National Summary*, *supra*, app. B at B-4 to -5.

[15] Fowler et al., *2020 National Summary*, *supra*, app. D at D-4 to -5.

Due to the COVID-19 pandemic, more people than ever need Title X's low-cost services. Many of amici's residents lost income and insurance coverage during the pandemic.[16] Others have sought to postpone pregnancy for reasons including health concerns and financial instability due to unemployment.[17] And many people have felt increased worry about their ability to pay for contraception.[18] Yet the 2019 Rule resulted in fewer clinics in amici States and nationwide at a time when Title X clinics and funding were most needed to meet amici's residents' healthcare needs.

**B.     The 2019 Rule Severely Harmed Underserved and Low-Income Communities, with Serious Consequences for Public Health.**

Before the 2019 Rule, a robust group of Title X providers and clinics delivered vital and unique services to millions of patients throughout the nation—particularly those from underserved communities. By forcing so many providers to leave the program and reduce services or even close their doors, the 2019 Rule restricted access to Title X–funded health care for the people who most relied upon it, with negative consequences for family planning and public health. The implementation of the 2021 Rule will restore their access to critical healthcare services.

One of the priorities of the Title X program is to provide clinical services to underserved and hard-to-reach populations.[19] As a result, longstanding Title X providers have developed skills

---

[16] *See* M. Kate Bundorf et al., *Trends in US Health Insurance Coverage During the COVID-19 Pandemic*, JAMA Health Forum, Sept. 3, 2021, at 1, 1-2 (internet); *see also* Taylor Riley et al., *Estimates of the Potential Impact of the COVID-19 Pandemic on Sexual and Reproductive Health in Low- and Middle-Income Countries*, 46 Int'l Persps. on Sexual and Reprod. Health 72 (2020) (internet).

[17] Alan Yuhas, *Don't Expect a Quarantine Baby Boom*, N.Y. Times (Apr. 8, 2020) (internet).

[18] Laura Lindberg et al., *Early Impacts of the COVID-19 Pandemic: Findings from the 2020 Guttmacher Survey of Reproductive Health Experiences* 5 (Guttmacher Inst. 2020) (internet).

[19] *See* Institute of Med., *A Review of the HHS Family Planning Program: Mission, Management, and Measurement of Results* 77, 81 (Adrienne Stith Butler & Ellen Wright Clayton, eds. 2009) (internet).

and experience in meeting the needs of these groups. Title X clinics are more likely than other contraceptive clinics to have multilingual staff with training in providing services to adolescents, individuals with disabilities, patients with limited English proficiency, immigrants, refugees, and LGBTQ patients, and are more likely to conduct specific outreach to these groups.[20] Research shows that providers at Title X clinics spend more time on patients' initial visits for contraceptive care than providers at non–Title X clinics, particularly with patients who are younger, have limited English proficiency, or have other specific medical or personal needs.[21] In amici States, losing these Title X providers made it harder to ensure underserved patients would receive quality and culturally competent care.

Minority and rural communities were also severely affected by the 2019 Rule. Of the patients receiving Title X services in 2019 as compared to 2018, there were 128,882 fewer Black or African Americans; 50,039 fewer Asians; 8,724 fewer American Indians or Alaska Natives; 7,218 fewer Native Hawaiians or Pacific Islanders; and 269,569 fewer Hispanics or Latinos.[22] OPA estimates that in 2020 as compared to 2019, Title X providers saw 37% fewer patients with limited English proficiency.[23] Rural areas also lost Title X care: for example, Connecticut lost nearly all of its Title X providers, leaving the State with service sites only in the urban New Haven area.[24] And in

---

[20] Heike Thiel de Bocanegra et al., *Enhancing Service Delivery Through Title X Funding: Findings from California*, 44 Persps. on Sexual and Reprod. Health 262 (2012) (internet); *see also* Jennifer J. Frost et al., *Variation in Service Delivery Practices Among Clinics Providing Publicly Funded Family Planning Services in 2010*, at 19, 22 (Guttmacher Inst. 2012) (internet).

[21] Frost et al., *Variation in Service Delivery Practices*, *supra*, at 15.

[22] *See* Christina Fowler et al., *Title X Family Planning Annual Report: 2019 National Summary* app. A at A-10, A-12 (Off. of Population Affs. 2020).

[23] Fowler et al., *2020 National Summary*, *supra*, at 26.

[24] Frederiksen et al., *Data Note: Is the Supplemental Title X Funding Awarded by HHS Filling in the Gaps in the Program?*, *supra*.

Colorado, there are now 20 rural counties that have few to no healthcare providers offering contraceptive services.[25] Title X family planning clinics are especially critical in rural areas, where provider shortages, lack of transportation, and other factors often limit access to needed health care.[26]

Low-income individuals, many of whom have long relied on Title X programs for no-cost or low-cost family planning services, were the most seriously harmed by the reduced access to care. Following implementation of the 2019 Rule, Title X providers saw 573,650 fewer patients under 100% of the federal poverty level (FPL), which in 2019 was an annual income of $25,750 for a family of four. Providers also saw 139,801 fewer patients between 101–150% of the FPL; 65,735 fewer patients between 151–200% of the FPL; and 30,194 fewer patients between 201–250% of the FPL.[27]

The 2019 Rule has therefore harmed the delivery and quality of healthcare services for these patients. After the 2019 Rule caused many Title X providers to withdraw from the program or even close their doors, many patients could not go to any Title X provider and therefore had to pay more out-of-pocket costs and experience a disruption in their continuity of care. And patients seeing their former Title X providers were often subject to increased fees by the providers' need to compensate for the loss of Title X funding. 86 Fed. Reg. at 56,151. Accordingly, organizations saw patients forgoing recommended tests, lab work, sexually transmitted infection (STI) testing,

---

[25] Comment Letter from Att'ys Gen., *supra*, at 6.

[26] *See* American Coll. of Obstetricians and Gynecologists, Comm. on Health Care for Underserved Women, Committee Op. No. 586, at 1 (2014) (internet) ("Rural women experience poorer health outcomes and have less access to health care than urban women. . . . Health care professionals should be aware of this issue and advocate for reducing health disparities in rural women.").

[27] Comment Letter from George M. Abraham, President, Am. Coll. of Physicians 4 (May 17, 2021) (internet).

clinical breast exams, and Pap tests in large numbers. *Id.* And for many providers forced to leave the Title X program by the 2019 Rule, the loss of funding meant a concomitant loss of eligibility for programs that help subsidize the cost of contraceptives. As a result, one New York City provider reported that its "capacity to provide care and access to the full range of contraceptive methods to low income and/or uninsured patients was drastically reduced," and it was forced to choose which services to offer.[28]

Related harms to the public health from the 2019 Rule are severe and measurable. In 2019 compared to 2018, 225,688 fewer patients received oral contraceptives; 49,803 fewer patients received hormonal implants; and 86,008 fewer patients received intrauterine devices.[29] 86 Fed. Reg. at 56,147. Some patients who lost access to Title X services have reported being forced to switch to a less effective form of contraception. *See id.* at 56,151.[30] As a result of the decrease in patients able to receive Title X services, it is estimated that the 2019 Rule may have led to up to 181,477 unintended pregnancies. 86 Fed. Reg. at 19,815. Unintended pregnancies are associated

---

[28] *See* Comment Letter from Natalie Tobier, Senior Director of Sexual & Reprod. Health, Public Health Solutions 2 (May 13, 2021) (internet) (New York City provider). The two school-based health centers in Connecticut also lost their eligibility for the discounted contraceptive program when they left the Title X program.

[29] *See* Fowler et al., *2019 National Summary*, *supra*, app. A at A-20.

[30] *See also* Kristine Hopkins et al., *Women's Experiences Seeking Publicly Funded Family Planning Services in Texas*, 47 Persps. on Sexual & Reprod. Health 63, 66, 68 (2015) (internet); M. Antonia Biggs et al., *Findings from the 2012 Family PACT Client Exit Interviews* 53-54, 103 (Bixby Ctr. for Global Reprod. Health 2014) (internet). In Colorado, for instance, the use of long-acting reversible contraceptives, one of the most effective contraceptive methods, decreased from 39.4% to 38.8% between 2019 and 2020. *See* Comment Letter from Att'ys Gen., *supra*, at 6 n.23.

with higher risks to maternal health, adverse birth outcomes, and negative psychological outcomes for both mothers and children, thus leading to even broader public health harms.[31]

Title X healthcare services outside the contraceptive context also decreased, harming patients and public health. Clinics performed 90,386 fewer cervical cancer screening tests, 188,920 fewer clinical breast exams, 276,109 fewer human immunodeficiency virus tests, and more than one million fewer STI tests between 2018 and 2019.[32] The Centers for Disease Control and Prevention (CDC) reported that in 2019, annual cases of STIs reached record highs.[33]

## C. Amici States Have Experienced Specific Harms to Their Budgets and Their Capacity to Promote the Public Health.

Under the 2019 Rule, amici States were forced to expend extra funds to keep clinics open and provide critical healthcare to patients. Several amici States have used state or local funding to replace some of their lost Title X funds in order to retain clinics and providers that were fully and effectively serving low-income patients in compliance with professional standards.[34] But many of these supplemental funds are one-time grants or rely on other finite sources of support that have been or will be exhausted, and efforts to replace Title X funds means fewer resources available for other public health purposes. For instance:

---

[31] *See* Kathryn Kost & Laura Lindberg, *Pregnancy Intentions, Maternal Behaviors, and Infant Health: Investigating Relationships with New Measures and Propensity Score Analysis*, 52 Demography 83, 99-101, 103 (2015) (internet).

[32] Comment Letter from George M. Abraham, *supra*, at 4; *see also* Fowler et al., *2019 National Summary*, *supra*, app. A at A-23 to -25. For example, in Colorado, the number of female Title X patients under 25 years old screened for chlamydia decreased by 56% between 2018 and 2020. *Compare* Fowler et al., *2020 National Summary*, *supra*, app. B at B-12, *with* Fowler et al., *2018 National Summary*, *supra*, app. B at B-12.

[33] Press Release, CDC, *Reported STDs Reach All-Time High for 6th Consecutive Year* (Apr. 13, 2021) (internet).

[34] Fredericksen et al., *Data Note: Impact of New Title X Regulations on Network Participation, supra.*

- California provided $348,488 in one-time grants to two healthcare facilities and their affiliates.[35]

- New York made emergency appropriations to cover the loss of Title X funds from fall 2019 through March 2020, and thereafter established annual appropriations to offset the loss of Title X funds. A total of $14.2 million was allocated for this purpose in fiscal year 2021. That significant appropriation required the state department of health to divert funds that had been intended for other program initiatives, and it is not expected that the State will be able to continue this level of investment into the future.

- Colorado spent $200,000 in 2020 to mitigate the loss of Title X funds and will spend $198,583 in 2021.

- Connecticut was not able to provide additional funding until the biennial state budget for 2021-2022, which included an additional $2.1 million per year for Planned Parenthood of Southern New England, the State's primary Title X provider before the 2019 Rule.

- Hawaiʻi made a one-time appropriation of $750,000 in state funds to offset the absence of Title X funds in fiscal year 2020. However, additional funding was not appropriated for fiscal year 2021. As a result, there was a 100% reduction of the Hawaiʻi State Department of Health's Title X–funded staff.

- Illinois supplied $3.7 million to fill the gap created by the loss of Title X funds.

- Maine's clinics remain open but rely on state and private funds, instead of Title X funds.

- Michigan allocated approximately $1.6 million to make up the loss of Title X funds.

- Massachusetts made an annual emergency appropriation of $6.7 to $8 million in state funds to replace lost Title X funds in fiscal years 2020, 2021, and 2022.

- New Jersey made an appropriation of $9.5 million to the state department of health for family planning services to make up for the loss of Title X funds in fiscal year 2020. The family planning line item, which has continued to factor into the state budget, is $19.5 million in the fiscal year 2021 budget and in the fiscal year 2022 budget.

---

[35] *See* Comment Letter from Att'ys Gen., *supra*, at 7. California also passed legislation specifically intended to increase funding and investment in reproductive healthcare to respond to the previous federal administration's restrictions on reproductive freedom. *See id.* at 7 n.29.

- Oregon has provided state funds of approximately $3 million per year to replace lost Title X funds and continue its family planning programs. Such funding was included in the current budget which runs from July 2021 to June 2023.

- Vermont has dedicated approximately $1.6 million for two fiscal years to fill the gap in Title X funds.

- Washington, whose state health department was the State's sole Title X grantee, allocated $8.4 million from general state funds as a temporary funding measure for a two-year period ending in June 2022 to offset the loss of Title X funds.[36]

This temporary infusion of millions of dollars in additional state healthcare spending, particularly during the time of exceptional public need caused by the COVID-19 pandemic,[37] has strained state budgets and left family planning programs uncertain of their ability and capacity to continue providing care. Implementation of the 2021 Rule is necessary to restore Title X funds and amici States' capacity to ensure the provision of critical healthcare for their residents.

## POINT II

### AMICI STATES' EXPERIENCE CONFIRMS THAT THE NEW RULE WILL IMPROVE PATIENT OUTCOMES AND PUBLIC HEALTH CONDITIONS

Allowing the 2021 Rule to remain in effect will have significant positive effects on the Title X program. Amici States' experience confirms that the 2021 Rule will improve both patient outcomes and public health conditions.

---

[36] *See* Comment Letter from Att'ys Gen., *supra*, at 7-9.

[37] Even now, States continue to require public health resources to respond to new pandemic developments. *See, e.g.*, N.Y. Exec. Order No. 11 (Nov. 26, 2021) (internet) (declaring a disaster emergency in the State of New York).

**A.      Elimination of the 2019 Restrictions Will Result in an Expanded Title X Network, Better Health Outcomes, and Increased Economic Stability.**

The 2021 Rule eliminates the restrictions in the 2019 Rule that had a devastating impact on the Title X program. While retaining the requirement that Title X funds cannot be used for abortion services, the 2021 Rule eliminates the ban on abortion referrals and the requirement of strict physical separation between Title X services and any abortion-related services. *See* 86 Fed. Reg. at 56,148. In doing so, HHS has reinstituted the primary standards in place for nearly thirty years before the 2019 Rule was promulgated. HHS has also realigned the Title X program with nationally recognized standards of care and the CDC's Quality Family Planning Guidelines, including by requiring nondirective options-based pregnancy counseling consistent with the patient's request. *Id.* at 56,153-54.

The 2021 Rule will allow former Title X grantees, who had structured their clinics and operations to comply with well-established pre-2019 requirements, to rapidly reenter the program and expand Title X services. States can therefore reestablish their former expansive Title X networks to serve many more patients. The elimination of the 2019 Rule's restrictive prohibitions and its new emphasis on health equity has even prompted some amici State grantees like Michigan to structure future grant proposals to attract new partners in order to further broaden and diversify their subrecipient network. Many former Title X grantees have already expressed their intention to rejoin the program and participate in the upcoming 2022 grant opportunity.

Indeed, amici States' plans are underway to add new service sites immediately. For example, Essential Access Health, the sole grantee in California, is planning to increase the number of participating subrecipients now that the 2021 Rule has gone into effect. A grantee in Pennsylvania has already added back two subrecipients who had left because of the 2019 Rule. Subrecipients of a grantee in Nevada have plans to expand to new locations and provide additional outreach to hard-

15

to-reach communities. And in Michigan, where the Michigan Department of Health and Human Services is the sole grantee, Planned Parenthood of Michigan plans to reenter as a subrecipient as early as January 2022, allowing some Title X funding to be restored to sixteen former service sites throughout the State.

Former Title X grantees can also seek funds under the 2021 Rule before the next grant cycle commences in spring 2022. OPA has announced that nearly $10 million in grant funds are being made available, in part, to assist States currently without Title X providers or with limited Title X services.[38] Some of the most heavily impacted amici States, including Washington, plan to apply for these funds to allow the immediate expansion of Title X services.

The expansion of the Title X program under the 2021 Rule will increase access to family planning services and a greater range of services for patients' health care. While the decrease in Title X providers had a direct negative impact on patient and public health, a rebuilding of the Title X program will have a corresponding positive impact as Title X services are restored, as clinics are able to return to Title X fee scales (including sliding fees based on patients' ability to pay), and as Title X services are expanded to rural and underserved areas that lost all such services.

The expanded Title X network will also have a direct and positive impact on patient and public health generally. A 2016 survey showed that Title X clinics were the only source of comprehensive medical care for 60% of their patients.[39] The confidential, low-cost, and high-quality care that Title X clinics provide encourages many individuals, especially those without insurance, to

---

[38] HHS, Office of the Assistant Sec'y for Health, No. PA-FPH-22-003 (Synopsis 9), Funding to Address Dire Need for Family Planning Services (Nov. 17, 2021) (internet).

[39] Megan L. Kavanaugh et al., *Use of Health Insurance Among Clients Seeking Contraceptive Services at Title X–Funded Facilities in 2016*, 50 Persps. on Sexual & Reprod. Health 101, 105 (2018) (internet).

visit Title X clinics,[40] increasing opportunities for the receipt of health care and potentially life-saving medical interventions.

The 2021 Rule also provides the important and immediate benefit of restoring patient-directed options counseling and complete referrals. This approach best aligns with professional medical ethics and permits providers to communicate freely with patients in order to provide the best care.[41] Patients, in turn, will once more receive all the medically relevant and accurate information they need to make informed choices.

Increased delivery of services from an expanded Title X network will in turn allow individuals to achieve better economic stability and reduce the burden on amici's social safety-net resources. Access to contraception allows patients to achieve greater economic stability by having the ability to decide whether to become pregnant and to intentionally time and space their pregnancies. Increased use of oral contraceptives has been correlated with patients' ability to obtain higher levels of education, participate more fully in the workforce, and receive higher wages—a combination that has helped reduce the gender pay gap.[42] The restoration of Title X funds will allow the amici States that have expended state funds to cover the gap in lost Title X funding to redirect those funds to other needed programs.

---

[40] *See id.* at 104-05.

[41] *See* American Med. Ass'n, Code of Medical Ethics Op. E-2.1.3, *supra*.

[42] Martha J. Bailey & Jason M. Lindo, Nat'l Bureau of Econ. Research Working Paper No. 23465, *Access and Use of Contraception and Its Effects on Women's Outcomes in the U.S.* (2017) (internet). As a recent study shows, contraception access resulted in a statistically significant increase in high school graduation rates and helped avoid the poor life outcomes and lifetime earning inequalities associated with the failure to graduate. Amanda Stevenson et al., *The Impact of Contraceptive Access on High School Graduation*, Sci. Advances, May 5, 2021 (internet).

**B.    Other Provisions of the 2021 Rule That Increase Access and Promote Health Equity Support Immediate Positive Outcomes for Underserved Populations.**

Allowing the 2021 Rule to continue in place will result in additional immediate benefits to patients and the public health because the 2021 Rule contains features that increase healthcare access, even relative to the pre-2019 regime, by requiring providers to take new actions that focus on health equity. *See* 86 Fed. Reg. 56,144. Several provisions of the 2021 Rule enhance patient access to the full range of supported services, including "family planning services" that include all FDA-approved contraceptive products. *See* 42 C.F.R. § 59.2. For example, Title X programs that do not offer a broad range of family planning methods on-site must provide a prescription for the patient's method of choice or offer a referral to another provider if requested. *Id.* § 59.5(a)(1). Another provision of the 2021 Rule authorizes all providers to deliver services through telehealth. *Id.* § 59.5(b)(1). The 2021 Rule also revised provisions governing fees so that low-income patients with insurance do not pay more in copayments and fees than they would under the discounted fee scale. *Id.* § 59.5(a)(8)(ii).

With respect to health equity, the 2021 Rule requires that Title X programs "[p]rovide services in a manner that is client-centered, culturally and linguistically appropriate, inclusive, and trauma-informed." *Id.* § 59.5(a)(3). Title X programs must ensure the equitable delivery of services and not discriminate against any patient based on numerous factors, including age, sexual orientation, gender identity, and number of pregnancies. *See id.* § 59.5(a)(4).

These provisions will have immediate beneficial consequences for patients. Patients' access to all FDA-approved contraceptive products can no longer be limited. Patients visiting a service site that provides only natural family planning methods, or that otherwise does not provide a broad range of family planning methods, will be provided a prescription or referral for any method of

their choice. Low-income patients with insurance will immediately be able to take advantage of the sliding fee scale where it results in cost savings.

Grantees in amici States, whose programs already emphasize equitable access to health care, intend to take full advantage of these new provisions to facilitate greater access to healthcare services, especially to underserved populations. For example, the Hawaiʻi State Department of Health and its new Office of Health Equity intends to focus on increasing access to Title X services for minorities and members of the LGBTQ community. Subrecipients will be required to provide printed documents and resources in multiple languages and enhanced access to language interpreters. Subrecipients also will be required to hire staff with at least two-to-three years of experience working with LGBTQ patients. Massachusetts will require providers to identify a priority population based on local needs, in addition to requiring providers to prioritize low-income individuals, adolescents, and people of color. Colorado expects to expand nonbinary and transgender clinical services and to implement trauma-informed care principles, a reproductive-justice framework, and reproductive health equity tenets in its Title X programs. And Colorado's Title X program will continue to fund providers in rural and frontier areas where there is extremely limited access to health care—especially affordable and accessible care.

The 2021 Rule's express authorization for the provision of Title X services via telehealth will also increase patients' access to services. Amici States' experience with the expanded use of telehealth during the COVID-19 pandemic has encouraged state grantees like the Michigan Department of Health and Human Services to assist its subrecipients in implementing telehealth options. Current grantees in Nevada and Pennsylvania plan to use telehealth and mobile and pop- up clinics to expand services to rural and other areas with current barriers to access. Colorado will also use the new authorization to expand telehealth services among its Title X network, which is especially

important in reaching patients in underserved areas. Virginia plans to expand its Title X network's use of telehealth services with a new videoconferencing platform. As the California Department of Health Care Services has explained, telehealth services "help provide beneficiaries, especially those residing in rural and underserved areas of the State, with increased access to critically needed subspecialties, and could improve access to culturally appropriate care, such as allowing care with a provider whose language, race, or culture are the same as that of the beneficiary."[43]

Amici States' experience thus confirms that the new Rule will have an immediate and positive impact on access to Title X services, especially for underserved populations. A preliminary injunction halting implementation of the 2021 Rule will eliminate these benefits to patients and the public health.

## CONCLUSION

For the reasons set forth above and in the federal governments' opposition, this Court should deny the plaintiffs' motion for a preliminary injunction.

---

[43] California Dep't of Health Care Servs., Post-COVID-19 Public Health Emergency Telehealth Policy Recommendations (June 10, 2021) (internet).

Dated: New York, New York
November 29, 2021

Respectfully submitted,

ROB BONTA
  *Attorney General*
  *State of California*

Renu R. George
  *Senior Assistant Attorney General*
Kathleen Boergers
  *Supervising Deputy Attorney General*
Ketakee Kane
Anna Rich
Brenda Ayon Verduzco
  *Deputy Attorneys General*

LETITIA JAMES
  *Attorney General*
  *State of New York*

  /s/ Blair J. Greenwald*
BLAIR J. GREENWALD
*Assistant Solicitor General*

  /s/ Shannan C. Krasnokutski[+]
SHANNAN KRASNOKUTSKI
*Deputy Section Chief*
Trial Attorney (0073814)

Barbara D. Underwood
  *Solicitor General*
Anisha S. Dasgupta
  *Deputy Solicitor General*
Laura Etlinger
  *Assistant Solicitor General*
    *of Counsel*

California Department of Justice
1515 Clay Street, 20th Floor
Oakland, CA 94612-0550
(510) 879-1519
ketakee.kane@doj.ca.gov

Office of the Attorney General
28 Liberty Street
New York, NY 10005
(212) 416-6102
(212) 416-8962 (fax)
blair.greenwald@ag.ny.gov

*Admitted pro hac vice
[+]By Blair Greenwald per email authorization

*Counsel listing continues on next page.*

PHILIP J. WEISER
 *Attorney General*
 *State of Colorado*
1300 Broadway
Denver, CO 80203

BRIAN E. FROSH
 *Attorney General*
 *State of Maryland*
200 St. Paul Place
Baltimore, MD 21202

WILLIAM TONG
 *Attorney General*
 *State of Connecticut*
165 Capitol Avenue
Hartford, CT 06106

MAURA HEALEY
 *Attorney General*
 *Commonwealth of Massachusetts*
One Ashburton Place
Boston, MA 02108

KATHLEEN JENNINGS
 *Attorney General*
 *State of Delaware*
820 N. French Street
Wilmington, DE 19801

DANA NESSEL
 *Attorney General*
 *State of Michigan*
P.O. Box 30212
Lansing, Michigan 48909

CLARE E. CONNORS
 *Attorney General*
 *State of Hawai'i*
425 Queen Street
Honolulu, HI 96813

KEITH ELLISON
 *Attorney General*
 *State of Minnesota*
75 Rev. Dr. Martin Luther King Jr. Blvd.
St. Paul, MN 55155

KWAME RAOUL
 *Attorney General*
 *State of Illinois*
100 West Randolph Street
Chicago, Illinois 60601

AARON D. FORD
 *Attorney General*
 *State of Nevada*
100 North Carson Street
Carson City, NV 89701

AARON M. FREY
 *Attorney General*
 *State of Maine*
6 State House Station
Augusta, ME 04333

ANDREW J. BRUCK
 *Acting Attorney General*
 *State of New Jersey*
Richard J. Hughes Justice Complex
25 Market Street
Trenton, New Jersey 08625

HECTOR BALDERAS
 *Attorney General*
 *State of New Mexico*
P.O. Drawer 1508
Santa Fe, NM 87504

THOMAS J. DONOVAN, JR.
 *Attorney General*
 *State of Vermont*
109 State Street
Montpelier, VT 05609

JOSHUA H. STEIN
 *Attorney General*
 *State of North Carolina*
North Carolina Department of Justice
114 W. Edenton Street
Raleigh, NC 27603

MARK R. HERRING
 *Attorney General*
 *Commonwealth of Virginia*
202 North Ninth Street
Richmond, VA 23219

ELLEN F. ROSENBLUM
 *Attorney General*
 *State of Oregon*
1162 Court Street N.E.
Salem, OR 97301

ROBERT W. FERGUSON
 *Attorney General*
 *State of Washington*
P.O. Box 40100
Olympia, WA 98504

JOSH SHAPIRO
 *Attorney General*
 *Commonwealth of Pennsylvania*
Strawberry Square, 16th Fl.
Harrisburg, PA 17120

JOSHUA L. KAUL
 *Attorney General*
 *State of Wisconsin*
17 West Main Street
Madison, WI 53703

PETER F. NERONHA
 *Attorney General*
 *State of Rhode Island*
150 South Main Street
Providence, RI 02903

KARL A. RACINE
 *Attorney General*
 *District of Columbia*
441 4th Street, NW
Washington, D.C. 20001