## IN THE UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF OHIO

| | | |
|---|---|---|
| STATE OF OHIO, STATE OF ALABAMA, STATE OF ARIZONA, STATE OF ARKANSAS, STATE OF FLORIDA, STATE OF KANSAS, COMMONWEALTH OF KENTUCKY, STATE OF MISSOURI, STATE OF NEBRASKA, STATE OF OKLAHOMA, STATE OF SOUTH CAROLINA, STATE OF WEST VIRGINIA, | : : : : : : : : : : : : | Case No. 1:21-cv-675 |
| *Plaintiffs*, | : | |
| v. | : | |
| XAVIER BECERRA, in his official capacity as Secretary of Health and Human Services; U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES; JESSICA S. MARCELLA, in her official capacity as Deputy Assistant Secretary for Population Affairs; and OFFICE OF POPULATION AFFAIRS, | : : : : : : : : : : : | |
| *Defendants*. | : : | |

## REPLY IN SUPPORT OF MOTION FOR A PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES .......................................................................................... iii

I.      The States are likely to prevail in this challenge to the Final Rule ...............................2

    A.      The Final Rule is not in accordance with law. ........................................................2

Section 1008 of Title X provides: "None of the funds appropriated under" Title X "shall be used in programs where abortion is a method of family planning." 42 U.S.C. §300a-6. HHS's "Final Rule," *see Ensuring Access to Equitable, Affordable, Client-Centered, Quality Family Planning Services*, 86 Fed. Reg. 56144-01 (Oct. 7, 2021) (to be codified at 42 C.F.R. pt. 59), violates this restriction in two ways. *First*, the Final Rule requires Title X grantees to make abortion referrals "upon request." *Id*. at 56179. *Second*, with respect to financial and physical separation, the Final Rule "reinstat[es] interpretations and policies under Section 1008 that were in place for much of the program's history"—interpretations that permitted a significant degree of integration between Title X programs and abortion services. *Id*. at 56150. HHS's defense of the Final Rule begins by pointing out that, according to the Supreme Court, Title X is "ambiguous" with respect to "counseling," "referral," and "program integrity" requirements. *Rust v. Sullivan*, 500 U.S. 173, 184 (1991). Agencies are entitled to deference when their attempts to implement ambiguous statutes rest on a "permissible construction" of the statutory text. *Chevron, USA, Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 843 (1984). According to HHS, Section 1008 can plausibly be read as empowering HHS to mandate abortion referrals upon request and to permit the significant degree of financial and physical overlap that the Final Rule allows. Therefore, HHS contends, the Final Rule survives scrutiny. This argument fails because the Final Rule does not rest on a permissible construction of Section 1008. While that statute leaves HHS with some interstices to fill, it forbids using Title X funds to subsidize or support abortion. The Final Rule's referral requirements and lack of program-integrity safeguards cause Title X funds to subsidize or support abortion.

    B.      The Final Rule is arbitrary and capricious. ...........................................................8

        1.      HHS engaged in arbitrary and capricious decisionmaking when it adopted the Final Rule's financial- and physical-separation requirements. ...................9

For at least four reasons, HHS acted arbitrarily and capriciously in adopting the Final Rule's approach to financial and physical separation. *First*, HHS failed to consider viable alternatives to the approach it adopted. *Second*, HHS justified its change in policy with reference to the 2019 Rule's "negative health consequences," but relied on data that failed to prove such consequences. *Third*, HHS failed to account for the degree to which the States and other providers relied on the 2019 Rule. *Finally*, HHS never considered the degree to which abandoning the 2019 Rule's financial- and physical-separation requirements would erode public support for Title X. HHS's responses all come up short, and largely fail to engage with the problems the States identified. Further, HHS supports the Final Rule with information from

outside the administrative record. That is impermissible: "It is well established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself," not based on "*post hoc* rationalizations for [the] agency action." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 50 (1983).

2.      HHS acted arbitrarily and capriciously by mandating referrals. ...................... 15

For at least four reasons, HHS acted arbitrarily and capriciously in adopting the Final Rule's referral requirement. The first two reasons overlap with the problems relating to the financial- and physical-separation requirements: HHS relied on flawed data in assessing the public health consequences of the 2019 Rule it repealed, and it failed to account for what mandating referrals would mean in terms of public support for Title X. HHS also made two errors unique to the referral requirement. First, the Final Rule never addresses HHS's prior determination that, "in most instances when a referral is provided for abortion, that referral necessarily treats abortion as a method of family planning." 84 Fed. Reg. at 7717. While agencies may change course, any "departure" from earlier policy must be "explicitly and rationally justified." *Michigan v. Thomas*, 805 F.2d 176, 184 (6th Cir. 1986). Second, the Final Rule never addressed relevant ethical concerns raised by the States. While HHS tries to address those concerns in its brief, courts cannot uphold agency actions based on "*post hoc* rationalizations." *State Farm*, 463 U.S. at 50.

II.     The plaintiff States satisfy the remaining preliminary-injunction factors ................... 19

The States have also satisfied the remaining factors governing their request for injunctive relief. Because the Final Rule is illegal, the public interest and concerns about harms to others weigh in favor of a preliminary injunction. And the States will suffer at least three forms of irreparable harm absent a stay. *First*, they will be irreparably harmed by being exposed to greater competition for Title X funds. Even HHS admits that unfair competition is an irreparable harm. *See Basicomputer Corp. v. Scott*, 973 F.2d 507, 512 (6th Cir. 1992). And if the Final Rule is illegal, the additional competition to which it exposes the States is necessarily unfair. *Second*, the States (like Ohio) that expanded their services based on the availability of additional Title X grants will face reputational injuries if they are no longer able to provide the same level of service. HHS does not dispute that the States stand to lose millions of dollars in grants when new providers enter the program. This will require the States to either make up those losses themselves or make reputationally damaging cuts to services. Either response causes irreparable harm. *Finally*, the States will be irreparably injured if they are forced to make referrals, as this would require the States to put their imprimatur on abortion—an imprimatur that the States, as indicated by their laws, legitimately seek to withhold.

CONCLUSION ..........................................................................................................................23

CERTIFICATE OF SERVICE .................................................................................................26

## TABLE OF AUTHORITIES

**Cases**                                                    **Page(s)**

*Atrium Med. Ctr. v. U.S. Dep't of Health & Hum. Servs.*,
766 F.3d 560 (6th Cir. 2014) ...................................................................... 15

*Basicomputer Corp. v. Scott*,
973 F.2d 507 (6th Cir. 1992) ...................................................................... 20

*BellSouth Telecommunications, Inc. v. Farris*,
542 F.3d 499 (6th Cir. 2008) ........................................................................7

*Bostock v. Clayton Cty., Georgia*,
140 S. Ct. 1731 (2020) ...................................................................................6

*Chevron, USA, Inc. v. Natural Resources Defense Council, Inc.*,
467 U.S. 837 (1984) ................................................................................... 4, 7

*Dep't of Homeland Sec. v. MacLean*,
574 U.S. 383 (2015) .................................................................................... 14

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
140 S. Ct. 189113 (2020) ..................................................................9, 11, 14

*Elonis v. United States*,
575 U.S. 723 (2015) .......................................................................................7

*Holder v. Humanitarian Law Project*,
561 U.S. 1 (2010) ...........................................................................................3

*Kentucky v. U.S. ex rel. Hagel*,
759 F.3d 588 (6th Cir. 2014) ...................................................................... 20

*Kirtsaeng v. John Wiley & Sons, Inc.*,
568 U.S. 519 (2013) .......................................................................................6

*Mayor of Baltimore v. Azar*,
973 F.3d 258 (4th Cir. 2020) (*en banc*)..................................................... 17

*Michigan v. E.P.A.*,
576 U.S. 743 (2015) .......................................................................................8

*Michigan v. Thomas*,
805 F.2d 176 (6th Cir. 1986) ...................................................................... 16

*Mont v. United States*,
  139 S. Ct. 1826 (2019) ....................................................................................................7

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983) ................................................................................................ 15, 18

*Nat'l Ass'n of Home Builders v. Defs. of Wildlife*,
  551 U.S. 644 (2007) .......................................................................................... 8, 17

*O'Gilvie v. United States*,
  519 U.S. 79 (1996) ..........................................................................................................6

*Ohio v. Yellen*,
  —F.Supp.3d—, No. 1:21-CV-181, 2021 WL 2712220 (S.D. Ohio July 1, 2021).................... 20

*PDK Labs. Inc. v. DEA*,
  362 F.3d 786 (D.C. Cir. 2004) .....................................................................................7

*Rust v. Sullivan*,
  500 U.S. 173 (1991) ................................................................................................ *passim*

*Sherley v. Sebelius*,
  664 F.3d 388 (D.C. Cir. 2011) .................................................................................21

*United States v. Real Prop.*
  *known as 2916 Forest Glen Ct., Beavercreek, Ohio*, 162 F. Supp. 2d 909 (S.D.
  Ohio 2001) ................................................................................................................ 20

**Statutes**

65 Fed. Reg. 41281 (July 3, 2000) ........................................................................ 1, 3, 8

84 Fed. Reg. 7714 (Mar. 4, 2019) .................................................................... 1, 2, 4, 16

86 Fed. Reg. 56144 (Oct. 7, 2021) ...................................................................... *passim*

5 U.S.C. §706 ......................................................................................................................2

42 U.S.C. §300 ............................................................................................................ 1, 2, 3

Ky. Rev. Stat. §311.800 ............................................................................................... 18

LA Rev. Stat. §40:1061.2 ............................................................................................ 18

Mont. Code Ann. §50-20-111 ...................................................................................... 18

Ohio Rev. Code §4731.91 ............................................................................................ 18

Or. Rev. Stat. Ann. §435.485 ......................................................................................... 18

**Other Authorities**

Br. for Am. Coll. of OBGYNS, *et al.*, as *Amici Curiae* in Support of Appellees,
    *Preterm-Cleveland v. McCloud*, No. 18-3329, 2020 WL 980679 (6th Cir.) .............................. 19

Br. for the United States as *Amici Curiae*, *Preterm v. McCloud*, 18-3329, 2020 WL
    487179 (6th Cir.) ................................................................................................................ 19

Office of Population Affairs, *Title X Family Planning Directory* (October 2021) .......................... 21

Section 1008 of Title X provides: "None of the funds appropriated under" Title X "shall be used in programs where abortion is a method of family planning." 42 U.S.C. §300a-6. HHS recently issued a rule—the "Final Rule," *see Ensuring Access to Equitable, Affordable, Client-Centered, Quality Family Planning Services*, 86 Fed. Reg. 56144-01 (Oct. 7, 2021) (to be codified at 42 C.F.R. pt. 59)—that flouts Section 1008. The rule permits Title X providers to intermingle Title X and abortion resources. Providers can even have an "abortion element in a program of family planning services," as long as that element is not "so large and so intimately related to all aspects of the program as to make it difficult or impossible to separate the eligible and non-eligible items of cost." *Provision of Abortion-Related Services in Family Planning Services Projects*, 65 Fed. Reg. 41281-01, 41282 (July 3, 2000) (incorporated by reference at 86 Fed. Reg. at 56150). What is more, the Final Rule requires Title X participants to make abortion referrals upon request—this notwithstanding the fact that HHS itself concluded, as recently as 2019, that "in most instances where a referral is provided for abortion, that referral necessarily treats abortion as a method of family planning." *Compliance With Statutory Program Integrity Requirements*, 84 Fed. Reg. 7714-01, 7717 (Mar. 4, 2019).

The Court now faces the question whether to preliminarily enjoin the Final Rule. It should do so. The States already explained why. The Final Rule is likely to be set aside under the Administrative Procedure Act, or "APA," because it is both contrary to law and arbitrary and capricious. *See* PI Mot., R.2, PageID#148–70. The rule will cause irreparable harm if not enjoined pending final judgment. *Id.*, PageID#171–72. And the balance of the equities supports issuance of an injunction. *Id.*, PageID#172–73. HHS's response brief refutes none of these points.

1

## I.      The States are likely to prevail in this challenge to the Final Rule

The APA requires courts to "hold unlawful and set aside agency action … found to be (A) arbitrary, capricious, … or otherwise not in accordance with law." 5 U.S.C. §706(2); §706(2)(A). The Final Rule is both contrary to law and arbitrary and capricious.

### A.      The Final Rule is not in accordance with law

**1.** Again, Section 1008 forbids "funds appropriated under" Title X from being "used in programs where abortion is a method of family planning." 42 U.S.C. §300a-6. If "one thing is clear from the legislative history" of this provision, "it is that Congress intended that Title X funds be kept separate and distinct from abortion-related activities." *Rust v. Sullivan*, 500 U.S. 173, 190 (1991). And so it is undisputed that HHS is "prohibited" from "subsidiz[ing] abortion." 86 Fed. Reg. at 56150.

The 2019 Rule, which the Final Rule replaces, honored this prohibition in two ways relevant here. *First*, the 2019 Rule forbade Title X providers from making elective-abortion referrals as part of their Title X programs. *See* 84 Fed. Reg. at 7788–89. *Second*, the 2019 Rule required abortion providers to strictly segregate, both physically and financially, their Title X and abortion services. *Id.* at 7789; *see also* PI Mot., R.2, PageID#142–43.

The Final Rule abandons both safeguards and replaces them with rules that cause Section 1008 violations. *First*, the Final Rule replaces the prohibition on abortion referrals with a rule mandating referrals "upon request." 86 Fed. Reg. at 56179. If the Title X provider also provides abortions, the provider can even make a referral to itself. This violates Section 1008. After all, a program in which physicians are required to make abortion referrals for family-planning purposes is a "program where abortion is a method of family planning," §300a-6—especially if partici-

pants may satisfy the referral policy by making a referral to their own office. Examples from outside the abortion context make the point clear. If a City or State ran a psychiatric program for low-income families, and if it required participating doctors to make referrals for lobotomies upon request, everyone would agree that participating psychiatrists run programs "where" lobotomy "is a method of" psychiatric care. *See also* PI Mot., R.2, PageID#152–53. The same logic applies here: HHS, by requiring grantees to run family-planning programs in which they make abortion referrals upon request, requires providers to run Title X programs in which abortion is a method of family planning.

*Second*, with respect to financial and physical separation, the Final Rule "reinstat[es] interpretations and policies under Section 1008 that were in place for much of the program's history." 86 Fed. Reg. at 56150. Those interpretations and policies allow for a significant degree of financial and physical integration. *See* PI Mot., R.2, PageID#150–52. In particular, they say that Title X providers who also offer abortions may share staff, facilities, file systems, and more. 65 Fed. Reg. at 41282 (incorporated by reference at 86 Fed. Reg. at 56150). Grantees can even have an "abortion element in a program of family planning services," as long as it is not "so large and so intimately related to all aspects of the program as to make it difficult or impossible to separate the eligible and non-eligible items of cost." *Id*. All this creates serious problems. For one thing, if Title X funds can go to entities with an "abortion element in a program of family planning services," *id*., then Title X funds can be used "in a program where abortion is a method of family planning," which is what Section 1008 expressly forbids. 42 U.S.C. §300a-6. Even putting that aside, the degree of integration the Final Rule permits enables abortion providers to subsidize abortion services with Title X funds. "Money is fungible." *Holder v. Humanitarian Law Project*,

3

561 U.S. 1, 31 (2010). So if grantees can put Title X funds toward facilities and staff that participate in abortion, then Title X funds will be used to subsidize abortion—they will be used to "achieve economies of scale" in the provision of abortion, 84 Fed. Reg. at 7766—absent alternative safeguards. The Final Rule contains no such alternative safeguards, and thus violates Section 1008.

**2.** HHS's responses to these arguments are unavailing.

***Referral requirement.*** With respect to the referral requirement, HHS's defense hinges largely on *Chevron, USA, Inc. v. Natural Resources Defense Council, Inc.*, which requires that courts faced with ambiguous statutes defer to agencies' "permissible construction[s]" of the text. 467 U.S. 837, 843 (1984). In *Rust v. Sullivan*, the Supreme Court deemed Section 1008 "ambiguous" regarding abortion "counseling" and "referral." 500 U.S. at 184. HHS argues that it reasonably interpreted Section 1008 to permit HHS to mandate referrals, and that its interpretation is owed deference.

The problem with this argument is that the Final Rule does not reflect a "permissible construction" of Section 1008. HHS does not respond at all to the States' primary argument: when a statute prohibits funding a "program where [some procedure] is a method of [treatment or care]," as Section 1008 does, it cannot be construed to allow the funding of programs where referral for the procedure in question is mandatory. PI Mot., R.2, PageID#152–54, *see above* 2–3. And the arguments that HHS does raise fare no better. Purporting to interpret the text, HHS declares: "the fact that a 'program' refers patients for abortion does not make the program one 'where abortion is a method of family planning,' since the abortion itself will necessarily take place outside of the program at issue." Opp. Br., R.27, PageID#330. But that argument is entire-

4

ly circular; it assumes the answer to the question of what it means to be a "program where abortion is a method of family planning." This fallacious argument gets HHS nowhere.

The agency next makes a confusing argument based on *Rust*. Again, that case deemed Section 1008 "ambiguous" with respect to referrals and held that the statute could permissibly be interpreted to *prohibit* referrals. From this, HHS infers that "the opposite reading—that Section 1008 permits grantees to make referrals—must also be permissible." *Id.*, PageID#331. That is a *non sequitur*: the fact that an ambiguous statute can be read to permit one thing does not show that the same statute can be read to permit that thing's opposite. A statute requiring officers to wear "red" uniforms might permit scarlet or crimson uniforms—it would not permit blue uniforms. To say a statute is ambiguous is just to say that it is susceptible of more than one interpretation. And as *Rust* recognized, Section 1008 could indeed be understood to permit multiple policies with respect to abortion "counseling" and "referral." 500 U.S. at 184. The States agree. Section 1008 could, for example, be read to prohibit even discussing abortion (this was the 1988 Rule's interpretation), or it could be read to prohibit referrals while allowing for nondirective counseling (as the 2019 Rule did). And it could, for example, be read as either permitting or prohibiting Title X providers from explaining to patients where they can go for a referral. The States concede that, under *Rust*, each of these readings is permissible. And so Section 1008 is, as *Rust* said, ambiguous with respect to counseling and referrals. It simply does not follow from this ambiguity, however, that the statute can be read to allow for a mandatory referral policy.

HHS's remaining arguments lack merit. For example, HHS says that, because Congress continued appropriating money for Title X even after HHS began allowing or requiring abortion referrals in 1993, Congress must have concluded that HHS was complying with Section 1008.

Opp. Br., R.27, PageID#332. This observation is legally irrelevant: "the view of a later Congress cannot control the interpretation of an earlier enacted statute." *O'Gilvie v. United States*, 519 U.S. 79, 90 (1996). To the extent HHS relies on the fact that Congress never amended Section 1008 to expressly prohibit abortion referrals, that too is irrelevant: "speculation about why a later Congress declined to adopt new legislation offers a 'particularly dangerous' basis on which to rest an interpretation of an existing law a different and earlier Congress did adopt." *Bostock v. Clayton Cty., Georgia*, 140 S. Ct. 1731, 1747 (2020) (citation omitted). HHS further points to a few other statutes, all of which were enacted decades *after* Section 1008, that expressly prohibit "referral." Opp. Br., R.27, PageID#333. HHS interprets the absence of such language in Section 1008 to suggest that Congress must have intended not to bar referral. Again, this does not follow. There is no "canon of interpretation that forbids interpreting different words used in different parts of *the same statute* to mean roughly the same thing." *Kirtsaeng v. John Wiley & Sons, Inc.*, 568 U.S. 519, 540 (2013) (emphasis added). So it is especially implausible to infer that different language appearing in different statutes passed years apart must mean different things.

One final note on this point. HHS emphasizes that "[n]o court has found the decades-long practice of referral upon request to violate" Section 1008. Opp. Br., R.27, PageID#332. But it fails to identify, and the States are not aware of, any decision holding that this practice is consistent with Section 1008. The judiciary's silence on the matter is best understood to mean what it says: nothing.

***Financial and physical separation.*** HHS defends its lax approach to financial and physical separation on grounds similar to those it raised in defense of its referral mandate. It notes that *Rust* deemed Section 1008 ambiguous with respect to "program integrity," 500 U.S. at 184, and

argues that the agency's interpretation is therefore entitled to deference under *Chevron*. This defense suffers from the same flaw as the first one: the Final Rule does not rest on a permissible interpretation of Section 1008.

Recall the States' argument. They have taken as a given *Rust*'s conclusion that Section 1008 does not precisely delineate what degree of financial and physical separation it requires. It is, in this sense, ambiguous. But that is no barrier to an injunction in this case, because the "Court need not define with precision the outer bounds of Section 1008." PI Mot., R.2, PageID# 149. It could say simply that the Final Rule's especially relaxed approach to program integrity allows Title X funds to be used in programs where abortion is a method of family planning and go no further.

HHS responds that it would be "unmanageable" for "the Court to declare the Final Rule insufficient in this regard without giving precise guidance about what sort of separation *is* mandated by Section 1008." Opp. Br., R.27, PageID#335. Not so. Courts often hold that statutes are not susceptible of one reading without going on to decide what the statute means in every application. *See, e.g.*, *Mont v. United States*, 139 S. Ct. 1826, 1832 (2019); *Elonis v. United States*, 575 U.S. 723, 740–41 (2015). Rightly so, as this approach adheres to "the cardinal principle of judicial restraint—if it is not necessary to decide more, it is necessary not to decide more." *PDK Labs. Inc. v. DEA*, 362 F.3d 786, 799 (D.C. Cir. 2004) (Roberts, J., concurring in part and concurring in judgment); *accord BellSouth Telecommunications, Inc. v. Farris*, 542 F.3d 499, 505 (6th Cir. 2008). This Court can and should hold that the Final Rule violates Section 1008 without feeling any need to give HHS an advisory opinion on what the law permits.

A similar insight defeats HHS's response to the States' fungibility argument. HHS notes

that the States' argument regarding "the fungibility of money cannot be taken to its logical ex-treme without" turning Section 1008 into an unambiguous, strict prohibition on "*any* overlap in a grantee's abortion and non-abortion services." Opp. Br., R.2, PageID#336. And that, HHS says, would contradict *Rust*'s ambiguity finding. The problem with this response is that the States' argument need not be taken to its "logical extreme." It would suffice to say that, because money is fungible, Section 1008 requires *some* meaningful protections to prevent the subsidization of abortion. And the 2000-era guidance falls well short of the mark. Again, that guidance allows a *significant* amount of intermingling of Title X and non-Title X resources—grantees may even have "an abortion element in a program of family planning services," 65 Fed. Reg. at 41282. It is one thing to say, as *Rust* does, that Section 1008's ambiguity leaves HHS with room to decide what degree of financial and physical separation it will demand. It is quite another thing to say, as HHS does, that Section 1008's ambiguity empowers the agency to use Title X funds to subsidize abortion as long as they do not make it too obvious. Thus, even if (as HHS says) the 2019 Rule required more separation than Section 1008 required, Opp. Br., R.2, PageID#357, it does not fol-low that the Final Rule requires enough.

## B. The Final Rule is arbitrary and capricious

To survive review under the APA, agencies must "engage in 'reasoned decisionmaking.'" *Michigan v. E.P.A.*, 576 U.S. 743, 750 (2015) (citation omitted). An agency will be held not to have engaged in reasoned decisionmaking if it "relied on factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Nat'l Ass'n of Home*

8

*Builders v. Defs. of Wildlife*, 551 U.S. 644, 658 (2007) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).  The agency must consider any reliance interests the prior policy engendered, and must consider and rationally reject alternatives under the ambit of the existing policy.  *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1912–13 (2020).  HHS's decision to abandon financial- and physical-separation requirements, and its decision to mandate abortion referrals, are not the product of reasoned decisionmaking.  As a result, the States will likely prevail on the merits on the ground that the Final Rule is arbitrary and capricious.

> **1.** **HHS engaged in arbitrary and capricious decisionmaking when it adopted the Final Rule's financial- and physical-separation requirements**

For at least four reasons, HHS acted arbitrarily and capriciously in adopting the Final Rule's approach to financial and physical separation.  PI Mot., R.2, PageID#156–68.

*Failure to justify abandonment of the 2019 Rule.*  HHS, in its Final Rule, concluded that the 2019 Rule imposed stricter separation requirements than were necessary to comply with Section 1008.  On this ground, it abandoned those requirements in favor of the guidance and policies in place under the 2000 Rule.  *See* 86 Fed. Reg. at 56145.  But HHS never considered whether the reinstituted 2000-era policies impose separation requirements that were *strict enough*.  Nor did it consider alternatives to the 2000-era policies.  Because HHS failed to consider key aspects of the problem before it, including viable alternative polices, it acted arbitrarily and capriciously.  PI Mot., R.2, PageID#158–60.

HHS responds that, for much of Title X's history, the agency enforced separation policies similar to those that the Final Rule reinstituted.  And its brief, like the Final Rule, emphasizes that the agency found little evidence of compliance issues during the years in which these policies

were in place. Opp. Br., R.27, PageID #339-40; 86 Fed. Reg. at 56145. But, for two reasons this response is inadequate to rebut the States' arguments.

First, the failure to uncover violations does not mean there were no violations—it may instead indicate that the policies made it difficult or impossible to uncover violations. *See* PI Mot., R.2, PageID#158-59. HHS dismisses this concern, which it says rests on the "assum[ption] that the 2019 Rule's strict separation requirements are required by Section 1008, and that any activity that would run afoul of that separation requirement would run afoul of Section 1008." Opp. Br., R.27, PageID#342 n.9. That is not true. Even HHS does not dispute that Section 1008 forbids it from using Title X funds to subsidize abortion. The problem with HHS's reinstitution of the 2000-era policies is that the Final Rule gave no basis for concluding that those policies enabled the agency to discover improper subsidization of abortion. For example, even HHS would presumably concede that Section 1008 bars Title X providers from subsidizing abortion through dollar-for-dollar fund-shifting—that is, reducing their expenditure of non-Title X funds on family-planning services by whatever amount they receive in Title X grants, and using every saved dollar to provide abortions. (If HHS does not believe that such a maneuver constitutes subsidizing abortion, its interpretation of Section 1008 is unreasonable, and thus entitled to no deference, as it permits abortion clinics to pay for abortions with Title X funds—in other words, to subsidize abortion with Title X funds.) HHS never explains, however, how it knows that the Final Rule's approach to financial and physical separation will enable the agency to uncover such maneuvers. While HHS says it "closely monitors" grantees "through regular grant reports, compliance monitoring visits, and legally required audits," 86 Fed. Reg. at 56145, it neither considers whether such procedures adequately uncovered violations in the past nor explains why it believes these

10

procedures can be trusted to work in the future.

Second, HHS's response does not make up for the second flaw in its decisionmaking: the failure to consider less-extreme alternatives than the complete abandonment of the 2019 Rule's financial- and physical-separation requirements. While HHS was not required to "consider all policy alternatives in reaching its decision," it was required to "address obviously germane alternatives proposed by commenters during the notice-and-comment period." Opp. Br., R.27, Page-ID #342 (quoting *Am. Ass'n of Cosmetology Sch. v. DeVos*, 258 F. Supp. 3d 50, 75 (D.D.C. 2017)). It failed to do so. The States presented viable alternatives. Recognizing HHS's desire to alleviate "undue and improper" restrictions on grantees, 86 Fed. Reg. at 56145, the States proposed several options for easing the compliance costs associated with the 2019 Rule's financial- and physical-separation requirements. In particular, the States suggested "dedicating funds to assist grantees with those costs, providing additional runway for grantees to comply, giving additional guidance to clarify restrictions, or granting targeted exceptions for those Title X programs in need of flexibilities." States' Comment Letter, R.2-2, PageID #194–95. (The States did not suggest, as HHS implies, imposing "additional restrictions" on grantees. Opp. Br., R.27, PageID#342.) Neither the Final Rule nor HHS's brief even mentions these possibilities. By failing to consider these alternatives, all of which are "within the ambit of the existing policy," HHS failed to engage in reasoned decisionmaking. *See Regents*, 140 S.Ct. at 1913. That was arbitrary and capricious.

***Failure to establish negative health consequences.*** HHS's abandonment of the 2019 Rule's financial- and physical-separation requirements was arbitrary and capricious for a second reason: HHS justified its change in policy with reference to the 2019 Rule's "negative health consequences," but relied on data that failed to prove such consequences. *See* PI Mot., R.2,

PageID#160–66. HHS's reasoning suffered from two particular flaws. First, while HHS identified data showing a decrease in Title X participation following the 2019 Rule's effective date, it failed to justify its assumption that a decrease in the provision of Title X services implies harm to the public health. *Id.*, PageID#160–63. Second, in concluding that the 2019 Rule had caused a *permanent* decrease in the number of Title X providers, HHS failed to account adequately for the degree to which the COVID-19 pandemic hindered the ability of would-be providers to fill any gaps in coverage caused by other providers leaving the program. *See* PI Mot., R.2, PageID#163–66.

HHS's responses to these arguments are unavailing. With respect to the flawed assumption that a smaller Title X program is always bad for public health, HHS continues to stress that prior grantees, having left the Title X program, no longer offer Title X services at Title X prices. Opp. Br., R.27, PageID#343–44. HHS says it is reasonable to assume that public health must have declined. *Id.*, PageID#344. But that is simply not true. For one thing, the Final Rule acknowledged that some patients continued seeking care outside the program, and that Planned Parenthood provided *more* services after leaving the Title X program. 86 Fed. Reg. at 56174. For another, there is reason to think that providing family-planning services at an abortion clinic may be deleterious for public health, and that a smaller program *without* abortion providers may therefore improve public health. *See* PI Mot., R.2, PageID#162–63 (citing 116 Cong. Rec. 37375 (Nov. 16, 1970) (statement of Rep. Dingell)). Indeed, sexually transmitted diseases reached a record high in 2018, under the very regime that the Final Rule seeks to reinstitute. *Id.*, PageID#163 (citing Association of State and Territorial Health Officials, *National STD Trends: Key Information on Sexually Transmitted Diseases for Public Health Leadership* 1 & n.1 (2019), https://perma.cc/G58R-

WBEW and States' Comment Letter, R.2-2, at 7–8 & n.36). Given all this, HHS needs to *justify* its decision to assume that a smaller Title X program means worse public health. It did not do so. True, it cited one study suggesting that restoring the 2000-era rules would reduce unintended pregnancies significantly. 86 Fed. Reg. at 56172. But as the States explained already, that study is deeply flawed. *See* PI Mot., R.2, PageID#161. HHS silently concedes the point by declining to defend the study.

Now consider what HHS has to say about the Final Rule's assumption that the 2019 Rule caused a *permanent* decrease in the number of Title X providers: "the data clearly reflects that the 2019 Rule 'directly resulted in a significant loss of grantees, subrecipients, and service sites.'" Opp. Br., R.27, PageID#345 (quoting 86 Fed. Reg. at 56151). The trouble for HHS is that saying it does not make it so. The States identified a serious flaw in the primary study on which HHS relied to support its conclusion that the drop in providers was the permanent result of the 2019 Rule and not a temporary effect of the COVID-19 pandemic. In particular, the study failed to account for the fact that, during the pandemic, few would-be providers had the resources to expand their services. PI Mot., R.2, PageID#164. HHS does not respond to this problem at all. To make matters worse, the same study suffered from a second flaw: it failed to account for the number of individuals who sought Title X services *because of* the 2019 Rule. *Id.* The presence of such individuals means that data regarding services rendered in 2020 *understates* the pandemic's effect. *Id.*, PageID#164–65. HHS does not disagree. Instead, HHS says it is "impossible" to know why individuals seek Title X services. Opp. Br., R.27, PageID#345. That is likely wrong and certainly irrelevant. It is likely wrong because providers that participated in the Title X program both before and after the 2019 Rule may have information or even data regarding how many people

sought Title X services for the first time after the 2019 Rule's promulgation, which would provide some evidence of the degree to which the 2019 Rule increased Title X use. It is irrelevant because the impossibility of compiling good data does not excuse reliance on bad data: if it is impossible to know how many individuals sought Title X services because of the 2019 Rule, then it is irrational to assume that no one did. Yet that is exactly the assumption that HHS, and the study upon which it relied, made.

*Reliance interests.* The third reason to find the shift in policy arbitrary and capricious is that the Final Rule failed to account for the degree to which the States and other providers took steps in reliance on the 2019 Rule. PI Mot, R.2, PageID#166. HHS responds that the States had no reliance interests, since no one has a "legally cognizable interest[]" in the continued receipt of Title X grants. Opp. Br., R.27, PageID#346. But the Supreme Court rejected the idea that one must have a legal entitlement to the benefits of a policy in order to rely on the policy's existence. In *Regents*, it held that the agency responsible for administering the "DACA" program acted arbitrarily and capriciuosly by canceling the program without considering reliance interests. 140 S. Ct. at 1915. And it did so *notwithstanding* its acknowledgment that DACA recipients have no legal entitlement to the program's benefits. *Id*. at 1914. HHS responds that *Regents*'s holding does not apply to "discretionary funding" programs like Title X. Opp. Br., R.27, PageID#346. While that "interpretation" of *Regents* "happens to fit this case precisely," "it needs more than that to recommend it." *Dep't of Homeland Sec. v. MacLean*, 574 U.S. 383, 394 (2015). *Regents* establishes that the failure to consider reliance interests is arbitrary and capricious. Neither its reasoning nor its holding is limited to DACA or DACA-like programs. It follows that HHS, by failing to consider reliance interests here, acted arbitrarily and capriciously.

14

*Public support.* HHS also acted arbitrarily and capriciously by failing to consider the degree to which abandoning the 2019 Rule's financial- and physical-separation requirements would erode public support for Title X. *See* PI Mot., R.2, PageID#167–68. HHS responds that, since Title X had sufficient public support before the 2019 Rule, it will retain that support when the pre-2019 *status quo* is reinstated. Opp. Br., R.27, PageID#347. That argument is legally impermissible, since this reasoning appears nowhere in the Final Rule. "It is well established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself," not based on "*post hoc* rationalizations for [the] agency action." *State Farm*, 463 U.S. at 50; *accord Atrium Med. Ctr. v. U.S. Dep't of Health & Hum. Servs.*, 766 F.3d 560, 568 (6th Cir. 2014). In any event, times change. As the States showed in their opening brief, the People's representatives in States across the country have enacted numerous laws and policies over the past decade restricting public funding of abortion. PI Mot, R.2, PageID#167. Changing public sentiment and the salience of HHS's abandoning a rule designed to prevent the subsidization of abortion is likely to be controversial.

## 2. HHS acted arbitrarily and capriciously by mandating referrals

HHS's rule requiring referrals for elective abortions is also arbitrary and capricious, for four reasons. PI Mot., R.2, PageID#168–70. Two share substantial overlap with HHS's decision to abandon the 2019 Rule's financial- and physical-separation requirements. First, HHS failed to consider the effect that the Final Rule would have on public support for the Title X program. Second, HHS engaged in illogical reasoning when it concluded that the 2019 Rule caused negative public health consequences. In response to the first two problems, HHS incorporates the arguments it made with respect to the financial- and physical-separation rules. Opp. Br., R.27,

PageID#347–48. Its responses fail for the reasons addressed above.

The other two flaws with HHS's decisionmaking are unique to the agency's decision to mandate referrals. The States consider them in turn.

***Failure to address the 2019 Rule's findings.*** HHS acted arbitrarily and capriciously because it failed to adequately justify its sudden departure from the 2019 Rule. That rule rested on HHS's observation that, "in most instances when a referral is provided for abortion, that referral necessarily treats abortion as a method of family planning." 84 Fed. Reg. at 7717. On that basis, HHS in 2019 found that allowing referrals would, in practice, lead to violations of Section 1008. Yet the Final Rule did not address this observation or explain why it was wrong. It simply ignored it. That was arbitrary and capricious. For, while agencies are free to change course, any "departure" from earlier policy must be "explicitly and rationally justified." *Michigan v. Thomas*, 805 F.2d 176, 184 (6th Cir. 1986). Put differently, the agency must "justif[y]" its change in policy "with a 'reasoned analysis.'" *Rust*, 500 U.S. at 187 (quoting *State Farm*, 463 U.S. at 42).

HHS's brief, like the Final Rule, fails to grapple at all with the agency's prior conclusion. Instead, HHS stresses that Section 1008 does not forbid referrals in the abstract, since it does not *legally* forbid referrals. Opp. Br., R.27, PageID#329–33, 348. But that does not address HHS's prior determination that, *in practice*, referrals usually cause providers to treat abortion as a method of family planning in violation of Section 1008. HHS also attempts to justify its shift in policy by appealing to the loss of providers and coverage following the 2019 Rule's implementation. *Id.* at PageID#348 (quoting 86 Fed. Reg. at 56150–51). But that does not address the relevant question either, since it has no bearing on HHS's prior determination that, "in most instances," providers treat abortion as a method of family planning when they make abortion referrals.

16

***Ethical issues.*** HHS also acted arbitrarily and capriciously by failing to consider ethical concerns surrounding the mandating of abortion referrals—it "entirely failed to consider an important aspect of the problem" before it. *Nat'l Ass'n of Home Builders*, 551 U.S. at 658 (quoting *State Farm*, 463 U.S. at 43). HHS has no good counterargument. Indeed, its brief *proves* that it did not consider the issue. HHS concedes that its notice of proposed rulemaking noted "that the 2019 Rule's ban on referrals was not 'in accordance with the ethical codes of *major medical organizations*.'" *Id.*, PageID#349 (quoting *Ensuring Access to Equitable, Affordable, Client-Centered, Quality Family Planning Services*, 86 Fed. Reg. 19812-01, 19817 (Apr. 15, 2021) (emphasis added)). And in the Final Rule, HHS acknowledged the same: it received comments from *medical organizations* reporting ethical concerns with the 2019 Rule's prohibition on abortion referrals. *Id.*, PageID#350 (quoting 86 Fed. Reg. at 56146). But conspicuously absent from HHS's brief is anything in the Final Rule or the administrative record acknowledging comments from the States regarding ethical concerns that cut the other way. HHS's brief also fails to identify anything in the Final Rule or the administrative record explaining why it found the medical organizations' ethical objections more compelling than the ethical objections lodged by the States. As HHS's silence on these points indicates, the agency "entirely failed to consider an important aspect of the problem" before it. *Nat'l Ass'n of Home Builders*, 551 U.S. at 658 (quoting *State Farm*, 463 U.S. at 43).

And HHS cannot dispute that ethical concerns are an important aspect of every Title X rule. Indeed, the very decision on which HHS primarily relies—the Fourth Circuit's decision in *Mayor of Baltimore v. Azar*, 973 F.3d 258 (4th Cir. 2020) (*en banc*)—expressly held that HHS acts arbitrarily and capriciously when it fails to thoroughly *explain* why its rule comports with medical ethics. *Id.* at 276. Yet, as the foregoing shows, HHS in the Final Rule offered no explanation of

17

its decision to reject the States' ethical concerns. That was, *per se*, arbitrary and capricious.

Perhaps in attempt to make up for its failure to address the States' ethical concerns during the rulemaking process, HHS tries to do so now. But again, it cannot legally do so, since "an agency's action must be upheld, if at all, on the basis articulated by the agency itself" in the administrative record, not based on "counsel's *post hoc* rationalizations." *State Farm*, 463 U.S. at 50. In any event, HHS's belated explanation fails on its own terms. The States explained in their comment letter that States, not major medical organizations, are the regulators of medical ethics. *See* States' Comment Letter, R.2-2, PageID#197. Yet the States, as opposed to medical organizations, have enacted many laws empowering medical providers *not* to make abortion referrals. *Id.*, PageID#197 n.53. Thus, the then-proposed (now-final) rule mandating abortion referrals was contrary to medical ethics. *Id.*, PageID#197. HHS responds that "[n]one of these laws make any mention of *referrals*," and instead provide only "that a medical provider cannot be forced to perform an abortion or participate in an abortion procedure." Opp. Br., R.27, PageID#351. As an initial matter, making an abortion referral constitutes "participating in" abortion. That is why Ohio interprets its law to excuse providers from having to make abortion referrals. *See* Ohio Rev. Code §4731.91(D). In any event, some of the cited laws speak directly to referrals. For example, a Louisiana law prohibits discrimination against individuals based on their refusal to "recommend" or "accommodate" an abortion, LA Rev. Stat. §40:1061.2, while a Kentucky law frees individuals from having to "cooperate in" an abortion, Ky. Rev. Stat. §311.800(4). Oregon law provides: "A physician or naturopathic physician is not required *to give advice with respect to* or participate in any termination of a pregnancy" in some situations. Or. Rev. Stat. Ann. §435.485 (emphasis added). And Montana law creates a right not "to advise concerning" abortion. Mont.

Code Ann. §50-20-111(2).

Finally, HHS is mistaken in arguing that it was reasonable to defer to the American College of Obstetrics and Gynecology, often called "ACOG," on matters of medical ethics. Opp. Br., R.27, PageID#350. Even putting aside that HHS never addressed the point in its Final Rule, it misses the major problem with relying on such groups. Not long ago, the Department of Justice filed a brief arguing that abortion regulations opposed by ACOG (and other large medical groups, like the AMA) help promote "the integrity and ethics of the medical profession." Br. for the United States as *Amici Curiae*, *Preterm v. McCloud*, No. 18-3329, 2020 WL 487179, *10 (6th Cir.); *contra* Br. for Am. Coll. of OBGYNS, *et al.*, as *Amici Curiae*, *Preterm-Cleveland v. McCloud*, No. 18-3329, 2020 WL 980679 (6th Cir.). It is indeed irrational for a federal agency, without explanation, to rely on the ethical views of an organization whose views *the federal government itself* so recently deemed contrary to medical ethics.

## II.  The plaintiff States satisfy the remaining preliminary-injunction factors

The States have also satisfied the remaining factors governing their request for injunctive relief. HHS cannot seriously dispute that, *if* the Final Rule is illegal, the public interest and concerns about harms to others weigh in favor of a preliminary injunction. Opp. Br., R.27, PageID#361–62. Rightly so. *See* PI Mot., R.2, PageID#172–73. Instead, HHS argues that the Final Rule is not illegal and that the States will suffer no irreparable harm from the Rule's taking effect. Section I of this brief addresses the Rule's legality. *See* Opp. Br., R.27, PageID#359–61. This section addresses the three irreparable injuries that the States will suffer absent a preliminary injunction.

**1.** If the Final Rule goes into effect, the States will sustain irreparable harm in the form of

greater competition for Title X funds.  In particular, they will have to compete with entities (like abortion providers) who were ineligible for Title X funds under the 2019 Rule.

HHS admits, as it must, that increased competition is an injury.  Opp. Br., R.27, Page-ID#352.  But it says that an injury sufficient for standing is not "automatically" irreparable.  *Id.*, PageID#353.  That is true, but also irrelevant.  Here, there is no way for the States to make themselves whole from the injury they will suffer:  the States will not be able to sue the federal government, which has sovereign immunity, to recover the resources they spend competing for Title X grants or the funding they lose.  In the Sixth Circuit, the impossibility of getting money damages from the federal government makes economic injuries the federal government inflicts irreparable.  *See Kentucky v. U.S. ex rel. Hagel*, 759 F.3d 588, 599–600 (6th Cir. 2014); *accord Ohio v. Yellen*, —F.Supp.3d—, No. 1:21-CV-181, 2021 WL 2712220, at *21 (S.D. Ohio July 1, 2021); *see also United States v. Real Prop. known as 2916 Forest Glen Ct., Beavercreek, Ohio*, 162 F. Supp. 2d 909, 915 (S.D. Ohio 2001) (no irreparable harm where, because of sovereign-immunity waiver, aggrieved party could sue government for money damages).  And in any event, "competitive losses," such as the loss of an advantageous competitive position, cause irreparable harm.  *See Basicomputer Corp. v. Scott*, 973 F.2d 507, 511 (6th Cir. 1992).  The States will sustain such an injury.  Indeed, the Final Rule is *designed* to bring more providers into the program, *see* 86 Fed. Reg. at 56152, meaning the States will lose their competitive position.

HHS responds that only "potentially *unfair* competition"—in other words, competition the plaintiff is entitled not to face—can cause irreparable injury.  Opp. Br., R.27, PageID#353 n.15 (citing *Basicomputer*, 973 F.2d at 512).  Even if that is true, it is irrelevant here:  if the Final Rule violates the APA, and thus wrongfully allows entities not eligible for grants to compete for grants,

the States are subjected to competition they are entitled not to face.  In any event, even HHS must concede that increased competition for grant funds constitutes irreparable harm if current grantees will face "a significant additional burden upon [the] ability to secure funding."  *Sherley v. Sebelius*, 664 F.3d 388, 398 (D.C. Cir. 2011).  Here, the record shows that Ohio gained *$11 million* in additional grant funds when abortion providers left the Title X program following the 2019 Rule and that this enabled Ohio to expand its services.  *See* Clark Decl., Ex. 1 ¶¶7, 10, 13–14. Since the whole point of the Final Rule is to incentivize those providers to reenter, Ohio will now be significantly burdened in its ability to secure this additional funding going forward.  And the same is true of other States that participate in Title X.  Since their participation is a matter of public record, *see* Office of Population Affairs, *Title X Family Planning Directory* (October 2021), https://perma.cc/TG8P-KHMQ, they did not need to submit further evidence to win relief for themselves, as HHS insists.

At times, HHS suggests that the loss of grant funds constitutes an irreparable injury only when it will "devastate" the plaintiff in its "ability to carry out its mission."  Opp. Br., R.27, PageID#356 (quoting *Experience Works, Inc. v. Chao*, 267 F. Supp. 2d 93, 96 (D.D.C. 2003)).  But if that were true, it is doubtful anyone would *ever* be able to challenge Title X rules.  Planned Parenthood, for example, served *more* patients after leaving the Title X program.  86 Fed. Reg. at 56174.  So accepting the government's theory of irreparable harm would mean blocking Planned Parenthood and other clinics from winning a preliminary injunction of any future reinstitution of the 2019 Rule.  Tellingly, in the challenges to the 2019 Rule, no court denied that abortion clinics or States that left the program suffered irreparable harm as a result.  Rightly so.

**2.**  The States (like Ohio) that expanded their services based on the availability of addi-

tional Title X grants will face reputational injuries if they are no longer able to provide the same level of service. HHS doubts the States will suffer such harms. Opp. Br., R.27, PageID#358. But if the States lose out on *millions* of dollars in grant funds, as they will under the Final Rule, they will need to either self-fund the current level of services or scale back services. Regardless of the choice they make, the injury is irreparable: self-funding means spending unrecoverable funds, and scaling back services means sustaining a reputational injury as a result of denying care to those who have come to rely on it.

**3.** Finally, the States will be irreparably injured if they are forced to make referrals. To do so would require the States to put their imprimatur on abortion—an imprimatur that the States, as their laws indicate, legitimately seek to withhold. *See* PI Mot., R.2, Page ID#172. HHS responds that States concerned about the referral requirement can simply drop out of the program. Opp. Br., R.27, PageID#359. But the same could be said of the abortion providers who disliked the 2019 Rule, and no court held that this defeated their ability to prove irreparable injury. HHS further says that, because the States participated in the Title X program before the 2019 Rule, they must not object to the referral requirement. Opp. Br., R.27, PageID#359–60. That, however, does not follow. States, just like all other parties, are entitled to conclude that the benefits of participating in a program outweigh the costs of doing so. That States were willing to bear those injuries to participate in the Title X program does not mean that they are not injuries.

## CONCLUSION

The Court should preliminarily enjoin the Final Rule.

Dated: December 3, 2021

STEVE MARSHALL
Alabama Attorney General

*/s/ Thomas Wilson*
THOMAS WILSON  (admitted *pro hac vice*)
Deputy Solicitor General
Office of the Attorney General
501 Washington Ave
Montgomery, AL 36130
Phone: 332-242-7300
Thomas.Wilson@AlabamaAG.gov

*Counsel for the State of Alabama*


MARK BRNOVICH
Arizona Attorney General

*/s/ Kate Sawyer*
KATE SAWYER (admitted *pro hac vice*)
Assistant Attorney General
Arizona Attorney General's Office
2005 N. Central Ave.
Phoenix, AZ 85004
Phone: 602-542-8304
kate.sawyer@azag.gov

*Counsel for the State of Arizona*

DAVE YOST
Ohio Attorney General

*/s/ Benjamin  M. Flowers*
BENJAMIN M. FLOWERS* (0095284)
Solicitor General
  **Trial attorney*
STEPHEN P. CARNEY (0063460)
MAY DAVIS (admitted *pro hac vice*)
Deputy Solicitors General
30 East Broad Street, 17th Floor
Phone: 6l4-466-8980
Fax: 614-466-5087
bflowers@ohioago.gov

*Counsel for the State of Ohio*


ERIC S. SCHMITT
Missouri Attorney General

*/s/ D. John Sauer*
D. JOHN SAUER (admitted *pro hac vice*)
Solicitor General
Office of the Missouri Attorney General
Supreme Court Building
207 West High Street
Jefferson City, MO 65102
Phone: 573-751-8870
John.Sauer@ago.mo.gov

*Counsel for the State of Missouri*

LESLIE RUTLEDGE
Arkansas Attorney General

*/s/ Vincent M. Wagner*
VINCENT M. WAGNER (admitted *pro hac vice*)
Deputy Solicitor General
Office of the Arkansas Attorney General
323 Center Street, Suite 200
Little Rock, Arkansas 72201
Phone: 501-682-6302
vincent.wagner@arkansasag.gov

*Counsel for the State of Arkansas*

DOUGLAS J. PETERSON
Nebraska Attorney General

*/s/ James A. Campbell*
JAMES A. CAMPBELL (0081501)
Solicitor General
Office of the Nebraska
Attorney General
2115 State Capitol
Lincoln, NE 68509
Phone: 402-471-2682
jim.campbell@nebraska.gov

*Counsel for the State of Nebraska*

ASHLEY MOODY
Florida Attorney General

*/s/ Natalie Christmas*
NATALIE CHRISTMAS (admitted *pro hac vice*)
Assistant Attorney General of Legal Policy
Office of the Attorney General
PL-01 The Capitol
Tallahassee, FL 32399-1050
Phone: 850-414-3300
Fax: 850-410-267
Natalie.christmas@myfloridalegal.com

*Counsel for the State of Florida*

JOHN M. O'CONNOR
Oklahoma Attorney General

*/s/ Zach West*
ZACH WEST (admitted *pro hac vice*)
Assistant Solicitor General
Office of the Oklahoma Attorney General
313 N.E. Twenty-First St.
Oklahoma City, OK 73105
Phone: 405-522-4392
zach.west@oag.ok.gov

*Counsel for the State of Oklahoma*

DEREK SCHMIDT
Kansas Attorney General

*/s/ Kurtis Wiard*
KURTIS WIARD (admitted *pro hac vice*)
Assistant Solicitor General
Office of Kansas Attorney General
120 SW 10th Avenue, 3rd Floor
Topeka, KS 66612-1597
Phone: 785-368-8435
Fax: 785-291-3767
kurtis.wiard@ag.ks.gov

*Counsel for the State of Kansas*

ALAN WILSON
South Carolina Attorney General

EMORY SMITH
   (admitted *pro hac vice*)
Deputy Solicitor General
*/s/ Thomas T. Hyrdick*
THOMAS T. HYDRICK
   (admitted *pro hac vice*)
Assistant Deputy Solicitor General
Office of the Attorney General
P.O. Box 11549
Columbia, SC 29211
Phone: 803-734-3742
ThomasHydrick@scag.gov

*Counsel for the State of South Carolina*

DANIEL CAMERON
Kentucky Attorney General

*/s/ Olivia F. Amlung*
OLIVIA F. AMLUNG (0098606)
Assistant Attorney General
Office of Kentucky Attorney General
1840 Simon Kenton Way, Suite 5300
Covington, KY 41011
Phone: 502-696-5300
Fax: 502-564-2894
Olivia.Amlung@ky.gov

*Counsel for the Commonwealth of Kentucky*

PATRICK MORRISEY
West Virginia Attorney General

*/s/ Lindsay S. See*
LINDSAY S. SEE
   (admitted *pro hac vice*)
Solicitor General
Office of the West Virginia
Attorney General
State Capitol, Bldg 1, Room E-26
Charleston, WV 25305
Phone: 681-313-4550
Lindsay.S.See@wvago.gov

*Counsel for the State of West Virginia*

25

## CERTIFICATE OF SERVICE

I hereby certify that on December 3, 2021, a copy of the foregoing was filed electronically. Notice of this filing will be sent to all parties for whom counsel has entered an appearance by operation of the Court's electronic filing system.

*/s/ Benjamin Flowers*
BENJAMIN FLOWERS (0095284)
Solicitor General