## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

| | | |
|---|---|---|
| STATE OF OHIO, *et al.*, | : | Case No. 1:21-cv-675 |
| Plaintiffs, | : | |
| | : | Judge Timothy S. Black |
| vs. | : | |
| | : | |
| XAVIER BECERRA, *et al.*, | : | |
| Defendants. | : | |

## ORDER DENYING PLAINTIFFS' MOTION
## FOR A PRELIMINARY INJUNCTION

This civil case is before the Court on Plaintiffs' Motion for Preliminary Injunction

(Doc. 2), Defendants' memorandum in opposition (Doc. 27), and Plaintiffs' reply (Doc.

46).[1]  Plaintiffs seek an order preliminarily enjoining the Department of Health and

Human Services ("the Department," or "HHS") from implementing or enforcing the final

rule, *Ensuring Access to Equitable, Affordable, Client-Centered, Quality Family*

*Planning Services*, 86 Fed. Reg. 56144-01 (Oct. 7, 2021) (to be codified at 42 C.F.R. pt.

59) ("the Final Rule").  The Final Rule effectively re-adopts HHS's 2000 Rule by

eliminating strict physical and financial separation between Title X services and abortion

services and by requiring nondirective pregnancy counseling and referrals for abortion

services when requested.  Because the Court finds Plaintiffs unlikely to succeed

---

[1] The Court has also received and considered, with appreciation, four briefs of amicus curiae: one from Montana, Georgia, Idaho, Indiana, Louisiana, Mississippi, South Dakota, and Texas supporting Plaintiffs, (Doc. 22); one from California, New York, Colorado Connecticut, Delaware, Hawai'i, Illinois, Maine, Maryland, Massachusetts, Michigan, Minnesota, Nevada, New Jersey, New Mexico, North Carolina, Oregon, Pennsylvania, Rhode Island, Vermont, Virginia, Washington, Wisconsin, and the District of Columbia supporting HHS, (Doc. 28); one from Planned Parenthood Federation of America, Inc. supporting HHS, (Doc. 31); and one from National Family Planning & Reproductive Health Association (Doc. 33).

on the merits of their APA claim, that the Plaintiff states will not be irreparably harmed when the Final Rule becomes effective, and that enjoining the Final Rule would perpetuate well-documented harm to the public, the Court **DENIES** injunctive relief to Plaintiffs.

## I.     BACKGROUND

This case is a straightforward application of administrative law to Title X of the *Family Planning Services & Population Research Act of 1970*, Pub. L. No. 91-572, 84 Stat. 1504 (1970), codified at 42 U.S.C. §§ 300 *et seq.* ("Title X" or "the Act"). In 1970, Congress enacted Title X to provide federal funding for family planning services. The statute authorizes the Secretary of the Department of Health and Human Services to promulgate regulations for the distribution of Title X grants. *Id.* at § 300. Title X expressly requires that "priority will be given" to projects that provide family planning services to "persons from low-income families," *id.* at § 300a-4, and that funded projects must "offer a broad range of acceptable and effective family planning methods and services," *Id.* In Section 1008 of Title X, however, Congress qualified that "[n]one of the funds appropriated under this subchapter shall be used in **programs** where abortion is a method of family planning." *Id.* at § 300a-6 (emphasis supplied). This language is at the heart of this dispute.

For roughly the first 18 years of Title X's history, participating providers could offer non-directive pregnancy counseling including referrals for abortion at the patient's

request.[2]  The regulations implementing Title X merely required grant applicants to provide "[a]ssurances that … [t]he project w[ould] not provide abortions as a method of family planning."  *Project Grants for Family Planning Services*, 36 Fed. Reg. 18,465, 18,466 (Sept. 15, 1971).

Then, in 1988, HHS issued regulations that barred providers from referring patients for abortion services or offering them any abortion-related information, and required providers to refer patients to prenatal care regardless of their patients' wishes. *Statutory Prohibition on Use of Appropriated Funds in Programs Where Abortion is a Method of Family Planning; Standard of Compliance for Family Planning Services Projects*, 53 Fed. Reg. 2,922, 2,927 (Feb. 2, 1988).  The 1988 Rule further required physical and financial separation between Title X-funded services and any abortion-related services.  *Id.*  The 1988 Rule did not, however, purport to extend its restrictions beyond the "Title X-funded 'program' or 'project.'"  *Id.* at 2927.  HHS found "read[ing] the term 'program' in section 1008 as relating to the funded organization as a whole" was "not supportable."  *Id.*  The 1988 Rule was immediately challenged in court and was therefore never fully effective nationwide.  *See Standards of Compliance for Abortion-Related Services in Family Planning Services Projects*, 65 Fed. Reg 41,270, 41,271

---

[2] *See* Mem. from Carol C. Conrad, Off. of the Gen. Couns., Dep't of Health, Educ. & Welfare, to Elsie Sullivan, Assistant for Info. & Educ., Off. of Family Planning, BCHS (Apr. 14, 1978) ("[T]he provision of information concerning abortion services, mere referral of an individual to another provider of services for an abortion, and the collection of statistical data and information regarding abortion are not considered to be proscribed by § 1008.") (cited by *Family Planning Ass'n of Me. v. HHS*, 404 F. Supp. 3d 286, 292 n.7 (D. Me. 2019)); Standards of Compliance for Abortion-Related Services in Family Planning Service Projects, 58 Fed. Reg. 7464, 7464 (Feb. 5, 1993).

(July 3, 2000).

In 1991, the Supreme Court upheld the 1988 Rule. *Rust v. Sullivan,* 500 U.S. 173 (1991). Petitioners in *Rust* argued that Congress did not intend strict financial and physical separation, nor did Congress intend to ban referrals for abortion-related services where patients requested one. *Id.* at 184, 189. In rejecting petitioners' arguments, the Court held that Section 1008's legislative history was "ambiguous," and thus permitted multiple interpretations. The Supreme Court observed that petitioners' interpretation "may [have] be[en] a permissible one," but it was "by no means the only one" and "not the one found by the Secretary." *Id.* at 189. Thus, the Court accorded the interpretation on which the 1988 Rule was based "substantial deference." *Rust*, 500 U.S. at 184.

Where they *were* in effect, the 1988 Rules did not last long. In February 1993, President William Clinton directed HHS to rescind the 1988 Rules and return to the "compliance standards that were in effect prior to the issuance of the [1988 Rules]." *The Title X "Gag Rule,"* 58 Fed. Reg. 7,455 (Jan. 22, 1993); *Standards of Compliance for Abortion-Related Services in Family Planning Service Projects*, 58 Fed. Reg. 7,462 (Feb. 5, 1993) (interim rule). HHS simultaneously issued a notice of proposed rulemaking. *Standards of Compliance for Abortion-Related Services in Family Planning Service Projects*, 58 Fed. Reg. 7,464 (notice of proposed rule).

Starting in 1996, Congress added a rider to its annual HHS appropriations act that stated: "[A]mounts provided to [Title X] projects ... shall not be expended for abortions, [and] all pregnancy counseling shall be nondirective." *Omnibus Consolidated Rescissions and Appropriations Act of 1996*, Pub. L. No. 104–134, 110 Stat. 1321, 1321-221 (Apr.

26, 1996). An identical rider has appeared in every annual HHS appropriations bill since 1996. *See, e.g.*, *Consolidated Appropriations Act, 2021*, Pub. L. No. 116-260, 134 Stat 1182 (Dec. 27, 2020).

After considering the interim rule for nearly seven years, HHS released the final version in July 2000. *Standards of Compliance for Abortion-Related Services in Family Planning Services Projects*, 65 Fed. Reg. 41,270, 41,271 (July 3, 2000). The 2000 Rule mostly "readopt[ed] the regulations … that applied to [Title X] prior to February 2, 1988." *Id.* It permitted referrals for abortion services at the patient's request. *Id.* at 41,274. It also rejected the strict financial and physical separation requirements from the 1988 Rule. *Id.* at 41,275-76. HHS concluded that those requirements were "unenforceable" and inconsistent "with the efficient and cost-effective delivery of family planning services." *Id.* at 41,275-76. Simultaneously, HHS published notice of its interpretations of Section 1008's requirements. *Provision of Abortion-Related Services in Family Planning Services Projects*, 65 Fed. Reg. 41,281 (Jul. 3, 2000). The notice clarified that Section 1008's prohibition on "funds … used in a program where abortion is a method of family planning" "does not apply to all the activities of a Title X grantee, but only to those within the Title X project." *Id.* at 41,281. HHS defined "Title X project" as the "set of activities the grantee agreed to perform … as a condition of receiving Title X funds." *Id.* The notice warned that "[m]ere technical allocation of funds, attributing federal dollars to non-abortion activities," does not comply with Section 1008. By way of illustration, HHS elaborated that:

> Certain kinds of shared facilities are permissible, so long as it is possible to distinguish between the Title X supported activities and non-Title X abortion-related activities: (a) A common waiting room is permissible, as long as the costs [are] properly pro-rated; (b) common staff is permissible, so long as salaries are properly allocated and all abortion related activities of the staff members are performed in a program which is entirely separate from the Title X project. (c) a hospital offering abortions for family planning purposes and also housing a Title X project is permissible, as long as the abortion activities are sufficiently separate from the Title X project; and (d) maintenance of a single file system for abortion and family planning patients is permissible, so long as costs are properly allocated.

*Id.* at 41,282. **The 2000 Rule remained in effect, unchallenged, for more than 18 years.**

Then, in 2019, under the Trump administration, HHS promulgated a new final rule reinterpreting Section 1008. *Compliance with Statutory Program Integrity Requirements*, 85 Fed. Reg. 7,714, 7,722-77 (Mar. 4, 2019). The 2019 Rule reinstated the 1988 Rule's requirements for strict physical and financial separation citing the "fungibility of Title X resources." *Id.* It eliminated the requirement for nondirective pregnancy counseling (*i.e.*, counselling that is not designed to direct a patient towards either prenatal care or termination) citing federal conscience laws. *Id.* at 7,716. And it prohibited referrals for abortion because, in the Department's view, "referral necessarily treats abortion as a method of family planning." *Id.* at 7,717. HHS predicted that these changes would "contribute to more clients being served," and that "new applicants w[ould] apply to serve unserved or underserved patients and/or less concentrated population areas," and further that "new providers who previously were unable to participate in Title X projects

6

due to conscience concerns with the 2000 regulations w[ould] be free to apply for a Title X grant or to participate in a Title X project." *Id.* at 7,723.

This prediction proved wishful. Shortly after the 2019 Rule took effect, the number of Title X grantees cratered. According to HHS:

> After the implementation of the 2019 Title X Final Rule, 19 Title X grantees out of 90 total grantees, 231 subrecipients, and 945 service sites immediately withdrew from the Title X program. Overall, the Title X program lost more than 1,000 service sites. Those service sites represented approximately one quarter of all Title X-funded sites in 2019. Title X services are not currently available at all in six states (HI, ME, OR, UT, VT, and WA) and are only available on a very limited basis in six additional states (AK, CT, MA, MN, NH, and NY). California, the single-largest Title X project in the nation (before the 2019 Final Rule) had 128, or 36 percent, of its Title X service sites withdraw from the program, leaving more than 700,000 patients without access to Title X-funded care. Similarly, in New York, the number of Title X-funded service sites dropped from 174 to just two, leaving more than 328,000 patients without Title X-funded care. All Planned Parenthood affiliates—which in 2015 had served 41 percent of all clients at Title X service sites—withdrew from Title X due to the 2019 Final Rule.

*Ensuring Access to Equitable, Affordable, Client-Centered, Quality Family Planning Services*, 86 Fed. Reg. 19,812, 19,815 (April 15, 2021). The Office of Population Affairs ("OPA"), the office which administers Title X within HHS, estimates that **the 2019 Rule caused 1.5 million fewer patients to participate in Title X-funded services between 2019 and 2020.** Christina Fowler et al., *Title X Family Planning Annual Report: 2020 National Summary*, OPA, 25 (Sept. 2021), https://opa.hhs.gov/sites/default/files/2021-09/title-x-fpar-2020-national-summary-sep-2021.pdf.

The Department's efforts to reverse this trend were unavailing. When the withdrawn Title X grantees relinquished their funding, HHS distributed $33.6 million dollars of relinquished funds to 50 Title X grantees. *Press Release, HHS, HHS Issues Supplemental Grant Awards to Title X Recipients* (Sept. 30, 2019), https://opa.hhs.gov/about/news/grant-award-announcements/hhs-issues-supplemental-grant-awards-title-x-recipients. The Department "expect[ed] the supplemental awards w[ould] enable grantees to come close to—if not exceed—prior Title X patient coverage." *Id.* But by the end of 2019, OPA estimated that Title X had served 21% fewer patients (844,083 users) than in 2018.

Dozens of states challenged the rule.[3] District Courts for the District of Maryland,[4] the Eastern District of Washington,[5] the District of Oregon,[6] and the Northern District of California[7] granted preliminary injunctions. Sitting en banc, the Court of Appeals for the Ninth Circuit, vacated three of the preliminary injunctions. *See California by & through Becerra v. Azar*, 950 F.3d 1067 (9th Cir. 2020). The Court of Appeals for the Fourth Circuit, also en banc, disagreed with the Ninth Circuit. *Mayor of Baltimore v. Azar*, 973 F.3d 258 (4th Cir. 2020). Noting "the Ninth Circuit did not have

---

[3] Washington, Oregon, New York, Colorado, Connecticut, Delaware, District of Columbia, Hawai'i, Illinois, Maryland, Massachusetts, Michigan, Minnesota, Nevada, New Jersey, New Mexico, North Carolina, Pennsylvania, Rhode Island, Vermont, and Virginia.

[4] *Mayor & City Council of Baltimore v. Azar*, 392 F. Supp. 3d 602 (D. Md. 2019).

[5] *Washington v. Azar*, 376 F. Supp. 3d 1119 (E.D. Wash. 2019).

[6] *Oregon v. Azar*, 389 F. Supp. 3d 898 (D. Or. 2019).

[7] *State v. Azar*, 385 F. Supp. 3d 960 (N.D. Cal. 2019).

the full administrative record before it," the Fourth Circuit affirmed the Maryland court's ruling that the 2019 Rule was arbitrary and capricious, and upheld the lower court's permanent injunction of the 2019 Rule in the state of Maryland. *Mayor of Baltimore*, 392 F. Supp. 3d at 280, 295.

On February 22, 2021, the Supreme Court granted certiorari and consolidated the appeals from the Ninth and Fourth Circuits. *Oregon v. Cochran*, 141 S. Ct. 1369 (2021). But on March 12, 2021, the parties voluntarily dismissed the cases. *See Am. Med. Assn. v. Becerra*, 141 S. Ct. 2170 (2021).

On October 7, 2021, HHS published a new final rule interpreting Section 1008, ("the Final Rule"). Ensuring Access to Equitable, Affordable, Client-Centered, Quality Family Planning Services, 86 FR 56,144-01 (Oct. 7, 2021). **The Final Rule effectively re-adopts the 2000 Rule by eliminating strict physical and financial separation between Title X services and abortion services and by requiring nondirective pregnancy counseling and referrals for abortion services when requested.** *Id.* at 56,144. In response, some former Title X grantees have already mobilized to return to the program, either as sub-grantees[8] or by submitting applications to return to return as primary grantees.[9]

---

[8] *See, e.g.*, Bacharier, *Planned Parenthood's Springfield, Joplin Clinics to Rejoin Federal Grant Program after Trump Rule Reversed*, Springfield News-Leader (Oct. 22, 2021), https://www.newsleader.com/story/news/politics/2021/10/22/springfield-joplin-mo-planned-parenthood-rejoins-federal-program-titlex-after-trump-rule-reversed/6119400001/

[9] *See* Doc. 31-1 at 19; HHS, *Funding to Address Dire Need for Family Planning Services* (Nov. 10, 2021), https://www.grants.gov/web/grants/view-opportunity.html?oppId=335742); Dep't Health & Human Servs., Title X Family Planning Services Grants (Oct. 27, 2021), https://www.grants.gov/web/grants/view-opportunity.html?oppId=334698.

Plaintiffs, 12 states represented by their attorneys general, now seek to preliminarily enjoin the Final Rule under the Administrative Procedure Act ("the APA"). They argue that the Final Rule is "arbitrary and capricious" and/or "otherwise not in accordance with law." 5 U.S.C. § 706(2). They are wrong on both counts. And because the available record establishes that Plaintiffs are unlikely to succeed on their APA claims,[10] Plaintiffs' motion for a preliminary injunction is **DENIED**.

## II.    STANDARD OF REVIEW

Federal Rule of Civil Procedure 65 empowers district courts to issue preliminary injunctions "to preserve the status quo so that a reasoned resolution of a dispute may be had." *Procter & Gamble Co. v. Bankers Trust Co.*, 78 F.3d 219, 227 (6th Cir. 1996). Courts consider four factors: "(1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of the injunction." *City of Pontiac Retired Emps. Ass'n v. Schimmel*, 751 F.3d 427, 430 (6th Cir. 2014) (per curiam) (en banc). Where the federal government is the defendant, the third and fourth factors merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009). In the Sixth Circuit, "[t]hese factors are not prerequisites that must be met, but are interrelated considerations that must be balanced together." *Commonwealth v. Beshear*, 981 F.3d 505, 508 (6th Cir. 2020).

---

[10] The parties in this lawsuit have stipulated that the Court may adjudicate Plaintiffs' motion for a preliminary injunction without submission of Defendants' certified administrative record. (Doc. 20). *See California v. Azar*, 950 F.3d 1067, 1083 & n.11 (9th Cir. 2020) (en banc) (explaining that courts may rule on preliminary injunction motions before administrative record is completed where doing so is not unfair to either party).

That said, "the existence of an irreparable injury is mandatory," such that "even the strongest showing on the other three factors cannot eliminate the irreparable harm requirement." *D.T. v. Sumner Cnty. Schs.*, 942 F.3d 324, 326-27 (6th Cir. 2019).

A preliminary injunction is an "**extraordinary remedy** involving the exercise of a very far-reaching power, which is to be applied only in the limited circumstances which clearly demand it." *Leary v. Daeschner*, 228 F.3d 729, 739 (6th Cir. 2000). Accordingly, **a party seeking an "injunction must establish its case by clear and convincing evidence."** *Honeywell, Inc. v. Brewer–Garrett Co.*, 145 F.3d 1331 (6th Cir. 1998) (emphasis supplied).

## III.   ANALYSIS

### 1.   Plaintiffs are not likely to win their challenges under the APA

On the merits, Plaintiffs argue that the Court should block the Final Rule under the Administrative Procedure Act (the "APA").  The APA requires that courts "hold unlawful and set aside agency action[s]" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. §706(2)(A).  Plaintiffs assert the Final Rule is (1) "not in accordance" with Section 1008 and (2) "arbitrary and capricious."

#### a.  The Final Rule is entitled to *Chevron* deference

Plaintiffs assert that the Final Rule contravenes Section 1008 of Title X by eliminating strict financial and physical separation requirements, and requiring referrals for abortion services where requested.  To review, Section 1008 states, in its entirety:

11

> None of the funds appropriated under this subchapter shall be used in programs where abortion is a method of family planning.

42 U.S.C. § 300a-6.

In determining whether to uphold an agency's regulation implementing a federal statute, courts apply the "familiar two-step test pursuant to *Chevron U.S.A., Inc. v. Natural Resources Defense Council*, 467 U.S. 837 (1984)." *Mayor of Baltimore v. Azar*, 973 F.3d 258, 268 (4th Cir. 2020). On Step One, a court asks "whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron*, 467 U.S. at 842-43. Alternatively, "[i]f the statute is silent or ambiguous with respect to the specific issue," the court proceeds to Step Two where "the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843.

In this case, both parties agree that *Chevron* applies to the Department's interpretation of Section 1008 underlying the Final Rule. Plaintiffs further concede, as they must, that the Supreme Court in *Rust* declared Section 1008 "ambiguous." *See* Doc. 2 at 13; *Rust*, 500 U.S. at 184. Specifically, the Supreme Court in *Rust* held:

> [W]e agree with every court to have addressed the issue that the language is ambiguous. The language of § 1008—that "[n]one of the funds appropriated under this subchapter shall be used in programs where abortion is a method of family planning"—does not speak directly to the issues of counseling, referral, advocacy, or program integrity.

*Id.* The Supreme Court then quoted the lower court opinions that it agreed with, including the First Circuit's pronouncement that "[t]he language of the statute and the

legislative history can support either of the litigants' positions." *Id.* at 185 (citing *Com. of Mass. v. Sec'y of Health & Hum. Servs.*, 899 F.2d 53, 62 (1st Cir. 1990)). The Supreme Court's holding in *Rust* is binding on this Court. Plaintiffs' citations to the pronouncements of specific legislators (Doc. 2 at 3-4) are therefore gratuitous and irrelevant.

Because the Supreme Court has already held that Section 1008 is ambiguous, this Court's review of the Final Rule may skip ahead to *Chevron* Step Two. On Step Two, "the question for the court is whether the agency's [rule] is based on a *permissible* construction of the statute." *Chevron*, 467 U.S. at 843 (emphasis supplied). Traditionally, on Step Two, courts followed the Supreme Court's direction that "that considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer." *Id.* at 844. This **high degree of deference** follows from the Court's preference that, "in the context of implementing policy decisions a technical and complex arena, … policy arguments are more properly addressed to legislators or administrators, not judges." *Id.* at 864-65. "Judges are not experts in the field" of energy policy (as in *Chevron*) or healthcare policy (as in this case).

Nor are judges "part of either political branch of the Government." *Id.* at 865. Though agencies may not be "directly accountable to the people, the Chief Executive is." *Id.* Thus, as held by the Supreme Court, an agency may "properly rely upon the incumbent administration's views of wise policy to inform its judgments," where a court may not. *Id.*

A final reason for *Chevron* deference recognizes that, in some statutes, Congress may have *intended* ambiguity. Courts may "accord deference to agencies under *Chevron* … because of a presumption that Congress, when it left ambiguity in a statute meant for implementation by an agency, understood that the ambiguity would be resolved, first and foremost, by the agency, and desired the agency (rather than the courts) to possess whatever degree of discretion the ambiguity allows." *Smiley v. Citibank (S. Dakota), N.A.*, 517 U.S. 735, 740–41 (1996) (Scalia, J.).

*Chevron* deference applies equally where an "agency has from time to time changed its interpretation." *Id.* at 863. An agency "must consider varying interpretations and the wisdom of its policy on a continuing basis. Moreover, the fact that the agency has adopted different definitions in different contexts adds force to the argument that the definition itself is flexible, particularly [where] Congress has never indicated any disapproval of a flexible reading of the statute." *Id.* at 863-64.

**This case features all of the reasons to defer to HHS's interpretation of Section 1008.** To preview the Court's discussion below, Section 1008 involves technical and complex decisions about healthcare policy; the Final Rule was obviously and properly a response to shifting political winds; and the ambiguous language of Section 1008, as Plaintiffs eagerly point out, was likely the intentional result of legislative compromise. Accordingly, the Final Rule is entitled to *Chevron* deference. Therefore, to demonstrate a strong likelihood of success on the merits of their APA claim, Plaintiffs must show that the Final Rule is not a "permissible construction" of Section 1008. Plaintiffs make two arguments on that score. *First*, they assert that the Final Rule is "not

14

in accordance with law," *i.e.*, Section 1008.  5 U.S.C. § 706(2)(A).  *Second*, Plaintiffs argue that the Final Rule is "arbitrary and capricious."  *Id.*

> ### i. Plaintiffs are unlikely to demonstrate that the Final Rule is not in accordance with Section 1008

Plaintiffs first argue that the Final Rule rests on an interpretation of Section 1008 that is "impermissible" because it is "not in accordance with" Section 1008.  The Court is not aware of authority that permits it to merge "permissibility" under *Chevron* with "accordance with law" under the APA.[11]  The parties, however, seem content to treat them the same, so, for the purposes of this Order, the Final Rule is "in accordance with" Section 1008, (5 U.S.C. § 706(2)(A)), <u>if</u> it is a "permissible construction" of Section 1008, (*Chevron*, 467 U.S. at 843).

*First,* Plaintiffs assert that Section 1008 prohibits the degree of financial and physical integration between Title X programs and abortion service providers permitted in the Final Rule.  Under the Final Rule:

> Non-Title X abortion activities must be separate and distinct from Title X project activities. Where a grantee conducts abortion activities that are not part of the Title X project and would not be permissible if they were, the grantee must ensure that the Title X-supported project is separate and distinguishable from those other activities. What must be looked at is whether the abortion element in a program of family planning services is so large and so intimately related to all aspects of the program as to make it difficult or impossible to separate the eligible and non-eligible items of cost.

---

[11] Although the Sixth Circuit has suggested that "permissible under *Chevron*" is a distinct inquiry from the requirements under the APA, that case only addressed the distinction between "permissible" and "arbitrary and capricious." *Atrium Med. Ctr. v. U.S. Dep't of Health & Hum. Servs.*, 766 F.3d 560, 567 (6th Cir. 2014)

65 Fed. Reg. at 41,282 (incorporated by reference at 86 Fed. Reg. at 56150).

The Final Rule further clarifies that:

> Separation of Title X from abortion activities does not require separate grantees or even a separate health facility, but separate bookkeeping entries alone will not satisfy the spirit of the law. Mere technical allocation of funds, attributing federal dollars to non-abortion activities, is not a legally supportable avoidance of section 1008.

> Certain kinds of shared facilities are permissible, so long as it is possible to distinguish between the Title X supported activities and non-Title X abortion-related activities: (a) A common waiting room is permissible, as long as the costs properly pro-rated;(b) common staff is permissible, so long as salaries are properly allocated and all abortion related activities of the staff members are performed in a program which is entirely separate from the Title X project; (c) a hospital offering abortions for family planning purposes and also housing a Title X project is permissible, as long as the abortion activities are sufficiently separate from the Title X project; and (d) maintenance of a single file system for abortion and family planning patients is permissible, so long as costs are properly allocated.

*Id.* Therefore, Plaintiffs argue, the Rule permits grantees to have an "abortion element" which contravenes the statute's prohibition on grants "used in programs where abortion is a method of family planning." 42 U.S.C. § 300a-6.

**Plaintiffs' argument elides the distinction between a Title X "grantee" and a Title X "program" or "project."**[12] Title X "expressly distinguishes between a Title X *grantee* and a Title X *project*." *Rust*, 500 U.S. at 196. While a grantee "may receive funds from a variety of sources for a variety of purposes," the grantee's Title X funds are

---

[12] The terms "program" and "project" were used interchangeably in both the 2019 and 1988 Rules. *See* 84 Fed. Reg. at 7787; 53 Fed. Reg. at 2922.

reserved for the "specific and limited purpose of establishing and operating a Title X project." *Id.* (citing 42 U.S.C. § 300(a)). Thus, a Title X program may offer less than the full menu of family planning services without bringing off-menu services into the program.

The Supreme Court specifically approved of this possibility in *Rust*. 500 U.S. at 196. Concluding that the 1988 Rule did not impermissibly condition grant awards on "relinquishment of a constitutional right," the Court found that a "Title X *grantee* can continue to perform abortions, provide abortion-related services, and engage in abortion advocacy" as long as it "conduct[s] those activities through programs that are separate and independent from the project that receives Title X funds." *Id.* (emphasis in original). Because the Final Rule expressly prohibits abortion-related services from being a part of a grantee's Title X *program*, the Court finds Plaintiffs' argument unpersuasive.[13]

Next, Plaintiffs argue that the Final Rule's permission to share staff, waiting rooms, and file systems is impermissible because it allows Title X funds to be used "in a program *where* abortion is a method of family planning"—emphasizing that "where" refers to a "physical location." (Dec. 2 at 15). This is not a serious argument. "Where" need not refer to a physical location.[14] Plaintiffs point to nowhere in the legislative

---

[13] An alternative interpretation of Plaintiffs' argument is that the phrase, "abortion element in a program of family planning services," presumes that a *Title X program* may have an "abortion element." 65 Fed. Reg. at 41282. While the Court acknowledges that the Department's choice of the word "program" is unfortunate, reading the passage with full context reassures that the Final Rule does not permit an abortion element in a "Title X program." *See id.* ("Non-Title X abortion activities must be separate and distinct from Title X project activities.").

[14] Where, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/where (defining "where" as "at, in, or to what situation, position, direction, circumstances, or respect").

history suggesting Congress meant otherwise.

Last, Plaintiffs argue that the Final Rule is "not in accordance with" Section 1008 because removing strict physical and financial separation requirements permits Title X funds to impermissibly "subsidize" abortion activities. The way this works, according to Plaintiffs, is that, because "[m]oney is fungible," "every dollar an abortion provider receives through Title X frees up another dollar that the grantee can use to subsidize abortion." (Doc. 2 at 16) (citing *Holder v. Humanitarian Law Project*, 561 U.S. 1, 31 (2010)).

Unfortunately for Plaintiffs, "fungible" is not the magic word they wish it were. True, money is fungible. But strict financial and physical separation does not make it any less fungible. By Plaintiffs' logic, even the 2019 Rule permitted Title X funds to subsidize abortions. Under that rule, abortion providers could still receive Title X grants so long as they could comply with the physical and financial separation requirements. *Rust*, 500 U.S. at 199 n.5 (noting that regulations implementing Section 1008 "are limited to Title X funds; the recipient remains free to use private, non-Title X funds to finance abortion-related activities."); *see also, e.g.*, *Planned Parenthood of Hous. & Se. Tex. v. Sanchez*, 403 F.3d 324, 340 (5th Cir. 2005) ("Under Title X, then, abortion providers are eligible to receive family planning funding."); *Planned Parenthood of Cent. N.C. v. Cansler*, 804 F. Supp. 2d 482, 487 (M.D.N.C. 2011) ("[T]itle X does not contain any provision that would prohibit entities that provide abortions from receiving Title X funds for non-abortion-related services."). Therefore, under the 2019 Rule, a hypothetical family planning service provider with two physical clinics, distinct staff at each location,

separate accounting records for each, and a $100,000 overall budget might provide $50,000 of services at each location. If the same provider received a $100,000 Title X grant to run one clinic as a Title X program, that grant would "free up" $100,000 to be spent on abortion services at the other clinic. Because demand for family planning and abortion services is finite, money is equally fungible across entities too. Every grant dollar spent providing contraceptive services at a Title X program, for example, is a dollar a Planned Parenthood affiliate did not have to spend servicing the same patient.

These examples illustrate that Plaintiffs' reasoning is untenable. It leads, ineluctably, to the conclusion that abortion-providers may not participate in Title X. That may be Plaintiffs' true motivation, but it is not the law. *Rust*, 500 U.S. at 199. Indeed, courts have rejected the "freeing up" theory in the context of abortion funding. *See Planned Parenthood of Cent. & N. Arizona v. State of Ariz.*, 718 F.2d 938, 945 (9th Cir. 1983), *aff'd sub nom. Babbitt v. Planned Parenthood of Cent. & N. Arizona*, 479 U.S. 925 (1986) ("[W]e hold that as a matter of law, the freeing-up theory cannot justify withdrawing all state funds from otherwise eligible entities merely because they engage in abortion-related activities disfavored by the state."); *see also Planned Parenthood of Minn. v. Minnesota*, 612 F.2d 359, 362 (8th Cir. 1980) (rejecting "[t]he argument that the money given to Planned Parenthood by the state might free-up other money which would be used for abortions"). Accordingly, the Court is not persuaded that eliminating the strict financial and physical separation requirements from the 2019 Rule impermissibly "subsidizes abortions." **The principle that money is fungible must have theoretical limits or else no government appropriations for specific purposes could ever be**

**feasible.  Title X no more subsidizes abortions than funding a homeless shelter subsidizes substance abuse.**  Plaintiffs are therefore not likely to succeed on their claim that the Final Rule is impermissible because eliminating the separation requirements violates Section 1008.

Plaintiffs also assert that the Final Rule violates Section 1008 by requiring grantees to provide "information and counseling" and "referral" for abortion services upon request.  86 Fed. Reg. at 56,170.  Plaintiffs reason that a family planning program in which providers are required to make referrals for abortion upon request is a program "where abortion is a method of family planning" in violation of Section 1008.  (Doc. 2 at 17).  Plaintiffs' argument proceeds by analogy.  They ask, for example, "Is a dental practice that refers patients to its own doctors for root canals a practice where root canals are a method of dental care?"  (Doc. 2 at 18).  But again, Plaintiffs muddy the distinction between a "grantee" and a "program."  A "program" may provide less than the full gamut of healthcare services that a "grantee" would offer.  To take Plaintiffs' analogy head on: a dental practice that provides free teeth cleanings at a weekend clinic could decline to provide costly root canals as part of the program.  But a dentist could refer a patient to her own commercial practice for paid services during the week and no one could argue that root canals were a part of the weekend clinic program.  Simply put, root canals are indisputably a dental service, but they are not part of the menu of low-cost services offered at the weekend clinic program.  Likewise, abortion *is*, literally-speaking, a method of family planning.  But it is simply not part of the menu of family planning services that a Title X program can offer.  Providing a referral for it does not put it on the

menu. Therefore, because the *program* provides less than the full menu of treatment options at a reduced cost, referrals for services outside of the program do not contravene Section 1008. The Court is not persuaded, based on Plaintiffs' analogies, that Plaintiffs are likely to succeed on their argument that the Final Rule's referral mandate is "not in accordance" with Section 1008.

### b. Plaintiffs are unlikely to demonstrate that the Final Rule is arbitrary and capricious

The APA instructs courts to vacate agency action that is arbitrary and capricious. 5 U.S.C. § 706(2). In general, an agency's action is arbitrary and capricious where it has "relied on factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 658 (2007). Final rules must therefore "articulate a satisfactory explanation for [the] action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Automobile Ins. Co.*, 463 U.S. 29, 43 (1983). Agencies are not, however, required to consider all policy alternatives "conceivable by the mind of man" in reaching a decision. *Id.* at 51.

"When an agency changes its existing position, it need not always provide a more detailed justification than what would suffice for a new policy created on a blank slate." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221–22 (2016). The agency need only

21

"display awareness that it is changing position" and "show that there are good reasons for the new policy." *Id.* An agency changing "longstanding policies," should take into account "serious reliance interests." *Id*.

Arbitrary and capricious is a "deferential" standard. *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021). The "court simply ensures that the agency has acted within a zone of reasonableness and, in particular, has reasonably considered the relevant issues and reasonably explained the decision." *Id.* **A court's review is "narrow" and "is not to substitute its judgment for that of the agency."** *State Farm*, 463 U.S. at 43 (emphasis supplied).

Plaintiffs argue (unsuccessfully) that the Final Rule's "approach to financial and physical separation" and its requirement that providers make abortion referrals upon request are arbitrary and capricious.

### i. HHS reasonably revoked the 2019 Rule's physical and financial separation requirements

Plaintiffs advance four arguments to support to support their theory that the Final Rule arbitrarily and capriciously rescinded the 2019 Rule's financial and physical separation requirements. *First*, Plaintiffs reiterate their argument that the Final Rule does not prevent Title X funds from subsidizing abortion in violation of Section 1008. *Second*, Plaintiffs allege HHS relied on "flaw data and illogical reasoning" to conclude that the 2019 Rule had negative health consequences. *Third*, Plaintiffs accuse HHS of overlooking "important reliance interests" in promulgating the final rule. And *fourth*,

22

Plaintiffs claim HHS should have considered the Final Rule's effect on "public support for Title X." These arguments grasp at straws. None are persuasive.

*First,* HHS did properly address fears that Title X funds would be used to subsidize abortions. In the first section of the Notice of Final Rulemaking ("NFR"), HHS described reviewing more than 30 reports from the Government Accountability Office, HHS Office of the Inspector General, and the Congressional Research Service covering the Title X program from 1975 through 2021. 86 Fed. Reg. 56,145. Based on those reports, HHS concluded that, over 45 years, the majority of which time HHS required no strict financial and physical separation, there were only minor compliance issues going back to the 1980s. *Id.* HHS then reasonably weighed the minimal risk of compliance issues absent strict financial and physical separation against the high cost and burden of maintaining separate physical locations, duplicate staff, and separate patient records. *Id.* HHS reasonably concluded, "there has been no evidence of compliance issues regarding section 1008 by Title X grantees that would justify the greatly increased compliance costs for grantees and oversight costs for the federal government the 2019 rule required." *Id.*

For their part, Plaintiffs are hung up on Department's "disagree[ment] that Title X grant funds … are fungible." *Id.* at 56,150. But HHS's disagreement clearly meant only that "grant funds are spent for grant purposes." *Id.* In other words, where the agency provides $50,000 of Title X funds, the Title X grantee provides $50,000 of non-abortion related family planning services, and—regardless of what the grantee does with money it gets elsewhere—none of that $50,000 is spent on abortion-related services. *State Farm*, 463 U.S. at 43 (courts may "uphold a decision of less than ideal clarity if the agency's

path may reasonably be discerned.").  The logical conclusion of Plaintiffs' hyperbolic fungibility principle is that any organization that performs abortion would be banned from receiving Title X funds.  HHS addressed that too by recognizing that Plaintiffs' reasoning would "raise serious constitutional issues." *Id.*

Plaintiffs are also wrong that HHS failed to "consider alternative policies" for keeping Title X funds from subsidizing or promoting abortion.  The Final Rule incorporates the interpretations and policies that accompanied the 2000 Rule.  *Id.* at 56,150.  Those policies require abortion activities to "be separate and distinct from Title X project activities" and demand more than "[m]ere technical allocation of funds."  65 Fed. Reg. 41,282.  HHS further elaborated that "[a]ll Title X grantees are subject to 45 CFR part 75" which requires that Title X funds "be expended solely for the purpose for which the funds were granted in accordance with the approved application and budget" and provides an addition layer of generally applicable agency grant regulations.  86 Fed. Reg. at 56,152.  To enforce these requirements, HHS's Office of Population Affairs ("OPA") "closely monitors Title X grantee compliance through regular grant reports, compliance monitoring visits, and legally required audits, and it has done so since the beginning of the program."  86 Fed. Reg. at 56,145.  Plaintiffs insist that HHS should have considered additional alternatives such as dedicating additional funds to help with compliance or choosing requirements somewhere between the 2000 Rule's and the 2019 Rule's.

But to survive arbitrary and capricious review, agencies are not required to consider every policy alternative "conceivable by the mind of man."  *State Farm*, 463

U.S. at 51; *see also Am. Ass'n of Cosmetology Sch. v. DeVos*, 258 F. Supp. 3d 50, 75

(D.D.C. 2017).  HHS met its burden by considering and adopting the 2000-era

monitoring and enforcement policies as an alternative to the 2019 separation

requirements.  The agency's reasoning here is especially persuasive because it can rely on

decades of experience using precisely these monitoring and enforcement mechanisms

with minimal compliance issues.  86 Fed. Reg. at 56,145.

      Plaintiffs, of course, dispute the reliability of the data on compliance issues.  This

makes sense given that Plaintiffs believe the 2000 Rule permits activities that in fact

violate Section 1008.  But on review for arbitrary and capricious decision-making, the

Court declines to wade into the reliability of reports covering 45 years from three

separate federal agencies.  **At bottom, Plaintiffs' argument is a policy disagreement**

**about what activities Section 1008 permits.**  For reasons stated above, the Court finds

the Department's interpretation of Section 1008 permissible and entitled to deference.

      *Second,* Plaintiffs assert that HHS "relied on flawed data and illogical reasoning"

to conclude that the 2019 Rule had a negative impact on public health.  According to

Plaintiffs, HHS improperly assumed that a reduction in Title X participation spelled

negative public health consequences.  (Doc. 2 at 25).  HHS responds that it "extensively

detailed the impact that the 2019 Rule had" in "dramatically reduc[ing] access to family

planning and preventive health services that are essential for hundreds of thousands of

clients, especially for the low-income clients Title X was specifically created to serve."

(Doc. 27 at 24) (citing 86 Fed. Reg. at 56,148).  The Court agrees with HHS.  The NFR

reflects that HHS considered comments from providers indicating that patients were

forgoing services or had lost access entirely. *Id.* at 56,150. It further illustrates that HHS

thoughtfully considered the effect and sustainability of transfers from Title X programs

non-Title X providers. *Id.* at 56,151-52. HHS found that these substitute non-Title X

providers could not provide the same scope of services, *id.*, or were not sustainable long

term because they were funded by emergency grants or labor-intensive fundraising

efforts. *Id.* at 56,152.

Plaintiffs protest that HHS should have disaggregated the effect of transfers on the

overall decline in Title X participation. (Doc. 2 at 26). They further complain that HHS

should not have relied on a study by a pro-choice organization and questioned the

truthfulness of statements by former Title X grantees. *Id.* at 26-27. **But fussing about**

**the scope and reliability of the Department's data is beyond the scope of arbitrary**

**and capricious review.** The agency need only "examine the relevant data and articulate

a satisfactory explanation for its action including a rational connection between the facts

found and the choice made." *State Farm*, 463 U.S. at 43; *see also Saint Mary's Cement v.*

*EPA*, 782 F.3d 280, 286 (6th Cir. 2015) ("**[W]e are at our most deferential when**

**reviewing an agency's scientific determinations about issues within its expertise**.")

(emphasis supplied). HHS has done that.

Plaintiffs contend that HHS failed to weigh the positive effects of the 2019 Rule

against its negative effects. (Doc. 2 at 27). Setting aside the probability that 2019 Rule

*had no* positive effects, HHS did consider its merits. HHS responded to several of

comments that proposed keeping various features of the 2019 Rule. *See, e.g.*, 86 Fed.

Reg. 56,161-62 (considering retaining the 2019 Rule's subrecipient monitoring), 56,168

26

(addressing comments that some states saw increased Title X participation under the 2019 Rule), 56,176 (discussing one option the department considered to retain much of the 2019 Rule). Nevertheless, HHS "determined that the most appropriate course [was] to revoke the 2019 rule in its totality." *Id.* at 56,148.

Plaintiffs then argue that HHS failed to consider the negative public health effects of the 2000 Rule. The only example Plaintiffs point to is a report showing that rates of sexually transmitted diseases "reached a record high in 2018." (Doc. 2 at 27). But apparently Plaintiffs did not read that report very carefully. The report, published in December 2019—eight months after the 2019 Rule went into effect—in fact reports that "in *2019*…[t]here were more than 1.8 million cases of chlamydia—the highest number of *annual* cases of any condition ever reported to the CDC."[15] Nevertheless, the Final Rule *did* consider the availability of STI testing and concluded that the 2019 Rule reduced access to it because of the loss of Title X funding. 86 Fed. Reg 56,151. Furthermore, the NFR concludes that the Final Rule will result in "earlier detection of sexually transmitted infections." *Id.* at 56,168.

Plaintiffs further argue that HHS "irrationally concluded that the 2019 Rule had permanently decreased the number of patients and grantees participating in Title X." (Doc. 2 at 28). Plaintiffs suggest that, given time, states like Ohio would have been able to replace the lost grantees and restore Title X to full participation. HHS responds that it did specifically address "the concern that the provision of Title X services would improve

---

[15] Association of State and Territorial Health Officials, *National STD Trends: Key Information on Sexually Transmitted Diseases for Public Health Leadership* 1 & n.1 (2019), https://perma.cc/G58R-WBEW (emphasis supplied).

after COVID-19, and utilized its expertise to determine that it was 'unlikely that the number of clients served or services provided would increase to pre-2019 levels or above without a change to the 2019 rule.'" (Doc. 27 at 26) (citing 85 Fed. Reg. at 56,152). HHS was entitled to make this determination, and its reasoning is not arbitrary or capricious.

Finally, Plaintiffs argue that HHS failed to consider that the 2019 Rule may actually have encouraged some new users of Title X services. This argument is frivolous. Though it is possible some consumers were encouraged to seek family planning services knowing their provider would not perform abortions, net is net. And the net change in participation in Title X programs is sharply negative. To the extent any new users sought Title X services *because* of the 2019 Rule, HHS accounted for them when it considered the net change of Title X users. *See, e.g.*, 86 Fed. Reg. at 56,146. HHS is free to pursue a policy that maximizes the number of participants in Title X.

*Third*, Plaintiffs assert that HHS failed to consider reliance interests in rescinding the 2019 Rule. Plaintiffs point to *Dep't of Homeland Sec. v. Regents of the Univ. of California*, for the proposition that failure to consider reliance interests, even when a recipient has no "substantive rights" to a benefit, renders an agency action arbitrary and capricious. 140 S. Ct. 1891, 1913-14 (2020). But that case relied on the principle that "*longstanding* policies may … engender[] serious reliance interests that must be taken into account." *Id.* at 1913 (citing *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 212 (2016)) (emphasis supplied). **The 2019 Rule was in effect for less than two years.** In any event, HHS did expressly state that "no particular private organizations have a right

28

to Title X funding," thus HHS considered any reliance interests to be minimal. 86 Fed. Reg. at 56,150. On a motion for preliminary injunction, the Court finds it unlikely that Plaintiffs will successfully argue that failure to consider reliance interests accrued over two years renders the Department's decision arbitrary and capricious.

*Fourth*, Plaintiffs insist the Final Rule is arbitrary and capricious because it fails to consider whether eliminating the 2019 Rule's physical and financial separation requirements "would erode public support for the Title X program." (Doc. 2 at 32). Quoting the Final Rule, HHS responds that it reinstates "compliance standards that had been in effect for nearly the entirety of the Title X program, had been widely accepted by grantees, had enabled the Title X program to operate successfully, and had not resulted in any litigation." (Doc. 27 at 28) (citing 86 Fed. Reg. at 56,145). The Court agrees that this passage shows HHS did consider public support and concluded that the 2000 Rules' wide acceptance, lack of litigation, and persistence through three *two*-term presidencies likely demonstrated public support for the Final Rule. Though this Court is well aware that counsel for some of the Plaintiff states remain skeptical of the 2020 presidential election, the objective truth is that a majority of voters rejected the administration responsible for the 2019 Rule. Thus, the Final Rule cites President Biden's January 28, 2021, "Memorandum on Protecting Women's Health at Home and Abroad" which "instructed the Department to review the Title X Rule and any other regulations governing the Title X program that impose undue restrictions on the use of Federal funds or women's access to complete medical information and shall consider, as soon as practicable, whether to suspend, revise, or rescind, or publish for notice and comment

29

proposed rules suspending, revising, or rescinding, those regulations, consistent with applicable law, including the Administrative Procedure Act." 86 Fed. Reg. at 56,148. Thus, in promulgating the final rule, HHS announced that it was following the instructions of a very recently elected chief executive. This shows HHS considered public support and reasonably concluded that it favored the Final Rule.

### ii. HHS's decision to require abortion referrals upon request was not arbitrary or capricious

Plaintiffs' last argument on the merits is that the Final Rule arbitrarily and capriciously requires Title X programs to provide referrals for abortion services upon request. Again, Plaintiffs supply four arguments.

*First*, Plaintiffs argue that the Final Rule relies on flawed data that the 2019 Rule had negative public health outcomes. The Court has already rejected this argument and does so again here.

*Second*, Plaintiffs repeat their argument that Final Rule fails to consider how mandatory referrals for abortion services will erode public support for Title X. Again, the Court has rejected this argument. Strong public support was the starting premise for the Final Rule. Indeed, a recently-elected President Biden directed HHS to "review the Title X Rule and any other regulations … that impose undue restrictions on … *women's access to complete medical information*…." 86 Fed. Reg. at 56,148 (emphasis supplied).

*Third*, Plaintiffs argue that HHS failed to show "good reasons for the new policy," *Encino*, 136 S. Ct. at 2126, which departs from the 2019 Rule's finding that "in most instances when a referral is provided for abortion, that referral necessarily treats abortion

30

as a method of family planning." (Doc. 2 at 33) (quoting 84 Fed. Reg. at 7,717).  HHS

responds that it did address the departure and provide "good reasons" for it.  (Doc. 27 at

29).  The Final Rule explains that the 2019 Rule caused "private organizations and states

to withdraw from the program, leaving multiple states without any Title X providers and

the agency struggling to meet its mandate to provide family planning services for low-

income populations in areas of high need."  85 Fed. Reg. at 56,150.  Departing grantees

told HHS that the 2019 Rule's prohibition on non-directive counselling and abortion

referral "interfered with the patient-provider relationship and compromised their ability to

provide quality healthcare."  *Id.* at 56,146.  HHS stated, unequivocally, that the fact

"[t]hat so many providers did in fact withdraw from the program is a change in

circumstances that, in the Department's view, demands reconsideration of the 2019 rule."

*Id.*  The Court is satisfied that this departure was not arbitrary or capricious.  *FCC v. Fox*

*Television Stations, Inc.*, 556 U.S. 502, 515 (2009) ("[I]t suffices that the new policy is

permissible under the statute, that there are good reasons for it, and that the agency

believes it to be better . . . .").  No authority requires HHS to "disprove[]" the agency's

prior interpretation of an ambiguous statute, as Plaintiffs demand.  (Doc 2 at 33).

    *Fourth*, Plaintiffs argue that HHS "failed to consider whether mandating referrals

was consistent with medical ethics."  (Doc. 2 at 34).  But Plaintiffs defeat their own

argument in the next sentence by acknowledging that HHS "stated that the 2019 Rule's

prohibition on referrals was contrary to the 'ethical codes of major medical

organizations.'"  (Doc. 2 at 34) (citing 86 Fed. Reg. at 19,817).  HHS considered medical

ethics in the Final Rule too.  *See* 86 Fed. Reg. at 56,146.  Indeed, in the context of

discussion about conscience statutes generally, HHS stated that "objecting individuals and grantees will not be required to counsel or refer for abortion," and committed to "ensur[ing] appropriate compliance with conscience laws as well as continuity of care." *Id.* at 56,153.  Thus, the Court agrees with HHS that it did consider and address the "important aspect" of medical ethics relating to abortion referrals.  *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 645 (2007) (quoting *State Farm*, 463 U.S. at 43).

Accordingly, the Court cannot say it is likely that Plaintiffs will prevail on their argument that the Final Rule is arbitrary and capricious.  Instead, the Court finds the Final Rule is based on a permissible interpretation of Section 1008 and is fully entitled to *Chevron* deference.

### 2.    Irreparable Harm

On a motion for preliminary injunction, "the existence of an irreparable injury is mandatory," such that "even the strongest showing on the other three factors cannot eliminate the irreparable harm requirement." *D.T. v. Sumner Cnty. Schs.*, 942 F.3d 324, 326-27 (6th Cir. 2019).  An irreparable harm "'must be both certain and immediate,' not 'speculative or theoretical.'"  *Id.*  Typically, "economic loss does not, in and of itself, constitute irreparable harm."  *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985); *see also Ohio ex rel. Celebrezze v. Nuclear Regulatory Com.*, 812 F.2d 288, 291 (6th Cir. 1987).  Where the economic loss is "irrecoverable," however, it "may constitute irreparable injury" but "a party asserting such a loss is not relieved of its obligation to demonstrate that its harm will be 'great.'"  *N. Air Cargo v. U.S. Postal Serv.*, 756 F.

Supp. 2d 116, 125 n.6 (D.D.C. 2010); *see also, e.g.*, *Allina Health Servs. v. Sebelius*, 756 F. Supp. 2d 61, 67–68 (D.D.C. 2010) (noting that "an inability to recover lost profits or payments does not always constitute irreparable harm" and collecting cases); *CoverDyn v. Moniz*, 68 F. Supp. 3d 34, 49 (D.D.C. 2014) ("Otherwise, a litigant seeking injunctive relief against the government would always satisfy the irreparable injury prong, nullifying that requirement in such cases.").

Here, Plaintiffs argue that they will be irreparably harmed by increased competition for Title X funds. The Court is not convinced. Of the 12 plaintiff states, only Ohio has submitted a declaration that it will even apply for Title X grants in January. (Doc. 2-1). HHS is correct that, besides Ohio, none of the Plaintiff states have provided evidence that they will face increased competition. Further, the Court declines to hold that an increase in fair competition for public grants can constitute irreparable injury. *Basicomputer Corp v. Scott*, 973 F.2d 507, 512 (6th Cir. 1992) (treating as irreparable the harm caused by "the loss of *fair* competition that results from the breach of a non-competition covenant") (emphasis supplied). However, even if Plaintiffs receive less grant funding as a result of the Final Rule, it is hard to see how the injury would be substantial. Plaintiffs concede that they have no "legally cognizable interest" in the grant funding. (Doc. 46 at 14). "To demonstrate irreparable injury, a plaintiff must show that it will suffer harm that is 'more than simply irretrievable; it must also be serious in terms of its effect on the plaintiff.'" *Hi-Tech Pharmacal Co. v. FDA*, 587 F. Supp. 2d 1, 11 (D.D.C. 2008). Plaintiffs' potential harm is also highly speculative. Ohio has not submitted any evidence that the number of Title X applicants it will have to

compete against has increased.  Moreover, Plaintiffs like Ohio that have been able to expand services since 2019 are likely better positioned to compete for Title X funds.  Nor is it clear that any reduction in Ohio's Title X grants would be strictly irrecoverable.  If Plaintiffs prevail and the 2019 Rules are reinstated, Title X grantees are likely to leave the program and relinquish their funds just as they did in 2019.  Under those circumstances, HHS has already demonstrated its willingness to redistribute relinquished funds to grantees, like Ohio, who stay in the program.

Finally, "an unexcused delay in seeking extraordinary injunctive relief may be grounds for denial because such delay implies a lack of urgency and irreparable harm." *Texas Children's Hosp. v. Burwell*, 76 F. Supp. 3d 224, 244 (D.D.C. 2014).  **Here, HHS seeks to implement a rule that was, effectively, in place for 20 years before 2019.  All of Plaintiffs arguments apply equally to the 2000 Rule as to the Final Rule, yet Plaintiffs never sought relief from the 2000 Rule.**  To the Court, this fact suggests that Plaintiffs' fears of irreparable injury are not genuine.

Accordingly, Plaintiffs have not shown by clear and convincing evidence that they will be irreparably injured by the Final Rule.  *Honeywell, Inc. v. Brewer–Garrett Co.*, 145 F.3d 1331 (6th Cir.1998).

### 3.    Balance of the Equities

Finally, though it is hardly necessary, the Court concludes that the balance of equities strongly disfavors a preliminary injunction.  Plaintiffs argue that "there is simply no evidence that the American public or abortion providers will be substantially harmed by a preservation of the *status quo*."  (Doc. 2 at 38).  That is blind.

34

The 2019 Rule harms our most vulnerable members of society daily.  Title X once provided comprehensive family planning services to more than 5 million patients annually, including low-income families in all 50 states.  But in 2019, that number dropped to 3.1 million, with no Title X services available in six states and drastically reduced services in several others.  This decline overwhelmingly affected the program's low-income users.  According to the Final Rule, after 2019, "573,650 fewer clients under 100 percent of the federal poverty level (FPL); 139,801 fewer clients between 101 percent FPL to 150 percent FPL; 65,735 fewer clients between 151 percent FPL and 200 percent FPL; and 30,194 fewer clients between 201 percent FPL to 250 percent FPL received Title X services." 86 Fed. Reg. 56,146.  **Weighed against the interests of the Plaintiff states, restoring access to vital family planning services for millions of Americans is a far greater priority.**

Plaintiffs' final argument is that "the public interest is always served by a correct application of the law."  This Court agrees.

## IV.    CONCLUSION

The Court finds that Plaintiffs have not met their burden of establishing entitlement to a preliminary injunction.  Accordingly, Plaintiffs' motion to enjoin the Department of Health and Human Services from implementing or enforcing the Final Rule, *Ensuring Access to Equitable, Affordable, Client-Centered, Quality Family Planning Services*, 86 Fed. Reg. 56144-01 (Oct. 7, 2021) (to be codified at 42 C.F.R. pt. 59) is **DENIED**.

**IT IS SO ORDERED.**

Date:  12/29/2021

Timothy S. Black
United States District Judge