**UNITED STATES COURT OF APPEALS**
FOR THE SIXTH CIRCUIT

100 EAST FIFTH STREET, ROOM 540
POTTER STEWART U.S. COURTHOUSE
CINCINNATI, OHIO 45202-3988

Kelly L. Stephens
Clerk

Tel. (513) 564-7000
www.ca6.uscourts.gov

Filed:  November 30, 2023


Mr. Steven H. Aden
Americans United for Life
1150 Connecticut Avenue, N.W.
Suite 500
Washington, DC 20036

Mr. Rob Bonta
Office of the Attorney General
of California
1515 Clay Street
20th Floor
Oakland, CA 94612

Mr. Nicholas J. Bronni
Office of the Attorney General of Arkansas
323 Center Street, Suite 200
Little Rock, AR 72201-2610

Mr. Andrew J. Bruck
Office of the Attorney General
State of New Jersey
P.O. Box 093
Trenton, NJ 08625-0093

Mr. John J. Bursch
Alliance Defending Freedom
440 First Street, N.W., Suite 600
Washington, DC 20001

Mr. James A. Campbell
Alliance Defending Freedom
44180 Riverside Parkway
Lansdowne, VA 20176

Mr. Stephen P. Carney
Office of the Attorney General
of Ohio
30 E. Broad Street
25th Floor
Columbus, OH 43215

Mr. Christopher Michael Carr
Office of the Attorney General
of Georgia
40 Capitol Square, S.W.
Atlanta, GA 30334

Ms. Natalie Christmas
Office of the Attorney General
of Florida
The Capitol, PL-01
Tallahassee, FL 32399-1050

Mr. Christian Brian Corrigan
Office of the Attorney General of Montana
P.O. Box 201401
Helena, MT 59620-1401

Ms. Courtney L. Dixon
U.S. Department of Justice
Civil Division, Appellate Staff
950 Pennsylvania Avenue, N.W.
Room 7513
Washington, DC 20530

Mr. Thomas J. Donovan Jr.
Office of the Attorney General of Vermont
109 State Street
Montpelier, VT 05609-1001

Ms. Margaret Dotzel
Zuckerman Spaeder
1800 M Street, N.W.
Suite 1000
Washington, DC 20036-5802

Ms. Catherine S. Duval
Zuckerman Spaeder
1800 M Street, N.W., Suite 1000
Washington, DC 20036-5802

Mr. Keith Ellison
Office of the Attorney General
of Minnesota
445 Minnesota Street
Suite 900
St. Paul, MN 55101

Ms. Laura Etlinger
Office of the Attorney General
of New York
The Capital
Albany, NY 12224

Mr. Robert W. Ferguson
Office of Attorney General of Washington
Solicitor General's Office
P.O. Box 40100
Olympia, WA 98504

Ms. Lynn Fitch
Office of the Attorney General
for Mississippi
550 High Street
Jackson, MS 20043

Mr. Aaron Darnell Ford
Office of the Attorney General
of Nevada
100 N. Carson Street
Carson City, NV 89701-4717

Mr. Aaron M. Frey
Office of the Attorney General of Maine
6 State House Station
Augusta, ME 04333-0000

Mr. Brian E. Frosh
Office of the Attorney General of Maryland
200 St. Paul Place
Baltimore, MD 21202

Ms. Blair Greenwald
Office of the Attorney General of New York
28 Liberty Street
23rd Floor
New York, NY 10005

Ms. Denise Harle
Shutts & Bowen
215 S. Monroe Street
Suite 804
Tallahassee, GA 30043

Ms. Maura Healey
Office of the Attorney General
of Massachusetts
1 Ashburton Place
Boston, MA 02108

Mr. Michael Jason Hendershot
Office of the Attorney General
of Ohio
30 E. Broad Street
25th Floor
Columbus, OH 43215

Ms. Alyssa Howard
Zuckerman Spaeder
1800 M Street, N.W.
Suite 1000
Washington, DC 20036-5802

Mr. Thomas T. Hydrick
Office of the Attorney General
of South Carolina
P.O. Box 11549
Columbia, SC 29211

Ms. Kathleen Jennings
Office of the Attorney General
of Delaware
8200 N. French Street
Wilmington, DE 19801

Ms. Cassandra Trombley Shapir Jonas
Zuckerman Spaeder
1800 M Street, N.W., Suite 1000
Washington, DC 20036-5802

Ms. Dana L Kaersvang
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, DC 20530

Mr. Joshua L. Kaul
Office of the Attorney General
17 W. Main Street
Madison, WI 53703

Mr. Matthew Franklin Kuhn
Office of the Attorney General
of Kentucky
700 Capitol Avenue
Suite 118
Frankfort, KY 40601

Mr. Jeff W. Landry
Louisiana Department of Justice
1885 N. Third Street
Sixth Floor
Baton Rouge, LA 70802

Mr. Mark Lippelmann
Alliance Defending Freedom
15100 N. 90th Street
Scottsdale, AZ 85260

Mr. Peter F. Neronha
Office of the Attorney General
of Rhode Island
150 S. Main Street
Providence, RI 02903-0000

Ms. Dana Nessel
Office of the Attorney General
of Michigan
P.O. Box 30212
Lansing, MI 48909

Mr. Ken Paxton
Office of the Attorney General
General Litigation Division
300 W. 15th Street, 11th Floor
Austin, TX 78701-0000

Mr. Karl A. Racine
Office of the Attorney General
for the District of Columbia
400 Sixth Street, N.W., Suite 8100
Washington, DC 20001

Mr. Kwame Raoul
Office of the Attorney General of Illinois
100 W. Randolph Street
12th Floor
Chicago, IL 60601

Mr. Ellen F. Rosenblum
Oregon Department of Justice
1162 Court Street, N.E.
Salem, OR 97301

Mr. Dean John Sauer
James Otis Law Group
13321 N. Outer Forty Road
Suite 300
St. Louis, MO 63017

Mr. Alan Evan Schoenfeld
Wilmer Hale
250 Greenwich Street
7 World Trade Center
New York, NY 10007

Ms. Lindsay Sara See
Office of the Attorney General
of West Virginia
1900 Kanawha Boulevard, E.
Building 1, Room 26E
Charleston, WV 25305

Mr. Josh Shapiro
Office of the Attorney General
of Pennsylvania
Strawberry Square
Harrisburg, PA 17120-0000

Ms. Holly T. Shikada
Office of the Attorney General
of Hawaii
425 Queen Street
Honolulu, HI 96813

Mr. Joshua H. Stein
North Carolina Department of Justice
114 W. Edenton Street, P.O. Box 629
Raleigh, NC 27603

Ms. Robin Summers
National Family Planning & Reproductive Health Association
1025 Vermont Avenue, N.W.
Suite 800
Washington, DC 20005

Mr. Treg R. Taylor
State of Alaska
Department of Law
1031 W. Fourth Avenue
Suite 200
Anchorage, AK 99501

Mr. Phil Weiser
Office of the Attorney General
of Colorado
1300 Broadway
Tenth Floor
Denver, CO 80203

Mr. Zachary Paul West
Office of the Attorney General
of Oklahoma
313 N.E. 21st Street
Oklahoma City, OK 73105

Mr. Kurtis Kenneth Wiard
Office of the Attorney General
of Kansas
120 S.W. Tenth Avenue
Second Floor
Topeka, KS 66612-1597

Ms. Abby Christine Wright
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, DC 20530

Re:  Case No. 21-4235*, OH, et al v. Xavier Becerra, et al*
     Originating Case No. : 1:21-cv-00675

Dear Counsel,

    The court today announced its decision in the above-styled case.

Enclosed is a copy of the court's published opinion together with the judgment which has been entered in conformity with Rule 36, Federal Rules of Appellate Procedure.

Yours very truly,

Kelly L. Stephens, Clerk

Cathryn Lovely
Deputy Clerk

cc:  Mr. Richard W. Nagel

Enclosures

Mandate to issue.

RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 23a0261p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

STATE OF OHIO; STATE OF ALABAMA; STATE OF
ARKANSAS; STATE OF FLORIDA; STATE OF KANSAS;
COMMONWEALTH OF KENTUCKY; STATE OF MISSOURI;
STATE OF NEBRASKA; STATE OF OKLAHOMA; STATE OF
SOUTH CAROLINA; STATE OF WEST VIRGINIA,

        *Plaintiffs-Appellants*,

    *v.*

XAVIER BECERRA, Secretary, Department of Health
and Human Services and JESSICA S. MARCELLA,
Deputy Assistant Secretary for Population Affairs, in
their official capacities; DEPARTMENT OF HEALTH AND
HUMAN SERVICES; OFFICE OF POPULATION AFFAIRS,

        *Defendants-Appellees*.

           > No. 21-4235

───────────────

Appeal from the United States District Court for the Southern District of Ohio at Cincinnati.
No. 1:21-cv-00675—Timothy S. Black, District Judge.

Argued:  October 27, 2022

Decided and Filed:  November 30, 2023

Before:  MOORE, THAPAR, and LARSEN, Circuit Judges.

───────────────

### COUNSEL

**ARGUED:**  Benjamin M. Flowers, OFFICE OF THE OHIO ATTORNEY GENERAL,
Columbus, Ohio, for Appellants.  Courtney L. Dixon, UNITED STATES DEPARTMENT OF
JUSTICE, Washington, D.C., for Appellees. **ON BRIEF:**  Benjamin M. Flowers, Stephen P.
Carney, Sylvia May Mailman, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus,
Ohio, Thomas T. Hydrick, OFFICE OF THE SOUTH CAROLINA ATTORNEY GENERAL,
Columbia, South Carolina, for Appellants.  Abby C. Wright, Kyle T. Edwards, UNITED
STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellees.  Christian B.
Corrigan, OFFICE OF THE MONTANA ATTORNEY GENERAL, Helena, Montana, Steven H.
Aden, AMERICANS UNITED FOR LIFE, Washington, D.C.,  Alan E. Schoenfeld, WILMER

No. 21-4235                    *Ohio, et al. v. Becerra, et al.*                    Page 2

CUTLER PICKERING HALE AND DORR LLP, New York, New York, Blair J. Greenwald, OFFICE OF THE NEW YORK ATTORNEY GENERAL, New York, New York, Robin Summers, NATIONAL FAMILY PLANNING & REPRODUCTIVE HEALTH ASSOCIATION, Washington, D.C., Margaret M. Dotzel, Catherine S. Duval, Casey Trombley-Shapiro Jonas, Alyssa M. Howard, ZUCKERMAN SPAEDER LLP, Washington, D.C., for Amici Curiae.

LARSEN, J., delivered the opinion of the court in which THAPAR, J., joined. MOORE, J. (pp. 29–53), delivered a separate opinion concurring in the judgment in part and dissenting in part.

———————————

**OPINION**

———————————

LARSEN, Circuit Judge. In 2021, the Department of Health and Human Services (HHS) issued a final rule governing the Title X grant program, which makes grants to assist in the establishment and operation of family planning projects. Among other things, the Rule interpreted § 1008 of Title X, which bars funds appropriated under the Title X grant program from being "used in programs where abortion is a method of family planning." A group of states sued, seeking to block two provisions of the 2021 Rule. First, the States challenge the 2021 Rule's elimination of a prior HHS rule that required grantees to maintain strict physical and financial separation between their Title X programs and any abortion-related services they might provide. Second, they challenge the Rule's requirement that Title X projects provide referrals for abortion services when requested by the patient.

The Supreme Court has already had occasion to interpret § 1008, the statutory provision at the heart of this case. In *Rust v. Sullivan*, the Supreme Court held that § 1008 is ambiguous as to program integrity and referrals for abortion and that *Chevron* deference applies. 500 U.S. 173, 184 (1991). Therefore, we defer to the agency's interpretation of § 1008 if the interpretation is permissible. *Id.* While the doctrinal landscape undergirding *Rust* has shifted significantly since it was decided, *Rust*, and its application of *Chevron*, remain binding on this court. Applying *Rust*, we cannot say that the 2021 Rule's referral requirement is an impermissible interpretation of § 1008. However, we hold that the 2021 Rule's program-integrity requirements do not

represent a permissible interpretation of § 1008. We therefore AFFIRM the district court's denial of a preliminary injunction in part and REVERSE in part.

I.

Title X of the Public Health Service Act empowers the Secretary of Health and Human Services "to make grants to and enter into contracts with public or nonprofit private entities to assist in the establishment and operation of voluntary family planning projects which shall offer a broad range of acceptable and effective family planning methods and services (including natural family planning methods, infertility services, and services for adolescents)." 42 U.S.C. § 300(a). Such grants are "made in accordance with such regulations as the Secretary may promulgate." *Id.* § 300a-4(a). At the heart of this case is the meaning of § 1008 of Title X, which states: "None of the funds appropriated under this subchapter shall be used in programs where abortion is a method of family planning." *Id.* § 300a-6. Since the program's inception, HHS regulations interpreting § 1008's prohibition have flipped back and forth as new administrations have come into power. In particular, HHS has taken different approaches to determining what § 1008 requires with respect to two aspects of Title X program administration. The first is "program integrity"—the degree of separation a grantee must maintain between its Title X grant program and any program it may run that provides abortion-related services.[1] *See Rust*, 500 U.S. at 187. The second is whether Title X programs must or may make referrals for abortion without running afoul of § 1008.

For context, we briefly recount the history of HHS's various rules interpreting § 1008. Beginning in 1981, HHS issued "Program Guidelines for Project Grants for Family Planning Services," without notice and comment, which required for the first time that Title X programs offer nondirective counseling to a pregnant patient on her options, including abortion, followed by a referral to an abortion provider upon the patient's request. Statutory Prohibition on Use of Appropriated Funds in Programs Where Abortion is a Method of Family Planning, 53 Fed. Reg. 2,922, 2,923 (Feb. 2, 1988) (describing prior agency policies). HHS permitted grantees to

---

[1]In *Rust*, the Supreme Court held that Title X "expressly distinguishes between a Title X *grantee* and a Title X *project*." 500 U.S. at 196. Grantees may "engage in abortion-related activity" but must do so "separately from activity receiving federal funding." *Id.* at 198.

provide Title X services and abortion-related services at a single site, so long as they maintained a separation that went beyond a "mere exercise in bookkeeping."  Standards of Compliance for Abortion-Related Services in Family Planning Service Projects, 58 Fed. Reg. 7,462, 7,462 (Feb. 5, 1993) (describing prior policies).

HHS changed course in 1988, when the agency addressed the scope of § 1008 in notice-and-comment rulemaking for the first time.  The 1988 Rule prohibited Title X projects from promoting, counseling on, or providing referrals for abortion.  53 Fed. Reg. at 2,923–24. The agency interpreted § 1008 to prohibit counseling on and referrals for abortion, reasoning that those "activities are integral parts of the provision of any method of family planning, [so] to interpret section 1008 as applicable only to the performance of abortion would be inconsistent with the broad prohibition against use of abortion as a method of family planning."  *Id.* at 2,923. The 1988 Rule also imposed strict program-integrity rules, which required grantees to keep their Title X programs "physically and financially separate" from all abortion-related activities.  *Id.* at 2,945.  HHS interpreted § 1008 to "mandate" physical and financial separation, reasoning that "[h]aving a program that is separate from [abortion] activities is a necessary predicate to any determination that abortion is not being included as a method of family planning in the Title X program."  *Id.* at 2,940.  Whether a Title X program had "objective integrity and independence from prohibited activities" was to be determined through a case-by-case review of facts and circumstances.  *Id.* at 2,945.  HHS outlined a list of factors it would consider, including "the existence of separate accounting records," the "degree of separation from facilities" like waiting rooms, the "existence of separate personnel," and the extent of overlap between signs and other promotional material.  *Id.*

The Supreme Court upheld these provisions of the 1988 Rule in *Rust v. Sullivan*, 500 U.S. 173 (1991).  The Court first deemed the text of § 1008 "ambiguous," concluding that the statute "does not speak directly to the issues of counseling, referral, advocacy, or program integrity."  *Id.* at 184.  The Court likewise found the "legislative history . . . ambiguous and unenlightening" on these questions.  *Id.* at 186, 188.  The Court therefore concluded that *Chevron* deference applied, and it deferred to HHS's reasonable interpretation of § 1008 as expressed in the 1988 Rule.  *Id.* at 184–90.

In 2000, HHS revoked the 1988 Rule and replaced it with another. The 2000 Rule required Title X projects to provide pregnant women with nondirective information and counseling regarding their options, including abortion, and to make referrals upon request. Standards of Compliance for Abortion-Related Services in Family Planning Services Projects, 65 Fed. Reg. 41,270, 41,279 (July 3, 2000). HHS explained that it did not consider the "provision of neutral and factual information about abortion," including referrals, "to promote or encourage abortion as a method of family planning." *Id.* at 41,270–74. The 2000 Rule also eliminated the 1988 Rule's strict program-integrity requirements. *See id.* at 41,275–76. HHS said that grantees would still be required to maintain a separation that was more than a "mere exercise in bookkeeping" and "demonstrate" by "financial records, counseling and service protocols, administrative procedures, and other means" that Title X funds were not being used to "promot[e], or encourage[] abortion as a method of family planning." *Id.* at 41,270, 41,276. But Guidance published alongside the 2000 Rule provided no direction on how to maintain separation beyond "mere . . . bookkeeping"; instead, the Guidance provided only examples of permissible *integration*. *Id.* at 41,270. Common waiting rooms, common staff, and maintenance of a single filing system were all permitted, so long as costs were properly allocated. Provision of Abortion-Related Services in Family Planning Services Projects, 65 Fed. Reg. 41,281, 41,292 (July 3, 2000).

In 2019, HHS reversed course again. Like the 1988 Rule, the 2019 Rule required that Title X projects be physically and financially separate from any abortion-related activities the grantee might engage in. Compliance With Statutory Program Integrity Requirements, 84 Fed. Reg. 7,714, 7,789 (Mar. 4, 2019). The 2019 Rule also prohibited Title X programs from making abortion referrals, but unlike the 1988 Rule, the 2019 Rule allowed nondirective pregnancy counseling, which could include discussion of abortion. *Id.* at 7,717.

The 2019 Rule prompted litigation. The Ninth Circuit upheld the rule, *Becerra v. Azar*, 950 F.3d 1067, 1074 (9th Cir. 2020) (en banc) (holding that the 2019 Rule was a reasonable interpretation of Title X and was not arbitrary and capricious), while the Fourth Circuit permanently enjoined its operation, but only in Maryland. *Mayor of Baltimore v. Azar*, 973 F.3d 258, 296 (4th Cir. 2020) (en banc) (holding that the 2019 Rule was contrary to law and arbitrary

No. 21-4235                     *Ohio, et al. v. Becerra, et al.*                     Page 6

and capricious).  The Supreme Court granted certiorari to resolve the circuit split, but dismissed the case without decision when HHS announced its intent to engage in a new rulemaking. *See Oregon v. Cochran*, 141 S. Ct. 1369 (2021); *Oregon v. Becerra*, 141 S. Ct. 2621 (2021); *Becerra v. Mayor of Baltimore*, 141 S. Ct. 2170 (2021).

In 2021, HHS issued the final rule at issue in this case.  Ensuring Access to Equitable, Affordable, Client-Centered, Quality Family Planning Services, 86 Fed. Reg. 56,144 (Oct. 7, 2021).  The 2021 Rule eliminated the 2019 Rule's strict program-integrity requirements, reinstating the 2000 Rule and its accompanying guidance.  *Id.*  The 2021 Rule also replaced the 2019 Rule's ban on abortion referrals with a mandate that Title X projects make abortion referrals upon request.  *Id.* at 56,179.  The 2021 Rule went into effect on November 8, 2021, and applied to the 2022 Title X grant cycle.[2]  *Id.* at 56,144.

Twelve states—Ohio, Alabama, Arizona,[3] Arkansas, Florida, Kansas, Kentucky, Missouri, Nebraska, Oklahoma, South Carolina, and West Virginia—challenged the 2021 Rule and sought a preliminary injunction.  The States argued that the 2021 Rule was contrary to law and arbitrary and capricious under the Administrative Procedure Act (APA).  The district court denied the preliminary injunction.  Applying *Chevron* deference, the district court held that the 2021 Rule comported with Title X and was not arbitrary and capricious.  The States appealed and filed an emergency motion for an injunction pending appeal.  A motions panel of this court denied the States' motion for an injunction pending an appeal, concluding that the States had not demonstrated that they would be irreparably harmed without the injunction.  *Ohio v. Becerra*, No. 21-4235, 2022 WL 413680, at *1 (6th Cir. Feb. 8, 2022).  The court "express[ed] no opinion on the States' likelihood of success on the merits [of] their claims.  Nor [did it] comment on whether the States could successfully obtain an injunction at some later point." *Id.* at *5.  We now review the district court's denial of a preliminary injunction.

---

[2]The 2021 Rule may be found at 42 C.F.R. §§ 59.1–59.11.

[3]On April 7, 2023, this court granted Arizona's motion to voluntarily withdraw from this appeal pursuant to Federal Rule of Appellate Procedure 42(b)(2).  *See* App. R. 79.

No. 21-4235 *Ohio, et al. v. Becerra, et al.* Page 7

## II.

We consider four factors when determining whether to grant a preliminary injunction: "(1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of the injunction." *City of Pontiac Retired Emps. Ass'n v. Schimmel*, 751 F.3d 427, 430 (6th Cir. 2014) (per curiam) (en banc) (citation omitted). Where the federal government is the defendant, as here, the third and fourth factors merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

We review de novo whether the movant is likely to succeed on the merits. *City of Pontiac*, 751 F.3d at 430. We review the district court's ultimate determination as to whether the four factors weigh in favor of granting or denying preliminary injunctive relief for abuse of discretion. *Id.*

We do not come to the task of interpreting § 1008 with a blank slate. As previously mentioned, the U.S. Supreme Court ruled on the meaning of § 1008 over thirty years ago in *Rust v. Sullivan*, 500 U.S. 173 (1991). In *Rust*, the 1988 Rule was challenged on the ground that its strict separation requirements and prohibition on abortion counseling and referrals represented an impermissible interpretation of Title X.[4] 500 U.S. at 181. The Court upheld the 1988 Rule, applying the two steps of the *Chevron* deference framework. The Court held that § 1008 was ambiguous at *Chevron* step one. *Id.* at 184. The Court did not engage the text of the provision, instead explaining that it need not "dwell on the plain language of the statute because [it] agree[d] with every court to have addressed the issue that the language is ambiguous." *Id.* Specifically, the Court held that the text of the statute did not "speak directly to the issues of counseling, referral, advocacy, or program integrity" and that the "legislative history is ambiguous and unenlightening." *Id.* at 184, 186. So its only question was "whether the agency's answer [was] based on a permissible construction of the statute." *Id.* at 184 (quoting *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842–43 (1984)). The Court determined

---

[4]The 1988 Rule was also challenged on constitutional grounds, which are not at issue here.

that the 1988 Rule reasonably interpreted the statute and therefore deferred to the agency at *Chevron* step two. *Id.* at 185–90.

Thirty years later, we find ourselves in an odd spot. *Rust* rests in a doctrinal landscape that has shifted dramatically since the Court last opined on Title X. The status of the *Chevron* deference doctrine is notoriously uncertain. The last time the Supreme Court applied *Chevron*'s two-step test was in 2016. *Cuozzo Speed Techs., LLC v. Lee*, 579 U.S. 261, 276–83 (2016). Since then, individual Justices have at times referenced *Chevron* deference in separate writings, but the Court has not actually applied it. *See, e.g.*, *Pereira v. Sessions*, 138 S. Ct. 2105, 2121 (2018) (Alito, J., dissenting) (concluding that the case should have been resolved using a "straightforward application of *Chevron*," but that "the Court, for whatever reason, is simply ignoring *Chevron*"). But neither has the Court formally overruled *Chevron*, even in cases where it had the opportunity to do so. *See Buffington v. McDonough*, 143 S. Ct. 14, 14 (2022) (mem.); *Am. Hosp. Ass'n v. Becerra*, 142 S. Ct. 1896 (2022); *Pereira*, 138 S. Ct. at 2129 (Alito, J., dissenting) ("*Chevron* . . . remains good law."). And the Court has now granted certiorari, potentially to resolve the question of whether *Chevron* should be overruled. *See Loper Bright Enters. v. Raimondo*, 143 S. Ct. 2429, 2429 (2023) (mem.).

Whatever *Chevron*'s vitality, it has undoubtedly "become pitted with exceptions and caveats." *Buffington*, 143 S. Ct. at 20 (Gorsuch, J., dissenting from the denial of certiorari). For instance, the Court recently clarified that *Chevron* deference does not apply when the agency's interpretation involves a "major question," *see West Virginia v. EPA*, 142 S. Ct. 2587 (2022), and has suggested that the Court may decline to consider whether any deference is due when the agency itself does not invoke *Chevron*, *HollyFrontier Cheyenne Refin., LLC v. Renewable Fuels Ass'n*, 141 S. Ct. 2172, 2180 (2021). Recent precedent has also fundamentally changed how courts should perform a *Chevron* deference analysis. Now we are to apply a far more rigorous analysis at step one than was typical in *Chevron*'s heyday. *See, e.g.*, *Arangure v. Whitaker*, 911 F.3d 333, 336 (6th Cir. 2018) (Courts "must first exhaust the 'traditional tools' of statutory interpretation and 'reject administrative constructions' that are contrary to the clear meaning of the statute." (quoting *Chevron*, 467 U.S. at 843 n.9)); *Seminole Nursing Home, Inc. v. Comm'r of Internal Revenue*, 12 F.4th 1150, 1156 (10th Cir. 2021) ("Determining whether a statute is

ambiguous on a particular point can be an arduous undertaking; 'a court must exhaust all the "traditional tools" of construction.'   The court 'must carefully consider the text, structure, history, and purpose of a [statute],' and proceed to step two only if 'the interpretive question still has no single right answer.'" (alteration in original) (quoting *Kisor v. Wilkie*, 139 S. Ct. 2400, 2415 (2019) (internal citations omitted)); *Tovar v. Zuchowski*, 982 F.3d 631, 634–35 (9th Cir. 2020) (At *Chevron* step one, "we must 'exhaust all the traditional tools of construction' before we 'wave the ambiguity flag.'" (quoting *Kisor*, 139 S. Ct. at 2415)).   While the Court in *Rust* said it "need not dwell on the plain language of the statute," 500 U.S. at 184, courts today are expected to dwell on the language at *length*.

Despite this uncertainty, the Supreme Court has instructed that when one of its precedents "has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions."   *Agostini v. Felton*, 521 U.S. 203, 237 (1997) (quoting *Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 (1989)). In other words, we apply directly applicable Supreme Court precedent as it currently stands, without projecting where we think it may be headed.

*Rust* remains binding precedent and controls here.   Neither party contests that we are bound by *Rust*'s determination that § 1008 is ambiguous under step one of *Chevron*, so we take that as our starting point.   *See Mayor of Baltimore*, 973 F.3d at 283; *Azar*, 950 F.3d at 1074–75. Thus, "our discussion of the merits is cabined to an analysis of whether HHS's interpretation of Section 1008 in the Final Rule is 'permissible' or 'reasonable' at *Chevron* step two."   *Mayor of Baltimore*, 973 F.3d at 283.

With this in mind, we address the two challenged features of the 2021 Rule, which the States argue represent an impermissible construction of § 1008 and are arbitrary and capricious.

III.

A.

We begin with the 2021 Rule's referral requirement. The 2021 Rule requires that Title X programs "offer pregnant clients the opportunity to" receive "neutral factual information and nondirective counseling" regarding prenatal care and delivery, infant care, foster care, adoption, and abortion. 42 C.F.R. § 59.5(a)(5)(i)–(ii). Title X programs must also provide a referral for any of these options if the patient so requests. *Id.* § 59.5(a)(5)(ii). The referral "may include providing a patient with the name, address, telephone number, and other relevant factual information (such as whether the provider accepts Medicaid, charges, etc.) about an abortion provider," but the Title X project "may not take further affirmative action (such as negotiating a fee reduction, making an appointment, providing transportation) to secure abortion services for the patient." 86 Fed. Reg. at 56,150 (quoting 65 Fed. Reg. at 41,281).

1.

Our analysis starts with *Rust*. The 1988 Rule at issue in *Rust* prohibited Title X programs from counseling on or making referrals for abortion. 53 Fed. Reg. at 2,945. The 1988 Rule replaced HHS's 1981 policy, which required non-directive counseling on and referrals for abortion. *Id.* at 2,923. Before the Supreme Court, each side argued that the plain text of § 1008 spoke directly to counseling and referral and compelled an outcome in its favor.

Petitioner, Dr. Rust, argued that the 1988 Rule's ban on abortion counseling and referral was an impermissible interpretation of § 1008. According to Rust, "[a] clinic that provide[d] counseling services to pregnant patients about a range of options, including abortion, [was] not in ordinary parlance one that use[d] abortion 'as a method of family planning.'" Brief for Petitioners at 41, *Rust*, 500 U.S. 173 (No. 89-1391). Instead, Rust argued, a "method of family planning" was "a particular contraceptive procedure or technology." *Id.* Referral for abortion, Rust reasoned, was therefore not a family planning *method*, but was rather a family planning *service*. *Id.* at 42. And because § 1008 disallows the use of Title X funds only in programs where "abortion is a *method* of family planning," Rust argued that HHS lacked authority to ban abortion counseling or referral. *Id.* In short, Rust argued that when Congress banned the use of

Title X funds in "programs where abortion is a method of family planning," 42 U.S.C. § 300a-6, it was not banning the use of Title X funds to *counsel or refer* for abortions because engaging in those activities is not using abortion as a "method of family planning."

The government took the opposite view. It argued that at *Chevron* step one, "Section 1008—read in light of Title X's structure, purpose and history—answers the precise question at issue: Title X projects may not engage in abortion counseling, referral or advocacy." Brief for Respondent at 33, *Rust*, 500 U.S. 173 (Nos. 89-1391, 89-1392). In the government's view, "[i]f the Title X project provides information or counseling that characterizes abortion as a family planning option, then it has become a 'program[] where abortion is a method of family planning.'" *Id.* at 34 (quoting 42 U.S.C. § 300a-6). "It would be wholly anomalous," the government argued, "to read Section 1008 to mean that a program that merely counsels but does not perform abortions does not include abortion as a method of family planning." *Id.* at 34–35 (quoting *New York v. Sullivan*, 889 F.2d 401, 407 (2d Cir. 1989)); *see also Rust*, 500 U.S. at 181.

The Supreme Court rejected each party's position that the text of § 1008 compelled, or even "sp[oke] directly to," its reading of the text. *Rust*, 500 U.S. at 184. The Court noted that "Title X does not define the term 'method of family planning,' nor does it enumerate what types of medical and counseling services are entitled to Title X funding." *Id.* The legislative history was also "ambiguous and fail[ed] to shed light on relevant congressional intent." *Id.* at 185. The Court continued: "At no time did Congress directly address the issues of abortion counseling, referral, or advocacy. The parties' attempt to characterize highly generalized, conflicting statements in the legislative history into accurate revelations of congressional intent are unavailing." *Id.* So, the question for the Court became whether the agency's position—that a program that counsels or refers for abortion is one "where abortion is a method of family planning"—was reasonable at *Chevron* step two. "Based on the broad directives provided by Congress in Title X in general and § 1008 in particular," the Court was "unable to say that the Secretary's construction of the prohibition in § 1008 to require a ban on counseling, referral, and advocacy within the Title X project is impermissible." *Id.* at 184. The Court therefore deferred to HHS's interpretation and upheld the Rule's ban on counseling and referrals.

No. 21-4235                     *Ohio, et al. v. Becerra, et al.*                     Page 12

*Rust*'s holding requires us to reject the States' argument that the 2021 Rule's referral requirement is contrary to law. The States insist that the plain text of § 1008 compels the conclusion that a program that refers for abortion is one where abortion is a method of family planning. But that's the same argument the government made in *Rust*. And the Supreme Court did not bite.

Nor does it matter—so far as *Rust*'s reading of § 1008 goes—that HHS requires referrals, rather than merely permitting them. The Supreme Court in *Rust* rejected the arguments proffered by both parties—that providing counseling and referral for abortion is either necessarily treating, or not treating, "abortion as a method of family planning." *Rust*, 500 U.S. at 184–85. The Court instead concluded that the statute "does not speak directly to the issues of counseling [or] referral." *Id.* at 184. In light of this holding, it must be permissible for an administration to treat referrals either as falling inside or outside § 1008's prohibition, so long as the Department adequately explains its choice.

In HHS's present judgment, a program that provides a referral for abortion upon request is not one "where abortion is a method of family planning." 86 Fed. Reg. at 56,149–50. But the agency also acknowledged that § 1008 imposes constraints. HHS clarified that a referral cannot go beyond the provision of neutral information, cautioning that taking any "affirmative" step, such as "negotiating a fee reduction, making an appointment, or providing transportation," would cross the line into promoting or encouraging abortion, which would run afoul of § 1008. *Id.* at 56,150. In light of the Supreme Court's holding in *Rust*, our question is not whether this is the best interpretation of § 1008, only whether it is an impermissible one. We cannot say that it is.

2.

That does not end the matter, though. Even if the referral mandate is not contrary to law, it still might be "arbitrary and capricious." 5 U.S.C. § 706(2)(A). We cannot vacate a rule for being arbitrary and capricious unless the agency "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644,

658 (2007) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).  We do not apply greater scrutiny to agency action that changes a prior policy because the APA makes no distinction between "initial agency action and subsequent agency action undoing or revising that action."  *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).  The Court made this point in *Rust* itself.  *Rust*, 500 U.S. at 186 ("This Court has rejected the argument that an agency's interpretation 'is not entitled to deference because it represents a sharp break with prior interpretations' of the statute in question." (quoting *Chevron*, 467 U.S. at 862)).  Our question is merely whether the agency has "justified [its] change of interpretation with a 'reasoned analysis.'"  *Id.* at 187 (quoting *State Farm*, 463 U.S. at 42).  Although courts "are to engage in a careful review of the facts and record, our ultimate standard of review is narrow and deferential."  *Mayor of Baltimore*, 973 F.3d at 318 (Richardson, J., dissenting) (concluding that the 2019 Rule was not arbitrary and capricious).  So long as "the agency's explanation is clear enough that its path may reasonably be discerned," the court must respect its policy choice.  *Id.* (quoting *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016)).

Here, the States have not shown that HHS's decision to require referrals upon request was arbitrary and capricious.  First, HHS explained its decision to depart from the 2019 Rule, which banned referrals.  In HHS's judgment, the fact that so many providers withdrew because of the 2019 Rule's referral prohibition, "leaving multiple states without any Title X providers," was "a change in circumstances that, in the Department's view, demand[ed] reconsideration of the 2019 rule."  86 Fed. Reg. at 56,146, 56,150.  That, of course, would not be enough to explain why HHS chose to replace its ban with a mandate, rather than a permissive regime.  But HHS offered some justification for that too, explaining that, in its view, counseling and "referral upon request for option(s) the client wishes to receive" are "critical for the delivery of quality, client-centered care."  *Id.* at 56,154.  HHS also readopted the agency's prior determination that "the provision of a referral is the logical and appropriate outcome of the counseling process."  65 Fed. Reg. at 41,274.  And, it's important to note, the States do not challenge the counseling requirement.

The States offer several reasons why they believe that the agency failed to adequately justify its referral mandate. Some are more convincing than others, but ultimately, none carries the day.

The States' most serious contention is that HHS failed to adequately consider the States' views on medical ethics—an "important aspect of the problem" before it. *See Nat'l Ass'n of Home Builders*, 551 U.S. at 658. Although HHS took account of the "ethical codes of major medical organizations" which opposed the 2019 Rule's referral *ban*, *see* 86 Fed. Reg. 19,812, 19,817 (notice of proposed rule), HHS failed to consider whether the 2021 Rule's referral *requirement* "conflicts with multiple States' ethical standards governing the practice of medicine—standards that confirm that sound medical practice does not require complicity in abortion." Appellants Br. at 43. And the agency was aware of this concern; the States raised it in a letter they submitted during the agency's notice and comment process.[5]

The States have a point. The agency did not address conflicting state ethics laws when explaining its decision to impose a referral requirement. It considered *federal* conscience laws. *See* 86 Fed. Reg. at 56,153–54 ("Section D. Application of Conscience and Religious Freedom Statutes to Title X"). And it credited one comment from one unnamed organization that said that the 2019 Rule's *ban* on referrals made it "impossible" to "provide healthcare and information to patients consistent with medical ethics." *Id.* at 56,146. But the agency did not mention state ethics laws whatsoever. This raises some concern. As the States' comment letter noted, "medical organizations represent doctors—the parties *regulated by* rules of medical ethics." R. 1-2, PageID 45. And while these views may be helpful, it is the States, not the organizations, that actually "regulate the ethics of the medical profession." *Id.* Agencies, of course, need not consider *every* alternative view. *Oakbrook Land Holdings, LLC v. Comm'r of Internal Revenue*, 28 F.4th 700, 714 (6th Cir. 2022). But privileging the voice of the regulated, at the expense of the regulator, might well cause the agency to miss an "important aspect of the problem" before it. *See Nat'l Ass'n of Home Builders*, 551 U.S. at 658. Here, however, we cannot say that the agency lost sight either of the ethical problem before it or of the substance of the States' views.

---

[5]All plaintiff-States signed this letter, in addition to a number of other States not party to this case.

In their letter to the agency, the States stressed that a referral mandate would conflict with a number of state conscience statutes that respect the rights of medical personnel and facilities to decline to perform or participate in abortion activities.[6]  The States' point was to rebut the notion that medical ethics *require* health care providers to make abortion referrals.  As noted above, HHS did not consider those laws.  But the final rule did consider federal conscience laws providing similar protections, a point the States acknowledge.  The States do not claim that the state conscience rules are more exacting than the federal conscience rules.[7]  And HHS pledged in the preamble to the 2021 Rule that providers and entities who are covered by federal conscience laws "will not be required to counsel or refer for abortions in the Title X program."  86 Fed. Reg. at 56,153.[8]  So the Rule responded to the States' expressed concern.  By pledging to respect

---

[6]The letter cited the following statutes: Ky. Rev. Stat. § 311.800(4); La. Rev. Stat. § 40:1061.2; Mont. Code Ann. § 50-20-11(2); Or. Rev. Stat. § 435.485; Ariz. Rev. Stat. § 36-2154(A); Conn. Agencies Regs. § 19-13-D54(f); Fla. Stat. § 390.0111(8); N.Y. Civ. Rights Law § 79-i; Ohio Rev. Code § 4731.91; 18 Pa. Cons. Stat. § 3213(d); Wis. Stat. § 253.09(1).

[7]We note that the Louisiana statute the States cite contains a section providing criminal penalties for abortion in the event that *Roe v. Wade*, 410 U.S. 113 (1973), were overturned.  *See* La. Stat. Ann. § 40:1061(A). When HHS implemented the 2021 Rule, that had not yet happened.  The Supreme Court decided *Dobbs v. Jackson Women's Health Org.* in June of 2022.  142 S. Ct. 2228 (2022).  The impact of *Dobbs* on the Title X program is undoubtedly an "important aspect" of the question now, but "judicial review of agency action is limited to the grounds that the agency invoked when it took the action."  *DHS v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1907 (2020) (citation omitted).

[8]We are somewhat puzzled about the interaction between the Rule's referral requirement and one federal conscience law, the Weldon Amendment, as applied to State grantees.  The Weldon Amendment is an appropriations rider that has been attached to every HHS appropriation since 2004.  *See, e.g.*, Consolidated Appropriations Act, 2022, Pub. L. No. 117-103, div. H, title V, § 507(d)(1), 136 Stat. 49, 496 (Mar. 15, 2022).  It says that appropriated funds may not

> be made available to a Federal agency or program, or to a *State* or local government, if such agency, program, or government subjects any institutional or individual health care entity to discrimination on the basis that the health care entity does not provide, pay for, provide coverage of, *or refer* for abortions.

*Id.* (emphasis added).

Both HHS and the States seem to agree that the States are not "health care entities" entitled to conscience protection. *See id.* § 507(d)(2) (defining "health care entities").  States typically apply for Title X grants and then subgrant the funds to county boards of health and other "health care entities."  *See Nat'l Fam. Plan. & Reprod. Health Ass'n, Inc. v. Gonzales*, 468 F.3d 826, 828 (D.C. Cir. 2006).  As grantees, the States must ensure that their subrecipients are complying with all Title X regulations, including the 2021 Rule's referral requirement.  86 Fed. Reg. at 56,152. Thus, the 2021 Rule would seem to forbid States from subgranting to "health care entities" who will not refer for abortion; that, in turn, seems to force the States to "discriminat[e] on the basis that the health care entity does not . . . refer for abortions," the very thing the Weldon Amendment forbids.  § 507(d)(1), 136 Stat. at 496.  But, although the States raised such a claim in their complaint, they did not press it either here or in the district court, so we will not consider it further.

federal conscience laws, HHS necessarily acknowledged Congress's agreement with the States' point—that "one can ethically practice medicine without making these referrals." Reply Br. at 17. In the end, acknowledging the ethical debate, HHS exercised its judgment and decided that a "client-centered" approach should prevail: a "default" rule requiring referrals upon request, subject to conscience exemptions for objecting providers. 86 Fed. Reg. at 56,153. Perhaps, as some commentators pointed out, a more straightforward approach would have been to adopt a permissive regime, "since the conscience statutes protect objecting providers from those requirements in any case." *Id.* But the question on arbitrary and capricious review is not "whether a regulatory decision is the best one possible or even whether it is better than the alternatives." *FERC v. Elec. Power Supply Ass'n*, 577 U.S. 260, 292 (2016). Instead, we must "uphold a rule if the agency has 'examine[d] the relevant [considerations] and articulate[d] a satisfactory explanation for its action.'" *Id.* (quoting *State Farm*, 463 U.S. at 30 (1983)) (alterations in original). "As long as 'the agency's explanation is clear enough that its path may reasonably be discerned,' we must respect its policy choice." *Mayor of Baltimore*, 973 F.3d at 318 (Richardson, J., dissenting) (quoting *Encino Motorcars, LLC*, 578 U.S. at 221) (concluding that the 2019 Rule was not arbitrary and capricious).

The States next charge that HHS did not "explain how its own conclusion [that referral necessarily treats abortion as a method of family planning] from 2019 has been disproven." Appellants Br. at 41. But this was not a fact that the agency needed to "disprove." Instead, it is a question of law whether § 1008 requires or permits the agency to treat a program that makes abortion referrals as one "where abortion is a method of family planning." In *Rust*, the Supreme Court held that § 1008 is ambiguous on this point. And when the agency changes course in interpreting an ambiguous statute, "it suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency *believes* it to be better." *Fox Television Stations, Inc.*, 556 U.S. at 515.

In sum, the Supreme Court's holding in *Rust* requires us to reject the States' argument that the referral mandate is arbitrary and capricious. And it is not the role of the court to "second guess[] the analysis and policy judgments that undergird the agency's regulations." *Mayor of Baltimore*, 973 F.3d at 325 (Richardson, J., dissenting). HHS acknowledged it was changing

course and gave rational reasons why it thought a change in policy was necessary and preferable. That is enough to withstand arbitrary and capricious review. *See Fox Television Stations, Inc.*, 556 U.S. at 515. The States are not likely to succeed on the merits of this claim.

## B.

Next, we turn to the 2021 Rule's program-integrity requirements. The 2021 Rule "revoke[d] the requirements of the 2019 regulations, including . . . eliminating requirements for strict physical and financial separation between abortion-related activities and Title X project activities." 86 Fed. Reg. at 56,144. In its place, the 2021 Rule readopted HHS's 2000-era policy, which contained no "requirement for physical separation." *Id.*; 65 Fed. Reg. at 41,276.

Again, our analysis starts with *Rust*. There, the parties disputed what program-integrity requirements are necessary to comply with § 1008. HHS argued that the 1988 Rule's strict physical separation requirements—which are largely the same as those in the 2019 Rule—were necessary to comply with § 1008. *Rust*, 500 U.S. at 188 (quoting 53 Fed. Reg. at 2,940 (1988)). The petitioners, on the other hand, argued that the 1988 Rule's physical separation requirements were inconsistent with the plain language of Title X because they "frustrate[d] the clearly expressed intent of Congress that Title X programs be an integral part of a broader, comprehensive, health-care system." *Id.* at 187–88. Once again, the Court did not accept either party's position that § 1008 compelled its reading of the text at *Chevron* step one. Instead, the Court concluded that § 1008 neither prohibited, nor required, the strict program-integrity protocols of the 1988 Rule. *Id.* at 188–90. And at *Chevron* step two, the Court upheld the 1988 Rule's program-integrity policy because it was "based on a permissible construction of the statute and [was] not inconsistent with congressional intent." *Id.* at 188.

Though *Rust* held that § 1008 didn't "speak directly to . . . program integrity," and was therefore "ambiguous" in that regard, 500 U.S. at 184, it did set out some clear benchmarks. First, it rejected Rust's argument that either the statute or the legislative history required integration of abortion activities and Title X programs. Had it been otherwise, the Court would have been obligated to declare the 1988 Rule's separation requirements contrary to law. Next, the Court made clear that § 1008 does not require separation at the grantee level. "Title X

No. 21-4235 *Ohio, et al. v. Becerra, et al.* Page 18

expressly distinguishes between a Title X *grantee* and a Title X *project*." *Id.* at 196 (emphasis in original). So, the Court concluded, § 1008 does not ban any person or entity who receives a Title X grant from also "engag[ing] in abortion-related activity." *Id.* at 198. But a plain reading of § 1008 also tells us that the statute requires more than just a separation of funds; the statute does not, for example, say merely that "no Title X funds shall be used *for* abortions or abortion services."[9] Instead, it requires separation at the program level. The statute says that "[n]one of the funds appropriated under" Title X "shall be used in *programs* where abortion is a method of family planning." 42 U.S.C. § 300a-6 (emphasis added). So, in explaining why the 1988 Rule did not amount to an unconstitutional condition, the Court made clear that a grantee may choose to provide abortion services, so long as it "conduct[s] those activities through *programs* that are *separate and independent from the project* that receives Title X funds."[10] *Rust*, 500 U.S. at 196 (emphasis added).

How to go about implementing this statutory directive is largely for the agency to decide. HHS has discretion to carry out the Title X program in any manner consistent with a "permissible construction of the statute." *Chevron*, 467 U.S. at 843. Here, both the text of the statute and the Supreme Court's interpretation plainly set forth the legislative command: no Title X funds may be "used in programs where abortion is a method of family planning," 42 U.S.C. § 300a-6, so any abortion "programs" a Title X grantee runs must be kept separate from Title X projects and funds, *Rust*, 500 U.S. at 190. The agency's discretion comes in its ability to choose the means to hit that statutory target. But the statute mandates separate "programs" (rather than demanding separate grantees, or merely requiring separate books), and the agency must enforce that limitation.

---

[9]By contrast, Congress has included language in appropriations bills allocating funds for the Title X program that says funds "shall not be expended for abortions." *See, e.g.*, Consolidated Appropriations Act, 2022, Pub. L. No. 117-103, div. H, title II, Family Planning (Mar. 15, 2022).

[10]As the dissent points out, the Court here was explaining why the 1998 Rule did not violate the First Amendment. *Rust*, 500 U.S. at 197. But in so doing, it provided an important reason why the 1988 Rule's program-integrity requirements were consistent with § 1008—Title X grantees could still perform abortion services, but they were required to do so "through *programs* that [were] separate and independent from the project that receives Title X funds." *Id.* at 196. This comports with the plain language of § 1008, which says that no Title X funds may be "used in programs where abortion is a method of family planning."

The 1988 and 2019 Rules chose similar means to implement the statutory command—strict financial and physical separation. That's how one would know whether a grantee that provided both abortion-related services and Title X family planning services kept the abortion activities to a "program" that was "separate" from the Title X project.[11] *See id.* at 179 (explaining that the 1988 Rule was "designed to provide 'clear and operational guidance' to grantees about how to preserve the distinction between Title X programs and abortion as a method of family planning." (quoting 53 Fed. Reg. at 2,923–24)); *id.* at 188 (quoting 1988 Rule for the proposition that "[h]aving a program that is separate from [abortion] activities is a necessary predicate to any determination that abortion is not being included as a method of family planning in the Title X program") (quoting 53 Fed. Reg. at 2,940)). An outside observer, or an HHS compliance officer, could tell the difference between the two "programs" because they would not share physical space, or personnel, or records. In *Rust*, the Supreme Court said this was a "permissible" way to meet the statutory goal of keeping the programs separate. *Id.* at 188–90. But the Court also said that was not the exclusive way in which the agency might meet Congress's goal—it rejected the Secretary's argument that the 1988 Rules were required. *Id.* at 189.

How does the 2021 Rule purport to ensure that any abortion "program" a Title X grantee runs is kept separate and distinct from Title X projects and funds? It "eliminat[ed] requirements for strict physical and financial separation between abortion-related activities and Title X project activities." 86 Fed. Reg. at 56,144. In its place, the 2021 Rule reverted to the language of the

---

[11]Both the 1988 and 2019 rules used the term "program" and "project" interchangeably. *See* 53 Fed. Reg. at 2,922; 84 Fed. Reg. at 7,714. The 2000 and 2021 Rules do not say that the terms are used interchangeably, but HHS represents in its brief that it views the terms that way. *See* Appellee Br. at 28. And the States do not argue otherwise. Across administrations, HHS has defined "program/project" similarly, and somewhat circularly, to "mean a plan or sequence of activities that is funded to fulfill the requirements elaborated in a Title X funding announcement." 84 Fed. Reg. at 7,787 (2019 Rule); *see* 53 Fed. Reg. at 2,944 (1988 Rule) ("program" and "project" . . . mean "a coherent assembly of plans, activities, and supporting resources contained within an administrative framework" and a "Title X program" or "Title X project" means "the identified program which is approved by the Secretary for support under section 1001 of the Act."); 65 Fed. Reg. at 41,276 (2000 Rule) ("The Department has traditionally viewed a grant project as consisting of an identified set of activities supported in whole or in part by grant funds."); 65 Fed Reg. at 41,282 (2000 Guidance) ("The Title X project is the set of activities the grantee agreed to perform in the relevant grant documents as a condition of receiving Title X funds."). In other words, as HHS defined the terms, a program or project is the set of activities that receive grant funding and are, therefore, subject to the grant conditions. So the *conditions* on the grant-funded set of activities are what distinguish a Title X program from other programs.

2000 Rule, which says nothing about any sort of separation. Instead, it merely states that an eligible Title X project must "[n]ot provide abortion as a method of family planning." 42 C.F.R. § 59.5; 65 Fed. Reg. at 41,279. The preamble to the 2021 Rule indicates, however, that it reinstated Guidance accompanying the 2000 Rule. 86 Fed. Reg. at 56,150. That Guidance says that "[n]on-Title X abortion activities must be separate and distinct from Title X project activities." 65 Fed. Reg. at 41,282. It also says that "separate bookkeeping entries alone will not satisfy the spirit of the law. Mere technical allocation of funds, attributing federal dollars to non-abortion activities, is not a legally supportable avoidance of section 1008." *Id.*

So what does the Guidance require beyond separate bookkeeping? If it requires anything, the Guidance doesn't say. We know it's not a "separate health facility." *Id.* The Guidance makes clear that "[s]eparation of Title X from abortion activities does not require" that. *Id.* Inside a common health facility, a "common waiting room is permissible, as long as the costs [are] properly pro-rated." *Id.* So is the "maintenance of a single file system for abortion and family planning patients . . . so long as costs are properly allocated." *Id.* "[C]ommon staff is permissible" too "so long as salaries are properly allocated." *Id.* So, from the examples HHS has provided, it seems that cost-accounting is, in fact, the only limit on comingling. To be complete, with respect to common staff, the Guidance also requires that "all abortion related activities of the staff members [be] performed in a *program* which is entirely *separate* from the Title X project." *Id.* (emphasis added). But since our quest is to uncover what the Guidance means by a "separate" "program," this latter qualification offers no help. And neither does the Guidance's blessing of a "hospital offering abortions for family planning purposes and also housing a Title X project," which is "permissible, as long as the abortion activities are *sufficiently separate* from the Title X project." *Id.* (emphasis added). The Guidance does nothing to answer the critical question: sufficiently separate, how?

The Guidance does offer one more clue. It says that "[w]here a grantee conducts abortion activities that are not part of the Title X project and would not be permissible if they were, the grantee must ensure that the Title X supported project is separate and distinguishable from those other activities." *Id.* It then offers a test: "What must be looked at is whether the *abortion element* in a *program* of family planning is so large and so intimately related to all aspects of the

No. 21-4235                    *Ohio, et al. v. Becerra, et al.*                    Page 21

program as to make it difficult or impossible to separate the eligible and the non-eligible items of cost." *Id.* (emphasis added).

The States say that this language decides the case. Section 1008 prohibits Title X funds from being "used in programs where abortion is a method of family planning." 42 U.S.C. § 300a-6. But the Guidance "says that Title X grantees *can* have an 'abortion element in a program of family planning services,' as long as it is not too 'large' or 'intimately related' with the non-abortion parts of the family-planning program." Appellants Br. at 24–25. The States say this cannot be a permissible reading of the statute. Taken at face-value, the States have a point; obviously, a Title X "program" cannot have an "abortion element," no matter how small and unrelated it is to other aspects of the program. But even giving the most charitable reading to this language, as the district court did, does not help us discover a "permissible" construction of the statute.

As HHS and the district court see it, the Department's "unfortunate" "choice of the word 'program'" is of no concern because it does not mean "that a *Title X program* may have an 'abortion element.'" *Ohio v. Becerra*, 577 F. Supp 3d 678, 691 n.13 (S.D. Ohio 2021). *Rust* held that "Title X expressly distinguishes between a Title X *grantee*," which *may* run an abortion program, "and a Title X *project*," which may not. *Rust*, 500 U.S. at 196; *see also id.* at 198. And the Guidance does say that "[n]on-Title X abortion activities must be separate and distinct from Title X project activities." 65 Fed. Reg. at 41,282. So "reading the passage with full context," *Becerra*, 577 F. Supp. 3d at 691 n.13, the district court and the Secretary essentially ask us to construe the Guidance as if it said: "What must be looked at is whether the abortion element in a grantee's *collective set* of "program[s] of family planning" (which may encompass both Title X programs and abortion programs) "is so large and so intimately related to all aspects of the [collective set of] program[s] as to make it difficult or impossible to separate the eligible and the non-eligible items of cost." *See id.* at 690 (quoting 65 Fed. Reg. at 41,282); *see id.* at 691 n.13.

Of course, that's not what the Guidance says. But even if we were to give it this construction, the Guidance still fails in its critical task—to offer a permissible construction of the statute's key term, "program." The Guidance offers just one test for assessing whether a "Title X

supported project [or program] is separate and distinguishable from [abortion] activities." 65 Fed. Reg. at 41,282. "What must be looked at" is whether the "abortion element" is "so large" and "so intimately related" to the Title X activities that it is just too hard to "separate the eligible and the non-eligible items of cost." *Id.* In other words, so long as it is possible to account for the "abortion costs," the Guidance deems the "abortion program" to be "separate and distinguishable" from the Title X project. And the examples, whose limits all boil down to cost-accounting, confirm this construction.

This test cannot be squared with the statute. Section 1008 does not say merely that no Title X funds "shall be used *for* abortions or abortion-related activity." If it did, then perhaps mere cost-accounting would suffice. But the statute requires more than separate dollars. It requires separate *programs*: no Title X funds "shall be used in *programs* where abortion is a method of family planning." 42 U.S.C. § 300a-6 (emphasis added). That language can only be read to say that no Title X funds can be used in such "programs," even to support non-abortion activities.[12] Title X funds cannot be spent even on contraceptive counseling, a core-Title X function, if the "program" is one "where abortion is a method of family planning." 42 U.S.C. § 300a-6. So it is incumbent upon the agency to have a discernible, and permissible, conception of what constitutes a "program." And because it violates the statute for any Title X dollars to be spent, even for Title X-approved purposes, in a "program where abortion is a method of family planning," *id.*, the boundaries of the "program" cannot be defined merely by how the money is spent. The Agency does not say otherwise. Indeed, HHS acknowledges that a "[m]ere technical allocation of funds, attributing federal dollars to non-abortion activities, is not a legally supportable avoidance of section 1008." 65 Fed. Reg. at 41,282. Yet the *only* dividing line the agency has offered to distinguish one "program" from another is whether it is possible to "separate the eligible and the non-eligible items of cost." *Id.*; *see also id.* (listing examples of

---

[12]To be clear, we do not hold that § 1008 requires "complete physical separation," as the dissent seems to believe. Dissent Op. at 42. Such a holding would conflict with *Rust*, which held that complete separation was permitted but not required. *See supra* at 19. We disagree, however, with the dissent that if the Court in *Rust* "believed physical separation requirements were mandated by the statute, it would not have held that § 1008 was ambiguous." Dissent Op. at 40. Contrary to the dissent's suggestion, it does not follow that because the Court did not believe that § 1008 required *complete* physical separation, the Court thought that § 1008 required no physical separation. Nothing in *Rust* can be read as the Court concluding as much.

permissible integration of Title X program and abortion program facilities and personnel, "so long as costs are properly allocated" or "pro-rated").

The Agency offers little in response. It points to the Guidance's language requiring that a grantee's "Title X-supported project must be 'separate and distinguishable' from any abortion-related activities," but it does not answer what it means by those terms. Appellee Br. at 27 (quoting 65 Fed. Reg. at 41,282). It insists that "more than mere 'separate bookkeeping'" is required," *id.* (quoting 65 Fed. Reg. at 41,282), though both its many examples and its lone test say otherwise. It says that a grantee may use "financial records, counseling and service protocols, administrative procedures, and other means" to "demonstrate" that its Title X and abortion programs are "distinct." *Id.* (quoting 65 Fed. Reg. at 41,276). And it promises "robust monitoring processes to ensure grantee compliance, . . . including through regular grant reports, compliance monitoring visits, and legally required audits." *Id.* (quoting 86 Fed. Reg. at 56,152). But these "means" of enforcing compliance do not answer the question before us. Our question is whether the agency has permissibly determined what it must enforce. That is, has the agency permissibly determined when Title X funds would be mis-spent through "use[] in *programs* where abortion is a method of family planning"? 42 U.S.C. § 300a-6 (emphasis added).

HHS has offered but one answer to this question—Title X funds may not be "used in programs where abortion is a method of family planning," *id.*, when the "abortion element" is "so large" and "so intimately related" to the Title X project that it would be "difficult or impossible to separate the eligible and the non-eligible items of cost items of cost." 65 Fed. Reg. at 41,282. But, as we have explained, that answer is insufficient to mark the critical boundary set forth in the statute—between what is and what is not a "*program*[] where abortion is a method of family planning." 42 U.S.C. § 300a-6 (emphasis added).

The Supreme Court in *Rust* upheld the 1988 Rule's decision to mark the boundaries between a grantee's Title X "program" and any abortion-related "program" through strict physical and financial separation. 500 U.S. at 190. At the same time, because the statute is "ambiguous" on this score and does not "speak directly to the issue[] of . . . program integrity," other approaches are possible. *Id.* at 184. Yet the Agency must offer some concrete conception, beyond mere financial separation, of the statute's key term "program," so that it can ensure

compliance with the statute's command that no Title X funds "shall be used in programs where abortion is a method of family planning." 42 U.S.C. § 300a-6. Because the 2021 Rule fails in this regard, its construction is not a permissible reading of the statute, and the States are likely to succeed on the merits of this challenge.

IV.

"Even with a high likelihood of success on the merits, a preliminary injunction is not warranted unless the plaintiffs are likely to suffer irreparable injury in the absence of interim relief." *Kentucky v. Biden*, 57 F.4th 545, 555 (6th Cir. 2023). Before any grants had been awarded under the 2021 Rule, the States sought an injunction pending appeal, offering three theories of harm: (1) increased competition for Title X funds from other prospective grantees who were unable or unwilling to comply with the stricter 2019 Rule; (2) reputational injury that would result from any loss of funding affecting the States' ability to provide the level of healthcare services their citizens had come to expect; and (3) injury caused by forcing the States to put their imprimatur on abortion. *Ohio v. Becerra*, 2022 WL 413680, at *3 (6th Cir. Feb. 8, 2022). A motions panel of this court rejected all three theories of harm at that stage of the litigation. *Id.* at *2.

Relevant here is the States' competition-based theory of harm, which posits that applicants for government grants "suffer [an] injury in fact when agencies lift regulatory restrictions on their competitors or otherwise allow increased competition against them." *Sherley v. Sebelius*, 610 F.3d 69, 72 (D.C. Cir. 2010) (alteration in original) (citation omitted);[13] *Planned Parenthood of Greater Wash. & N. Idaho v. Dep't of Health & Hum. Servs.*, 946 F.3d 1100, 1108 (9th Cir. 2020) ("An agency action that increases competition tilts the playing field for parties that were already competing, and those parties suffer an injury-in-fact."); *Clinton v. City of New York*, 524 U.S. 417, 432–33 (1998). The motions panel deemed this theory too

---

[13]The motions panel questioned *Sherley*'s relevance because *Sherley* held that increased competition "can suffice as an injury-in-fact for standing purposes," but did not "comment on when that injury might be irreparable" in the preliminary injunction context. *Becerra*, 2022 WL 413680, at *3. But the panel did not explain why harm in the standing context would not be relevant to the irreparable harm inquiry in the preliminary injunction context. Assuming that a party has successfully made the requisite showing of a cognizable injury for standing, the question at the preliminary injunction stage is whether that harm is irreparable. *See D.T. v. Sumner Cnty. Schs.*, 942 F.3d 324, 327 (6th Cir. 2019).

speculative at the time because it was premised on the then-uncertain prediction that the States would receive less Title X funding under the new rule. *Becerra*, 2022 WL 413680, at *4. Because "[n]o grant money ha[d] been allocated," the motions panel could not determine "at th[at] point" whether HHS would "provide the States with less money" than under the 2019 Rule. *Id.* at *3. The panel said that "any economic injury in this case would only occur . . . after HHS determine[d] its Title X funding allocations for the 2022-2023 funding year." *Id.* at *4.

Shortly after the motions panel's decision, HHS announced its 2022-23 grant awards.[14] The agency's announcement established that the economic harm the States predicted had come to pass. At least one of the appellant States, Ohio, received fewer Title X funds following the adoption of the 2021 Rule. The States filed a motion, asking us to take judicial notice of this fact. In their motion, the States point out that the Ohio Department of Health received $1,760,00 less compared to its previous annual award under the 2019 Rule, representing a substantial twenty-percent decrease. App. R. 57 at 2.

HHS contends that we cannot consider the grant award amounts because when the district court denied the preliminary injunction, the grants had not yet been made, so they were not part of the record before the district court. But we retain the power to take judicial notice of changed circumstances. Reply Br. at 21 (citing *Namo v. Gonzales*, 401 F.3d 453, 458 (6th Cir. 2005); *Broom v. Shoop*, 963 F.3d 500, 509 (6th Cir. 2020); *Mallory v. Eyrich*, 922 F.2d 1273,1281 (6th Cir. 1991)).[15] HHS's grant announcement is publicly available online, is "not subject to reasonable dispute" and "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b); *see United States v. Husein*, 478 F.3d 318, 337 (6th Cir. 2007) (applying rule to request on appeal). What's more, it cannot be that the

---

[14]*HHS Awards $256.6 Million to Expand & Restore Access to Equitable & Affordable Title X Family Planning Services Nationwide*, Mar. 30, 2022, https://www.hhs.gov/about/news/2022/03/30/hhs-awards-256-million-to-expand-restore-access-to-equitable-affordable-title-x-family-planning-services-nationwide html.

[15]We have adopted HHS's argument in an unpublished opinion. *Johnson v. City of Memphis*, 444 F. App'x 856, 860 n.2 (6th Cir. 2011). And in a published opinion, we've stated that our task on an appeal from a preliminary injunction is "to review the record that was before the district court." *Wilson v. Williams*, 961 F.3d 829, 833 (6th Cir. 2020) (quoting *Johnson*, 444 F. App'x at 860 n.2). But the unpublished opinion is not binding. And, in our published opinion, nothing turned on our suggestion that our review was limited to the record before the district court. *See id.* at 833. So, any suggestion in *Wilson* that we cannot take judicial notice of changed circumstances in an appeal from a preliminary injunction was dicta, and therefore nonbinding. *See Wright v. Spaulding*, 939 F.3d 695, 701 (6th Cir. 2019).

No. 21-4235                    *Ohio, et al. v. Becerra, et al.*                    Page 26

States' claim of injury was too early at the injunction-pending-appeal stage—because the alleged harm was too uncertain—but is too late now that the harm has actually come to pass. We therefore hold that at least Ohio[16] has made the requisite showing of irreparable injury based on its competition-based theory of harm.

HHS counters that the States "do not attempt to explain how any decrease in funds would be traceable to increased competition rather than to the agency's independent judgments about a grantee's performance on [various performance] factors." Appellee Br. at 16 ("Title X grant applications are evaluated based on a broad range of criteria, including, for example, evidence of the applicant's ability to increase access to quality family planning services and the applicant's history of performance." (cleaned up)). But the causal link here is not obscure. With respect to Ohio, the only State to submit evidence supporting its claim of competitive injury, an official from the Ohio Department of Health attested: "Before the 2019 Rule went into effect . . . both the Ohio Department of Health and Planned Parenthood of Greater Ohio received grants. After the 2019 Rule, Planned Parenthood of Greater Ohio stopped participating in Title X, and the Ohio Department of Health received all of the funds that were allocated to grantees in Ohio— amounting to $8.8 million in each of 2020-2021 and 2021-2022." *Becerra*, 2022 WL 413680, at *3. And after the adoption of the 2021 Rule, HHS "announced two grants in the State of Ohio: Planned Parenthood of Greater Ohio . . . has now been awarded $2 million. The Ohio Department of Health was awarded $7,040,000 . . . a decrease of $1,760,000 from its previous (undisputed) annual award of $8,800,000." App. R. 57 at 1–2. In other words, when Planned Parenthood (the only other grant recipient in Ohio) "dropped out of Title X, Ohio's funding went up. When Planned Parenthood reentered, Ohio's funding went down." Reply Br. at 25. And nothing in the record supports HHS's suggestion that Ohio's decrease in funds was a result of poor performance. In sum, due to the rule change, Ohio lost one-fifth of its Title X funding, an amount that it cannot get back: "economic injuries caused by federal agency action are generally

---

[16]Of the eleven remaining Plaintiff-States, only Ohio submitted a declaration providing concrete evidence that it would face increased competition as a result of the 2021 Rule. R. 50, PageID 678. And in the States' motion to take judicial notice of the 2022–23 grants, the States note only that "*some* of the appellant States are receiving fewer Title X funds in light of the Final Rule's adoption." App. R. 57 at 1 (emphasis added). But the motion provides no funding data for any state but Ohio.

No. 21-4235                     *Ohio, et al. v. Becerra, et al.*                     Page 27

unrecoverable because the APA does not waive sovereign immunity for damages claims." *Becerra*, 2022 WL 413680, at *4.  The 2021 Rule has caused irreparable harm.

V.

Finally, we consider whether issuing an injunction would serve the public interest.  The States argue correctly that the public interest lies in correctly applying the law and that, because the Rule's program integrity policy is not a reasonable interpretation of § 1008, enjoining the Rule would serve the public interest.  *See Coal. to Def. Affirmative Action v. Granholm*, 473 F.3d 237, 252 (6th Cir. 2006).  HHS, on the other hand, argues that the public interest favors leaving the 2021 Rule in place because the former 2019 Rule reduced patient access to Title X services.  Ohio introduced some evidence undermining this concern:  testimony in the record reflects that the Ohio Department of Health used its supplemental Title X funding to fill the service gaps in counties where Planned Parenthood had stopped offering Title X services after withdrawing from the Title X program.  R. 1-1, PageID 30–31.  With that said, data from the preamble to the 2021 Rule suggests otherwise.  HHS stated that Ohio "experienced a 10 percent decline in service sites between 2018 and 2020, an 18 percent decline in clients from 2018 to 2019, and a 57 percent decline in clients from 2019 to 2020."  86 Fed. Reg. at 56,151.  The agency explained, "While many states and territories experienced a decline in clients from 2019 to 2020 due to COVID-19, Ohio's percentage decline in clients from 2019 to 2020 ranked 18th in order of states from largest to smallest decline."  *Id.*  Given the public interest in correctly applying the law on the one hand but the apparent decrease in services in Ohio on the other, we thus find that this factor does not cut in either direction.

With the majority of the preliminary injunction factors favoring the States' position, we therefore find that the balance of the equities weighs in favor of a preliminary injunction.

But that relief must be limited to Ohio.  A showing of irreparable harm is an indispensable perquisite for the issuance of a preliminary injunction.  *D.T.*, 942 F.3d at 327 ("If the plaintiff isn't facing imminent and irreparable injury, there's no need to grant relief *now* as opposed to at the end of the lawsuit.");  *State of Ohio ex rel. Celebrezze v. Nuclear Regul. Comm'n*, 812 F.2d 288, 290 (6th Cir. 1987) ("In order to substantiate a claim that irreparable

No. 21-4235 *Ohio, et al. v. Becerra, et al.* Page 28

injury is likely to occur, a movant must provide some evidence that the harm has occurred in the past and is likely to occur again."). As discussed above, Ohio is the only plaintiff-State that provided the requisite facts and affidavits supporting the States' assertion that the 2021 Rule would cause them to suffer the competition-based harm. *See Celebrezze*, 812 F.2d at 290. Ohio argues that a nationwide injunction is necessary to ensure that it "suffer[s] no adverse consequences." Reply Br. at 24. But Ohio's competition-based theory of harm is premised on the increased competition *within* Ohio's borders—specifically from Planned Parenthood of Ohio, the only other Title X grantee in the state. *See id.* at 19–20 ("Now that HHS has awarded $2 million to Planned Parenthood of Greater Ohio for the coming grant year, Ohio will receive $1.76 million less. The overall increase in grants for Ohio providers did not overcome the State of Ohio's loss to competitor Planned Parenthood."); Appellants Br. at 12 ("Before the 2019 Rule, Planned Parenthood was the only other grantee in Ohio. Once Planned Parenthood left the program, Ohio applied for and received more than $4 million annually in additional Title X funds."). Ohio has not made the requisite showing that a nationwide preliminary injunction is necessary to ameliorate its competition-based harm. *See Gill v. Whitford*, 138 S. Ct. 1916, 1934 (2018) ("A plaintiff's remedy must be tailored to redress the plaintiff's particular injury." (citing *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 353 (2006)); *McNeilly v. Land*, 684 F.3d 611, 615 (6th Cir. 2012) ("The party seeking the preliminary injunction bears the burden of justifying such relief." (citing *Granny Goose Foods, Inc. v. Teamsters*, 415 U.S. 423, 441 (1974)).

In sum, we hold that the preliminary injunction factors weigh in favor of granting relief on the challenge to the 2021 Rule's program-integrity requirements. Because only Ohio made the requisite showing of irreparable harm, Ohio is entitled to a preliminarily injunction enjoining the United States from enforcing the 2021 Rule's program integrity rules in Ohio in a manner that would affect the allocation of funding in Ohio.

\* \* \*

We AFFIRM in part, REVERSE in part, and REMAND to the district court for further proceedings consistent with this opinion.

No. 21-4235                          *Ohio, et al. v. Becerra, et al.*                          Page 29

---

**CONCURRENCE / DISSENT**

---

KAREN NELSON MOORE, Circuit Judge, concurring in the judgment in part and dissenting in part.  This ought to be a simple, straightforward application of well-established precedent in administrative law.  The Department of Health and Human Services ("HHS") issued a final rule in 2021 governing the Title X program, which makes grants to support the establishment and operation of voluntary family-planning service projects.  The 2021 Rule interpreted various provisions of Title X, including, as is relevant to this appeal, § 1008 of Title X, codified at 42 U.S.C. § 300a-6.  Section 1008 bars funds appropriated under Title X from being "used in programs where abortion is a method of family planning."  42 U.S.C. § 300a-6.  The 2021 Rule revoked the previous regulation, the 2019 Rule, which had required grantees to maintain strict physical and financial separation between Title X programs and any abortion-related services they might provide and which barred Title X grantees from providing referrals for abortion services upon request.  The 2021 Rule reinstated, with some updates, the 2000 Rule, which required only financial separation between Title X programs and grantees' other activities and required Title X grantees to provide referrals for abortion services upon request.

A group of states sued, seeking to block these two changes.  The States argued that the 2021 Rule's program-integrity and abortion-referral provisions are "not in accordance" with § 1008 and that they are "arbitrary and capricious" in violation of the Administrative Procedure Act ("APA").  5 U.S.C. § 706(2)(A).  They sought a preliminary injunction to reinstate the 2019 Rule, which the district court denied, and they timely appealed.  I would conclude that the States are not likely to succeed on their challenges to the program-integrity provisions or the referral provisions of the 2021 Rule.  I would also conclude that the public interest weighs in favor of denying a preliminary injunction.  Therefore I would affirm the district court's denial of a preliminary injunction, and I dissent from section III.B and part of section V of the majority opinion.

# I. BACKGROUND

Congress enacted Title X "[t]o promote public health and welfare by expanding, improving, and better coordinating the family planning services and population research activities of the Federal Government." Family Planning Servs. & Pop. Res. Act of 1970, Pub. L. No. 91-572, 84 Stat. 1504. Under the statute, the Secretary of HHS "is authorized to make grants to and enter into contracts with public or nonprofit private entities to assist in the establishment and operation of voluntary family planning projects which shall offer a broad range of acceptable and effective family planning methods and services (including natural family planning methods, infertility services, and services for adolescents)." 42 U.S.C. § 300(a). The statute also authorizes the Secretary to "make grants to public or nonprofit entities and to enter into contracts with public or private entities and individuals to provide the training for personnel to carry out family planning service programs described in section 300 or 300a of this title." 42 U.S.C. § 300a-1. The statute provides further guidance on how the grant program is to operate. It specifies that grantees must make assurances that "(1) priority will be given in such project or program to the furnishing of such services to persons from low-income families; and (2) no charge will be made in such project or program for services provided to any person from a low-income family except to the extent that payment will be made by a third party (including a government agency) which is authorized or is under legal obligation to pay such charge." 42 U.S.C. § 300a-4(c). And finally, the statute requires that "[n]one of the funds appropriated under this subchapter shall be used in programs where abortion is a method of family planning." 42 U.S.C. § 300a-6. This final provision was enacted as § 1008 of Title X.

HHS regulations set out how the program works. "Any public or nonprofit private entity in a State may apply for a grant under this subpart." 42 C.F.R. § 59.3 (2021). Potential grantees submit an application that includes a description of the proposed project and how it will satisfy the Title X requirements, a budget and explanation of the amount of funds the project is requesting, and "[a] description of the standards and qualifications which will be required for all personnel and for all facilities to be used by the project." *Id.* § 59.4(c)(3). Projects must "[p]rovide a broad range of acceptable and effective medically approved family planning methods (including natural family planning methods) and services (including pregnancy testing

and counseling, assistance to achieve pregnancy, basic infertility services, STI services, preconception health services, and adolescent-friendly health services)." *Id.* § 59.5(a)(1). Projects obtain their funding from multiple sources; "[n]o grant may be made for an amount equal to 100 percent for the project's estimated costs." *Id.* § 59.7(c). And, most relevant to this case, projects must also "[n]ot provide abortion as a method of family planning." *Id.* § 59.5(a)(5).

The 2021 Rule revoked the 2019 Rule and then readopted the 2000 Rule with some minor changes. Ensuring Access to Equitable, Affordable, Client-Centered, Quality Family Planning Servs. ("2021 Rule Preamble"), 86 Fed. Reg. 56,144, 56,144 (Oct. 7, 2021).[1] Guidance published alongside the 2000 Rule states that the § 1008 bar on the use of Title X funds in programs in which abortion is a method of family planning "applies not only to the performance of abortion by a Title X project, but also to the conduct of certain abortion-related activities by the project. However, the prohibition does not apply to all the activities of a Title X grantee, but only to those within the Title X project." Provision of Abortion-Related Services in Family Planning Services Projects ("2000 Guidance"), 65 Fed. Reg. 41,281, 41,281 (Jul. 3, 2000). The 2000 Rule expressed HHS's interpretation of the statute, which in its view "on its face, requires financial separation only." Standards of Compliance for Abortion-Related Services in Family Planning Services Projects ("2000 Rule"), 65 Fed. Reg. 41,270, 41,275 (Jul. 3, 2000). The agency therefore "accepted the suggestion of a number of the comments that the requirement for physical separation be dropped." *Id.* at 41,276.

In so doing, the agency determined that although the prohibition on the use of Title X funds in programs where abortion is a method of family planning "was held to go beyond a requirement for the technical allocation of funds between Title X project activities and impermissible abortion activities," *id.* at 41,275, requiring financial separation only, and not physical separation, was sufficient to satisfy the statutory command. The test the agency put forth to determine whether financial separation of a Title X project from a grantee's other activities was possible asked "whether the abortion element in a program of family planning services is so large and so intimately related to all aspects of the program as to make it difficult

---

[1]The 2021 Rule is now found in the Code of Federal Regulations ("C.F.R."). *See* 42 C.F.R. §§ 59.1–59.11.

or impossible to separate the eligible and non-eligible items of cost." 2000 Guidance, 65 Fed. Reg. at 41,282. Read in context, this test essentially asks if, within a potential grantee's general program of family planning services, abortion services play such a large role that they are intimately related to all aspects of the family planning program, thus making it difficult or impossible to identify a Title X-eligible project that can operate financially separately from the rest of the grantee's activities—meaning that the financial separation required under the 2021 Rule goes beyond "[m]ere technical allocation of funds" or "separate bookkeeping entries alone." *Id.*

## II. ANALYSIS

Courts must consider four factors when determining whether to grant a preliminary injunction: "(1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury absent the injunction; (3) whether the injunction would cause substantial harm to others; and (4) whether the public interest would be served by the issuance of an injunction." *Am. Civil Liberties Union Fund of Mich. v. Livingston County*, 796 F.3d 636, 642 (6th Cir. 2015) (quoting *Bays v. City of Fairborn*, 668 F.3d 814, 818–19 (6th Cir. 2012)). When the federal government is the defendant, the third and fourth factors merge. *Commonwealth v. Biden*, 57 F.4th 545, 556 (6th Cir. 2023).

The Sixth Circuit "reviews the district court's denial of a motion for a preliminary injunction for abuse of discretion." *Wonderland Shopping Ctr. Venture Ltd. Partnership v. CDC Mortg. Capital, Inc.*, 274 F.3d 1085, 1097 (6th Cir. 2001); *see also Benisek v. Lamone*, 538 U.S. ----, 138 S. Ct. 1942, 1943–44 (2018) (per curiam) (reviewing a district court's decision to deny a preliminary injunction for abuse of discretion, "keeping in mind that a preliminary injunction is 'an extraordinary remedy never awarded as of right.'" (quoting *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008))); *Tumblebus, Inc. v. Cranmer*, 399 F.3d 754, 760 (6th Cir. 2005); *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 540–41 (6th Cir. 2007). Although "[t]he district court's determination of whether the movant is likely to succeed on the merits is a question of law and is accordingly reviewed *de novo*," "the district court's ultimate determination as to whether the four preliminary injunction factors weigh in favor of granting or denying preliminary injunctive relief is reviewed for abuse of discretion."

*Certified Restoration Dry Cleaning Network*, 511 F.3d at 541.  When reviewing a district court's decision for abuse of discretion, "[t]he district court's determination will be disturbed only if the district court relied upon clearly erroneous findings of fact, improperly applied the governing law, or used an erroneous legal standard." *Hamilton's Bogarts, Inc. v. Michigan*, 501 F.3d 644, 649 (6th Cir. 2007) (quoting *Nightclubs, Inc. v. City of Paducah*, 202 F.3d 884, 888 (6th Cir. 2000)).  Absent a legal or factual error, "the district court's weighing and balancing of the equities is overruled 'only in the rarest of cases.'" *American Imaging Servs., Inc. v. Eagle-Picher Indus., Inc.* (*In re Eagle-Picher Indus., Inc.*), 963 F.2d 855, 858 (6th Cir. 1992) (quoting *NAACP v. City of Mansfield*, 866 F.2d 162, 166 (6th Cir. 1989)).

## A.  Likelihood of Success on the Merits

### 1.  Impermissible Interpretation of § 1008

The States contend that HHS's interpretation is an impermissible interpretation of the statute.  Despite the majority's musings on the vitality and the future of deference to agency interpretation of statutes under *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), it is the law of the land, and it is our duty to apply the law as stated by the Supreme Court.  *Agostini v. Felton*, 521 U.S. 203, 237 (1997).  We therefore must apply the *Chevron* framework.  At *Chevron* Step One, a court asks "whether Congress has directly spoken to the precise question at issue.  If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron*, 467 U.S. at 842–43.  "[I]f the statute is silent or ambiguous with respect to the specific issue," however, we proceed to *Chevron* Step Two, in which "the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843.

Both parties agree that *Chevron* applies to HHS's interpretation of § 1008.  Appellants Br. at 16; Appellees Br. at 26–27.  Section 1008 states simply:  "None of the funds appropriated under this subchapter shall be used in programs where abortion is a method of family planning." 42 U.S.C. § 300a-6.  The majority correctly recognizes that the Supreme Court has already

answered the *Chevron* Step One question—the language of Section 1008 is ambiguous.  *Rust v. Sullivan*, 500 U.S. 173, 184 (1991).  The Supreme Court held in *Rust* that:

> we agree with every court to have addressed the issue that the language is ambiguous.  The language of § 1008—that "[n]one of the funds appropriated under this subchapter shall be used in programs where abortion is a method of family planning"—*does not speak directly to the issues of counseling, referral, advocacy, or program integrity*.

*Id.* (emphasis added).  The Supreme Court's holding is binding on this court, and we must therefore proceed to *Chevron* Step Two.

At *Chevron* Step Two, we consider whether the agency's rule "is based on a permissible construction of the statute."  *Chevron*, 467 U.S. at 843.  "A permissible construction is one that is not 'arbitrary, capricious, or manifestly contrary to the statute.'"  *Metro. Hosp. v. U.S. Dep't of Health & Hum. Servs.*, 712 F.3d 248, 265 (6th Cir. 2013) (quoting *Chevron*, 467 U.S. at 844).  "[I]f the implementing agency's construction is reasonable, *Chevron* requires a federal court to accept the agency's construction of the statute, even if the agency's reading differs from what the court believes is the best statutory interpretation."  *Nat'l Cable & Telecom. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 980 (2005).  "Whether an agency's construction is reasonable depends, in part, 'on the construction's "fit" with the statutory language, as well as its conformity to statutory purposes.'"  *Oakbrook Land Holdings, LLC v. Comm'r*, 28 F.4th 700, 719 (6th Cir. 2022) (quoting *Good Fortune Shipping SA v. Comm'r*, 897 F.3d 256, 262 (D.C. Cir. 2018)).

For the sake of clarity, I provide the 2000 Guidance on separation:

> Non-Title X abortion activities must be separate and distinct from Title X project activities.  Where a grantee conducts abortion activities that are not part of the Title X project and would not be permissible if they were, the grantee must ensure that the Title-X supported project is separate and distinguishable from those other activities.  What must be looked at is whether the abortion element in a program of family planning services is so large and so intimately related to all aspects of the program as to make it difficult or impossible to separate the eligible and non-eligible items of cost.

> The Title X project is the set of activities the grantee agreed to perform in the relevant grant documents as a condition of receiving Title X funds.  A grant applicant may include both project and nonproject activities in its grant application, and, so long as these are properly distinguished from each other and

prohibited activities are not reflected in the amount of the total approved budget, no problem is created. Separation of Title X from abortion activities does not require separate grantees or even a separate health facility, but separate bookkeeping entries alone will not satisfy the spirit of the law. Mere technical allocation of funds, attributing federal dollars to non-abortion activities, is not a legally supportable avoidance of section 1008.

Certain kinds of shared facilities are permissible, so long as it is possible to distinguish between the Title X supported activities and non-Title X abortion-related activities: (a) A common waiting room is permissible, as long as the costs [are] properly pro-rated; (b) common staff is permissible, so long as salaries are properly allocated and all abortion related activities of the staff members are performed in a program which is entirely separate from the Title X project; (c) a hospital offering abortions for family planning purposes and also housing a Title X project is permissible, as long as the abortion activities are sufficiently separate from the Title X project; and (d) maintenance of a single file system for abortion and family planning patients is permissible, so long as costs are properly allocated.

Whether a violation of section 1008 has occurred is determined by whether the prohibited activity is part of the funded project, not by whether it has been paid for by federal or non-federal funds. A grantee may demonstrate that prohibited abortion-related activities are not part of the Title X project by various means, including counseling and service protocols, intake and referral procedures, material review procedures, and other administrative procedures.

2000 Guidance, 65 Fed. Reg. at 41,282; *see also* 2021 Rule Preamble, 86 Fed. Reg. at 56,150 (readopting the 2000 Rule). This regulation clearly determines that programs—meaning Title X projects—must be kept financially separated, but need not be physically separated. This requirement goes beyond the "[m]ere technical allocation of funds," which would presumably involve using one central budget for the entire set of family planning services that a grantee or subgrantee offers and attributing federal dollars to non-abortion line items; instead, the regulation requires that the costs be allocated, salaries pro-rated, and the finances of a Title X project or program be kept separate from the grantee's overall budget, or even its overall family-planning services budget. "[C]onsiderable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer," *Chevron*, 467 U.S. at 844, and therefore we must defer to this interpretation unless it is "manifestly contrary" to the statutory command in § 1008, *id.* I cannot agree with the majority that this interpretation is "manifestly contrary" to the statutory text.

The States' first argument that the regulations are an impermissible interpretation of the statute rests on the contention that the 2021 Rule "permits [] Title X funds to flow to programs where abortion is a method of family planning," while "the statute prohibits Title X grants from being used in a program where abortion is a method of family planning." Appellants Br. at 25 (emphasis removed). They base this argument on a specious misreading of the 2000 Guidance. The States contend that the 2000 Guidance expressly permits Title X funds to be used for abortion activities, based on this sentence, divorced entirely from the surrounding context: "What must be looked at is whether the abortion element in a program of family planning services is so large and so intimately related to all aspects of the program as to make it difficult or impossible to separate the eligible and non-eligible items of cost." 2000 Guidance, 65 Fed. Reg. at 41,282. The States contend that this means that the 2000 Guidance, and thereby the 2021 Rule "*permits* . . . Title X funds to flow to programs where abortion is a method of family planning." Appellants Br. at 25.

The States' reading of the 2000 Guidance strains credulity. When read in context, it is quite clear that the "program of family planning services" that is permitted to have an "abortion element" refers not to a grantee's *Title X project*, but to its *overall "program" of family planning services*, as in, "a set of related measures, events, or activities with a particular long-term aim," *Program*, New Oxford American Dictionary (3d ed. 2015); "a plan of procedure: a schedule or system under which action may be taken toward a desired goal: a proposed project or scheme," *Program*, Merriam-Webster's Unabridged Dictionary, Merriam Webster, *https://unabridged.merriam-webster.com/unabridged/program* (accessed Aug. 23, 2023), or "a plan or scheme of any intended proceedings . . . ; an outline or abstract of something to be done," *programme/program*, n., sense 4, *Oxford English Dictionary* (July 2023). The statute quite clearly bars the use of federal funds in Title X projects/programs where abortion is a method of family planning, and the 2021 Rule does so as well. But grantees may have an overarching program of family planning options that they offer to clients, of which a Title X project is but one part. And the Supreme Court has held that "Title X expressly distinguishes between a Title X *grantee* and a Title X *project*." *Rust*, 500 U.S. at 196 (emphasis in original). The passage to which the States object identifies the key method by which HHS can determine that a potential Title X grantee is ineligible to host a Title X project—if its overall program of family planning

includes an abortion element that is so large or integrated that it cannot be separated financially from the potential Title X project, as § 1008 and the 2021 Rule requires. In this way, providers like Planned Parenthood may offer abortion services to their clients, and, provided that those abortion services are not so large a part of their overall programming that they cannot be separated financially from their other activities, also may operate a Title X project that provides low-cost family-planning services that do not include abortion.

The States' next argument is that the rule violates § 1008 because it "directly or indirectly subsidizes abortion as a method of family planning" by permitting Title X grant recipients to offer abortion services in the same facility in which they offer Title X services. Appellants Br. at 25. The States contend that because money is "fungible," "every dollar an abortion provider receives through Title X frees up another dollar that the grantee can use to subsidize abortion." *Id.* at 25–26. This argument is foreclosed by the Supreme Court's reasoning in *Rust* and in *Agency for International Development v. Alliance for Open Society International, Inc.*, 570 U.S. 205 (2013). In *Rust*, the Supreme Court acknowledged that Title X *grantees* were not prohibited from engaging in abortion-related activities as long as those activities were kept separate from Title X funds, because public funds can "be spent for the purposes for which they were authorized." *Rust*, 500 U.S. at 196. In *Alliance*, the Supreme Court held that a grant funding condition that required grantees to agree that they opposed prostitution and sex trafficking violated the First Amendment. 570 U.S. at 221. The Court summarily rejected the petitioners' argument that the funding condition was "necessary because, without it, the grant of federal funds could free a recipient's private funds 'to be used to promote prostitution or sex trafficking,'" because this argument "assumes that federal funding will simply supplant private funding, rather than pay for new programs or expand existing ones." *Id.* at 220. The Court distinguished *Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010), reasoning that not only did that case involve the context of a ban on material support for terrorist organizations, but also "the record indicated that support for those organizations' nonviolent operations was funneled to support their violent activities." *All. for Open Soc'y*, 570 U.S. at 220. Nowhere in the record here have the petitioners shown that federal funds were "funneled" to support the provision of abortion.

It is clear that Title X projects often represent an *extension* of services that grantees offer; Planned Parenthood affiliates reported, after withdrawing from the Title X program, "decreases of over 25% in visits by patients at or below the federal poverty line and 30% decreases in visits by patients who typically self-pay for care." Amicus Br., Planned Parenthood Fed. of Am., Inc. at 9. These statistics illustrate the harm that the reduction in Title X-funded services caused to Planned Parenthood's client base, of which the majority have incomes at or below 150% of the federal poverty level, *as well as* the fact that the loss of Title X funds for grantees like Planned Parenthood resulted in Planned Parenthood performing fewer Title-X-supported services like Pap tests, STI tests, and breast exams. *Id.* at 9–10. These statistics also illustrate that in the absence of federal funds, Planned Parenthood offers fewer low-cost family-planning and preventive-care services—indicating that federal funding does not "simply supplant private funding, rather than pay for new programs or expand existing ones." *All. for Open Soc'y*, 570 U.S. at 220.

There is yet another problem with the States' fungibility argument; the 2019 Rule still permitted abortion providers to receive Title X funds, provided that they complied with onerous physical and financial separation requirements. By the States' logic, the 2019 Rule also improperly subsidized abortion services by "freeing up" funds. Restoring the rule would not resolve their concerns about "freeing up" funds. This is made particularly evident by the discussion of "economies of scale." Appellants Br. at 26. As HHS points out, providers can still achieve economies of scale even with strict physical and financial separation because they can, for example, order ordinary supplies in bulk at a lower cost. Appellees Br. at 32. If the "freeing up" theory is taken to its logical conclusion, even this would be an impermissible "freeing up" because the cost savings to the grantee's abortion-providing from such bulk ordering, made possible by the increase in services that the grantee would provide under its physically separate Title X project, would necessarily "free up" other funds.

The States make no other arguments. And the majority must sense the weaknesses in their arguments, as it has opted not to rely on them in order to hold in the States' favor. The majority has instead seen fit to make out of whole cloth a new argument on the States' behalf and to determine that it wins the day. The majority concludes that "a plain reading of § 1008 . . . tells us that the statute requires *more* than just a separation of funds; the statute does not, for example,

say merely that 'no Title X funds shall be used *for* abortions or abortion services.' Instead, it requires separation at the program level." Maj. Op. at 18 (first emphasis added) (footnote omitted). It arrives at this conclusion because "[t]he statute says that 'none of the funds appropriated under' Title X 'shall be used in *programs* where abortion is a method of family planning.'" *Id.* (emphasis added by majority).

The majority encounters its first problem quite quickly: there is no requirement in the statute that there be more than a separation of funds between the Title X project and any abortion activities performed by the grantee. The majority directly contradicts the Supreme Court's clear holding that the statute is ambiguous and says nothing about program integrity to hold instead that the statute requires *more* than just financial separation. The Court in *Rust* was clear: "[t]he language of § 1008—that '[n]one of the funds appropriated under this subchapter shall be used in programs where abortion is a method of family planning'—does not speak directly to the issue[] of . . . program integrity." 500 U.S. at 184. The Court concluded that the physical and financial separation requirements in the 1988 regulations were "based on a permissible construction of the statute and are not inconsistent with congressional intent." *Id.* at 188. That is because, as the Court explicitly stated, "if one thing is clear from the legislative history, it is that Congress intended that Title X *funds* be kept separate and distinct from abortion-related activities," *id.* at 190 (emphasis added), and that "[h]ere Congress forbade the use of appropriated *funds* in programs where abortion is a method of family planning," *id.* at 191 (emphasis added). *That* is the plain meaning of § 1008, as determined by the Supreme Court.

The majority then selectively and misleadingly quotes *Rust* to imply that the Supreme Court held that Title X requires grantees to have separate "abortion 'programs'"[2] run separately and independently from Title X projects. Maj. Op. at 18. Of course, upon reading the passage from which the majority repeatedly quotes, it becomes clear that the *Rust* Court was instead *describing* the 1988 Rule: "The regulations govern the scope of the Title X *project*'s activities, and leave the grantee unfettered in its other activities. The Title X *grantee* can continue to perform abortions, provide abortion-related services, and engage in abortion advocacy; it simply

---

[2]With a little selective quotation, the majority invents the phrase "abortion 'programs'"—a phrase that appears neither in the statute, nor in *Rust*, nor in any of the regulations at issue.

is required to conduct those activities through programs that are separate and independent from the project that receives Title X funds. 42 C.F.R. § 59.9 (1989)." 500 U.S. at 196. The Court was doing so in the context of explaining why the 1988 Rule's program-integrity requirements did not infringe upon the First Amendment rights of Title X grantees. *Id.* And contrary to the majority's apparent position that a discussion in *Rust* pertaining to the constitutionality of the 1988 rule somehow elucidates what is statutorily permissible, Maj. Op. 18 n.10, *Rust* itself time and time again holds that § 1008 is ambiguous with respect to how to police the line between a Title X project and non-Title X activities, *see Rust*, 500 U.S. at 184, 187–91. What is clear from the statute and its history is simply a command that "Title X *funds* be kept separate and distinct from abortion-related *activities*." *Id.* at 190 (emphases added).

The ambiguity in § 1008 lies in the method by which the administration must distinguish between a Title X project and a grantee's other activities. The Supreme Court in *Rust* held that requiring both financial and physical separation was not inconsistent with the regulation. 500 U.S. at 187. But it also declined to agree with the contention that "[m]eeting the requirement of section 1008 mandates that Title X programs be organized so that they are physically and financially separate . . . ." *Id.* at 188 (quoting 53 Fed. Reg. 2940 (1988)). If the Court believed physical separation requirements were mandated by the statute, it would not have held that § 1008 was ambiguous. The foundation of the majority's opinion here—that the plain text of the statute requires more than financial separation of Title X projects (programs) from grantees' other activities, or that *Rust* itself requires more than financial separation of Title X projects from grantees' other activities—is plainly wrong. Attempting to gin up some further requirements by looking to a nonrelevant discussion in *Rust*, contrary to both the statute and the Court's holdings, is disingenuous at best.

Having concluded that financial separation between a Title X project and a grantee's other activities is insufficient as a matter of the statutory text, in blatant contradiction to binding Supreme Court precedent, the majority embarks on a "quest" to discern the meaning of a program, for which it believes the agency must "have a discernible, and permissible, conception." Maj. Op. at 20, 22. It argues that the regulations do not answer "what is and what is not a '*program*[] where abortion is a method of family planning.'" *Id.* at 23 (emphasis added

by majority) (quoting 42 U.S.C. § 300a-6). And it argues that HHS "must offer some concrete conception, beyond mere financial separation, of the statute's key term 'program,' so that it can ensure compliance with the statute's command that no Title X funds 'shall be used in programs where abortion is a method of family planning.'" *Id.* at 23–24.

But in the majority's "quest" to find the meaning of the word "program," it did not consider looking to the statute itself. The statute defines Title X programs in § 1003 and § 1001, codified at 42 U.S.C. §§ 300, 300a-1. Section 1003 authorizes the HHS Secretary to "make grants . . . to provide the training for personnel to carry out *family planning service programs* as described in section 300 or 300a of this title." 42 U.S.C. § 300a-1 (emphasis added). Turning back to § 1001, then, we find the description of a "family planning service program": a "voluntary family planning project[] which shall offer a broad range of acceptable and effective family planning methods and services (including natural family planning methods, infertility services, and services for adolescents)." 42 U.S.C. § 300(a). The meaning of § 1008 thus becomes clear: "None of the funds appropriated under this title shall be used in [family-planning service programs described in section 1001] where abortion is a method of family planning." 42 U.S.C. § 300a-6. Section 1006 also refers to "projects" and "programs" interchangeably. 42 U.S.C. § 300a-4 ("no grant under any such section for any *program or project*"; "unless the grant is to be made for a *program or project*"; "[a] grant may be made or contract entered into under section 300 or 300a of this title for a family planning service *project or program*"; "priority will be given in such *project or program*"; "no charge will be made in such *project or program*" (emphases added)). As the majority notes, "HHS has defined 'program/project' similarly" across administrations. Maj. Op. at 19 n.11. The 2000 Guidance defines a Title X project as "the set of activities the grantee agreed to perform in the relevant grant documents as a condition of receiving Title X funds." 65 Fed. Reg. at 41,282. Thus, in order to comply with § 1008, abortion and abortion-related services may not be part of the set of activities the grantee performs with Title X funding. And any activities performed by a grantee that are not part of the "set of activities the grantee agreed to perform in the relevant grant documents as a condition of receiving Title X funds," *id.*, must be part of a separate "project" or "program," because they are

certainly not part of the Title X project or program.[3]  As amici have noted, "Title X-funded providers operate like other outpatient medical providers, and as such, entities that also provide *other health care services*, including abortion care—without Title X funds and outside their Title X-funded projects, though sometimes under the same roof—have participated in Title X . . . throughout its history."  Amicus Br., Nat'l Family Planning & Reproductive Health Ass'n, at 5 (emphasis added).  The 2021 Rule requires that Title X funds be used only for project purposes. 2021 Rule, 42 C.F.R. § 59.9.  It is unclear why a grantee would be able to perform health care services like, for example, setting broken bones or treating cardiovascular illnesses under the same roof as a Title X project if complete physical separation is truly required to ensure that Title X funds are not being misused.  If occurring under the same roof or using the same staff could render a medical service otherwise unconnected with the Title X project's stated and approved activities part of its "program," many current Title X providers would suddenly become ineligible to host a Title X project.  It is therefore quite clear that a Title X project or program is what must be separate from the grantee's overall activities, and the Title X *project* is what must not include abortion services (or, indeed, any services unconnected with family planning) in its delineated set of activities.

The majority wrongly states that "the 2021 Rule reverted to the language of the 2000 Rule, which says *nothing* about any sort of separation."  Maj. Op. at 19–20 (emphasis added). But the 2000 Rule explicitly provided for *financial* separation of Title X projects from grantees' other activities, as the statute mandates.  That is clear both from the agency's discussion of the comments it received in response to its notice of formal rulemaking, 2000 Rule, 65 Fed. Reg. at 41,276, and in the test that it promulgated to determine whether the Title X project is separate and distinguishable from other activities:  it cannot be "difficult or impossible to separate the eligible and non-eligible items of cost" between a Title X *project* and a grantee's *overall family-*

---

[3]Suppose, for example, a small, rural hospital regularly provides treatment for cardiovascular disease or broken bones.  It also operates a Title X project.  Just as it would violate the statute for Title X grant funds to be used to support abortion activities, it would also violate the statute for Title X grant funds to be used to subsidize cardiovascular disease treatment or treatment of broken bones.  But a grantee would not need to establish that they have a physically separate cardiovascular or orthopedic program.  It would simply need to show that, despite using the same filing system, waiting rooms, and nursing staff, it was possible to distinguish financially its Title X-subsidized family-planning-service activities, like appointments for a Pap test or STI test, from its activities treating or diagnosing patients' cardiovascular illnesses or broken bones.

*planning program* (which may include abortion services). 2000 Guidance, 65 Fed. Reg. at 41,282. The 2000 Guidance specifies that "[m]ere technical allocation of funds, attributing federal dollars to non-abortion activities, is not a legally supportable avoidance of section 1008." *Id.* The majority willfully misreads this as an acknowledgement that financial separation is insufficient. It is instead an acknowledgement that financial separation, *beyond* simple bookkeeping exercises that allocate federal dollars to Title X-supported activities, is mandated by the statute. That means that a grantee cannot simply incorporate Title X funds into their general budget and, on paper, attribute those funds to Title X activities. Financial separation, in the sense that the Title X project has its own budget, out of which the Title X project pays for the pro-rated costs of the waiting room, the pro-rated portions of salaries for staff working within the Title X project, and the pro-rated costs of a common filing system, *is required* under the regulations. *Id.* The regulations provide further guidance on how to effect this financial separation: "A grantee may demonstrate that prohibited abortion-related activities are not part of the Title X project by various means, including counseling and service protocols, intake and referral procedures, material review procedures, and other administrative procedures." *Id.* These administrative procedures make it possible for grantees to distinguish items of cost that are attributable to the Title X project, as opposed to the grantee's non-Title X activities (which may include abortion services).

The majority thinks that this is the same as merely avoiding the use of federal funds for abortions or abortion activity. But it is not. The 2000 Guidance specifies that "[w]hether a violation of section 1008 has occurred is determined by whether the prohibited activity *is part of the funded project*, not by whether it has been paid for by federal or non-federal funds." *Id.* (emphasis added). This is an explicit recognition that exercises in bookkeeping are not sufficient. The Title X project, which is "the set of activities the grantee agreed to perform in the relevant documents as a condition of receiving Title X funds," cannot include abortion-related activities. *Id.* Title X projects are funded by multiple sources; they cannot be funded by the federal government entirely. 2021 Rule, 42 C.F.R. § 59.7(c) ("No grant may be made for an amount equal to 100 percent for the project's estimated costs."). An evaluation of the Title X grant program explains some of the sources of funding for Title X grantees and subrecipients:

> Title X funds represent only a portion of grantee and delegate budgets, and for some only a small fraction. . . .  Title X clinics may also receive funds from Medicaid, Maternal and Child Health (MCH) block grants . . . , state and local appropriations, the State Children's Health Insurance Program, Social Services block grants, and Temporary Assistance for Needy Families . . . .  Most clinics also have patients who are covered by private insurance or who pay out of pocket for services, and some receive charitable donations.

Inst. of Med. Comm. on a Comprehensive Review of the HHS Office of Family Planning Title X Program, A Review of the HHS Family Planning Program: Mission, Management, and Measurement of Results 116–17 (Butler A. Stith & Clayton E. Wright, eds. 2009) (footnotes omitted).  As the Supreme Court recognized in *Rust*, a "grantee, which normally is a health-care organization, may receive funds from a variety of sources for a variety of purposes.  The grantee receives Title X funds, however, for the *specific and limited purpose* of establishing and operating a Title X project."  500 U.S. at 196 (citing 42 U.S.C. § 300(a)) (emphasis added).  The Title X *project*, which is comprised of a defined set of activities and a defined budget, cobbles together funding from various private and public sources to accomplish its stated goal of "provid[ing] a broad range of acceptable and effective medically approved family planning methods (including natural family planning methods)" which cannot include abortion, "and services (including infertility services and services for adolescents)."  2021 Rule, 42 C.F.R. § 59.5(a)(1).  At the same time, a *grantee* operating a Title X project may receive a variety of public and private funds with which it provides a variety of services—which can include family-planning services *not* funded by Title X, like abortion services, as well as services completely unrelated to family planning, like treatment for broken bones or cardiovascular disease.  Title X funds, however, can be used "solely for the purpose for which the funds were granted in accordance with the approved application and budget"—that is, the specific activities that the grantee has applied for and received funds to perform.  *Id.* § 59.9.

The Supreme Court has held that the statute is ambiguous and says nothing about program integrity.  *Rust*, 500 U.S. at 184.  In such cases, a court "*must* defer to a reasonable construction by the agency charged with its implementation."  *Barnhart v. Thomas*, 540 U.S. 20, 26 (2003) (emphasis added).  HHS has made a policy decision to interpret the ambiguous language in § 1008 to require financial but not physical separation of a Title X project from a

grantee's other activities. HHS's regulations repeatedly state that abortion activities must be separate and distinct from Title X project activities and, fundamentally, that it must be possible to distinguish items of cost so that they can be attributed either to the Title X project and its defined budget or to the grantee's overall program of non-Title X services.

Binding Supreme Court precedent requires us to give deference to an agency's interpretation of the statutory scheme it administers. *Chevron*, 500 U.S. at 844. We do so unless the agency's interpretation is "manifestly contrary" to the statute. *Id.* The majority attempts to shoehorn its assessment that financial separation requirements alone are insufficient into *Chevron* Step Two. But the majority's approach is fundamentally an attempt to circumvent the explicit holding in *Rust* that Title X says nothing about program integrity. The majority offers no explanation for its determination the financial separation requirements imposed by the 2021 Rule are "manifestly contrary" to the statute—other than the majority's incorrect assumption that the statute requires more than financial separation of a Title X project from a grantee's other activities—which is an effective holding that the statute is *not* ambiguous as to program-integrity requirements. The majority, in essence, quibbles with the methods by which HHS has chosen to distinguish Title X projects from grantees' overall programs of family-planning services without any basis in the statutory text, because the majority simply prefers to require more than just financial separation. But this is not the role of the courts. As the Supreme Court has said, "*Chevron* is rooted in a background presumption of congressional intent: namely, 'that Congress, when it left ambiguity in a statute' administered by an agency, 'understood that the ambiguity would be resolved, first and foremost, by the agency, and desired the agency (rather than the courts) to possess whatever degree of discretion the ambiguity allows.'" *City of Arlington v. F.C.C.*, 569 U.S. 290, 296 (2013) (quoting *Smiley v. Citibank (South Dakota), N.A.*, 517 U.S. 735, 740–41 (1996)).

Once one brushes aside the legal minutiae, the import of the majority's view is clear. Tucked away in a footnote, the majority gives up the game, eschewing its focus on its invented "program" issue to say what it wanted to all along: that § 1008 requires physical separation to meet any program-integrity requirement, despite *Rust*'s clear holding that § 1008 says nothing of the sort. Maj. Op. at 22 n.12 ("Contrary to the dissent's suggestion, it does not follow that

because the Court did not believe that § 1008 required *complete* physical separation, the Court thought that § 1008 required no physical separation."). So understood, the rest of the majority's opinion reveals itself as merely an attempt to clothe pure judicial policymaking in legal jargon. That is, the opinion is an attempt to confuse the reader, by suggesting that it is not requiring some extratextual preference, but instead holding HHS to its statutory obligations. *Id.* at 23–24 (stating that "the Agency must offer some concrete conception, beyond mere financial separation, of the statute's key term 'program' so that it can ensure compliance with the statute's command"). Evidently, that "concrete conception" of "program" means that abortion activities cannot be done under a Title X grantee's roof. Any other analysis in the majority opinion is meant to distract, not to elucidate Congress's intent.

Judges ought not behave like lawmakers, imposing their policy preferences by judicial fiat. A regulation is not an impermissible interpretation of a statute merely because it is not how a particular couple of judges would have written it. A permissible interpretation need not be the best or the only interpretation. The administrative scheme that the majority finds is now impermissible existed for nearly twenty years—through Republican and Democratic administrations alike, including on both sides during periods where one party held a majority of seats in both legislative chambers and the presidency at the same time with no change to the statutory text, even as HHS required only financial separation of Title X projects from grantees' other activities. *Cf. Commodity Futures Trading Comm'n v. Schor*, 478 US. 833, 846 (1986) ("[C]ongressional failure to revise or repeal the agency's interpretation is persuasive evidence that the interpretation is the one intended by Congress."). The majority has usurped the role of the executive *and* the legislature by imposing its view of the best reading of an ambiguous statute.

I would decline to contradict binding Supreme Court precedent. Because the 2021 Rule is not "manifestly contrary" to Title X, I would defer to HHS.

### 2. Arbitrary or Capricious

I would further hold that the 2021 Rule is not arbitrary or capricious. Courts do not vacate rules as arbitrary or capricious unless the agency "entirely failed to consider an important

aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 658 (2007) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983)).  An agency, in a formal rulemaking, "must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *State Farm*, 463 U.S. at 43 (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962)).  The Supreme Court has held that "[t]hat requirement is satisfied when the agency's explanation is clear enough that its 'path may reasonably be discerned.'" *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016) (quoting *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974)).

The APA "makes no distinction . . . between initial agency action and subsequent agency action undoing or revising that action," so we do not apply greater scrutiny to agency actions that change a prior policy.  *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 514–15 (2009).  When an agency changes its position, it "must at least 'display awareness that it is changing position' and 'show that there are good reasons for the new policy,'" and also "be cognizant that longstanding policies may have 'engendered serious reliance interests that must be taken into account.'" *Encino Motorcars*, 579 U.S. at 221–22 (quoting *Fox*, 556 U.S. at 515).

The States first argue that, in abandoning the 2019 Rule's strict program-integrity requirements, HHS failed to adopt "any alternative to keep Title X funds from being used to subsidize abortion."  Appellants Br. at 34.  They argue that HHS therefore failed to "consider an 'important aspect of the problem,'" failed to "'show that there are good reasons for the new policy,'" and "failed to consider alternative policies."  *Id.* (first quoting *Michigan v. E.P.A.*, 576 U.S. 743, 752 (2015), then quoting *Encino*, 579 U.S. at 221).  These arguments are unavailing.  As discussed above, HHS repealed the 2019 Rule and the provisions requiring strict physical separation of Title X projects and replaced them with provisions requiring only financial separation.  The 2000 Rule and the 2021 Rule describe the separation necessary to comply with Title X's command that funds not be used in programs where abortion is a method of family planning.

HHS gave legitimate reasons for returning to the financial separation policy set out in the 2000 Rule. The agency examined over thirty reports from the Government Accountability Office, Office of the Inspector General, and Congressional Research Service involving Title X. 2021 Rule Preamble, 86 Fed. Reg. at 56,145. It determined that there were only minor compliance issues with grantees, which occurred in the 1980s, and that the strict separation requirements had diverted funds from the "core purpose" of Title X, which is the provision of family-planning services, due to the increased compliance costs that grantees incurred as a result of the new physical separation requirements. *Id.* At the same time, there were significant impacts on the efficacy of the Title X program; many providers withdrew from the program in direct response to the implementation of the 2019 Rule—which had the result that Title X grantees provided Title X services to 844,083 fewer clients in 2019 as compared to 2018. *Id.* at 56,146. The agency determined that "[t]he 2019 rule has significantly decreased the number of low-income, uninsured, and racial and ethnic minorities accessing Title X services." *Id.* Because the "mandate of the Title X program is to support access to critical family planning and preventive health services," "the result of the 2019 rule ran counter to that effort." *Id.* at 56,147. The agency laid out its legitimate reasons for returning to its previous policy of requiring financial separation, rather than physical separation.

The States contend that HHS failed to consider alternatives that are less strict than the 2019 Rule but stricter than the 2021 Rule. This is incorrect. HHS explicitly stated that it "considered one option to maintain many elements of the 2019 rule and to impose additional restrictions on grantees. This approach would exacerbate the trends of reduced Title X grantees, subrecipients, service sites, and clients served that [HHS] ha[d] observed under the 2019 rule." *Id.* at 56,176. The States then contend that the agency should have "alleviate[d] the compliance burden" by "dedicating funds to assist grantees" with compliance costs. Appellants Br. at 36 (quotation omitted). But these are not solutions to the principal problem that HHS identified with alternatives to the ultimate final rule: the separation requirements provided no "discernible compliance benefits" and diverted Title X funds away from its core purpose of providing family planning services but instead caused "increased infrastructure costs." 2021 Rule Preamble, 86 Fed. Reg. at 56,145. These alternatives would still direct funds *away* from the provision of

No. 21-4235         *Ohio, et al. v. Becerra, et al.*          Page 49

family-planning services and *towards* compliance efforts that the agency had already determined were not necessary. The agency clearly considered alternatives.

The States then contend that HHS failed to consider reliance interests. Appellants Br. at 38. Although agencies must consider that "longstanding policies may have 'engendered serious reliance interests,'" *Encino Motorcars*, 579 U.S. at 222 (quoting *Fox*, 556 U.S. at 515), the 2019 Rule was not longstanding, *cf. Breeze Smoke, LLC v. U.S. F.D.A*, 18 F.4th 499, 507 (6th Cir. 2021) (holding that "the FDA's 2019 guidance does not qualify as 'longstanding'"). It also cannot be said that the agency did not consider reliance interests; HHS explicitly noted that "a few states were able to increase their service sites following the 2019 rule," and specifically referenced Ohio as one such state, but noted that these states were "the exception," and that the 2019 rule overall "resulted in a significant loss of grantees, subrecipients, and service sites, and close to one million fewer clients served from 2018 to 2019." 2021 Rule Preamble, 86 Fed. Reg. at 56,151. The agency was entitled to consider the effect of the new rule on states that expanded the number of service sites and to determine that a change in the rule, while it might have negatively impacted a few states, would have an overall benefit for the program as a whole.

The States' argument that HHS did not consider the effect of returning to the 2000 Rule on the public support for the Title X program is also easily dispensed with. HHS readopted the 2000 Rule that "had been in effect for nearly the entirety of the Title X program, had been widely accepted by grantees, had enabled the Title X program to operate successfully, and had not resulted in any litigation." *Id.* at 56,145. The States provide no evidence beyond conclusory claims that grantees will not participate in the program or that Congress would be less likely to fund the program, despite the clear evidence that it was actually the 2019 rule that resulted in "much resistance and/or a lack of interest" on the part of potential Title X providers. *Id.* at 56,151.

Because the program-integrity provisions in the 2021 Rule are neither manifestly contrary to the statute nor arbitrary or capricious, I would hold that the States are not likely to succeed on the merits of their claim.

## B.  Irreparable Harm

I would hold that the States have not shown that they will suffer an irreparable harm.  The only cases the States cite in support of their theory of irreparable harm by increased competition are *Sherley v. Sebelius*, 610 F.3d 69, 74 (D.C. Cir. 2010), and *Planned Parenthood of Greater Washington & N. Idaho v. U.S. Dep't of Health & Hum. Servs.*, 946 F.3d 1100, 1108 (9th Cir. 2020).  Both of these cases considered whether increased competition can serve as an injury-in-fact for standing purposes, and neither held that increased competition constitutes an irreparable harm.  *Sherley*, 610 F.3d at 73 ("[A]n actual or imminent increase in competition . . . will almost certainly cause an injury in fact."); *Planned Parenthood*, 946 F.3d at 1108 ("'[T]he inability to compete on an equal footing in [a] bidding process' is sufficient to establish injury-in-fact." (quoting *Ne. Fla. Chapter of Assoc. Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 666 (1993))).  In fact, the D.C. Circuit later reasoned that it was "necessarily uncertain" that invalidating the challenged rule "would result in the plaintiffs getting any more grant money from the NIH," *Sherley v. Sebelius*, 644 F.3d 388, 398 (D.C. Cir. 2011), and invalidated the district court's grant of a preliminary injunction to the plaintiffs in that case—which was predicated on the same theory of increased competition for discretionary grant funding as the required irreparable injury, *see Sherley v. Sebelius*, 704 F. Supp. 2d 63, 72 (D.D.C. 2010), *vacated*, 644 F.3d 388 (D.C. Cir. 2011).  Neither the States nor the majority have cited any other basis for the novel theory that increased competition for discretionary grant funds constitutes an irreparable injury.

The majority also relies on an unpublished order stating that "economic injuries caused by federal agency action are generally unrecoverable because the APA does not waive sovereign immunity for damages claims." *Ohio v. Becerra*, No. 21-4235, 2022 WL 413680, at *4 (6th Cir. Feb. 8, 2022).  But even if economic injuries are unrecoverable, under our precedent, irreparable harms must also be "certain and great." *State of Ohio ex rel. Celebrezze v. Nuclear Regulatory Comm'n*, 812 F.2d 288, 290 (6th Cir. 1987).  Our cases considering economic losses irreparable have highlighted the substantial attendant harms that made those economic losses "great." *See Performance Unlimited, Inc. v. Questar Publishers, Inc.*, 52 F.3d 1373, 1382 (6th Cir. 1995) (holding that "[t]he impending loss or financial ruin of [a plaintiff's] business constitutes

irreparable injury"). This is an immensely broad statement that will have extended follow-on effects—not least that it will effectively do away with the irreparable-harm requirement when the government is a defendant in an injunctive suit. It cannot be that a party may sue and establish irreparable harm if it sustains an economic loss of *any* magnitude when such loss results from federal agency action. Preliminary injunctions are "an extraordinary remedy." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008).

## C. Public Interest

I would conclude that public interest weighs against granting an injunction. The majority deems this preliminary injunction factor a draw, based on an affidavit submitted by Ohio suggesting that Ohio expanded services in counties formerly served by Planned Parenthood. But HHS's data paints a more complete picture of how patient access was reduced by the 2019 Rule.

In addressing this very point, the preamble introducing the 2021 Rule specifically discusses Title X services in Ohio after the imposition of the 2019 Rule. HHS concluded that "[d]espite the state health department receiving additional funds to provide Title X services following the departure of another grantee, [Family Planning Annual Report] data from Ohio, however, do not provide any clear support" for the claim that Ohio would be able to increase the number of Title X clients served. 2021 Rule Preamble, 86 Fed. Reg. 56,151. According to the agency, "the state experienced a 10 percent decline in service sites between 2018 and 2020, an 18 percent decline in clients from 2018 to 2019, and a 57 percent decline in clients from 2019 to 2020." *Id.* The agency concluded that even though Ohio had expanded its service sites, "[t]he data show that even if the same amount of funding is provided to a different set of grantees in a given area, it does not necessarily follow that the same number of clients will be served or same number of services will be provided, depending on the differences in grantee service capacity." *Id.* HHS's data indicates that there was an eighteen-percent decline in clients served from 2018 to 2019 in Ohio, prior to the COVID-19 pandemic. *Id.*

Ohio may have serviced a slightly higher number of *visits* in 2021 than it did in each of 2018, 2019, and 2020. R. 1-1 (Clark Decl. at 5–6) (Page ID #31–32). But that number does not make up for the 57 percent decline in the number of *clients*. 2021 Rule Preamble, 86 Fed. Reg.

at 56,151.  In 2018, prior to the imposition of the 2019 Rule, Ohio had 100,033 family-planning users.  RTI Int'l, TITLE X FAMILY PLANNING ANNUAL REPORT: 2018 NAT'L SUMMARY, Ex. B-1.  In 2019, during which the 2019 Rule was implemented and the new program-integrity provisions requiring both physical and financial separation were imposed, the number of family-planning users in Ohio declined to 81,876.  RTI Int'l, TITLE X FAMILY PLANNING ANNUAL REPORT: 2019 NAT'L SUMMARY, Ex. B-1.  In 2020, by contrast, the number of family-planning users in Ohio had declined to 35,175—even though the Ohio Department of Health apparently serviced the same number of "visits."  RTI Int'l, TITLE X FAMILY PLANNING ANNUAL REPORT: 2020 NAT'L SUMMARY, Ex. B-1; R. 1-1 (Clark Decl. at 5–6) (Page ID #31–32).  In 2021, with Title X still operating under the 2019 Rule, Ohio again served only 35,942 family-planning users, even as the Ohio Department of Health claims that it was servicing more visits in 2021 than it had in 2018, 2019, or 2020.  RTI Int'l, TITLE X FAMILY PLANNING ANNUAL REPORT: 2021 NAT'L SUMMARY, Ex. B-1.  This data clearly supports HHS's conclusion that the number of clients served in Ohio decreased after the imposition of the 2019 Rule.

Rather than interrogate these statistics, the majority throws up its hands, cites HHS's and Ohio's respective positions, and calls the public-interest factor a draw.  But patient access was clearly reduced by the 2019 Rule.  And that means that the district court did not abuse its discretion in finding that restoring this access outweighs whatever interests the States might have at this stage.

Finally, though I  would not lean on the majority's conclusory statement that "the public interest lies in correctly applying the law," Maj. Op. at 27—which makes the public-interest inquiry  "no more than a makeweight for the court's consideration of the moving party's probability of eventual success on the merits," *Cont'l Grp., Inc. v. Amoco Chemicals Corp.*, 614 F.2d 351, 358 (3d Cir. 1980)—the majority misapplies the law, for all of the reasons that I have discussed.  We have consistently recognized the importance of and public interest in respecting our "limited role under the Constitution's separation of powers, even if we think it would be good policy" to disregard Congress's  choices.  *Elhady v. Unidentified CBP Agents*, 18 F.4th 880, 883 (6th Cir. 2021), *cert. denied sub nom. Elhady v. Bradley*, 143 S. Ct. 301 (2022).  *Rust* already deemed § 1008 ambiguous, and *Chevron* tells us that "[i]f Congress has explicitly left a

gap for the agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation." *Chevron*, 467 U.S. at 843–44. The public interest undoubtedly lies in our respecting Congress's choice, and upholding the Executive's reasonable action in line with that choice. The balance of the equities, therefore, weighs in favor of denying a preliminary injunction.

## III. CONCLUSION

A district court's "determination as to whether the four preliminary injunction factors weigh in favor of granting or denying preliminary injunctive relief is reviewed for abuse of discretion." *Certified Restoration Dry Cleaning*, 511 F.3d at 541. This is a "highly deferential" standard of review. *Id.* (quoting *Leary v. Daeschner*, 228 F.3d 729, 739 (6th Cir. 2000)). If a district court has not "relied upon clearly erroneous findings of fact, improperly applied the governing law, or used an erroneous legal standard," we must not disturb its determination. *Hamilton's Bogarts*, 501 F.3d at 649 (quoting *Nightclubs, Inc. v. City of Paducah*, 202 F.3d 884, 888 (6th Cir. 2000)). As the district court has not erred in any of these ways, I would decline to disturb its decision not to issue a preliminary injunction.

The majority has taken a straightforward application of administrative law and Supreme Court precedent and twisted it to impose its atextual views on the agency charged with administering Title X. The majority misunderstands the plain-language meaning of the statute and the HHS regulations implementing the statute. And it exceeds the bounds of the judicial role by effectively refusing to defer to a clearly permissible interpretation of an ambiguous statute. I respectfully dissent.

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

No. 21-4235

STATE OF OHIO; STATE OF ALABAMA; STATE OF
ARKANSAS; STATE OF FLORIDA; STATE OF KANSAS;
COMMONWEALTH OF KENTUCKY; STATE OF
MISSOURI; STATE OF NEBRASKA; STATE OF
OKLAHOMA; STATE OF SOUTH CAROLINA; STATE OF
WEST VIRGINIA,

     Plaintiffs - Appellants,

     v.

XAVIER BECERRA, Secretary, Department of Health and
Human Services and JESSICA S. MARCELLA, Deputy
Assistant Secretary for Population Affairs, in their official
capacities; DEPARTMENT OF HEALTH AND HUMAN
SERVICES; OFFICE OF POPULATION AFFAIRS,

     Defendants - Appellees.

**FILED**
Nov 30, 2023
KELLY L. STEPHENS, Clerk

Before:  MOORE, THAPAR, and LARSEN, Circuit Judges.

# JUDGMENT

On Appeal from the United States District Court
for the Southern District of Ohio at Cincinnati.

THIS CAUSE was heard on the record from the district court and was argued by counsel.

IN CONSIDERATION THEREOF, it is ORDERED that the judgment of the district court is
AFFIRMED IN PART, REVERSED IN PART, and REMANDED for further proceedings consistent
with the opinion of this court.

**ENTERED BY ORDER OF THE COURT**

_____
Kelly L. Stephens, Clerk